ORIGINAL

1  SEAN K. KENNEDY (No. 145632)
   Federal Public Defender
2  (E-mail: Sean_Kennedy@fd.org)
   SYLVIA TORRES-GUILLEN (No. 164835)
3  Deputy Federal Public Defender
   (E-mail: Sylvia Torres-Guillen@fd.org)
4  321 East 2nd Street
   Los Angeles, California 90012-4202
5  Telephone (213) 894-2644
   Facsimile (213) 894-0081
6
7  Attorneys for Defendant
   CALVIN C. COLBERT, JR.
8
9              UNITED STATES DISTRICT COURT
10            CENTRAL DISTRICT OF CALIFORNIA
11                   WESTERN DIVISION
12
13  UNITED STATES OF AMERICA,        )    NO. CR 09-301-GW
14               Plaintiff,          )    **NOTICE OF MOTION;**
                                     )    **MOTION TO SUPPRESS**
15          v.                       )    **EVIDENCE; MEMORANDUM**
                                     )    **OF POINTS AND**
16  CALVIN C. COLBERT, JR.,          )    **AUTHORITIES;**
                                     )    **DECLARATION; EXHIBITS**
17               Defendant.          )
                                     )    Hearing Date: 11/10/09
18  _____  )    Time: 8:30 a.m.
19
20
21
22
23
24
25
26
27
28  P:\Torres\COLBERT, CALVIN\MOTIONS\SUPPRESSION MTN draft1.wpd

# TABLE OF CONTENTS

Page

MOTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

MEMORANDUM OF POINTS AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . 3

I.    STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

THE MOTION TO SUPPRESS SHOULD BE GRANTED BECAUSE THE SEARCH WARRANT WAS (1) OBTAINED WITHOUT PROBABLE CAUSE TO SEARCH ROOMS #217 AND #200; (2) CONTAINED FALSE STATEMENTS AND MATERIAL OMISSIONS; AND (3) MR. COLBERT WAS NOT ADVISED OF HIS *MIRANDA* RIGHTS BEFORE HE WAS QUESTIONED BY THE OFFICERS. . . 8

A.    There Was No Probable Cause to Support the Search Warrant of Rooms #217 and #220. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

B.    The Search Warrant Affidavit Contains False Statements and Material Omissions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

False Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

1.    Officer Beall intentionally or recklessly characterized observations of a man who was allegedly Mr. Colbert as first-hand, although they were not personally made by him. . . . . . . . . . . . . . . . . . . . . . . . 12

2.    The search warrants should be invalidated because the affidavit on which they were based contained deliberate or reckless omissions that could have misled the judge who issued the warrants. . . . . 13

a.    Officer Beall provided no information about the reliability of the unidentified "confidential reliable informant" on whose tip the investigation of the Economy Inn, and Mr. Colbert in particular, were based. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

b.    Officer Beall omitted the fact that the informant's description of the narcotics dealer was markedly different than Mr. Colbert's appearance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

c.    Officer Beall failed to include in his affidavit that room #220, from which all the evidence was seized, was not Mr. Colbert's hotel room. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

C.    The Government Cannot Establish That Mr. Colbert Was Given His

*Miranda* Warnings When He Made Several Statements about the Firearm. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

III.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

EXHIBITS

PROOF OF SERVICE

iii

1

# TABLE OF AUTHORITIES

2

3

**Page**

## FEDERAL CASES

4

*Franks v. Delaware,*
  438 U.S. 154 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

5

*Illinois v. Gates,*
  462 U.S. 213, 108 S. Ct. 2317, 76 L. Ed. 2d 527 (1983) . . . . . . 8, 9, 14, 18

6

7

*Miranda v. Arizona,*
  384 U.S. 436 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 18, 19, iii

8

*Steagald v. United States,*
  451 U.S. 204 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

9

10

*United States v. Angulo-Lopez,*
  791 F.2d 1394 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

11

*United States v. Bishop,*
  264 F.3d 919 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

12

13

*United States v. Davis,*
  714 F.2d 896 (9th Cir.1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

14

*United States v. Dozier,*
  844 F.2d 701 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

15

16

*United States v. Fouche,*
  776 F.2d 1398 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

17

*United States v. Leon,*
  468 U.S. 897 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

18

19

*United States v. Martin,*
  615 F.2d 318 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

20

*United States v. Rowland,*
  464 F.3d 899 (9th Cir.2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 18

21

22

*United States v. Stanert,*
  769 F.2d 1410 (9th Cir.1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

23

*United States v. Taylor,*
  716 F.2d 701 (9th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

24

## FEDERAL STATUTES

25

Fed. R. Crim. P. 4(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

26

27

28

iv

1 | SEAN K. KENNEDY (No. 145632)
Federal Public Defender
2 | (E-mail: Sean_Kennedy@fd.org)
SYLVIA TORRES-GUILLEN (No. 164835 )
3 | Deputy Federal Public Defender
(E-mail: Sylvia_Torres-Guillen@fd.org)
4 | 321 East 2nd Street
Los Angeles, California 90012-4202
5 | Telephone (213) 894-2644
Facsimile (213) 894-0081
6
Attorneys for Defendant
7 | CALVIN C. COLBERT, JR.

8

9                     UNITED STATES DISTRICT COURT

10                     CENTRAL DISTRICT OF CALIFORNIA

11                            WESTERN DIVISION

12

13 | UNITED STATES OF AMERICA,      )   NO. CR 09-301-GW
                                   )
14 |            Plaintiff,          )   **NOTICE OF MOTION; MOTION**
                                   )   **TO   SUPPRESS   EVIDENCE;**
15 |     v.                         )   **MEMORANDUM    OF   POINTS**
                                   )   **A N D    A U T H O R I T I E S ;**
16 | CALVIN C. COLBERT, JR.,        )   **DECLARATION; EXHIBITS**
                                   )
17 |            Defendant.          )   Hearing Date: 11/10/09
                                   )
18 | ——————————————————————        )   Hearing Time: 8:30 a.m.

19

20 | TO:    ACTING UNITED STATES ATTORNEY GEORGE S. CARDONA   AND

21 | ASSISTANT UNITED STATES ATTORNEY JERRY C. YANG:

22

23 |        PLEASE TAKE NOTICE that on November 10, 2009, at 8:30 a.m., or as soon

24 | thereafter as counsel may be heard, in the courtroom of the Honorable George Wu,

25 | United States District Judge, defendant Calvin C. Colbert, Jr., will bring on for hearing

26 | the following motion:

27

28                                      1

1

## **MOTION**

2   Defendant, Calvin C. Colbert, by and through his attorney of record, Deputy

3   Federal Public Defender Sylvia Torres-Guillén, hereby moves this Honorable Court to

4   suppress the evidence seized from room #220 at the Economy Inn.  Law enforcement

5   seized, *inter alia,* cocaine base, $957, a firearm and ammunition. In addition, Mr. Colbert

6   moves for the suppression of any and all statements he purportedly made to law

7   enforcement during the execution of the search warrant.

8   Mr. Colbert further moves this Honorable Court, pursuant to *Franks v. Delaware,*

9   438 U.S. 154 (1978), for an evidentiary hearing on specified allegations contained in the

10   affidavit in support of the search warrant.

11   This motion is based upon the attached Memorandum of Points and Authorities,

12   Declaration of Counsel, all files and records in this case, and any further evidence

13   presented at the hearing on this motion.

14

15   Respectfully submitted,

16   SEAN K. KENNEDY
    Federal Public Defender

17

18   DATED:  October 2⁷, 2009          By

19   SYLVIA TORRES-GUILLÉN
    Deputy Federal Public Defender

20

21

22

23

24

25

26

27

28                                    2

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

### I.

3

### STATEMENT OF FACTS

4

The Affidavit in Support of the Search Warrant

5   On March 11, 2009, Gerald J. Beall, a police officer for the San Bernardino

6   Police Department ("Officer Beall"), submitted an affidavit in support of a search

7   warrant to Judge Michael Smith of the San Bernardino Superior Court. Exhibit A,

8   Affidavit in Support of Search Warrant ("Exhibit A"). Officer Beall's affidavit

9   alleged that there was probable cause to believe that "there is now located at 685 W.

10  6th Street, #217, City of San Bernardino, County of San Bernardino, State of

11  California, cocaine base" and "there is now located at 685 W. 6th Street, #217, City

12  of San Bernardino, County of San Bernardino, State of California, cocaine base." *Id.*

13  Based upon the affidavit, Judge Smith issued a warrant for the search of both rooms

14  in the "Economy Inn" motel. *Id.*

15  Officer Beall's statement of probable cause alleged that: (1) On March 10,

16  2009, at 4:00 p.m., a "confidential reliable informant (CRI)" notified him that a

17  "Black male in his mid to late 20's, approximately 5'10" tall, with a medium

18  complexion and average build, staying at the "Economy Inn" motel [was] selling

19  cocaine base"; (2) Officer Beall went to the Economy Inn with the CRI and the CRI

20  pointed to someone who matched the description and identified him as "Cal"; (3)

21  Officer Beall saw a Black male on a bicycle ride up to "Cal" and "a small object" was

22  exchanged by both at the corner of the motel parking lot; (4) other officers saw

23  "numerous individuals go to room #217, knock on the door and receive no response";

24  (5) On March 11, 2009, at about 9:30 a.m., Officer Beall suggested he saw a Black

25  female go to room #217, where "Cal" allegedly spoke to her, then went to room #220

26  together and he then opened the door using a pass key; "Cal" left a minute later and

27

28                                          3

went back to room #217; the Black female later left the room and the motel lot; the Black male then left room #217, walked over to the Black female and gave her something through the fence; (6) Officer Beall suggests he saw Officer White, who was wearing audio and video recording equipment, go to the fence "along 6th Street below room #217" and saw a Black female speak to a Black male wearing "a white jacket, had a medium complexion, appeared to be approximately 5'08" tall, 170 lbs., and had short, Afro-style hair." She asked him for some "dub", he came to the edge of the stairwell and the Black male said, "I don't know him."; (7) Officer Beall suggests that he saw the Black female allegedly continue to negotiate the drug transaction with the Black male who was standing at the stairwell; (8) a second Black older female appeared from the west side of the motel and approached Officer White and asked who wanted the "dub." Officer White said he did and she said she had it and that "he" had given it to her. She wanted Officer White to get the $20 back from the first Black female which she did and he gave the second Black female the $20 and he then got the two baggies of suspected cocaine base; (9) the second Black female told Officer White that the Black male was "cool", he didn't know Officer White, the male was her "nephew" and that "the Black male has sent her to Officer White's location with the dope"; and (10) the first Black female and Officer White walked to the Greyhound station and met Officer Beall; Officer White then gave the first woman $10; Officer Beall then suggests he saw her walk to the "area of the vacant lot east of the motel and conducted what appeared to be a second transaction with the Black male subject." Appendix A, at 4-5.

Although Office Beall relied on the "CRI" in his statement of probable cause, Officer Beall did not identity the "CRI", nor did he specifically state why the informant was "reliable". Appendix A, at 3-5.

Officer Beall described the premises to be searched. Appendix A at 5. Officer

4

1  Beall described the hotel and the rooms.  *Id.*  Specifically, he stated that the number

2  "217" and "220" was "affixed to [the door]."

3       The Police Report and the Audio and Video Recording.

4       On the morning of March 11, 2009, undercover police officers in the narcotics

5  unit of the San Bernardino Police Department conducted an operation designed to

6  ascertain the identity of and arrest a crack dealer.  Exhibit B, Police Report at 1.  The

7  officers set up this operation based on a tip that an unidentified informant had given

8  them the previous afternoon.  Exhibit A, at 2.  Pursuant to the plan, Officer Beall was

9  stationed in a Greyhound bus parking lot near the suspected location from which the

10  dealer was selling crack, namely, the Economy Inn at 685 W. 6th Street in San

11  Bernardino. Exhibit B, at 1.

12       Shortly thereafter, an unidentified black female approached Officer Beall and

13  attempted to sell him a cellular phone for twenty dollars.  Exhibit B, at 2.  He

14  declined and asked whether she could procure some crack for him instead.  *Id.*  The

15  unidentified female said she could, and Officer Beall asked her to wait with him until

16  his "friend" arrived, *i.e.*, Officer White.  *Id.* When Officer White arrived, the three of

17  them had a conversation, which was video-recorded.  *Id.*  Then, Office White gave the

18  unidentified female twenty dollars and she went over to the Economy Inn, apparently

19  to ask someone if they would sell crack to her for him.  *Id.*

20       The person with whom the female spoke looked at Officer White, became

21  angry and said he did not know him.  Exhibit B, at 2.  Officer White then had a

22  conversation with an unidentified male standing nearby, who allegedly told him that

23  the female would "be right back."  *Id.* at 3.  Then, a second unknown female walked

24  out of the motel and told Officer White to get his money back from the first

25  unidentified female.  *Id.*  Once he did this, the second woman took the money and

26  gave him some crack.  *Id.*  Officer White then gave the first woman ten dollars for

27

28                                        5

1   helping to facilitate the transaction. *Id.* According to another officer, Officer
2   Landeros, the first woman apparently used the ten dollars to immediately purchase
3   crack from "Cal". *Id.* at 3.

4       Officers Beall and White then left the area, and Officer Beall wrote the search
5   warrant, which was signed by the Honorable Judge Smith. Exhibit B, at 3. When
6   Officer White and Officer Beall returned to the office to write the affidavit, Officer
7   Beall said: "**I'll have you help me spew some of that shit out to write my**
8   **affidavit**," and "**As far as I'm concerned, he fucking threw at you from the**
9   **fucking room upstairs**." *See* Exhibit C and Exhibit D, at 11. Once they had the
10  search warrant, and were driving back to the Economy Inn, Officer Landeros
11  informed the officers that it appeared as if someone was moving their belongings
12  from room #217 to room #220 at the Economy Inn. Exhibit B, at 3. Officers Beall
13  and White then arrived at the Inn, where a detective, two other officers, and two
14  Agents working for the Bureau of Alcohol, Tobacco, and Firearms joined them, and
15  proceeded to execute the search warrant on rooms #217 and #220. *Id.* They observed
16  that room #217 was clean and empty. *Id.* The officers, detective, and agents then
17  walked to room #220, used a ram to bust open the door after issuing a verbal warning,
18  and entered the room. *Id.* No information is contained in the report regarding any
19  time given to respond or any furtive noises. *Id.* Once they busted the door open, they
20  saw Mr. Colbert sitting in a chair. *Id.* Officer Beall ordered him to the ground, and
21  he complied. *Id.,* at 4.

22      Before any *Miranda* warnings were given, Officer Beall asked Mr. Colbert if
23  there were any weapons in the room. Mr. Colbert allegedly said "yes". *Id.* at 4.
24  Officer Beall then asked where the weapon was and  Mr. Colbert allegedly said, "It's
25  over there; motioning toward the dresser, and then said, after further questioning,
26  "It's in the drawer." Exhibit B, at 4. Thereafter, a gun was discovered in the dresser
27
28                                    6

1   drawer. *Id.*

2        The search of room #220 also revealed $957.00, 24 grams of crack, plastic

3   baggies, a scale, a man's wallet, and a cellular phone. Exhibit B, at 4. The only item

4   actually found on Mr. Colbert's person was $18, which was seized after being

5   discovered in his shirt pocket. *Id.* The other items seized during the search were

6   found in different locations throughout room #220. *Id.*

7        Mr. Colbert was arrested for possession of crack cocaine with intent to

8   distribute and possession of a firearm. Exhibit B, at 7. Before being taken to the

9   detention center, Mr. Colbert was Mirandized and made a statement in which he

10  denied selling crack. *Id.*, at 8.

11       After Mr. Colbert's arrest, the officers failed to identify and locate both of the

12  woman they interacted with during the undercover investigation, even though these

13  women were the only people with whom they made contact in the events leading up

14  to Mr. Colbert's arrest. Exhibit B, at 7. The second woman whom the officers failed

15  to identify and locate was the person who allegedly handed Officer White the

16  substance later identified as crack. Moreover, neither of the people who were

17  registered to room #220 (as indicated on the Economy Inn registration cards) have

18  been located or questioned, even though all of the seized contraband was found in

19  room #220, and no contraband whatsoever was found in the room registered to Mr.

20  Colbert (room #217). Exhibit B, at 7; *see also* Exhibit E, Discovery, Bates No. 14.

21  Additionally, the officers failed to identify and locate the unidentified male who told

22  Officer White that the first unidentified female would "be right back" when he was

23  trying to negotiate a drug transaction with her. Exhibit D, at 5. This unidentified

24  male interacted with Officer White for at least a couple of minutes, and appeared to

25  have material knowledge of both narcotics transactions; yet, there is no evidence that

26  any effort was made to locate or identify this man once Mr. Colbert was arrested.

27

28                                    7

1  Transcript, 6.  In fact, in both the Police Report and the Affidavit in Support of

2  Search Warrant, no mention at all is made of this man's existence or presence on the

3  scene at the time of the investigation.  Exhibit B, at 2; *see also* Exhibit A, at 3-5.

4

5  ## II.

6  ## ARGUMENT

7  **THE MOTION TO SUPPRESS SHOULD BE GRANTED BECAUSE**

8  **THE SEARCH WARRANT WAS (1) OBTAINED WITHOUT**

9  **PROBABLE CAUSE TO SEARCH ROOMS #217 AND #200; (2)**

10  **CONTAINED FALSE STATEMENTS AND MATERIAL OMISSIONS;**

11  **AND (3) MR. COLBERT WAS NOT ADVISED OF HIS *MIRANDA***

12  **RIGHTS BEFORE HE WAS QUESTIONED BY THE OFFICERS.**

13

14  **A.    There Was No Probable Cause to Support the Search Warrant of**

15  **Rooms #217 and #220.**

16  An arrest warrant protects an individual from unreasonable seizures and issues

17  upon a showing of probable cause to believe a suspect is committing or has

18  committed an offense.  *Steagald v. United States*, 451 U.S. 204, 213 (1981); Fed. R.

19  Crim. P. 4(a) (arrest warrant issued if affidavit shows probable cause to believe that

20  an offense was committed and that defendant committed it).  A search warrant issues

21  upon a showing of probable cause to believe the object of the search is located in a

22  particular place.  *Steagald*, 451 U.S. at 213.

23  Probable cause exists when there is a "fair probability or substantial chance of

24  criminal activity."  *United States v. Bishop*, 264 F.3d 919, 924 (9th Cir. 2001).  The

25  Court applies the "totality of the circumstances" test to determine whether an affidavit

26  supporting a warrant established probable cause to search *a specific location*.  *Illinois*

27

28                                                    8

1    *v. Gates*, 462 U.S. 213, 238, 108 S.Ct. 2317, 76 L.Ed 2d 527 (1983). The Court is

2    limited to the information contained within the four corners of the underlying

3    affidavit. *United States v. Taylor*, 716 F.2d 701 (9th Cir. 1983).

4         When a search warrant is based upon information supplied by a confidential

5    informant, the proper analysis is whether probable cause exists from the totality of the

6    circumstances to determine a sufficient level of reliability and basis of knowledge for

7    the tip. *Gates*, 462 U.S. at 238, 103 S.Ct. 2317. One of the factors the courts

8    consider in this type of case is the basis of the informant's knowledge. When

9    considering the basis of the knowledge, the courts will examine "how the informant

10   came by his or her knowledge." *United States v. Angulo-Lopez*, 791 F.2d 1394, 1396

11   (9th Cir. 1986). For example, in many cases, the information provided by the

12   informant is based upon first-hand knowledge. In *United States v. Bishop*, 264 F.3d

13   at 925, the informant had gone to Bishop's home, had observed the methamphetamine

14   packaged for sale, and the twenty or thirty thousand dollars in cash. *Id.* The

15   informant had also observed Bishop cooking methamphetamine *at his home*. *Id.*

16   Furthermore, in applying the totality of the circumstances, the Court may employ a

17   number of methods to determine if an informant's tip is reliable. In *Bishop*, the court

18   determined that the reliability of the informant's tip may be demonstrated through

19   "independent police corroboration" and "admissions against penal interest." *Id. See*

20   *also United States v. Dozier,* 844 F.2d 701, 706 (9th Cir. 1988). Finally, the affiant

21   must "demonstrate why the affiant believes the informant to be trustworthy and how

22   the informant came upon the information alleged." *United States v. Angulo-Lopez*,

23   791 F.2d 1394, 1396 (9th Cir. 1986).

24        Here, on March 11, 2009, Officer Beall sought a search warrant for rooms #217

25   and #220 located at 685 West 6th Street in San Bernardino. There is no information

26   whatsoever that "Cal" rented either room #217 or room #220. In fact, the discovery

27

28                                              9

1    makes clear that two men, not Mr. Colbert, rented room #220.  *See* Exhibit E.  In

2    addition, at best, officers saw Mr. Colbert, enter room #220 one time and leave

3    "[a]pproximately one minute later."  *See* Exhibit C, at 3.

4         In addition, Officer Beall references a "CRI", yet fails to establish any nexus

5    between the information the officer received record from the "CRI" and either room

6    #217 or room #220.  At no point does Officer Beall state that the "CRI" purchased

7    any drugs from anyone in room #217or #220 or that there were drugs in either of

8    those rooms.

9         Accordingly, based upon the totality of the circumstances, the search warrant

10   was not supported by probable cause and, therefore, all evidence seized must be

11   suppressed.

12

13        **B.**     **The Search Warrant Affidavit Contains False Statements and**

14                 **Material Omissions.**

15        **False Information**

16        Mr. Colbert is entitled to a *Franks* hearing because the affidavit on which the

17   search warrants were based contained "a false statement knowingly and intentionally,

18   or with reckless disregard for the truth" and that "false statement is necessary to the

19   finding of probable cause," so the "Fourth Amendment requires that a hearing be held

20   at the defendant's request." *Franks v. Delaware*, 438 U.S. 154 (1978). A district court

21   must suppress evidence seized under a warrant when an affiant has knowingly or

22   recklessly included false information in the affidavit on which the warrant is based.

23   *United States v. Dozier*, 844 F.2d 701, 705 (9th Cir. 1985)(citing to  *United States v.*

24   *Leon*, 468 U.S. 897 (1984). In order for the search warrant to be invalidated at a

25   *Franks* hearing, "the defendant must prove by a preponderance of the evidence that

26   there was a knowing and intentional falsehood or a reckless disregard for the truth,

27

28                                          10

1   and that the challenged statement was essential to the finding of probable cause."
2   *Franks*, 438 U.S. at 171-72.

3          "The determination of whether misstatements or omissions are knowing or
4   reckless or merely negligent is a factual inquiry but it is guided by cases in which
5   this court has found reckless disregard by an affiant." *Dozier*, 844 F.2d at 705 (citing
6   *United States v. Davis*, 714 F.2d 896 (9th Cir.1983) in which the affiant signed a
7   statement written in the first person knowing that it would mislead the magistrate
8   into believing the affiant had first-hand knowledge of the facts therein).

9          In *Davis*, the court held that the way in which an affiant characterized *how* he
10  obtained the information - whether first-hand or second-hand - in his affidavit was
11  essential to determining whether the affidavit gave rise to a valid search warrant.
12  714 F.2d at 899.  If affiants intentionally or recklessly characterize information
13  obtained second-hand, for example, from the observations of other officers, as first-
14  hand knowledge, "by failing properly to identify the sources of information the
15  affiants...[make] it impossible for the magistrate to evaluate the existence of probable
16  cause." *Id.*  The *Davis* court stated that the lesson of *Franks* is that when an affiant's
17  misrepresentations rise to the level of reckless or intentional "the warrant must be
18  invalidated [and] the fact that probable cause did exist and could have been
19  established by a truthful affidavit does not cure the error." *Id.*

20         As the *Davis* court noted, the affiant in that case "could have relied on the
21  facts learned from his subordinates to prepare a truthful affidavit [and] this entire
22  problem could have been avoided if [the affiant] had simply rewritten the affidavit to
23  indicate that he was relying on his officers who had personally" obtained the
24  information. *Id.*

25  //

26

27

28                                           11

1. **Officer Beall intentionally or recklessly characterized observations of a man who was allegedly Mr. Colbert as first-hand, although they were not personally made by him.**

Throughout his affidavit, Officer Beall describes Officer White's, and Officer Landero's and other officers' observations as if they were his own. *Cf.* Exhibit A and B. For example, Officer Beall suggests that he was the person who saw the following: (1) a Black female go to room #217 and #220 with "Cal"; (2) a Black male talk to the Black female about getting "dub"; (3) the Black female negotiating a drug transaction with the Black male standing in the stairwell; (4) the drug exchange with the second Black female; and (5) saw or participated in the conversation about the person who gave her the drugs; and (6) saw the black woman and male engage in a second drug transaction. Exhibit A, at 4. There is no question that Officer Beall could not have seen or participated as he suggests given that he was parked at the Greyhound station. *See* Exhibit B, at 2. The Greyhound station does not face rooms #217 or #220.

Officer White, moreover, was wearing audio and video recording equipment during this undercover investigation. Officer White's interactions with the unidentified woman, and the woman's interactions with the man in the hotel were documented. Officer Beall was nowhere in sight.

In addition, the information regarding what transpired is inconsistent with the video. For example, the man on the video is not clearly visible. Exhibit A, at 4. The video does not reflect (at approximately the 15 minute mark) the vivid description that Officer Beall provides of "a Black male who was wearing a white jacket, had a medium complexion, appeared to be approximately 5'8" tall, 170 pounds, and had short, Afro-style hair." Exhibit A, at 4.

Officer Beall fails to disclose that he is not obtaining this description, which he wants the judge to believe is "Cal," from personal knowledge. At best, he

12

could only have gotten that description from Officer White. In the video, Officer White provides a description of the unidentified man that is nearly identical to the one Officer Beall represented as his own: "[The unidentified female] made contact with a black male wearing a white jacket. Medium dark complexion. Appeared to be about 5'8", maybe 160, 165. Short Afro." *See* Exhibit D, at 13.

Importantly, anything Officer White would have told Officer Beall would be highly suspect given Officer Beall's conversation with Officer White as he was preparing his affidavit. Officer Beall practically admits to changing Officer White's first-hand knowledge into his own and creating new facts in the video. Officer Beall said: "**I'll have you help me spew some of that shit out to write my affidavit**," and "**As far as I'm concerned, he fucking threw at you from the fucking room upstairs**." *See* Exhibit C and Exhibit D, at 11.

Officer Beall's intentional or reckless falsehood in his affidavit that he personally observed the above-mentioned interaction between Officer White, the unidentified female and the male requires that Mr. Colbert be given a *Franks* hearing or, as in *Dozier*, that the court "suppress evidence seized under a warrant based on false information that the affiant has recklessly or knowingly included." *Dozier*, 844 F.2d at 705.

**2.**     <u>The search warrants should be invalidated because the</u> <u>affidavit on which they were based contained deliberate or</u> <u>reckless omissions that could have misled the judge who issued</u> <u>the warrants.</u>

A slightly different analysis is required when challenging an affidavit where in material information has been omitted, since omissions cannot by their nature be deleted. *DeLeon* 979 F.2d at 763. The *DeLeon* court reasoned that a better approach, therefore, would be to delete false or misleading statements and insert the omitted truths revealed at the suppression hearing. *United States v. Martin*, 615 F.2d 318,

13

328 (1980)(if the defendant proves omissions were intentionally or recklessly made, court must "determine whether, if the omitted material had been included in the affidavit, the affidavit would still establish probable cause. . .").

The Ninth Circuit has held that a defendant may also challenge a facially valid warrant when it contains deliberate or reckless omissions of facts that tend to mislead." *Dozier*, 844 F.2d at 705 (citing to *United States v. Stanert*, 769 F.2d 1410 (9th Cir.1985)).  In the present case, Officer Beall, as the affiant for the affidavit which gave rise to the search warrants for rooms #217 and #220 of the Economy Inn, deliberately or recklessly omitted facts from his affidavit in a misleading way.

> a.  **Officer Beall provided no information about the reliability of the unidentified "confidential reliable informant" on whose tip the investigation of the Economy Inn, and Mr. Colbert in particular, were based.**

No detail about the "CRI" was provided.[1] By omitting all information about the informant whose tip inaugurated the investigation at the Economy Inn - including the informant's identity - Officer Beall denied the magistrate who issued the search warrants the opportunity to determine whether the informant was reliable.

In *United States v. Wall*, the court discussed the approach used to determine whether an informant's tip is sufficient to support a finding of probable cause. 277 Fed.Appx. 704 (9th Cir. 2008).  Although in the present case, the informant's tip was only part of the basis for probable cause in Officer Beall's affidavit, *Wall* nonetheless offers useful factors for assessing an informant's reliability, employing "a totality-of-the-circumstances approach that takes into consideration the informant's "veracity" or "reliability" and his "basis of knowledge."" *Id.* at 705 (citing to *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).  The court identified "several factors to which a

---

[1]    Mr. Colbert respectfully requests that the government provide the defense with the name and background regarding the informant.

14

court should look to determine the reliability of an informant's tip," (citing to *United States v. Rowland*, 464 F.3d 899, 907-08 (9th Cir.2006)), including:

>    (1) whether the informant is known or anonymous,
>
>    (2) whether the informant has a proven track record of reliability,
>
>    (3) the informant's basis of knowledge, and
>
>    (4) whether the informant "provides detailed predictive information about future events that is corroborated by police observation."

*Id.* at 706 (citing to *Rowland*).

In *Wall*, the court concluded that the informant's tip was not sufficient to justify probable cause because: "[although] the confidential informant met in person with a Drug Enforcement Agency (DEA) agent, the informant had no track record of reliability, did not reveal her/his basis of knowledge, and did not provide any predictive information about future events. DEA agents verified only "innocent" information, which was just as consistent with legal activity as it was with the illegal activity the informant alleged." *Id.* at 706.

In the present case, as in *Wall*, there is little basis for treating the unidentified informant's information as reliable. First, Officer Beall said information whatsoever about the unidentified informant in his affidavit, aside from describing the person as a "confidential reliable informant." Exhibit A, at 2. This moniker offers no clue as to the informant's name, age, or relationship to Mr. Colbert. At most, it suggests that sometime in the past, the informant provided officers with information about another suspect. The lack of information about the informant in the affidavit leaves it unclear whether the informant is an addict, whether he has a financial motive for giving information to the officers, whether he has a personal motive for implicating Mr. Colbert, or whether the tip he provided was entirely speculative. The magistrate who issued the search warrant had no way to answer these questions based on the sparse mention of an unidentified informant that Officer

15

Beall provided in his affidavit.  Therefore, the informant's tip should form no part of the probable cause that was the basis for the search warrants.  In addition, Officer Beall's intentional omission of any facts about the informant aside from the moniker "confidential reliable informant" has a tendency to mislead since the magistrate is left without any facts from which to derive whether the informant - and, for that matter, his tip - are actually reliable.  As such, the search warrant should be invalidated.

In addition, the only part of the unidentified informant's tip that Officer Beall verified while with the informant "was just as consistent with legal activity as it was with the illegal activity the informant alleged." *Wall*, 277 Fed.Appx. at 706.  The man the informant said was selling crack, "Cal", was standing in a parking lot. Exhibit A, at 3.  Officer Beall and the informant then saw "Cal" talking to someone riding a bicycle, handing the bicyclist something, and the bicyclist handing him something back.  That behavior - out in the open, public space of a parking lot, between two friends - is just as consistent with legal activity as it is with a narcotics transaction. There was, for example, nothing in the affidavit that suggested that either male engaged in any furtive or stealth action.  As the court held in *United States v. Mendosa*, "mere confirmation of innocent static details is insufficient to support an anonymous tip."  989 F.2d 366, 369 (9th Cir.1993).

### b. **Officer Beall omitted the fact that the informant's description of the narcotics dealer was markedly different than Mr. Colbert's appearance.**

In Officer Beall's affidavit, he stated that the unidentified informant described the suspected narcotics dealer to him as "a black male in his mid to late 20's, approximately 5'10" tall, with a medium complexion and average build." Exhibit A, at 2.  Not only is this description alarmingly generic, lacking any specificity with regard to unique identifying characteristics such as tattoos, scars, hairstyle, and attire, but it is also at odds with Mr. Colbert's actual characteristics. *See* Exhibit F.  Mr.

16

1   Colbert was 21 years old at the time of the investigation on March 11, 2009.  He is

2   6'2", weighs over 200 pounds, and has a dark complexion.

3        Therefore, the only actual similarity that Mr. Colbert has to the person

4   described by the unidentified informant is that he was staying at the Economy Inn

5   when the investigation began, his height, weight, complexion, and age all differ

6   significantly from the informant's information.  Mr. Colbert is four inches taller,

7   significantly younger, heavier, and darker complected than the person the "CRI"

8   described as "Cal".  These differences between Mr. Colbert and "Cal" are striking

9   enough that their omission by Officer Beall from his affidavit is materially

10  misleading, and thus, the search warrants based on his affidavit should be invalidated.

11       In addition, the difference between the man by the stairwell, the man first seen

12  on March 10, 2009, and Mr. Colbert is stark.  Yet, Officer Beall failed to disclose that

13  information.

14            **c.     <u>Officer Beall failed to include in his affidavit that room #220,</u>**

15                      **<u>from which all the evidence was seized, was not Mr. Colbert's</u>**

16                      **<u>hotel room.</u>**

17       The registration cards from the Economy Inn show that room #220, from

18  which the firearm, narcotics, and money were seized, was registered to Jamine

19  DeShawn Marshall along with another occupant, Daryl Sean Montoya.  Exhibit E.

20  Each of these occupants provided a different car license number.  The address

21  provided by Mr. Marshall is in Highland, California.  *Id.*  The registration card also

22  shows that Mr. Marshall and Mr. Montoya checked into room #220 on March 10,

23  2009.  *Id.*  By contrast, Mr. Colbert checked into room #217 as the sole occupant on

24  March 9, 2009.  *Id.*

25       The registration cards provide no evidence to suggest any connection

26  between the occupants of room #217 and Mr. Colbert in room #220.  Although

27  Officer Beall possibly described the observations of one or more officers conducting

28                                         17

1   surveillance at the Economy Inn on March 11, 2009, who stated that they saw a Black
2   male enter room #220 once, Officer Beall never mentioned that room #220 was
3   registered to different occupants.  And, based on the information on the registration
4   cards, including different check-in dates, cars, addresses, and names, had no
5   connection to Mr. Colbert.  These omissions by Officer Beall from his affidavit which
6   was the basis for the search warrants - whether reckless or deliberate - were
7   misleading in that they gave the judge issuing the search warrant no basis for
8   distinguishing the custody and control "Cal" had over these rooms.  Importantly, Mr.
9   Colbert's room was clean and entirely empty of contraband.  Room #220, registered
10  to Mr. Marshall and Mr. Montoya,had the narcotics, weapon, and money.  The fact
11  that room #220 was not registered to Mr. Colbert was a material fact which affected
12  the probable cause for searching that room.

13       Officer Beall's false statements and omissions undermined Judge Smith's
14  ability to assess probable cause, including his ability to properly assess the reliability
15  of the informant, employing the totality of the circumstances that takes into
16  consideration the informant's "veracity" and "reliability" and his "basis of
17  knowledge". *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *See also United States v.*
18  *Rowland*, 464 F.3d 899, 907-08 (9th Cir. 2006).

19       **C.   The Government Cannot Establish That Mr. Colbert Was**
20       **Given His *Miranda* Warnings When He Made Several**
21       **Statements about the Firearm.**

22       Before an officer may question an arrestee, the Fifth Amendment
23  requires officers to advise him of his privilege against self-incrimination and his right
24  to counsel.  *Miranda v. Arizona*, 384 U.S. 436, 469-73 (1966); *Dickerson v. United*
25  *States*, 530 U.S. 428, 440 (2000).  The officers questioning Mr. Colbert should
26  have first given him the *Miranda* warning and obtained a valid waiver of the rights.

27
28                                          18

1  The government bears the heavy burden of establishing the voluntariness of

2  statements made in the absence of a knowing, intelligent waiver of this right. *United*

3  *States v. Fouche*, 776 F.2d 1398, 1404 (9th Cir. 1985), *aff'd. on remand*, 833

4  F.2d 1284 (9th Cir. 1987), *cert. den.* 486 U.S. 1017 (1988).

5  Here, there is no written waiver of *Miranda* rights. There are no recordings

6  of any advisement of rights or Mr. Colbert's responses to questioning after the

7  officers executed the search warrant. There are no written reports signed by Mr.

8  Colbert to confirm that he was advised of his rights. There is nothing but a report

9  which summarizes the purported admissions made by Mr. Colbert regarding the

10  firearm. *See* Exhibit B, at 4. The government cannot meet its burden to show that Mr.

11  Colbert received the *Miranda* warnings or that he waived them. For this reason, any

12  statements Mr. Colbert may have made must be suppressed.

13

14                                  **III.**

15                            **CONCLUSION**

16  The affidavit, authored by Officer Beall, that was the basis for the search

17  warrants for rooms #217 and #220 of the Economy Inn, contained at least one intentional

18  or reckless falsehood and multiple omissions that severely compromised the probable

19  cause which formed the basis for the warrants. Therefore, there should be either a

20  *Franks* hearing, or, alternately, the court should find that the search warrant lacked

21  //

22  //

23  //

24  //

25  //

26  //

27

28                                  19

probable cause.  In addition, any and all statements purportedly made by Mr. Colbert regarding the firearm should be suppressed.

Respectfully submitted,

SEAN K. KENNEDY
Federal Public Defender

DATED: October 28, 2009          By _____

SYLVIA TORRES-GUILLEN
Deputy Federal Public Defender

20

## DECLARATION OF ELIUD E. GALDAMEZ

I, Eliud E. Galdamez, hereby state and declare as follows:

1.      I am a Trial Paralegal in the Office of the Federal Public Defender and have been so employed since 2007.

2.      On April 8, 2009, Sylvia Torres-Guillen, Deputy Federal Public Defender, was appointed to represent Calvin Charles Colbert, Jr., Case No. CR 09-301-GW.

3.      In connection with our office's representation, Ms. Torres-Guillen asked me to prepare a transcription of the CD Rom provided by the Unites States Attorney's Office on April 13, 2009.

4.      The CD Rom contained three video recordings with the following session length:  A) 40 minutes, 36 seconds; B) 5 minutes, 23 seconds; and C) 1 minute, 30 seconds.

5.      Per Ms. Torres-Guillen's request, I reviewed the CD Rom and created a transcription of each video recording in WordPerfect format.

6.      To the best of my knowledge, the information on the transcribed WordPerfect documents are accurate and complete, as of October 27, 2009.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

DATED: October 27, 2009

_____
ELIUD E. GALDAMEZ
Paralegal

1

1      *UNITED STATES V. CALVIN C. COBERT*, CR No. 09-301-GW
       **LIST OF EXHIBITS IN SUPPORT OF**
2      **MR. COLBERT'S MOTION TO SUPPRESS EVIDENCE**

3

4      <u>EXHIBIT</u>                          <u>DESCRIPTION</u>

5      A              Search Warrant, Affidavit in Support of Search Warrant and
6                     Return to Search Warrant

7      B              Police Report

8      C              Video/Audio Compact Disc

9      D              Transcript

10     E              Discovery, Bates Number 14

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

IN THE SUPERIOR COURT

COUNTY OF SAN BERNARDINO, STATE OF CALIFORNIA

## SEARCH WARRANT
(PENAL CODE 1529)

09-08274

THE PEOPLE OF THE STATE OF CALIFORNIA:  To any Sheriff, Constable, Marshal, Peace Officer, or Policeman in the County of San Bernardino:
Proof, by affidavit, having been this day made before me by

### GERALD BEALL

That there is probable cause for believing that:

There is now located at 685 W. 6th Street #217, City of San Bernardino, County of San Bernardino, State of California, cocaine base. Said possession of cocaine base and possession of cocaine base for sale constitutes a felony in the City of San Bernardino, County of San Bernardino, State of California.

YOU ARE COMMANDED at any time of the day, or as the case may be according to Section 1533, to make immediate search of:

The premises located at 685 W. 6th Street, room #217 in the City and County of San Bernardino, State of California.   The premises are more particularly described as the "Economy Inn" motel.  The building is a two-story motel on the southeast corner of 6th Street and "G" Street.  The building has an off-white stucco exterior with faded blue trim and a blue tile roof. There are rooms on the first and second floors, with the doors facing east and west. The room in question is #217. Room #217 is located on the second floor on the east side. The door faces east, is green in color and has the number "217" affixed to it. There is a sign in the parking lot of the location which states "Economy Inn". This sign is clearly visible from the street. The address, "685 W. 6th Street" is affixed to the window of the office located on the first floor, west side.

The search is also to be made of any storage sheds, storage areas or vehicles under direct control of the occupants to which persons in control of these premises may have access to and may be able to conceal items to be seized.

For the following property:

Cocaine base, a controlled substance.  Also to be searched for are any materials and paraphernalia used in the storage, packaging, weighing, processing, conversion or distribution of cocaine base. Also to be searched for are any papers or items showing illicit sales transactions, buyers lists, sellers lists, or records of such transactions involving the buying, transportation or selling of cocaine base. Furthermore, any items of personal property or papers tending to show occupancy, ownership or control of the premises/area/vehicles being searched.   These include receipts, bills, keys, birth certificates, addressed mail, phone books, address books, bankbooks and any other papers showing occupancy or documents that tend to show narcotic transactions.  Also to be

IN THE SUPERIOR COURT

COUNTY OF SAN BERNARDINO, STATE OF CALIFORNIA

## SEARCH WARRANT
### (PENAL CODE 1529)

09-08274
Page 2

searched for are any amounts of U.S. currency or other assets or items of value that can be shown to be the result of or involved in the trafficking of a controlled substance. Also recordings and notes of any incoming phone calls that might be related with the sales of a controlled substance or narcotic transactions. This includes monitoring incoming telephone calls, as well as incoming messages contained on electronic communication devices such as pagers or telephone answering machines that would constitute evidence of the commission or furtherance of a felony, specifically, the sales or possession for sale of controlled substances.

Computers, keyboards, central processing units, external drives and storage tapes, disks, terminals and/or video display units, other peripheral equipment such as, but not limited to printers, modems, computer software and manuals; electronic data storage devices such as address, memo, calendar and phone books.

It is further requested that a Forensic Technician, sworn or non-sworn, be granted authorization to examine, make duplicate images/copies of the above mentioned electronic media and to determine if evidence of the offenses enumerated above are contained therein. Therefore, authorization is requested to make images/copies of the actual pre-requested data. Evidence copies of the items relating to these offenses will be created and retained for further proceeding and made available to the authorities.

And if you find the same or any part thereof, to bring it forthwith before me at my courtroom or any other judge of this court.

GIVEN UNDER MY HAND, and dated: 3/11/09

_____
Judge of the Superior Court
County of San Bernardino
State of California

IN THE SUPERIOR COURT

COUNTY OF SAN BERNARDINO, STATE OF CALIFORNIA

## SEARCH WARRANT
### (PENAL CODE 1529)

09-08274

THE PEOPLE OF THE STATE OF CALIFORNIA:   To any Sheriff, Constable, Marshal, Peace Officer, or Policeman in the County of San Bernardino:
    Proof, by affidavit, having been this day made before me by

## GERALD BEALL

That there is probable cause for believing that:

There is now located at 685 W. 6th Street #220, City of San Bernardino, County of San Bernardino, State of California, cocaine base. Said possession of cocaine base and possession of cocaine base for sale constitutes a felony in the City of San Bernardino, County of San Bernardino, State of California.

YOU ARE COMMANDED at any time of the day, or as the case may be according to Section 1533, to make immediate search of:

The premises located at 685 W. 6th  Street, room #220 in the City and County of San Bernardino, State of California.   The premises are more particularly described as the "Economy Inn" motel.  The building is a two-story motel on the southeast corner of 6th Street and "G" Street.  The building has an off-white stucco exterior with faded blue trim and a blue tile roof. There are rooms on the first and second floors, with the doors facing east and west. The room in question is #220. Room #220 is located on the second floor on the east side. The door faces east, is green in color and has the number "220" affixed to it. There is a sign in the parking lot of the location which states "Economy Inn". This sign is clearly visible from the street. The address, "685 W. 6th Street" is affixed to the window of the office located on the first floor, west side.

The search is also to be made of any storage sheds, storage areas or vehicles under direct control of the occupants to which persons in control of these premises may have access to and may be able to conceal items to be seized.

For the following property:

Cocaine base, a controlled substance.  Also to be searched for are any materials and paraphernalia used in the storage, packaging, weighing, processing, conversion or distribution of cocaine base.  Also to be searched for are any papers or items showing illicit sales transactions, buyers lists, sellers lists, or records of such transactions involving the buying, transportation or selling of cocaine base. Furthermore, any items of personal property or papers tending to show occupancy, ownership or control of the premises/area/vehicles being searched.   These include receipts, bills, keys, birth certificates, addressed mail, phone books, address books, bankbooks and any other papers showing occupancy or documents that tend to show narcotic transactions. Also to be

IN THE SUPERIOR COURT

COUNTY OF SAN BERNARDINO, STATE OF CALIFORNIA

### SEARCH WARRANT
(PENAL CODE 1529)

09-08274
Page 2

searched for are any amounts of U.S. currency or other assets or items of value that can be shown to be the result of or involved in the trafficking of a controlled substance. Also recordings and notes of any incoming phone calls that might be related with the sales of a controlled substance or narcotic transactions. This includes monitoring incoming telephone calls, as well as incoming messages contained on electronic communication devices such as pagers or telephone answering machines that would constitute evidence of the commission or furtherance of a felony, specifically, the sales or possession for sale of controlled substances.

Computers, keyboards, central processing units, external drives and storage tapes, disks, terminals and/or video display units, other peripheral equipment such as, but not limited to printers, modems, computer software and manuals; electronic data storage devices such as address, memo, calendar and phone books.

It is further requested that a Forensic Technician, sworn or non-sworn, be granted authorization to examine, make duplicate images/copies of the above mentioned electronic media and to determine if evidence of the offenses enumerated above are contained therein. Therefore, authorization is requested to make images/copies of the actual pre-requested data. Evidence copies of the items relating to these offenses will be created and retained for further proceeding and made available to the authorities.

And if you find the same or any part thereof, to bring it forthwith before me at my courtroom or any other judge of this court.

GIVEN UNDER MY HAND, and dated: 3/11/09

Judge of the Superior Court
County of San Bernardino
State of California

IN THE SUPERIOR COURT, CENTRAL DIVISION

COUNTY OF SAN BERNARDINO, STATE OF CALIFORNIA

| STATE OF CALIFORNIA | ) | AFFIDAVIT | |
|---|---|---|---|
| | ) | IN SUPPORT OF | 2009-08274 |
| COUNTY OF SAN BERNARDINO | ) | SEARCH WARRANT | |

Personally appeared before me this ___11___ day of ___March___, 2009

**GERALD J. BEALL**, Affiant, swears under oath that the facts expressed by him in the attached and incorporated Statement of Probable Cause are true and that based thereon he has probable cause to believe and does believe that the property described below is lawfully seizable pursuant to Penal Code Section 1524, as indicated below, and is now located at the locations set forth below.  Wherefore, affiant requests that this Search Warrant be issued.

Your affiant, **GERALD J. BEALL**, is a Police Officer for the San Bernardino Police Department (SBPD) and has been so employed since July 2002. During that time I have been assigned as a Patrol Officer, was selected as a member of the Gang Team, SWAT Team, the SBPD PACT (Police and Corrections Team) and I am currently assigned to the Narcotics Unit as a Narcotics Investigator. I am a member of the California Narcotics Officer's Association (C.N.O.A.) and the California Narcotics Canine Association (C.N.C.A.).

I attended the Riverside Sheriff's Academy where I received formal training in the recognition of narcotics, methods of manufacturing, packaging and illegal use of controlled substances, as well as methods in which narcotics are obtained, transported and sold. During my attendance at the Riverside Sheriff's Academy I also received formal training in crime scene investigations; relating not only to narcotics investigation but crimes against the public including but not limited to homicide, burglary, sex crimes, vehicle theft and robbery.

I received formal training in search warrants and clandestine laboratory safety with the San Bernardino Sheriff's Department. I completed an eighty-hour course in Basic Narcotics Investigation, with the California Department of Justice. I completed an eight-hour course in interception of wire, electronic digital pager, or electronic cellular telephone communications with the California Department of Justice. I completed a 16-hour course of indoor cannabis cultivation investigation instructed by the Midwest Counter drug Training Center.

During my career as a Police Officer, I have made hundreds arrests for narcotics related offenses and participated in numerous narcotic related investigations for possession, influence or sales of Methamphetamine, Cocaine, Cocaine Base, Heroin, Marijuana, Ecstasy and PCP. The investigations include recovering the aforementioned controlled substances and the subsequent interview of suspect/s in these crimes. I have seen and identified substances alleged to be Methamphetamine, Cocaine, Cocaine Base, Heroin, Marijuana, Ecstasy and PCP, and a subsequent analysis by the crime lab has shown that the substances in question were, in fact, controlled substances.

1

GOVT00027

IN THE SUPERIOR COURT, CENTRAL DIVISION

COUNTY OF SAN BERNARDINO, STATE OF CALIFORNIA

| STATE OF CALIFORNIA | ) | AFFIDAVIT | |
|---|---|---|---|
| | ) | IN SUPPORT OF | 2009-08274 |
| COUNTY OF SAN BERNARDINO | ) | SEARCH WARRANT | |

In the course of these investigations, as well as assisting in other arrests, I have spoken with numerous persons who were arrested for narcotic related offenses. From these conversations, I gained knowledge of the methods used to manufacture, package, transport, use, sell, conceal or obtain these controlled substances. I also learned the various methods of record keeping/accounting and other business practices of the narcotic dealer. These practices include the use of pagers and/or the telephone to take drug orders for pick-up or delivery. I have been present at various drug-related investigations where officers have answered the suspect's pager or telephone and accepted orders for various narcotics. Additionally, I learned that user-dealer contact also may involve the use of a personal pager where the dealer will receive a numerical message from a customer indicating a phone number, amount of controlled substance requested or numerals predesignated to indicate a meeting place. I have also found persons sometimes will utilize "text messaging" on cellular phones to place and/or receive orders for narcotics. This type of evidence constitutes evidence of the commission or furtherance of a felony, specifically the sales or possession for sale of a controlled substance.

It is also your affiant's experience suspects often contact customers via computers in Internet communities, instant messaging, e-mail, chat rooms, or other computer based sources. Your affiant is aware that computer based information is stored on internal hard drives, external drives, flash drives, CD ROMs, DVDs, and other peripherals. This type of evidence constitutes evidence of the commission or furtherance of a felony, specifically the sales, possession for sale, transportation, manufacturing, conversion, or distribution of a controlled substance and/or firearms.

It has been my experience subjects involved in the possession of narcotics often hide the substances and paraphernalia in their homes, on their person, and in their vehicles. They also often possess business ledgers or other documents tending to identify the persons involved in the narcotic related offenses. It has also been my experience that those involved with illicit narcotic transactions will maintain weapons, not limited to but including firearms and explosive devices, which have been known to be used both offensively and defensively against law enforcement officials in an attempt to protect their illicit narcotic transactions.

**PROBABLE CAUSE:**

On 3/10/09, at approximately 1600 hours, your affiant was notified by a confidential reliable informant (CRI) of a Black male in his mid to late 20's, approximately 5'10" tall, with a medium complexion and average build, staying at the "Economy Inn" motel selling cocaine base. This subject was stated to be known as "CAL."

2

IN THE SUPERIOR COURT, CENTRAL DIVISION

COUNTY OF SAN BERNARDINO, STATE OF CALIFORNIA

| STATE OF CALIFORNIA | ) | AFFIDAVIT | |
|---|---|---|---|
| | ) | IN SUPPORT OF | 2009-08274 |
| COUNTY OF SAN BERNARDINO | ) | SEARCH WARRANT | |

Your affiant drove to the location with the CRI and the CRI pointed to a subject in the parking lot who matched the description the CRI had given your affiant and identified this subject as "CAL." Your affiant conducted surveillance on the subject identified as "CAL" and after approximately five minutes, your affiant observed a Black male on a bicycle ride up to the suspect. They conducted a brief conversation and the subject on the bicycle rode to the corner of the parking lot of the motel. The subject identified as "CAL" then walked over and handed the subject on the bicycle a small item from his pocket. The subject on the bicycle handed the subject known as "CAL" a small object in return. Based on your affiant's training and experience, he found this action to be consistent with a hand to hand narcotic transaction.

Your affiant then returned the location a short time later with additional undercover narcotic officers, as well as OFFICER TONY WHITE, who would act in an undercover capacity in an attempt to purchase narcotics from the subject known as "CAL." However, after approximately two hours, "CAL" was not seen again to the front of the motel. Officers did see numerous individuals go to room #217, knock on the door and receive no response.

On 3/11/09, at approximately 0930 hours, your affiant returned to the "Economy Inn" motel to conduct further surveillance. Officers positioned themselves around the motel with a full view of the east and west sides where the rooms are located. A few moments after arriving, your affiant observed numerous subjects walking up and down the street to the front of the motel; one of whom went into the motel and went to room #217. A Black male matching the description of "CAL" opened the door and had a brief conversation with the Black female. The Black male and Black female then went to room #220 where the Black male opened the door using a pass key, not knocking, as if he resided in this room as well. Approximately one minute later, the Black male exited room #220, walked back to room #217 and also opened this door with a pass key without knocking, then went inside. The Black female was then observed to walk out of the motel lot and around to the south side of 6th Street, which borders the motel.

The Black female stood at the wrought iron fence below room #217. A few moments later, the Black male she had met in room #217 and room #220 again exited room #217, walked down to the fencing where the Black female was standing and handed her an unknown object through the fence. The two subjects then stood at the location and had a brief conversation. At this time, your affiant observed a marked San Bernardino Police Department patrol unit pass by on 6th Street. When the Black male noticed the patrol unit pass by, he immediately turned, walked back into the motel and entered room #217, closing the door behind him. Based on your affiants training and experience, he found this to be consistent with a hand to hand narcotics transaction.

3

GOVT00029

IN THE SUPERIOR COURT, CENTRAL DIVISION

COUNTY OF SAN BERNARDINO, STATE OF CALIFORNIA

| STATE OF CALIFORNIA | ) | AFFIDAVIT | |
|---|---|---|---|
| | ) | IN SUPPORT OF | 2009-08274 |
| COUNTY OF SAN BERNARDINO | ) | SEARCH WARRANT | |

At approximately 1000 hours, your affiant, who was parked near the motel, was approached by one of the Black females earlier observed loitering in the parking lot of the "Economy Inn." This Black female asked your affiant if he wanted to purchase a cell phone, which she was holding, for twenty dollars. Your affiant stated, "No," and advised the Black female he was waiting for a friend and we were looking to purchase some cocaine base. The Black female stated she could obtain the cocaine base for us and your affiant told the Black female to stand by at the location and wait until your affiant's friend arrived, who would be Officer WHITE, again acting in an undercover capacity.

A short time later, Officer WHITE, wearing audio and video recording equipment, arrived and made contact with the Black female. Officer WHITE then provided the Black female with a $20 bill and requested to purchase an amount of cocaine base. This Black female took Officer WHITE to the fence along 6th Street below room #217. The Black female then yelled up to the room to a Black male who was wearing a white jacket, had a medium complexion, appeared to be approximately 5'08" tall, 170 pounds, and had short, afro-style hair. The Black female told the Black male that she needed a "dub." He then came to the edge of the stairwell, looked at Officer WHITE and said, "I don't know him." The Black female then told Officer WHITE to walk down the street and he walked to the southeast corner of 6th and "G" Street.

The Black female continued to negotiate the narcotic transaction with the Black male who was standing on the stairwell. Moments later, a second Black older female appeared from the west side of the motel and approached Officer WHITE. She contacted Officer WHITE and asked who wanted the "dub." Officer WHITE stated he wanted the "dub" and she then said she had it, that "he" gave it to her. She told Officer WHITE to get his money from the first Black female. Officer WHITE then walked back to the original location and told the Black female the other Black female had gotten the "dope" and he needed the $20 back. The first Black female handed Officer WHITE the $20 and he handed it to the second Black female, who then handed Officer WHITE two prepackaged baggies of suspected cocaine base. The second Black female advised Officer WHITE that the Black male was "cool," he just did not know Officer WHITE. She also stated the Black male was her nephew. She stated the Black male had sent her to Officer WHITE'S location with the "dope."

After the transaction was complete, the second Black female walked away westbound on 6th Street and the first Black female accompanied Officer WHITE across the street to the "Greyhound" bus station where they met your affiant. The first Black female asked if Officer WHITE was going to give her one of the rocks of cocaine and Officer WHITE then gave her a $10 bill instead. The Black female then immediately walked back to the

4

GOVT00030

IN THE SUPERIOR COURT, CENTRAL DIVISION

COUNTY OF SAN BERNARDINO, STATE OF CALIFORNIA

| STATE OF CALIFORNIA | ) | AFFIDAVIT | |
|---|---|---|---|
| | ) | IN SUPPORT OF | 2009-08274 |
| COUNTY OF SAN BERNARDINO | ) | SEARCH WARRANT | |

area of the vacant lot east of the motel and conducted what appeared to be a second transaction with the Black male subject.

Based on the aforementioned circumstances, your affiant has formed the opinion that there is now illegal trafficking of narcotics occurring at the above described residence. It is also your affiant's opinion that a search of this residence will reveal evidence of such trafficking.

Your affiant requests the identity of the CRI to remain confidential for the following reasons: disclosure will jeopardize the life and safety of the informant and will destroy the informant's future usefulness to Law Enforcement officials in detecting illegal narcotic activity.

## DESCRIPTION OF PLACE TO BE SEARCHED:

The premises located at 685 W. 6th Street, room #217 in the City and County of San Bernardino, State of California. The premises are more particularly described as the "Economy Inn" motel. The building is a two-story motel on the southeast corner of 6th Street and "G" Street. The building has an off-white stucco exterior with faded blue trim and a blue tile roof. There are rooms on the first and second floors, with the doors facing east and west. The room in question is #217. Room #217 is located on the second floor on the east side. The door faces east, is green in color and has the number "217" affixed to it. There is a sign in the parking lot of the location which states "Economy Inn". This sign is clearly visible from the street. The address, "685 W. 6th Street" is affixed to the window of the office located on the first floor, west side.

The premises located at 685 W. 6th Street, room #220 in the City and County of San Bernardino, State of California. The premises are more particularly described as the "Economy Inn" motel. The building is a two-story motel on the southeast corner of 6th Street and "G" Street. The building has an off-white stucco exterior with faded blue trim and a blue tile roof. There are rooms on the first and second floors, with the doors facing east and west. The room in question is #220. Room #220 is located on the second floor on the east side. The door faces east, is green in color and has the number "220" affixed to it. There is a sign in the parking lot of the location which states "Economy Inn". This sign is clearly visible from the street. The address, "685 W. 6th Street" is affixed to the window of the office located on the first floor, west side.

The search is also to be made of any storage sheds, storage areas or vehicles under direct control of the occupants to which persons in control of these premises may have access to and may be able to conceal items to be seized.

5

GOVT00031

IN THE SUPERIOR COURT, CENTRAL DIVISION

COUNTY OF SAN BERNARDINO, STATE OF CALIFORNIA

| | | |
|---|---|---|
| STATE OF CALIFORNIA | ) | AFFIDAVIT |
| | ) | IN SUPPORT OF    2009-08274 |
| COUNTY OF SAN BERNARDINO | ) | SEARCH WARRANT |

**DESCRIPTION OF PROPERTY TO BE SEIZED:**

Cocaine base, a controlled substance. Also to be searched for are any materials and paraphernalia used in the storage, packaging, weighing, processing, conversion or distribution of cocaine base. Also to be searched for are any papers or items showing illicit sales transactions, buyers lists, sellers lists, or records of such transactions involving the buying, transportation or selling of cocaine base. Furthermore, any items of personal property or papers tending to show occupancy, ownership or control of the premises/area/vehicles being searched. These include receipts, bills, keys, birth certificates, addressed mail, phone books, address books, bankbooks and any other papers showing occupancy or documents that tend to show narcotic transactions. Also to be searched for are any amounts of U.S. currency or other assets or items of value that can be shown to be the result of or involved in the trafficking of a controlled substance. Also recordings and notes of any incoming phone calls that might be related with the sales of a controlled substance or narcotic transactions. This includes monitoring incoming telephone calls, as well as incoming messages contained on electronic communication devices such as pagers or telephone answering machines that would constitute evidence of the commission or furtherance of a felony, specifically, the sales or possession for sale of controlled substances.

Computers, keyboards, central processing units, external drives and storage tapes, disks, terminals and/or video display units, other peripheral equipment such as, but not limited to printers, modems, computer software and manuals; electronic data storage devices such as address, memo, calendar and phone books.

It is further requested that a Forensic Technician, sworn or non-sworn, be granted authorization to examine, make duplicate images/copies of the above mentioned electronic media and to determine if evidence of the offenses enumerated above are contained therein. Therefore, authorization is requested to make images/copies of the actual pre-requested data. Evidence copies of the items relating to these offenses will be created and retained for further proceeding and made available to the authorities.

6

IN THE SUPERIOR COURT, CENTRAL DIVISION

COUNTY OF SAN BERNARDINO, STATE OF CALIFORNIA

| | | | |
|---|---|---|---|
| STATE OF CALIFORNIA | ) | AFFIDAVIT | |
| | ) | IN SUPPORT OF | 09-08274 |
| COUNTY OF SAN BERNARDINO | ) | SEARCH WARRANT | |

Page 7

## STATUTORY GROUNDS:

Your affiant states that the above property constitutes evidence which tends to show that a felony has been or is being committed in the City of San Bernardino and County of San Bernardino, State of California, or tends to show that a particular person has committed a felony; to wit, possession of illegal narcotics for sale.

And this complainant prays that a search warrant may be issued to search for the same, and that the same may be brought before a magistrate and disposed of according to law.

Subscribed and sworn to before me this ___|__|___ day of __MARCH__ , 2009.

Judge of the Superior Court
County of San Bernardino
State of California

IN THE SUPERIOR COURT DISTRICT

COUNTY OF SAN BERNARDINO, STATE OF CALIFORNIA

## RETURN TO SEARCH WARRANT

09-08274

The following personal property was taken from 685 W. 6th Street #220, City and County of San Bernardino, State of California, by virtue of a search warrant dated this 11th day of March, 2009, and executed by Judge SMITH of the Superior Court District, County of San Bernardino, State of California.

## ITEMS TAKEN:

1.   Located by Officer BEALL on a table along the west wall of the motel room was approximately thirty-five pieces of unpackaged suspected cocaine base.

2.   Located on a table along the west wall of the motel room by Officer BEALL was nineteen pieces of suspected cocaine base, all individually packaged in pieces consistent with $20 pieces of cocaine.

3.   Located on a table along the west wall of the motel room by Officer BEALL was a clear plastic bag that contained two larger, off-white pieces of a substance consistent with that of cocaine base.

4.   Located on the bed inside the motel room by SA KAIGHIN was a clear plastic bag with a white residue coating the interior, as well as numerous small pieces of what appeared to be suspected cocaine base.

5.   An operable black digital scale with a white residue (field test positive for cocaine) was located on the table along the west wall of the motel room by Officer BEALL.

6.   Located on top of the table along the west wall of room #220 by Officer BEALL was a room pass key (with the number "220" handwritten on it).

7.   Approximately $957.00 in U.S. currency consisting of one $100 bill, one $50 bill, twenty-one $20 bills, five $10 bills, forty-three $5 bills, three $2 bills and one hundred sixteen $1 bills was located on the nightstand in the southeast corner of the room by Officer BEALL. (this includes the $18.00 found in COLBERT's pocket, reference item #9)

8.   A box of clear plastic sandwich bags was located on the table along the west wall of room #220 by Officer BEALL.

9.   Approximately $18 of U.S. currency consisting of eighteen $1 bills located in the right front shirt pocket of CALVIN COLBERT by Officer BEALL.

10.   A razor blade with a white residue (field tested positive for cocaine) and numerous clear plastic baggies, all of which had a white residue on the interior, located on the table along the west wall of room #220 by Officer BEALL.

IN THE TRIAL COURT DISTRICT

COUNTY OF SAN BERNARDINO, STATE OF CALIFORNIA

**RETURN TO SEARCH WARRANT**

09-08274 /Page 2

11.    A polished metal with black handgrips "Ruger" MK2, .22 caliber, semi-automatic handgun (serial number 21489816) located in the top left dresser drawer along the north wall by Officer BEALL.

12.    Thirty-two live rounds of .22 caliber ammunition located in a plastic cup on the bed by SA KAIGHIN.

13.    A black leather men's wallet containing identification cards in the name of "CALVIN CHARLES COLBERT," DOB: 12/30/87, and "KEITH ROY ZEIGLER," DOB: 7/22/90, as well as miscellaneous ATM cards and a social security card in the name of "CALVIN CHARLES COLBERT" located on top of the dresser along the north wall by Officer BEALL.

14.    An operable cellular phone, blue and black in color, was located on top of the dresser along the north wall by Officer BEALL.

I, Officer BEALL, by whom this warrant was executed, do swear that the above inventory contains a true and detailed account of all the property taken by me under the warrant.

It is herein requested and authorized that property taken under this warrant, whose ownership is identified to this investigator, may be released to its owner, or disposed of according to law, at the discretion of the investigator, without further order from the court.

All of the property taken by virtue of said warrant will be retained in my custody subject to the order of this court or any other court in which the offense in respect to which the property was taken, is triable.

Subscribed and sworn to before me this

_____ day of _____, 2009.

_____

_____
Judge of the Superior Court
County of San Bernardino
State of California

POLICE DEPARTMENT  CA0__000                                                 09-08274

SAN BERNARDINO, CALIFORNIA                                                    PAGE 1

H&S 11351.5/11352/11370.1

STATE OF CALIFORNIA

## INVOLVED OFFICERS:

Detective ROEBUCK
Officer BEALL
Officer TAACK
Officer LANDEROS
Officer WHITE
Officer EVERETT
ATF S.A. KAIGHIN
ATF S.A. MICHALIK

## SUSPECT INFORMATION:

COLBERT, CALVIN CHARLES, JR.
MONIKER: "CAL"
DOB: 12/30/87
1155 E. Adams Blvd.
Los Angeles CA 90011

## ASSIGNMENT:

On Wednesday, 3/11/09, at approximately 0900 hours, members of the San Bernardino Police Department Narcotic's Unit held a briefing for a surveillance at 685 W. 6th Street in the downtown area of the City of San Bernardino.  This surveillance was being conducted based on observations I had made of apparent narcotic transactions the day before. Those observations were of a Black male identified to me by a CRI as "CAL" who was selling cocaine base.  Officers would attempt to locate the subject I had seen the day prior.  This subject was known as "CAL" and he was staying at the "Economy Inn" located at 685 W. 6th Street in the City of San Bernardino, possibly in room #217 or #220.

During the briefing, team members discussed all known and suspected hazards, as well as assignments.  The plan for the operation was to conduct surveillance and in the event "CAL" was seen to the front of the motel, Officer WHITE would work in an undercover capacity and attempt to purchase cocaine base from him. I would then author a search warrant for the room "CAL" was observed coming and going from.  The warrant would then be executed by the aforementioned officers.

The aforementioned officers then set up surveillance around the location.  I was parked in the "Greyhound" bus station parking lot directly west of the motel and had "point".  Other officers positioned themselves around the motel, with a view of both sides as well as the major traffic thoroughfares.

| BEALL/50524/JN | |
|---|---|
| REVIEWED BY:          DATE: | RECORDS USE ONLY : |

SBPD CR-2a

POLICE DEPARTMENT CA0___000                                     09-08274

SAN BERNARDINO, CALIFORNIA                                              PAGE 2

H&S 11351.5/11352/11370.1

STATE OF CALIFORNIA

## ARRIVAL:

On Wednesday, 3/11/09, at approximately 0915 hours, the above listed officers arrived at the location and set up surveillance around the "Economy Inn" motel.

On 3/11/09, at approximately 0930 hours, I was sitting in the parking lot of the "Greyhound" bus station, wearing plain clothes and in an unmarked vehicle. I began to observe numerous subjects walking up and down the street to the front of the motel and some were loitering in the parking lot. I observed a Black female walk into the motel and out of sight. Officer LANDEROS, who had a view of the east side of the motel, advised this Black female had gone to room #217. After she knocked on the door, a Black male fitting the description of "CAL," opened the door and they had a brief conversation. These two subjects then went from room #217 to room #220 where the CAL opened the door using a pass key, without knocking, and entered as if he resided in this room. Approximately one minute later, CAL exited room #220 and walked back to room #217, also opening the door with a pass key and without knocking. CAL then went into the room and closed the door. The unknown Black female was then observed to walk out of the motel, through the parking lot and around on to 6th Street, which borders the north side of the motel.

The Black female then stood at the north fence of the motel, which is on the south sidewalk of 6th Street, right below room #220. This Black female stood at the fence for a few moments and officers observed the CAL exit room #220, walk down the stairs and to the fence where the female was standing. CAL then appeared to hand the female an unknown object through the fence and the two of them had a brief conversation before the CAL went back up to his room.

At about 1000 hours, as I was parked in the "Greyhound" parking lot, one of the Black females (wearing a maroon track suit with white stripes on the shoulders) I had observed earlier loitering to the front of the "Economy Inn" approached me and attempted to sell me a cellular telephone for twenty dollars. I declined the purchase and asked this unknown Black female if she could obtain some cocaine base for me, to which she stated she could. I then advised this female I was waiting for a friend and if she did not mind, to wait in the parking lot until he got there, to which she agreed. A few minutes later, Officer WHITE arrived, wearing audio and video recording equipment and Officer WHITE struck up a conversation with the unknown Black female. This unknown Black female subsequently took Officer WHITE to the fence below room #220 of the "Economy Inn" where she yelled up to the room and made contact with the subject officers had been surveilling; CAL.

Officer WHITE gave the Black female a pre-recorded $20 bill (reference serial number EF85620576D). The Black female attempted to negotiate a purchase of cocaine base with the Black male known as "CAL" in room #220; however, he apparently became angry, looking at Officer WHITE stating he did not know this person. Officer WHITE was then told to step back and wait for a minute. Officer WHITE then walked to the corner of 6th and "G" Street where he stood by.

| BEALL/50524/JN | |
|---|---|
| REVIEWED BY:            DATE: | RECORDS USE ONLY |

SBPD CR-2a

POLICE DEPARTMENT  CA0  000

09-08274

SAN BERNARDINO, CALIFORNIA

PAGE 3

H&S 11351.5/11352/11370.1

STATE OF CALIFORNIA

A few moments later, a second unknown Black female (wearing a brown track suit) walked out of the motel, came up to Officer WHITE and asked who wanted the "dub." Officer WHITE advised he was the person who wanted the "dub" and he was then advised that "he" (referring to "CAL" in room #220) had given it to her. The unknown Black female told Officer WHITE to get the money back from the original unknown Black female who had taken him to the location. Officer WHITE then retrieved the $20 from the Black female, walked back to the second Black female and gave her the $20. This Black female then handed Officer WHITE two pre-packaged pieces of suspected cocaine base (later field tested positive, approximately 0.4 grams). The Black female then advised "CAL" was "cool," he just did not know who Officer WHITE was and it made him nervous about him coming to purchase cocaine from him. She also advised the male was her "nephew." The Black female stated "CAL" had sent her to Officer WHITE'S location with the "dope."

After the transaction was complete, Officer WHITE then gave the original Black female a $10 bill (reference serial number DJ01816340A) as payment for negotiating the narcotic transaction. This Black female then immediately headed back to the fence along the north side of the motel where Officer LANDEROS observed her to apparently purchase cocaine base from "CAL" utilizing the $10 bill.

Officer WHITE then returned to my vehicle and the two of us left the area. I then headed to the Narcotics Office where I authored a search warrant for room #220 and room #217.

The search warrant was subsequently signed by the Honorable Judge SMITH.

As I was en route to the location after having the search warrant signed, Officer LANDEROS, who was monitoring the location from his position of surveillance, advised he had observed the subject known as "CAL" moving personal items from room #217 to room #220. It appeared as if "CAL" was moving out of room #217. Officer LANDEROS based this opinion on the fact the cleaning crew came into room #217 after "CAL" moved his items and apparently cleaned/prepped the room for a new occupant.

At approximately 1200 hours, Detective ROEBUCK, Officer TAACK, Officer EVERETT, SA KAIGHIN, SA MICHALIK and I arrived at 685 W. 6th Street to execute the search warrant. As officers made their way along the rear balcony toward room #220, we passed by room #217, finding the front door wide open and the drapes on the front window open. It appeared as if the room had been vacated. Officers continued past this room to room #220.

On arrival, I knocked on the wall, stating in a loud and clear voice, "San Bernardino Police Department. We have a search warrant and demand entry." At this time, Officer TAACK utilized the ram to breach the door of the motel room. As I entered the room, I immediately came upon a Black male (later identified as CALVIN COLBERT) seated in a chair in the southwest corner of the room with a stack of money in front him, as well as

| BEALL/50524/JN | |
|---|---|
| REVIEWED BY:          DATE: | RECORDS USE ONLY |

SBPD CR-2a

POLICE DEPARTMENT  CA0000                          09-08274

SAN BERNARDINO, CALIFORNIA                                   PAGE 4

H&S 11351.5/11352/11370.1

STATE OF CALIFORNIA

money in his hands. It appeared as if COLBERT was counting this money. I immediately ordered COLBERT to the ground, to which he complied. Officers then cleared the room and found no one else inside.

Prior to searching his person, I asked COLBERT if he had any weapons and he stated, "Yes." I then asked COLBERT where the weapon was because I did not want to get injured and he stated, "It's over there," motioning with his head toward the dresser. I asked if he had a weapon on his person and he stated, "No. It's in the drawer." I then searched COLBERT'S person and found only $18 of U.S. currency in his left front shirt pocket. COLBERT was then handcuffed and seated on the balcony to the front of the motel room.

**SEARCH:**

During a search of COLBERT'S person, officers located approximately $18 of U.S. currency in his shirt pocket.

During a search of room #220, officers located approximately $957 of U.S. currency in denominations consistent with street-level narcotic sales, a loaded .22 caliber handgun and approximately 24 grams of suspected cocaine base, packaged for sales as well as in "bulk," apparently waiting to be broken down and packaged. Also located was a men's wallet with identification belonging to CALVIN COLBERT, was well as a second subject by the name of KEITH ROY ZEIGLER.

On the dresser along the north wall of the motel room, I located a blue and black "Samsung" cellular phone. Upon going through the text message inbox, I located numerous text messages apparently from a female by the name of "MONAE." Following along through the text messages, which were all dated with today's date (3/11/09), it appeared CALVIN COLBERT was having relationship problems with the female. I found one message dated 3/11/09, at 0714 hours from "MONAE," stating, "No U need that dope U be sale'n U don't need me."

Officers also located a box of clear sandwich bags, a digital scale and thirty-two live rounds of .22 caliber ammunition. This ammunition was found to "rim-fire" ammunition, consistent with the handgun found.

Officers searched room #217 and found no items of evidence in the room. This room had been vacated and cleaned.

**EVIDENCE:**

During a search of the involved party and location, team members located the following items of evidence:

1.      Located by me on a table along the west wall of the motel room was approximately thirty-five pieces of unpackaged suspected cocaine base.

| BEALL/50524/JN | |
|---|---|
| REVIEWED BY:          DATE: | RECORDS USE ONLY |

SBPD CR-2a

POLICE DEPARTMENT CA0_____000                                     09-08274

SAN BERNARDINO, CALIFORNIA                                              PAGE 5

H&S 11351.5/11352/11370.1

STATE OF CALIFORNIA

These pieces were all consistent in size with pieces I am familiar with as being sold as $20 pieces. I weighed the approximate thirty-five pieces and found them to weigh approximately 4.8 grams. These pieces of cocaine base were subsequently field tested with a positive result for cocaine. The suspected cocaine base was recovered, placed in an envelope and labeled with the letter "A."

2.    Located on a table along the west wall of the motel room by me was nineteen pieces of suspected cocaine base, all individually packaged in pieces consistent with $20 pieces of cocaine.

I weighed the suspected cocaine base and found it to weigh approximately 4.3 grams with packaging. The suspected cocaine base was field tested with a positive result for cocaine. The suspected cocaine base was recovered and secured in an envelope labeled with the letter "B."

3.    Located on a table along the west wall of the motel room by me was a clear plastic bag that contained two larger, off-white pieces of a substance consistent with that of cocaine base.

The suspected cocaine base was field tested with a positive result for cocaine. I later weighed the suspected cocaine base and found it to weigh approximately 15.2 grams with packaging. The suspected cocaine base was recovered and secured in an envelope labeled with the letter "C."

4.    Located on the bed inside the motel room by SA KAIGHIN was a clear plastic bag with a white residue coating the interior, as well as numerous small pieces of what appeared to be suspected cocaine base.

The suspected cocaine base was field tested with a positive result for cocaine. I later weighed the suspected cocaine base and found it to weight approximately 1.3 grams with packaging. The suspected cocaine base was recovered, placed in an envelope and labeled with the letter "D."

       *The aforementioned items (A, B, C and D) were all secured in one larger envelope and then given to SA KAIGHIN for future testing at the DEA Crime Lab.

5.    An operable black digital scale with a white residue (field test positive for cocaine) was located on the table along the west wall of the motel room by me.

6.    Located on top of the table along the west wall of room #220 by me was a room pass key (with the number "220" handwritten on it).

This room pass key was found to have a white residue consistent with cocaine base on one edge of it, as if someone had been using it to scrape/manipulate cocaine on the table.

| BEALL/50524/JN | |
| --- | --- |
| REVIEWED BY:          DATE: | RECORDS USE ONLY |

SBPD CR-2a

POLICE DEPARTMENT CA0___000                                 09-08274

SAN BERNARDINO, CALIFORNIA                                                    PAGE 6

H&S 11351.5/11352/11370.1

STATE OF CALIFORNIA

7.   Approximately $957.00 in U.S. currency consisting of one $100 bill, one $50 bill, twenty-one $20 bills, five $10 bills, forty-three $5 bills, three $2 bills and one hundred sixteen $1 bills was located on the nightstand in the southeast corner of the room by me. (See additional information heading for further information regarding the U.S. currency.)

8.   A box of clear plastic sandwich bags was located on the table along the west wall of room #220 by me.

9.   Approximately $18 of U.S. currency consisting of eighteen $1 bills located in the right front shirt pocket of CALVIN COLBERT by me.

10.  A razor blade with a white residue (field test positive for cocaine) and numerous clear plastic baggies, all of which had a white residue on the interior, located on the table along the west wall of room #220 by me.

11.  A polished metal with black handgrips "Ruger" MK2, .22 caliber, semi-automatic handgun (serial number 21489816) located in the top left dresser drawer along the north wall by me.

This handgun was found to be loaded with one live round in the chamber, as well as ten live rounds in the magazine which was inserted into the handgun.

12.  Thirty-two live rounds of .22 caliber ammunition located in a plastic cup on the bed by SA KAIGHIN.

13.  A black leather men's wallet containing identification cards in the name of "CALVIN CHARLES COLBERT," DOB: ____87, and "KEITH ROY ZEIGLER," DOB:____90, as well as miscellaneous ATM cards and a social security card in the name of "CALVIN CHARLES COLBERT" located on top of the dresser along the north wall by me.

14.  An operable cellular phone, blue and black in color, was located on top of the dresser along the north wall by me.

     *All of the aforementioned items of evidence were given to SA KAIGHIN for retention and possible federal prosecution.

**ADDITIONAL INFORMATION:**

| BEALL/50524/JN | |
|---|---|
| REVIEWED BY:          DATE: | RECORDS USE ONLY. |

SBPD CR-2a

POLICE DEPARTMENT CA01000 09-08274

SAN BERNARDINO, CALIFORNIA PAGE 7

H&S 11351.5/11352/11370.1

STATE OF CALIFORNIA

Thirty dollars of U.S. currency located among the bills recovered was found to be a $20 bill and a $10 bill of pre-recorded money used by Officer WHITE for the narcotic transaction. This money was photographed and returned to Officer WHITE/San Bernardino City funds.

Officers later went back to the downtown area surrounding the "Economy Inn" motel and attempted to search for the two Black females who had assisted in the narcotic transaction with Officer WHITE. Officers spent approximately two hours searching, however were unable to locate these two unknown Black females.

The video of the controlled buy performed by Officer WHITE was copied onto a DVD and provided to SA KAIGHIN.

## DISPOSITION OF SUSPECT:

CALVIN COLBERT was subsequently arrested and lodged at the Central Detention Center with a federal prosecution hold.

## RECOMMENDATIONS:

SBPD narcotic officers conducted a controlled buy of suspected cocaine base utilizing Officer ANTHONY WHITE in an undercover capacity. Officer WHITE was successful in purchasing $20 worth of cocaine base from a Black female who had obtained it from CALVIN COLBERT. This purchase was documented on video. Officers later executed a search warrant on the motel room of CALVIN COLBERT and located approximately 24 grams of suspected cocaine base, a loaded firearm and evidence of narcotic sales/packaging, as well as the pre-recorded San Bernardino City funds utilized by Officer WHITE.

I recommend the San Bernardino County District Attorney's Office proceed with charges of H&S 11351.5 (POSSESSION OF COCAINE BASE FOR SALES), H&S 11352 (SALES OF COCAINE BASE), and H&S 11370.1 (POSSESSION OF A FIREARM WHILE IN POSSESSION OF A CONTROLLED SUBSTANCE).

I also recommend the District Attorney's Office proceed with asset forfeiture of the $957.00 of U.S. currency located during a search of room #220 per H&S 11470.1.

| BEALL/50524/JN | |
| --- | --- |
| REVIEWED BY:          DATE: | RECORDS USE ONLY |

SBPD CR-2a

POLICE DEPARTMENT  CA0__000                              09-08274

SAN BERNARDINO, CALIFORNIA                                        PAGE 8

---

H&S 11351.5/11352/11370.1

STATE OF CALIFORNIA

---

## STATEMENT OF SUSPECT – CALVIN COLBERT:

I advised CALVIN COLBERT of his rights per a department issued Miranda card while at 685 W. 6th Street #220 at about 1218 hours.  I then asked COLBERT if he understood each of the rights as I had read them to him, to which he stated, "Yes."  I then began asking COLBERT questions, which he freely answered, showing me an implied waiver of his Miranda rights.  The following is a summary of my interview.

I asked COLBERT how much cocaine base officers would find in the room and he stated, "About an ounce, ounce and a half."  CALVIN COLBERT then paused for approximately ten seconds and stated, "Not even that. Maybe three quarters of an ounce."  I then asked COLBERT how much cocaine base he started with when he began selling today and he stated, "About two ounces."

I then advised COLBERT he had sold cocaine base to a police officer and he appeared to be thinking to himself for a moment and then stated, "Oh yeah.  Now I know what you're talking about."  COLBERT then stated, "I can take the charges, I'll do the time."

I asked COLBERT how much money officers would find in the room and he stated, "About a thousand."  I asked COLBERT if he had earned all of this money from selling cocaine base and he stated, "I don't sell cocaine, I just smoke."  I again advised COLBERT he had sold cocaine base to a police officer and he became uncooperative.

I then concluded my interview with COLBERT.

---

BEALL/50524/JN

REVIEWED BY:              DATE:              RECORDS USE ONLY

SBPD CR-2a



*U.S. v. CALVIN CHARLES COLBERT*
**CR 09-301-GW**

**Transcript**
*40:36 minutes video*

| | |
|---|---|
| Police Radio 1: | [unclear]...on the radio.  We got a black female with a purple running suit with a white stripe on the back.  [unclear]...pick me up and uh...[unclear]...  I got Tony coming over right now to act like he's getting off the bus.  We're gonna see if we can send her across the street to pick us something up.  So I'm going to be off the air but I will have my phone when she's close. |
| Police Radio 2: | And this is going to be like a controlled buy.  No one is going to be taken down.  We're gonna [write or right] paper after, correct? |
| Police Radio 1: | Yeah, affirmed.  Again, black female purple track suit with a big white stripe on it.  So you guys watch her once she makes contact and who's it with.  Alright, I'm off the air. |
| Police Radio 2: | [unclear]... does anybody have an eye on Jerry? |
| Police Radio 1: | Rich does. |
| Police Radio 2: | Beautiful, thank you. |
| Officer White: | Scottie, ready for me? |
| Police Radio UM: | Absolutely. |
| Officer White: | Alright, I'll be off the air on the Nextel. |
| Police Radio UM: | Black female, brown jacket going up to 220.  She knocks on the door, no one answers.  She's walking back towards the other one.  Knocks on 218...[unclear] southbound, along the... |

1

| | |
|---|---|
| Officer White: | [10-I?] |
| Officer White: | I'm in F & G now. F & 6th, westbound. |
| Officer White: | Alright, I'll be there in a sec. |
| Officer White: | Today's date is March 11, 10:10 hours. Tony White. I'm gonna do a controlled buy at the Econolodge. 6th & G. |
| Officer White: | Coming up on the apartments now. |
| Officer White: | Say again? Alright. |
| Officer White: | Damn, cuz. I was waiting for your ass over there, nigga. Whassup? |
| Officer Beall: | How the fuck you doing, man? |
| Officer White: | Whassup? |
| Officer Beall: | [Unclear]... drive your ass over here. What the fuck you walking for? Took you for ever. |
| Officer White: | Hey, who got the fire, man? |
| Officer Beall: | Hey... |
| Officer White: | Whassup girl? |
| Officer Beall: | [Unclear]... right here is gonna hook you up. |
| Officer White: | Whassup, you got the fire? |
| UF1: | Yeah, my homeboy got it. |
| Officer White: | Can I go whitcha'? |

2

UF1:    [Unclear]...somebody over there...[unclear]?

Officer Beall:    [Unclear]...

Officer White:    Oh yeah, we gotta get going.

Officer Beall:    I'll get some of that [unclear] girl.

UF1:    Alright.

Officer White:    Where is it at?  I thought it was around here.  I thought it was around here.

UF1:    [Unclear]...hold on.  Huh?  What's your name?

Officer White:    "T".

UF1:    "T".

Officer White:    Hmm mm.

UF1:    My uncle's name is "T."

Officer White:    Is that right?

UF1:    Yeah.

Officer White:    What's your boy name?

UF1:    Huh?

Officer White:    What's you boy name, here?

UF1:    Ahhh...[unclear].  You saw him around the corner?

Officer White:    Nah, I ain't seen nobody yet.  Here you go.

3

UF1:             Pull up to this car [?]...

Officer White:   A dub.

UF1:             A dub?

Officer White:   Yeah.

UF1:             You gotta pipe [?]

Officer White:   Nah...[unclear]...

UF1:             I got one.

Officer White:   You got one?

UF1:             Yup...[unclear]...

*UF talking to someone else*:   [Unclear].   Huh?   That one...[Unclear].   [Long
                 pause...]  He come right now.

Officer White:   Huh?

UF1:             [Unclear]... You taking the bus?

Officer White:   Yeah.

UF1:             [Unclear]...

Officer White:   Fifteen minutes?

UF1:             Oh, ten minutes?

Officer White:   Fifteen.

UF1:             Where you going?

Officer White:   Up north.

4

UF1:            Are you catching that bus?

Officer White:      Huh?  Nah, nah, I gotta catch this one.

*UF talking to UM1 on the stairwell*:   [Unclear]... right here.

UM1:            I don't know that dude.

UF1:            Hey, that was for me.  Hey...hey...hey... That's for me.

*UM2 at the corner*:        She be back [unclear]... money?

Officer White:      Yeah.

UM2:            She be right back.

Officer White:      She ain't gonna burn me is she?

UM2:            Nah... you could've went someplace else, though.

Officer White:      Yeah.

UM2:            You know what I'm saying.  You the one driving the car, right?

Officer White:      Nah, that's my homeboy in the car.

UM2:            You didn't see [unclear] in the back?

Officer White:      Huh?

UM2:            You didn't see [unclear] in the back?

Officer White:      Yeah, but old dude didn't want so serve me, though.

UM2:            Yeah.

Officer White:      I ain't trippin' - I just didn't trust homegirl.

5

UM2:  Us standing on this corner ain't cool, though.

Officer White:  It ain't cool?  I ain't from around here, man.  Poli?

UM2:  Yeah.

Officer White:  I ain't got nothing on me right now.

UM2:  Yeah.  At least you standing by the bus stop.

Officer White:  Yeah.  I just don't want homegirl to take off with my money.

UM2:  You gave it to her?

Officer White:  Yeah, nah, I gave it to her.

UM2:  Oh, the other girl [unclear]...

Officer White:  This, this chick right here.  She alright?

UM2:  Yeah, she alright.

Officer White:  She seem like, she kinda slow.

UM2:  I thought that was your young girl [?]

Officer White:  I could've went somewhere close - oh, there go the police right there.

UM2:  [Unclear]...

UF2:  [Unclear]...

Officer White:  Me.

UF2:  [Unclear]...

Officer White:  Yeah, she got my money.

6

UF2:             Go get your money from her.

Officer White:   Hey... Hey... Just give me my money, I'll go get it down there.

UF1:             But she's locked out.

UF2:             He gave it to me right here.

UF1:             Oh.

UF2:             Here. [Unclear] here.

UF1:             I'm sorry.

Officer White:   That's alright.

UF1:             Huh?

Officer White:   That's alright, homegirl.  Alright, homeboy.

UF1:             I'm so sorry.

Officer White:   Why was he tripping?

UF1:             Because he acting stupid.  He was like, "who was that?" [Unclear]... is for me.  I said, "It's for me."  And he was like, "oh."  And then he decided to give it to me.  Cuz he's stupid... That's fire, too.

Officer White:   Hmm?

UF1:             That's fire.

Officer White:   Is it?

UF1:             [Unclear]...You gonna go back for seconds, watch.

Officer White:   Is that right?

UF1:                I'm telling you, it's fire. [Unclear]... it's fire.

UF2:                You straight over here?


Officer White:     Yeah, I'm straight.  I appreciate it, lady.

UF2:                [Unclear]... couldn't resist.

Officer White:     Yeah, I know... I ain't trippin.

UF2:                You know him?

Officer White:     Nah, I don't know him.  That's why...

UF2:                He's my nephew.  [Unclear]...I look and I seen you up here. I said [unclear]...go down there...

Officer White:     Yeah.

UF2:                [Unclear] crack... [unclear] smoke it all up...

Officer White:     I ain't trippin'.  Appreciate it though.

UF2:                You guys be careful.

UF1:                Thank you.

Officer White:     Alright.

UF1:                I'm so sorry about that.

Officer White:     That's alright.  That's alright.

UF1:                Please don't be mad at me.

Officer White:     Huh?

| | |
|---|---|
| UF1: | Don't be mad at me. |
| Officer White: | I ain't mad at you.  Here, here, homey... |
| UF1: | Well, thank you. |
| Officer White: | Alright. |
| Officer Beall: | What the fuck took so long, man? |
| Officer White: | Man... |
| UF1: | Because they was trippin' on him. |
| Officer Beall: | Hey, my old lady is calling and freakin' out... |
| Officer White: | Hold up, hold up... |
| Officer Beall: | Here, here, just... |
| Officer White: | I gave her some money. |
| Officer Beall: | Alright, hey, I gotta go.  My old lady is calling... |
| UF1: | [Unclear]... |
| Officer White: | Huh... |
| Officer Beall: | He took care of you? |
| Officer White: | I gave you a dub - I mean, that's a dime. |
| UF1: | [Unclear]... |
| Officer White: | Go get you one.  Yeah, go get you one.  I just gave you a dime. |
| Officer Beall: | Fucking beautiful. |

9

| | |
|---|---|
| Officer White: | It was him. He gave it to the chick. And the chick gave it to me and she said that he gave it to her. I just hope I got it on video. |
| Officer Beall: | It... fuck...we got a [unclear] - it don't matter. |
| Officer White: | No, yeah, but all the conversation and shit. |
| Officer Beall: | [Unclear] would be nice. 11-3-52 be nice, too. But... |
| Officer White: | Yeah. |
| Officer Beall: | Are you off? |
| Officer White: | Yeah. |
| Officer Beall: | That chick is fucking 'tarded, ay? |
| Officer White: | Yeah, she was. I need to go down to my car, though. |
| Officer Beall: | Alright... Chewy [?] is gonna hold point. We're gonna head back to the barn. Where's your car at? |
| Officer White: | Right down there on 6th Street. |
| Officer White: | Yeah, she's fucking seriously retarded. She said, "Go go go go. He don't wanna serve." He came down and he looked. He said, "I don't know that dude." And she said, "Go away go away go away." Alright. I was trying to get the camera focused so I can see him. And I walked back. And uh, I waited on the corner. The dude on the corner told me, "Hey man, you can get it closer than that dude, right there. It's closer than that. You don't have to go all the way over there." So...ok. So he was helping me watch for the police - then the lady came down and she said, "Whatcha looking for, a dub?" I said yeah. I said yeah. She said, "I got it right here. He gave it to me." I said, "Oh, okay." She said, "Go get your money from her. He gave it to me already." Then when I went to go get the money, he said that I gave it to her. He said it. I heard her. I heard him say it. "I gave it to her." |

So, and then she came, she handed it to me, and she said, "Oh, he cool, that's my nephew. He cool." I said, "Alright."

Officer Beall: She said that about the guy in the room?

Officer White: Yeah.

Officer Beall: Where at?

Officer White: Go up to 6th, turn right.

Officer Beall: Alright, I'll have you help me spew some of that shit out to write my affidavit.

Officer White: Ok.

Officer Beall: I got everything up to that point pretty much already scratched down. Just right there clear me up. As far as I'm concerned, he fucking' threw at you from the fucking room upstairs.

Officer White: We got his room pinned down and all that shit.

Officer Beall: Yeah, we got two.

Officer White: Alright. I'm a leave this here.

Officer Beall: Alright.

Officer White: Alright, I'm back up. I'm gonna be heading to the barn with Jerry[?].

Police Radio UM: [Unclear]...

Officer White: She was seriously [tired or 'tarded]. I think I coulda' did that wearing a uniform.

Police Radio UM: You know what's funny but [unclear] her rock. She can't find it she's looking for it on the northside - on the ground.

11

Officer White:          Was she... she went and bought her a dime?

Police Radio UM:   Yeah, he threw it at her and she can't find it.  She's all looking for it.

Police Radio UM:   She's gonna start licking that sidewalk if she doesn't find it soon.

Police Radio UM:   [Unclear]... back at 220 now.

Officer White:          Same guy with the white jacket and short Afro?

Police Radio UM:   Yup...[unclear]...

Police Radio UM:   I bet you you're wrong.  I bet you the dope's in 220, the money is in his pocket and he's staying in the other one.

Police Radio UM:   [Unclear]... the door is wide open.  They're all wide open.  I'm wondering if someone is inside there?

Police Radio UM [Chewy?]:      Alright.  He's moving out of the primary room.  He's got his clothes in a bag - going over to the other room, 220.

Police Radio UM:   [Unclear]... Chewy?

Police Radio UM [Chewy?]:      Yeah, he just took about 4 bags out of the primary room and put'em inside the other room.

Officer White:          You hear that Jerry?

Police Radio UM [Jerry?]:      [Unclear]... what was that?  What was that [unclear]?

Police Radio UM:   He said your primary is moving clothing and bags from 217 into 220.

Police Radio UM [Jerry?]:      Ok, just keep an eye on him, Chewy.  Make sure he goes no further than that.

12

Officer White:          Where is the dope?

Officer White:          I made contact with a Black female at the bus stop.  Negotiated
the purchase of 20 dollars of cocaine.  She said she would go and
get it at the Economy Inn on 6th & "G" George.  I asked if I could
go with her and she said yeah.  We walked around to the north
side of the fence.  She walked into the vacant lot just east of and
made contact with a black male wearing a white jacket.  Medium
dark complexion.  Appeared to be about 5'8, maybe 160, 165.
Short Afro.  He came after she told him that she needed a dub.
She came at the edge of the stairwell, looked at me and said I
don't know him.  She then told me to walk down the street.  I then
walked west, stayed at intersection of 6th and "G" George and she
continued to, what appeared to be, negotiate the transaction with
the subject  who was standing on the stairway.  Moments later a
second black male, excuse me, second black female, older,
appeared from the westside of the motel and approached me.  She
contacted me and said who wanted the dub.  I told her it was me.
She then said that she had it - that "he gave it to her."  She told
me to go get my money from the first female.  I then walked
midway between the intersection and the vacant lot where the
female was and told her that the other female had gotten the dope
and that I needed the 20 dollars back.  She gave me the 20 dollars,
I gave it to the second black female, who handed me two pre-
packaged baggies of suspected cocaine base.  She said that he was
cool.  That he just didn't know me and that he was her nephew.
She also stated that he had sent her down with the dope.  After the
transaction was complete, the second black female walked away
westbound on 6th Street and the first black female accompanied
me across the street to the Greyhound where we met with Officer
Beall.  The first black female asked me if I was going to give her
one of the rocks of cocaine and I gave her a ten dollar bill instead.
She then immediately walked back to the area of the vacant lot
just east of the motel and conducted what appeared to be a second
transaction with the black male subject.

                    **Officer White plays above-recording**

13

Officer Beall:        You gave her [unclear]?

Officer White:        Uh, yeah.  Which point?

Officer Beall:        [Unclear]... started walking off with [unclear].

Officer White:        [Talking on his recording machine]...

UNK Officer:          Good job you two [unclear]...

Officer White:        It worked out alright.  Let's see, let's see.

UNK Officer:          I wondered what happened when your buddy...?  What happened
                      when the first time he walked away?  He came down...

Officer White:        He came down...

UNK Officer:          Was he bitter?

Officer White:        Yeah, he was bitter.  He came down, he looked at me, he stared
                      at me for a little while and said, "I don't know him.  I don't know
                      him."  So I walked away.

UNK Officer:          Ok, we're at the point where you gave her 20 bucks and she walks
                      you over to the fence, below Room 217.  And she yells out to the
                      guy in the room.

          **Officer White, UNK Officer and Female Typist begin listening to White's
                      previous recording**

UNK Officer:          Can you fill her in on that part from there?

Officer White:        Hmm mm.

UNK Officer:          [Unclear]... little part there in the end.  I'll start up the search
                      warrants.

Officer White:        Where are you at now?

                                        14

| | |
|---|---|
| Female Typist: | [Unclear]... |
| Officer White: | That's where I'm at, right there.  You know how to work this thing?  No? |
| Female Typist: | What is it? |
| Officer White: | This is where, this is where you are at, right here. |
| Female Typist: | [Unclear]... you want me to take that out, or...? |
| Officer White: | Ummm, [unclear] that's cool.  To the room... to a Black male wearing a white jacket... |
| Female Typist: | Is that the [unclear]...? |
| Officer White: | Hmm mm.  She, she told, oh, she told him that she needed a dub. He then...  [Listening to recording]... |
| Female Typist: | [Unclear]...? |
| Officer White: | Oh my God, you type fast.  And then, the female told me to walk down the street.  I walked to the southwest corner of 6th and "G". [Listening to recording]... uh, older female. |

End - Duration:  40:36 minutes

15

**U.S. v. Calvin Charles Colbert**
**CR 09-301-GW**

**Transcript**
*05:23 minutes video*

***Officer White and Female Typist listen to recording:*** *She then said that she had it - that "he gave it to her." She told me to go get my money from the first female. I then walked midway between the intersection and the vacant lot where the female was...*

Officer White:  You know what, I didn't put the [unclear]...

Female Typist:  The first female or...?

Officer White:  Yeah. From the place where we first did it, so, wherever you did - however you described it the first time. Where we ended up.

Female Typist:  [Unclear]... on my desk. Uhmm, huh?

Officer White:  Wherever you described - how did you describe where I was the first time? Midway between the intersection and under the stairwell. Or something like that.

Female Typist:  Where do you want that? "Walk midway between the intersection..."

Officer White:  Or you could just say walk back to... original location.

[Recording]:  *and told her that the other female had gotten the dope and that I needed the 20 dollars back. She gave me the 20 dollars, I gave it to the second black female, who handed me two pre-packaged baggies of suspected cocaine base. She said that he was cool.*

Female Typist:  You or the...?

1

Officer White:        The...

Female Typist:        The first, ok.

Officer White:        He was cool but he just didn't know you.

*[Recording]:*        *and that he was her nephew. She also stated that he had sent her down with the dope.*

Officer White:        Sent her down with the dope [unclear]...

Female Typist:        How about [unclear]...?

Officer White:        Ok.

*[Recording]:*        *After the transaction was complete, the second black female walked away westbound on 6th Street and the first black female accompanied me across the street to the Greyhound where we met with Officer Beall. The first black female asked me if I was going to give her one of the rock of cocaine and I gave her a ten dollar bill instead. She then immediately walked back to the area of the vacant lot just east of the motel and conducted what appeared to be a second transaction with the black male subject.*

Officer White:        That's all I got.

Female Typist:        Ok.

Officer White:        Thank you, ma'am.  Ok, I'm done with my piece, Jerry.

UNK Officer [Jerry?]:      [Unclear]...that should, uh...

Officer White:        [Unclear]... two out there... probably go...

UNK Officer [Jerry?]:  Good job, though.

| | |
|---|---|
| Officer White: | Thank you, sir. |
| UNK Officer: | Who is this McNally? |
| Female Typist: | That's the D.A. that's got the Delgado case.  And, he never calls back, so what I do is just say, this is what we're going to do.  If you have any concerns or problems, call me. |
| Officer White: | If we find stupid out there... |
| Female Typist: | And I left a message for [unclear]... |
| Officer White: | ...unless we wanna use stupid for... |
| UNK Officer: | [Unclear]...in this case...  I gotcha. |

End - Duration:  05:23 minutes

### U.S. v. CALVIN CHARLES COLBERT
### CR 09-301-GW

**Transcript**
**01:30 minutes video**

| | |
|---|---|
| UM1: | We got [unclear] for his report he can say recommend filing of... on this bitch. |
| Officer White: | Because, I mean, we can use her again.  She's stupid enough that she... |
| UM1: | Yeah, instead of burdening her, she can get you another rock later today.  We can do it again. |
| UF [Typist?]: | 'Cuz she'll forget who you are by the afternoon. |
| UM1: | No, she'll remember [unclear]... |
| Officer White: | I gave her money.  I was giving her, yeah, I was giving her $10 dollars and she wasn't even looking at the $10 dollars.  She said, "Just give me a piece of rock."  That's all she wanted.  She just zero'd in on the rock.  Like, "Here, I got some money for you. Money, money, money, money, money." |
| UM1: | Get your own rock. |
| Officer White: | You can go buy your rock. |
| UM1: | This shit's mine. |
| Officer White: | Yeah.  "You gonna give me a piece - just a little piece?" |
| UM1: | You're not suiting up, right? |
| Officer White: | No. |

1

| | |
|---|---|
| UM: | Ok. |
| UM2: | Was she the one that Chewy said, when we were leaving, she was scrambling around trying to [unclear]....? |
| Officer White: | Yeah, she went and bought her a rock. |
| UM1: | He threw her... or she the threw him the crumbled up ten and then he fuckin' tossed out her rock to her and... |
| Officer White: | You know what... |
| UM1: | [Unclear]...whoo hoo! |
| Officer White: | That ten is probably going to be... |
| UM2: | That ten is photocopied, too, right. |
| Officer White: | Yeah, I think so |
| UM1: | She went straight to the ground [unclear]... |
| UM2: | I told Chewy she's gonna crack her head [unclear]... |
| Officer White: | She's gonna - yeah... She's gonna be in there... She's gonna be still there looking for her rock. |
| UM1: | She's sniffing it out like a bloodhound. |
| Officer White: | I doubt very seriously if I got him on video 'cuz he was up on the stairs. And I was trying to lean back. |
| UM2: | Oh, you were wired? |
| Officer White: | Yeah. So, we'll see. |
| UM2: | Jerry, may I help you with anything? |

2

UM1:      Ah, I don't think so, brother.  I got the, uh...

End - Duration:  01:30 minutes

DARY SEAM MONTOYA

## REGISTRATION A37N3591

ROOM NO. _220_

### NO REFUNDS
### ADVANCE PAYMENT REQUESTED

IN                                          OUT

RATE: _____

DATE IN: _3-10-09_

DATE OUT: _____

NOTICE TO GUESTS: _Feb 3-19-68_
This property is privately owned and the management reserves the right to refuse service to anyone, and will not be responsible for accidents or injury to guests or for the loss of money, jewelry or valuables of any kind. By signing this contract, I abide to the rules set by management to not to coduct any illegal or unlawful activities on premises. Also declare that the accompanied guest is my Spouse or Boyfriend/Girlfriend or as stated.

NAME: _Marine M Ashil_

STREET: _7012 Victoria Ave. 21C_

For your protection please give full address

CITY: _Highland_    STATE: _CA_    ZIP: _92346_

CAR LICENSE: _V3620937_    STATE: ___    ZIP: ___

DRIVERS LICENSE: ___    STATE: ___    ZIP: ___

MAKE OF CAR: ___    NUMBER OF PERSONS: _6_

SIGNATURE _____

| | SUN | | | | |
|---|---|---|---|---|---|
| MON | | | | | |
| TUE | | | | | |
| WED | | | | | |
| THUR | | | | | |
| FRI | | | | | |
| SAT | | | | | |

Rate $ _____

Tax _____

TOTAL DAYS    Total _____

AMTEX, CA 1-800-650-3360

NAME: DOMINE DESHAWN MOORE
ROOM

---

RS

## REGISTRATION

ROOM NO. _217_

### NO REFUNDS
### ADVANCE PAYMENT REQUESTED

IN                                          OUT

RATE: _____

DATE IN: _3-9-09_

DATE OUT: _____

NOTICE TO GUESTS: _Dec 12-36-54_
This property is privately owned and the management reserves the right to refuse service to anyone, and will not be responsible for accidents or injury to guests or for the loss of money, jewelry or valuables of any kind. By signing this contract, I abide to the rules set by management to not to coduct any illegal or unlawful activities on premises. Also declare that the accompanied guest is my Spouse or Boyfriend/Girlfriend or as stated.

NAME: _Calvin Culbert JR_

STREET: _1155 E Adams Blvd_

For your protection please give full address

CITY: _Los Angeles_    STATE: _CA_    ZIP: _90011_

CAR LICENSE: ___    STATE: ___    ZIP: ___

DRIVERS LICENSE: _D9778543_    STATE: _CA_    ZIP: ___

MAKE OF CAR: ___    NUMBER OF PERSONS: _1_

SIGNATURE _____

| | SUN | | | | |
|---|---|---|---|---|---|
| MON | | | | | |
| TUE | | | | | |
| WED | | | | | |
| THUR | | | | | |
| FRI | | | | | |
| SAT | | | | | |

Rate $ _____

Tax _____

TOTAL DAYS    Total _____

AMTEX, CA 1-800-650-3360

NAME: CLYDE CHARLES CULBERT
ROOM

GOVT000014



## PROOF OF SERVICE

I, the undersigned, declare that I am a resident or employed in Los Angeles County, California; that my business address is the Office of the Federal Public Defender, 321 East 2nd Street, Los Angeles, California 90012-4202; that I am over the age of eighteen years; that I am not a party to the above-entitled action; that I am employed by the Federal Public Defender for the Central District of California, who is a member of the Bar of the United States District Court for the Central District of California, and at whose direction I served the Notice of Motion; Motion to Suppress Evidence; Memorandum of Points and Authorities; Declaration; Exhibits.

On October ___, 2009, following ordinary business practice, service was:

[x] Placed in a closed envelope, for collection and hand-delivery by our internal staff, addressed as follows:

[ ] By hand-delivery addressed as follows:

[ ] Placed in a sealed envelope for collection and mailing via United States Mail, addressed as follows:

[ ] By facsimile as follows:

[ ] By e-mail as follows:

Jerry Yang
Assistant United States Attorney
United States Court House
312 North Spring Street, Suite 1200
Los Angeles, California 90012

This proof of service is executed at Los Angeles, California, on October 28, 2009.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_Lynn Evangelista_
Lynn Evangelista