GEORGE S. CARDONA
Acting United States Attorney
CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division
JERRY C. YANG
Assistant United States Attorney
California Bar Number 241323
General Crimes Section
     1200 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone:  (213) 894-2690
     Facsimile:  (213) 894-0141
     E-mail: jerry.yang@usdoj.gov

Attorneys for UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CR No. 09-901-GW |
| | ) |
| Plaintiff, | ) OPPOSITION TO DEFENDANT CALVIN |
| | ) COLBERT'S MOTION TO SUPPRESS |
| v. | ) EVIDENCE; DECLARATION OF |
| | ) OFFICER GERALD BEALL |
| CALVIN COLBERT, | ) |
| | ) Hearing |
| Defendant. | ) Date:  November 23, 2009 |
| | ) Time:  8:00 a.m. |
| | ) |
| | ) |
| | ) |

     Plaintiff United States of America, by and through its
attorney of record, Assistant United States Attorney Jerry C.
Yang, hereby submits the attached Opposition to Defendant Calvin
Colbert's Motion to Suppress Evidence.

     This opposition is based on the attached memorandum of
points and authorities, the files and records in this case, the

Declaration of Officer Gerald Beall, and whatever argument or evidence this Court may consider.

DATED: November 9, 2009

Respectfully submitted,

GEORGE S. CARDONA
Acting United States Attorney

CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division


_/s/_____
JERRY C. YANG
Assistant United States Attorney
Attorneys for Plaintiff
United States of America

ii

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

On March 10, 2009, after receiving a tip from a confidential informant, San Bernardino Police Officer Gerald Beall observed defendant Calvin Colbert conduct what appeared, based on Officer Beall's training and experience, to be a hand-to-hand drug transaction at the parking lot of the Economy Inn motel in San Bernardino.  Affidavit of Gerald Beall in Support of Search Warrant No. 2009-08274 ("Beall Aff.") attached as Exhibit A to defendant's Motion to Suppress Evidence, p. 2.  On March 11, 2009, agents and officers from the Alcohol Tobacco and Firearms and San Bernardino Police Department (collectively, "agents") observed defendant use two females as "runners" to sell crack cocaine out of Economy Inn motel rooms 217 and 220 (respectively, "Room 217" and "Room 220").  Id.  After undercover officer Tony White purchased $20 worth of crack cocaine from defendant, agents obtained a state search warrant to enter the room.  Declaration of Gerald Beall ("Beall Decl."), ¶ 6.  When agents entered the room to execute the search warrant, they found defendant in the act of counting his money while sitting at a table with a pile of 87.7 grams of crack cocaine in little baggies in front of him.

Agents immediately detained defendant.  Id. at 12.  In the interest of agents' and defendant's safety, Officer White asked defendant if there were any weapons in the room.  Id. at 13.  Defendant responded that he had a gun and motioned towards a dresser near the entrance of the room.  Id.  Agents recovered a loaded .22 caliber Ruger semi-automatic firearm from the dresser

1

and 32 rounds of live ammunition near the bed.  <u>Id.</u> at  14.

For these actions, defendant was indicted on March 27, 2009 for violating 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(iii): Possession With Intent to Distribute Cocaine Base in the Form of Crack Cocaine and 18 U.S.C. § 924(c)(1): Possession of Firearm in Furtherance of a Drug Trafficking Crime.  On October 28, 2009, defendant filed a Motion to Suppress Evidence recovered pursuant to the search warrant.  Defendant argues the search warrant was defective because it: 1) lacked probable cause; and 2) contained false statements and material omissions.  Defendant also argues that the statements he made about the gun should be suppressed because he was not <u>Mirandized</u>.  Defendant's arguments have no merit.

There was more than sufficient probable cause to issue the search warrant.  An informant told agents that defendant was selling crack cocaine out of an Economy Inn motel room.  Acting on this tip, agents actually observed defendant engage in what appeared to be a narcotics sale.  The very next morning, defendant, using two females as "runners," sold $20 of crack cocaine to undercover Officer White at the Economy Inn.  There was sufficient probable cause for a search warrant to be issued to search Rooms 217 and 220.

Moreover, a <u>Franks</u> hearing is not warranted because the affidavit supporting the search warrant did not contain any intentional mischaracterizations or reckless disregard for the truth.  The informant's tip was at most a small fraction, if any, of the basis for probable cause and unnecessary to establish sufficient probable cause.  If anything, the tip initiated the

2

agents' independent investigation, which culminated in a successful purchase of $20 of crack cocaine from defendant. Moreover, the Beall Affidavit did not mislead the Superior Court judge because the agents did not know defendant's <u>exact</u> height and the fact Room 220 was not registered to defendant, until after defendant was arrested.

Finally, defendant's statements about the location of the firearm should not be suppressed because of the public safety exception to <u>Miranda</u>.  Prior to having an opportunity to search the entire room for possible weapons, in the interest of safety, agents asked defendant the narrow question of whether he had a weapon.  Subsequently, agents found a loaded .22 caliber Ruger MK2 semi-automatic handgun in the dresser and 32 rounds of ammunition in a cup by the bed.

Accordingly, the Court should deny defendant's motion to suppress.

**II.  STATEMENT OF FACTS**

On March 10, 2009, a confidential informant reported to San Bernardino Police Officer Gerald Beall that a black male in his mid-late 20's, known as "Cal," was staying at the Economy Inn motel in downtown San Bernardino and selling cocaine base in the form of crack cocaine.  Beall Aff., p. 2.  The informant described "Cal" as approximately 5'10" tall, with medium complexion and average build.  <u>Id.</u>

Officer Beall drove to the Economy Inn with the informant. <u>Id.</u> at 3.  The informant pointed to a person in the parking lot and identified this person as "Cal," later identified as defendant.  <u>Id.</u>  Officer Beall surveilled defendant.  After

3

approximately five minutes, Officer Beall observed defendant hand a small item from his pocket to a black male on a bicycle.  Id. The black male on the bicycle handed defendant a small object in return.  Id.  Based on Officer Beall's training and experience, he found this action consistent with a hand to hand narcotics transaction.  Id.

A short while later, Officer Beall returned to the Economy Inn with additional agents and Officer Tony White, who would act as an undercover officer in order to purchase crack cocaine from defendant.  Id.  Over the next two hours, agents saw numerous individuals go to Room 217, knock on the door and receive no response.  Id.  During that two hours, Officers attempted to purchase crack cocaine from defendant, but were unsuccessful. Id.

The very next morning, agents returned to the Economy Inn. Id.  They positioned themselves on the east and west sides of the rooms.  Minutes later, defendant arrived and opened the door to Room 217.  Id.  Agents observed defendant briefly talk to a black female.  Id.  Defendant and the black female then went inside to Room 220, where defendant entered the room with a key card without knocking.  Id.  Approximately one minute later, defendant came out of Room 220, and went into Room 217, also using a key card without knocking.  Id.  The black female came out of Room 220 and stood near the Sixth Street, which borders the motel. Id.

A few minutes later, defendant came out of Room 217, walked over to the black female, and handed her an unknown object through the fence.  Id.  They had a brief conversation.  Id.  As

4

they were talking, a marked San Bernardino Police patrol car drove by. Id. When defendant noticed the patrol car, he immediately turned around and walked back into Room 217 and closed the door. Id.

At approximately 10:00 a.m., undercover Officer Beall was approached by one of the black females as he was parked near the motel. Id. at 4. The black female asked Officer Beall if he wanted to purchase a cellular phone for $20. Id. Officer Beall responded, "no," but that he was waiting for a friend and they would like to purchase some crack cocaine. Id. The black female said she could obtain crack cocaine. Id.

A short while later, Officer White, who was also operating undercover and wearing audio and video recording equipment, arrived. Id. He gave the black female $20 and requested to purchase crack cocaine. The black female took Officer White to the fence below Room 217. Id. The black female yelled up to Room 217 to defendant. Officer White observed defendant was wearing a white jacket, had medium complexion, and appeared to be approximately 5'8" tall, 170 pounds, and had a short, "Afro"-style hair. Id. Officer White also observed the black female tell defendant that she needed a "dub." Id. He came to the edge of the stairwell, looked at Officer White, and responded, "I don't know him." Id. The black female told Officer White to walk down the street to the corner of Sixth Street and G Street. Id.

As the black female continued to negotiate the transaction with defendant, a second black female approached Officer White. Id. She asked Officer White who wanted the "dub." Id. Officer

White responded that he wanted the "dub." Id. The second black
female said she had it, and that "he" gave it to her. Id. She
instructed Officer White to get his money from the first black
female. Id. Officer White walked back towards the first black
female and told her the second black female had gotten the "dope"
and that he needed the $20 back. Id.

The first black female returned the $20 to Officer White.
Id. Officer White handed the money to the second black female.
The second black female handed Officer White two prepackaged
baggies of suspected crack cocaine. Id. The second black female
explained to Officer White that defendant was "cool," and that he
just did not know Officer White. Id. She also stated that the
black male [appearing to refer to defendant] was her nephew and
that he had sent her to Officer White with the "dope." Id.

Both of the black females accompanied Officer White across
the street. Id. The first black female asked if Officer White
was going to give her one of the rocks of crack cocaine. Id. In
response, Officer White gave her a $10 bill. Id. The first
black female walked back across the street and conducted what
appeared to be a second transaction with defendant. Id. at 4-5.
Specifically, defendant threw a small object, consistent with the
size of a baggie of crack cocaine, to her from the second floor
near his room. Beall Decl., 9. She searched the nearby bush
for several minutes for the object. Id.

Based on these observations, Officers White and Beall
proceeded to get a search warrant. Beall Decl., 7. However,
unbeknownst to them, they neglected to turn Officer White's video
and audio recording device off. Id. at 8. As a result, their

6

discussion of the contents of the affidavit and what they both
observed were recorded.  Id.  The affiant, Officer Beall, was
aware of all of the events leading up to the sale.  Id. at  9.
However, he did not personally observe the second black female
actually hand over the crack cocaine to Officer White.  Id.  As
far as Officer Beall could tell, defendant "threw at you from the
[expletive] room upstairs," just as he threw the crack cocaine to
the first black female.  Id.  Therefore, he needed Officer White
to clarify that portion of the affidavit.  Id.

     A few hours later, based on his affidavit setting forth the
above-facts, Officer Beall obtained a search warrant signed by
the Honorable Michael A. Smith of the San Bernardino County
Superior Court.  Id. at  10.  While Officer Beall was coming back
to the Economy Inn with the search warrant, agents observed
defendant move personal items from Room 217 into Room 220.  Id.
at  11.  Agents also observed a cleaning crew clean Room 217
after defendant moved his belongings into Room 220.  Id.

     Around noon, agents began to execute the warrant.  Id. at
12.  As they passed Room 217, they could see that the door to
Room 217 was wide open and the drapes on the window were tied
back, indicating that the room was vacated.  Id.  Based on this
observation, agents skipped Room 217 and moved towards Room 220.
Id.

     Upon arriving at Room 220, Officer Beall knocked on the wall
and announced, "San Bernardino Police Department.  We have a
search warrant and demand entry."  Id.  Another agent then
breached the door.  Id.  Defendant was sitting in a chair with a
stack of money in front of him and in his hands and appeared to

7

be in the middle of counting the money. <u>Id.</u> In addition, there was a pile of individual baggies of crack cocaine on the table in front of him. <u>Id.</u>

Officer Beall immediately ordered defendant to the ground, to which he complied. <u>Id.</u> at 13. The agents cleared the room to ensure that no one else was inside Room 220. <u>Id.</u> Prior to searching defendant, Officer Beall asked if he had any weapons, and he responded, "yes." <u>Id.</u> Officer Beall asked where the weapon was because he did not want to get injured. <u>Id.</u> Defendant motioned towards the dresser and said, "it's over there." <u>Id.</u> Officer Beall asked defendant whether he had any weapons on his person, and defendant responded, "no, it's in the drawer." <u>Id.</u>

Agents recovered a .22 caliber Ruger MK2 semi-automatic handgun with a loaded magazine and one round chambered in the dresser next to the entrance of the room. <u>Id.</u> at 14. Agents searched defendant and found no weapons. <u>Id.</u> They also found 32 rounds of ammunition for the handgun in a cup next to the bed, a box of sandwich bags, a digital scale, and $957 in cash. <u>Id.</u> After defendant was arrested, agents obtained the receipts of Rooms 217 and 220 from the Economy Inn manager. <u>Id.</u> at 15.

**III. ARGUMENT**

    A. <u>There Was Sufficient Probable Cause</u>

        **1. Generally**

Key to proper analysis of the search at issue, but ignored by defendant, is the "great deference" that this Court must afford to the magistrate judge's finding that the Affidavit established probable cause to search the Residence. <u>Illinois v.</u>

1  *Gates*, 462 U.S. 213, 236 (1983); <u>United States v. Clark</u>, 31 F.3d

2  831, 834 (9th Cir. 1994) (a "judge's finding of probable cause is

3  entitled to great deference").  The Supreme Court has made clear

4  that reviewing courts must not subject affidavits in support of

5  search warrants to de novo review.  <u>Gates</u>, 462 U.S. at 236; <u>see</u>

6  <u>also</u> <u>Massachusetts v. Upton</u>, 466 U.S. 727, 733 (1984) ("A

7  grudging or negative attitude by reviewing courts toward warrants

8  is inconsistent both with the desire to encourage use of the

9  warrant process by police officers and with the recognition that

10  once a warrant has been obtained, intrusion upon interests

11  protected by the Fourth Amendment is less severe than otherwise

12  may be the case").  Instead, a judge's decision to issue a search

13  warrant must be upheld if the judge had a "substantial basis for

14  concluding that the affidavit in support of the warrant

15  established probable cause."  <u>United States v. Greany</u>, 929 F.2d

16  523, 524 (9th Cir. 1991); <u>see also</u> <u>United States v. Bertrand</u>, 926

17  F.2d 838, 842 (9th Cir. 1991).

18      Not only is the standard for reviewing a warrant

19  after-the-fact lenient, but the substantive requirement for

20  establishing probable cause in the first instance is not strict.

21  An affidavit in support of a search warrant demonstrates probable

22  cause when, under the "totality of the circumstances," it reveals

23  a "fair probability that contraband or evidence of a crime will

24  be found in a particular place."  <u>Gates</u>, 462 U.S. at 238; <u>United</u>

25  <u>States v. Hernandez-Escarsega</u>, 886 F.2d 1560, 1564 (9th Cir.

26  1989).  In <u>Gates</u>, the Supreme Court held that "'[o]nly the

27  probability, and not a prima facie showing of criminal activity

28  is the standard of probable cause.'"  <u>Gates</u>, 462 U.S. at 236

1 (quoting <u>Spinelli v. United States</u>, 393 U.S. 410, 419 (1969)).

2 Thus, the issuing court "need not determine that the evidence

3 sought is in fact on the premises to be searched . . . or that

4 the evidence is more likely than not to be found where the search

5 takes place . . . . [T]he [court] need only conclude that it

6 would be reasonable to seek the evidence in the place indicated

7 in the affidavit." <u>United States v. Peacock</u>, 761 F.2d 1313, 1315

8 (9th Cir. 1985), criticized on other grounds, <u>United States v.</u>

9 <u>France</u>, 886 F.2d 223 (9th Cir. 1989).

10        The totality of the circumstances test applies even when a

11 search warrant is based solely on an informant's tip.  The

12 "proper analysis is whether probable cause exists from the

13 totality of the circumstances to determine a sufficient level of

14 reliability and basis of knowledge for the tip." <u>United States</u>

15 <u>v. Bishop</u>, 264 F.3d 919, 924 (9th Cir. 2001)(interpreting Gates).

16 Indeed, under the <u>Gates</u> test, a weakness in either the

17 "reliability" or "basis of knowledge" prong is "not fatal to a

18 finding of probable cause, as long as the issuing [judge] had a

19 'substantial basis' for the finding." <u>United States v.</u>

20 <u>Angulo-Lopez</u>, 791 F.2d 1394, 1396 (9th Cir. 1986) (quoting Gates,

21 462 U.S. at 238).  Indeed, the court is restricted to the

22 affidavit itself in determining whether probable cause existed.

23 <u>United States v. Taylor</u>, 716 F.2d 701, 705 (9th Cir. 1983) ("The

24 validity of a search warrant depends upon the sufficiency of what

25 is found within the four corners of the underlying affidavit.").

26 The affidavit "is sufficient if it establishes probable cause."

27 <u>Id.</u>

28

### 2. The Four Corners Of The Affidavit Set Forth Probable Cause To Search Room 220

Here, there was more than sufficient probable cause to search Room 220.  There was not only an informant's tip that defendant was selling crack cocaine out of the Economy Inn, but the agents actually purchased $20 of crack cocaine from defendant, who was seen going in and out of both Rooms 217 and 220 with keycards.

First, the Beall Affidavit sets forth Officer Beall's personal observations of defendant's suspicious activities. Specifically, based on the tip of the informant, Officer Beall drove the informant to the Economy Inn, where the informant pointed out defendant to Officer Beall.  Beall Aff., p. 3.  Just five minutes after arriving, Officer Beall observed defendant walk over to an unidentified person on a bicycle and hand him a small item from defendant's pocket.  Id.  In return, the unidentified person handed a small object back to defendant.  Id. Based on his training and experience in narcotics sales, Officer Beall believed defendant appeared to conduct a hand to hand narcotics transaction.  Id.

Officer Beall also observed defendant hand an object to the first black female and have a brief conversation with her.  Id. However, as soon as defendant saw a marked San Bernardino Police Department patrol car drive by, he scurried back into Room 217 and closed the door.  Id.  Based on his training and experience, Officer Beall found this type of behavior to be consistent with a hand-to-hand narcotics transaction.  Id.

Second, agents surveilled both Rooms 217 and 220.  Id.  They

11

observed defendant go into Room 220 using a keycard and without knocking, as if he was staying there. _Id._ Likewise, they observed defendant go into Room 217, also using a keycard and without knocking. _Id._

Finally, and most importantly, agents successfully purchased $20 of crack cocaine from defendant. Based on Officer Beall's observation and the informant's tip, agents initially attempted unsuccessfully to purchase crack cocaine from defendant on March 10, 2009. The following morning, agents returned to the Economy Inn and resumed their efforts to buy crack cocaine from defendant. _Id._ at p. 4. This time, they were successful. Officer White posed as a buyer and purchased $20 of crack cocaine from defendant, who was using two black females to help his narcotics sales. _Id._

The facts set forth in the Beall Affidavit show that these two females were working together with defendant. Initially, the first black female approached Officer Beall and offered to sell him crack cocaine. _Id._ Once Officer White arrived on the scene with the audio and video recording device, the first black female took $20 from him for some crack cocaine. _Id._ She led him to Room 217 where defendant initially refused to sell crack cocaine to Officer White because defendant "didn't know him." _Id._

At that point, the first black female directed Officer White to wait by 6th Street and G Street while she continued to negotiate the transaction with defendant. _Id._ At this point, a second black female approached Officer White and asked him, "who wanted the dub?" Officer White responded he did. _Id._ The second black female said that she had it, and that "he" gave it

to her.  Id.  She instructed Officer White to get his money back
from the first black female.  Officer White then went back to the
first black female and asked for his money back because the
second black female had the "dope."  Id.  Once Officer White got
his money back from the first black female, he gave the $20 to
the second black female, who handed him two prepackaged baggies
of crack cocaine.  Id.  This amount of cooperation between the
two black females shows that they knew each other and knew that
both were working with defendant.

     After the sale, the second black female told Officer White
that defendant was her nephew.  Id.  She also explained that
defendant "was cool," he just did not know Officer White.  Id.
She also stated that defendant had sent her to Officer White with
the "dope."  Id.  Altogether, defendant's suspicious activities,
which appeared to be consistent with hand to hand narcotics
transactions, combined with the actual purchase of $20 of crack
cocaine from defendant, constituted sufficient probable cause to
search Room 220.

     B.   Defendant Is Not Entitled to a Franks Hearing

          1.   **Defendant Must Make A Substantial Preliminary**
               **Showing Of (1) An Intentional Or Deliberate**
               **Misleading Omission And (2) The Search Warrant**
               **Does Not Establish Probable Cause With The**
               **Omission To Warrant A Franks Hearing**

     Where evidence was seized pursuant to a defective search
warrant affidavit, the evidence is normally not suppressed.  See
United States v. Leon, 468 U.S. 897, 925 (1984).  This is because
law enforcement relied in good faith on the fact that they were

searching pursuant to a court-issued warrant.  Id.  However, where law enforcement obtained the warrant by misleading the issuing court in some way, they are not entitled to rely on good faith, and evidence may be suppressed.  Id. at 923.  Here, defendant argues that in order to obtain the search warrant, Officer Beall misled the court into issuing a search warrant by: 1) allegedly characterizing the observations of other agents as his own observations; 2) allegedly omitting the reliability of the confidential informant; 3) allegedly omitting the fact the informant's description of defendant was "markedly different" than the appearance of defendant; and 4) allegedly omitting the fact that Room 220 was not rented out by defendant.  Based on this, defendant argues that the evidence obtained from the search warrant and his statement concerning the gun must be suppressed.

In order to even get a hearing on this argument, defendant must first make a substantial preliminary showing that (1) a false statement was made knowingly and intentionally, or with reckless disregard for the truth, and (2) the allegedly false statement is necessary to the finding of probable cause.  Franks v. Delaware, 438 U.S. 154, 156 (1978).  Thus, in analyzing a claim that a search warrant affidavit contained a material misstatement of fact, the Court must first find a substantial showing that the affiant knowingly or recklessly included false information in the affidavit and misled the court.  If the Court finds that defendant made this substantial showing, the Court moves to the second step of the analysis - the Court must consider the affidavit as if the false information was not included, and determine whether there is still probable cause for

14

the search warrant.

Here, defendant does not claim that false information was included, but claims that critical information was omitted. The analysis, however, is similar. First, the Court must find that defendant has made a substantial showing that the omission was misleading and deliberate or reckless. United States v. Stanert, 762 F.2d 775, 781, amended, 769 F.2d 1410 (9th Cir. 1985). Second, the Court must consider the affidavit as if the omitted information had been included (or, strike the information completely). If the Court finds that, had the information been included, there would still have been probable cause for the warrant, there is no hearing on the matter, and request for suppression must be denied. See id.; Franks, 438 U.S. 154. Only if the Court determines both that defendant made a substantial showing that the omission was misleading and intentional or reckless, and that there would not have been probable cause for the warrant had the information been included, does the matter move on to an evidentiary hearing, commonly referred to as a Franks hearing, to determine whether the omission was in fact perjurous or reckless.

### 2.   Defendant Has Not Satisfied Either Element Required For A Franks Hearing

#### a.   There Was No Misleading Omission, Much Less A Deliberate Or Reckless Omission

To warrant a Franks hearing, defendant must first make a substantial preliminary showing that Officer Beall's omission of the informant's name and criminal history was misleading and deliberate or reckless. United States v. Stanert, 762 F.2d 775,

781 (9th Cir. 1985).  Defendant has not--and cannot--satisfy this element.

Defendant argues that the omission of the informant's information did not allow the Superior Court judge to determine whether the informant was reliable.  Although it is true that Officer Beall did not include the confidential informant's name and criminal history and inclusion of the criminal history would be the best practice, this omission was not misleading.

The affidavit made no representation with respect to the informant's criminal history.  Officer Beall did not selectively include only a portion of the criminal history in an attempt to mislead the issuing court.  See e.g. United States v. Hall, 113 F.3d 157, 159 (9th Cir. 1997)(Law enforcement selectively included a portion of the informant's criminal history and omitted another portion; included the fact of the arrest but omitted that the arrest did not result in a conviction.)  There was nothing misleading here at all.

Moreover, Officer Beall correctly and clearly identified the source of the information as a "confidential reliable informant" (as opposed to a citizen tip or anonymous tip) which automatically puts the judge on notice that the tip should be viewed with caution.  Beall Affidavit, p.2; Ninth Cir. Jury Instruction 4.9 (cooperators testimony should be examined with greater caution than other witnesses); United States v. Taylor, 774 F. Supp. 41, 42 (D. Me. 1991) ("Historically, confidential informants have been treated as the least credible source of information about the commission of crimes not only because informants enjoy anonymity, but also because they are often

16

criminals, drug addicts, or even pathological liars").  The
warrant also made clear that subsequent investigation was
completed which corroborated the tip and resulted in an actual
successful drug transaction with defendant.  <u>See e.g.</u>, <u>United
States v. Viers</u>, 251 Fed. Appx. 381, 383 (9th Cir. 2007) ("the
information from the CI is what started the investigation and
[did] not provide the primary support for probable cause").

More importantly, the informant's tip constituted only a
small fraction, if any, of the probable cause.  The informant's
tip only gave context to how the investigation into defendant was
initiated.  The tip prompted Officer Beall to surveille the
Economy Inn and bring the informant to identify defendant and the
room he was staying in.  Once that was achieved, the agents
attempted to negotiate and later successfully negotiated a
purchase of drugs from defendant, without any further assistance
from the informant.  The probable cause was primarily, if not
entirely, based on the agents' successful purchase of $20 of
crack cocaine from defendant the following morning.

                            b.   <u>Probable Cause Exists Without The Informant's
Information</u>

Even assuming for argument, the Court determined that
omission of the informant's information was misleading and
reckless or intentional, defendant is not entitled to a <u>Franks</u>
hearing because he cannot establish that the omission was
material to the Superior Court judge's finding of probable cause.
In other words, even assuming that the Court determines that the
omission was misleading and intentional or reckless, before a
<u>Franks</u> hearing is held, the Court must either supplement the

search warrant with the informant's identity and criminal history
or strike all of the informant's tip, and determine whether
probable cause still exists.

Here, as set forth above, the agents successfully purchased
$20 of crack cocaine from defendant. This fact, by itself and
independent of the informant's tip, provides sufficient probable
cause to issue the warrant. Because there is probable cause
either with the informant's tip or without the informant's tip
altogether, a <u>Franks</u> hearing is not warranted and defendant's
motion should be denied.

          c.   <u>Officer Beall Did Not Intentionally Or</u>
              <u>Recklessly Omit The Source of Some of His</u>
              <u>Observations</u>

A misstatement in an affidavit that is merely the result of
simple negligence or inadvertence, as opposed to reckless
disregard for the truth, will not render invalid the warrant that
is based on it. <u>United States v. Kyllo</u>, 37 F.3d 526, 529 (9th
Cir. 1994), reversed on other grounds by <u>Kyllo v. United States</u>,
533 U.S. 27 (2001)(citing <u>United States v. Davis</u>, 714 F.2d 896
(9th Cir. 1983).) Defendant here argues that Officer Beall
misattributed himself as the source of the following
observations:

        1) a black female go to room #217 and #220 with "Cal";
        2) a black male talk to the black female about getting
        "dub";
        3) the black female negotiating a drug transaction with
        the black male standing in the stairwell;
        4) the drug exchange with the second black female; and
        5) saw or participated in the conversation about the
        person who gave her the drugs; and
        6) saw the black woman engage in a second drug
        transaction.
Motion, p. 12.

As the Beall Affidavit sets forth, Officer Beall did in fact, personally observe defendant go with the first black female into Room 217 and later into Room 220. Beall Decl., 5. At that point in the investigation, Officer Beall was on the northeast side of the Economy Inn and had a direct view of Rooms 217 and 220. See Exhibit A to the Beall Decl.

In addition, contrary to defendant's assertion, Officer Beall did personally observe the first black female attempt to negotiate the drug transaction with defendant while defendant was standing on the stairwell. Id. at 6. When this conversation occurred, Officer Beall was positioned at the Greyhound Bus Station. Id. From his vantage point, Officer Beall could see the stairwell where that conversation took place. Id.

As for the fourth item, Officer Beall could see the second black female pass crack cocaine to Officer White, but did not hear the conversation between them. Id. at 9. The latter details were related by Officer White to Officer Beall afterwards.

With respect to the other items listed by defendant, Officer Beall did not clearly state the source of these observations. Nonetheless, the facts here are distinguishable from Davis, which defendant relies upon. In Davis, the court held that the failure of the affidavit to properly identify the source of the affiant's information rendered the warrant invalid. The affiant there, Officer Thompson, simply copied another affidavit which stated that its affiant, Officer Epstein, had personal knowledge of much of the information it contained. Officer Thompson testified that he knew some of the facts in his affidavit were false when he

19

signed the affidavit.  However, a search warrant should not be suppressed if a failure to identify the source of information was due to a simple oversight rather than knowing falsehood.  United States v. Sitton, 968 F.2d 947 (9th Cir. 1992).  In Sitton, the Ninth Circuit distinguished Davis:

> [In Davis,] Officer Thompson did not change the affidavit to state that Officer Epstein had been told or had observed certain things, but left it in the first person singular.  We held that the resulting affidavit contained material false statements, and that Officer Thompson knew them to be false when he signed the affidavit.  By contrast, the affidavit supporting the search of Unit 483 did not wrongly identify the source of the information that Sitton and Dewbre had entered Unit 483. It simply omitted any mention of the source. We see no reason to doubt the district court's conclusion that this omission was a simple oversight rather than a knowing falsehood.

(Citations omitted.)  Id. at 956.

Here, the facts are similar to those in Sitton.  Like the affiant in Sitton, Officer Beall did not knowingly mislead the Superior Court judge to believe that he personally observed all of the facts set forth in his affidavit.  Officer Beall never expressly attributed these statements to himself.  Although specific attribution to fellow officers is the best and preferred practice, at worst, the failure here to identify the source of the information was a simple oversight.

There was no motive for Officer Beall to mislead the Superior Court judge into believing that these observations were his own.  These portions of the Beall Affidavit would not have been weakened had Officer Beall specifically attributed each statement to his fellow agents.  Indeed, these observations were not from informants or other witnesses with less credibility than Officer Beall.  On the contrary, these observations were from

20

other agents involved in the same investigation and thus had the
same reliability as Officer Beall's personal knowledge.  See
United States v. Steed, 465 F.2d 1310, 1316 (9th Cir. 1972)
(information furnished to the affiant by fellow officers engaged
in a common investigation was reliable).  Therefore, at worst,
Officer Beall was negligent in failing to specifically attribute
each observation to the agent who made the observation.
Nonetheless, these omissions did not impact the weight of the
observations and was a simple oversight rather than a knowing
falsehood.

> d.   Officer Beall Did Not Mischaracterize
> Defendant's Physical Description

Defendant argues that Officer Beall misled the Superior
Court judge by omitting defendant's actual physical description,
which he claims was significantly different than the description
given by the informant.  This argument has no merit.  Officer
Beall did not mislead because he and the other agents did not
know defendant's exact height until they arrested him and looked
at his identification.  In his affidavit, Officer Beall
accurately stated that the informant indicated the defendant was
a "black male in his mid to late 20's, approximately 5'10" tall,
with a medium complexion and average build, staying at the
Economy Inn."  Beall Aff., p. 2.

There was no intentional misleading because defendant was
later described to be "approximately 5'08" tall, 170 pounds, and
had a short, afro-style hair."  Beall Aff., p. 4.  This was the
best estimate given to Officer Beall by the other agents who were
surveilling the other side of the Economy Inn.  If Officer Beall

21

1 and the other agents knew defendant's true exact height and
2 wanted to mislead the Superior Court judge, they would have
3 provided defendant's listed height and fabricated a height that
4 was closer to the listed height. They did not. Instead, they
5 were on the ground floor and observed defendant, who was on the
6 second floor, from approximately 150 feet away and gave their
7 best estimate of defendant's height. Therefore, there was no
8 intentional misleading and the Superior Court judge had the
9 information necessary to determine whether probable cause
10 existed.

11      Regardless, whether defendant's actual physical description
12 matched the informant or agents' description is immaterial
13 because Officer Beall drove the informant to the Economy Inn,
14 where the informant pointed out defendant, who was standing in a
15 parking lot and matched the description given by the informant.
16 Id. at p. 3. Moreover, the accuracy of the informant or agents'
17 description is irrelevant because the agents actually purchased
18 crack cocaine from defendant. Accordingly, there was sufficient
19 probable cause irrespective of how or if these descriptions
20 matched.

21           e.    Agents Did Not Know Who Was Registered To
22                 Room 220 Until After Defendant Was Arrested
23      Defendant argues that Officer Beall omitted the fact that
24 Room 220 was not registered to defendant. Again, this argument
25 fails. The agents did not know to whom Room 217 or 220 was
26 registered until after defendant was caught counting his money in
27 front of the pile of crack cocaine. Beall Decl., 15. Indeed,
28 agents almost never contact the managers of these motels prior to

1  effectuating a search or arrest warrant because these managers
2  often tip off the target.  Id.  Law enforcement officers need not
3  track down every piece of information that might potentially be
4  relevant before filing a warrant affidavit.  See Id.; United
5  States v. Martinez-Garcia, 397 F.3d 1205, 1216 (9th Cir. 2005).
6  Here, the agents did not acquire the registration slips for Room
7  217 and 220 until after defendant was arrested.  Id.

8         C.    The Search Was Constitutional Because It Was Conducted
9               With Good Faith Reliance On The Search Warrant

10        Regardless of whether this Court, conducting an
11  after-the-fact review of the warrant, concludes that probable
12  cause was absent, the evidence gathered in the search is still
13  admissible because the executing officers relied in good faith on
14  the validity of the state court search warrant.  See United
15  States v. Leon, 468 U.S. 897 (1984) (holding that the good faith
16  exception to the exclusionary rule should apply where law
17  enforcement officers acted in good faith and in reasonable
18  reliance on a facially valid search warrant).  Ordinarily,
19  searches "pursuant to a warrant will rarely require any deep
20  inquiry into reasonableness, for a warrant issued by a [court]
21  normally suffices to establish that a law enforcement officer has
22  acted in good faith in conducting the search."  Leon, 468 U.S. at
23  922 (citations and quotations omitted).

24        Nevertheless, an officer's reliance on the issuing court's
25  probable cause determination must be objectively reasonable.  Id.
26  "An officer does not manifest objective good faith in relying on
27  a warrant based on an affidavit that is so lacking in indicia of
28  probable cause that official belief in its existence is entirely

                                    23

unreasonable." <u>United States v. Fowlie</u>, 24 F.3d 1059, 1067 (9th Cir. 1994) (citing <u>Leon</u>, 468 U.S. at 923).

Here, as set forth above, the Beall Affidavit set forth facts that established that there was more than fair probability that narcotics would be found in Room 220. <u>See</u> <u>supra</u>. At the very minimum, the Beall Affidavit established a "plausible theory" that evidence might be found in Room 220, which is sufficient for application of the good faith exception. <u>See</u> <u>Fowlie</u>, 24 F.3d at 1067 (unnecessary to decide whether probable cause existed to search defendant's ranch because officers reasonably relied on affidavit containing plausible theory that ranch used as "safe house" for drug distribution).

In order for the Court to find that reliance on the search warrant was objectively unreasonable, the Beall Affidavit would have needed to have "no hint" of information from which a reasonable judge could have found probable cause. <u>See</u> <u>United States v. Hove</u>, 848 F.2d 137, 139-40 (9th Cir. 1988)(finding no good faith where the affidavit did not link the search location to the defendant, did not explain why the police might find incriminating evidence at the location, and "simply list[ed]" the location as a place to be searched). Certainly, here, the Beall Affidavit, which described how the agents purchased $20 of crack cocaine from defendant, contained far more than a "hint" of probable cause to search Rooms 217 and 220. As set forth above, there are no other grounds for rejecting application of the good faith exception such as a (i) suggestion that the issuing judge did not act in a neutral or detached fashion, (ii) facially deficiency in the warrant, or (iii) deliberate misrepresentation

24

1  or omission in the Affidavit.  See generally Leon, 468 U.S. at

2  923 (discussing grounds for rejecting good faith exception).

3       Finally, the underlying purpose of excluding evidence

4  obtained during a search lacking probable cause would not be

5  advanced by the suppression of evidence here.  As the Leon Court

6  noted when setting forth the good faith exception to the

7  exclusionary rule, the purpose of the exclusionary rule is to

8  deter police investigators from willfully infringing upon a

9  defendant's rights by conducting unlawful searches.  See Leon,

10 468 U.S. at 918-19.  Here, the agents gathered information about

11 defendant after conducting their own investigation, submitted an

12 affidavit in support of a search warrant, obtained a warrant from

13 a detached and neutral judge, and executed the obtained warrant.

14 The deterrent purpose of the exclusionary rule would not be

15 furthered by excluding evidence obtained by the agents, in good

16 faith, followed the procedures to obtain a search warrant.

17      Thus, because the agents obtained a warrant from a proper

18 judicial authority and the warrant contained no obvious

19 deficiencies that would have alerted them that probable cause was

20 lacking or that the issuing judge did not perform his neutral and

21 objective function, the executing agents were entitled to rely on

22 the warrant.  Accordingly, this Court should deny defendant's

23 motion on the separate and independent ground that the agents

24 acted in good faith reliance on the search warrant.

25      D.   Defendant's Statements Should Not Be Suppressed

26      Defendant argues that defendant's statements about the

27 location of the gun that was recovered should be suppressed

28 because he was not Mirandized.  However, an officer's questioning

25

of a suspect before <u>Mirandizing</u> the suspect is acceptable if it "relates to an objectively reasonable need to protect the police or the public from any immediate danger associated with the weapon." <u>New York v. Quarles</u>, 467 U.S. 649, 659 n.8.  The officer's subjective motivation in posing the question is not part of the analysis.  <u>See</u> <u>United States v. Brady</u>, 819 F.2d 884, 888 n.3 (9th Cir. 1987).

In <u>Reilly</u>, several officers and FBI agents surrounded defendant Reilly and placed him under arrest on the floor. <u>United States v. Reilly</u>, 224 F.3d 986, 992 (9th Cir. 2000). Reilly was surrounded by the "officers, at least three of whom had their loaded weapons trained on him, but he was not yet handcuffed and his arms were spread out to each side." <u>Id.</u>  One of the agents asked defendant "Where is the gun?"  <u>Id.</u>  Reilly stated that the "gun was in the bedroom in a black bag."  The Ninth Circuit held that the agent's "inquiry bears no indication of an attempt to elicit testimonial evidence." <u>Id.</u> at 993. Instead, the question only sought to "protect himself and his fellow officers."  <u>Id.</u>  The location has not been secured and the couch defendant had been sitting on had not "been searched, and a gun could have been hidden nearby."  <u>Id.</u>  Moreover, Reilly was "surrounded by officers with loaded weapons pointed at him, he was not yet handcuffed and still had the capacity to reach and grab any nearby objects."  <u>Id.</u>  Lastly, the agent's "inquiry was narrow, asking only a single question directed at determining the presence of the gun."  <u>Id.</u>  In light of this, the Ninth Circuit held that the public safety exception applied and therefore the testimonial and physical evidence gained as a result of Reilly's

response should not be suppressed  <u>Id.</u> at 994.

Here, the facts are similar to <u>Reilly</u>.  Agents had just breached the door to the Economy Inn and found defendant sitting at the table counting his money.  Beall Decl., 12.  The pile of baggies of crack cocaine was in plain view.  <u>Id.</u> Defendant was ordered to the ground.  Once defendant was on the ground, Officer Beall asked him, in the interest of officer and public safety, if he had a weapon anywhere.  <u>Id.</u> at  13.  Defendant replied yes, and motioned towards the dresser.  <u>Id.</u> At that point, neither defendant nor Room 220 had been searched.  <u>Id.</u> A gun could have been hidden on defendant's person, underneath the bed next to defendant, or somewhere else within reach of defendant.  Acting on defendant's information, agents found a loaded .22 caliber Ruger MK2 semi-automatic handgun in the dresser next to the entrance of the room.  <u>Id.</u> at  14.  Agents also found a cup with 32 rounds of ammunition next to the bed.  <u>Id.</u> These weapons were all found after defendant was asked if there were any weapons.  Accordingly, the public safety exception applies and the Court should not suppress defendant's statements.

**IV.   CONCLUSION**

For the reasons set forth above, the United States respectfully submits that the Court should deny defendants' motions to suppress.

## DECLARATION OF OFFICER GERALD BEALL

I, Gerald Beall, being duly sworn, hereby depose and say as follows:

1.    I am a Narcotics Investigator for the San Bernardino Police Department and have been so employed since 2002.  I am currently assigned to the Narcotics Unit of the San Bernardino Police Department.

2.    In this capacity I have participated in and executed hundreds of arrests for narcotics related offenses and participated in numerous narcotic related investigations for the sale of methamphetamine, cocaine, cocaine base, heroin, marijuana, ecstasy, and PCP.

3.    I have received formal training at the Riverside Sheriff's Academy in the recognition of narcotics, methods of manufacturing, packaging and illegal use of controlled substances, as well as methods in which narcotics are obtained, transported, and sold.  In addition, I have received training in search warrants and clandestine laboratory safety with the San Bernardino Sheriff's Department.

4.    On March 10, 2009, based on a tip from a confidential informant, I began investigating suspected drug sales out of the Economy Inn in San Bernardino, California.  As described in my affidavit in support of state search warrant, 2009-08274 ("Beall Affidavit"), I drove the informant to the Economy Inn to identify the suspect and conduct surveillance.

5.    As set forth in the Beall Affadvit, we observed defendant Calvin Colbert engage in suspicious activity that based on my training and experience, appeared to be consistent with

hand to hand narcotics transactions.  Specifically, from my
vantage point on the northeast side of the Economy Inn, I
observed defendant and a black female go into Room 217 and later
into Room 220.  Attached as Exhibit A is a true and correct
photograph depicting my vantage point.  We attempted
unsuccessfully to purchase narcotics from defendant on March 10,
2009.

     6.    However, the next morning, we returned with multiple
officers from the San Bernardino Police Department and agents
from the Alcohol Firearms and Tobacco Bureau (collectively,
"agents") to try again.  Officer Tony White was the undercover
officer making the purchase.  Initially, defendant refused to
sell the crack cocaine to Officer White.  The first black female,
who acted as defendant's runner, attempted to negotiate with him
into completing the sale with Officer White.  During this time, I
was at the Greyhound Bus Station.  I had a direct view of this
interaction between defendant and the first black female.

     7.    This time, we successfully purchased two baggies of
crack cocaine from defendant.  Based on this successful purchase
and the observations made by myself and the other agents, Officer
Tony White and I went to obtain a state search warrant while the
other agents maintained surveillance at the Economy Inn.

     8.    I was designated as the affiant.  However, because I
did not see and hear everything that occurred from my position
during the undercover sale, I needed to discuss the affidavit
with Officer White.  Unbeknownst to Officer White and me, we
neglected to turn off his video recording device while we
discussed my affidavit.  As a result, our discussion was

recorded.

9.   I was aware of all of the events leading up to defendant's sale of the crack cocaine to Officer White.  However, I did not personally observe the second black female actually hand over the crack cocaine to Officer White.  During our surveillance, Officer Landeros related to me that after the second black female gave the crack cocaine to Officer White and he gave her $10, she proceeded to the "area of the vacant lot east of the motel and conducted what appeared to be a second transaction with the black male subject."  Beall Aff., p. 5. Officer Landeros related to me that specifically, this second transaction involved defendant literally throwing the suspected baggie of crack cocaine at the second black female from the second floor.  The suspected baggie of crack cocaine landed in some bushes and the second black female searched for several minutes for it.  Therefore, because I did not personally observe the crack cocaine being handed over to Officer White, I needed clarification and told him that as far as I could tell, defendant "threw at you from the [expletive] room upstairs," just as he threw the crack cocaine to the first black female.

10.   A few hours later, I obtained a search warrant signed by the Honorable Michael A. Smith of the San Bernardino County Superior Court.

11.   While I was coming back to the Economy Inn with the search warrant, Officer Landero observed defendant move personal items from Room 217 into Room 220.  He also observed a cleaning crew clean Room 217 after defendant moved his belongings into Room 220.

30

12.  Around noon, we began to execute the warrant.  As we passed Room 217, we could see that the door to Room 217 was wide open and the drapes on the window were tied back, indicating that the room was vacated.  Based on this observation, we skipped Room 217 and moved towards Room 220.  Upon arriving at Room 220, I knocked on the wall and announced, "San Bernardino Police Department.  We have a search warrant and demand entry."  Another agent then breached the door.  Defendant was sitting in a chair with a stack of money in front of him and in his hands and appeared to be in the middle of counting the money.  In addition, there was a pile of individual baggies of crack cocaine on the table in front of him.

13.  I immediately ordered defendant to the ground, to which he complied.  Other agents cleared the room to ensure that no one else was inside Room 220.  Prior to searching defendant, I asked if he had any weapons, and he responded, "yes." In the interest of safety, I asked for the location of the weapon.  Defendant motioned towards the dresser and said, "it's over there."  I asked defendant whether he had any weapons on his person, and defendant responded, "no, it's in the drawer."

14.  We recovered a .22 caliber Ruger MK2 semi-automatic handgun with a loaded magazine and one round chambered in the dresser next to the entrance of the room.  Agents searched defendant and found no weapons.  We also found 32 rounds of ammunition for the handgun in a cup next to the bed, a box of sandwich bags, a digital scale, and $957 in cash.

15.  After defendant was arrested, we obtained the receipts of Rooms 217 and 220 from the Economy Inn manager.  We never

obtain the receipts from the motel manager prior to executing a search warrant because oftentimes, many of these managers would tip off the suspect and thwart our investigation.

    I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct. Executed this 9th day of November, 2009 in San Bernardino, California.


                              _____
                              GERALD BEALL
                              Police Officer
                              San Bernardino Police Department

obtain the receipts from the motel manager prior to executing a
search warrant because oftentimes, many of these managers would
tip off the suspect and thwart our investigation.

I declare under penalty of perjury, under the laws of the
United States of America, that the foregoing is true and correct.
Executed this 9th day of November, 2009 in San Bernardino,
California.

GERALD BEALL
Police Officer
San Bernardino Police Department

32

EXHIBIT A



**TABLE OF CONTENTS**

PAGE

I.   INTRODUCTION ............................................. 1

II.  STATEMENT OF FACTS ....................................... 3

III. ARGUMENT ................................................. 8

     A.   There Was Sufficient Probable Cause ............... 8

          1.   Generally .................................... 8

          2.   The Four Corners Of The Affidavit Set Forth
               Probable Cause To Search Room 220 ........... 11

     B.   Defendant Is Not Entitled to a Franks Hearing ...... 13

               1.   Defendant Must Make A Substantial
                    Preliminary Showing Of (1) An
                    Intentional Or Deliberate Misleading
                    Omission And (2) The Search Warrant Does
                    Not Establish Probable Cause With The
                    Omission To Warrant A Franks Hearing ..... 13

               2.   Defendant Has Not Satisfied Either
                    Element Required For A Franks Hearing .... 15

                    a.   There Was No Misleading Omission,
                         Much Less A Deliberate Or Reckless
                         Omission ........................... 15

                    b.   Probable Cause Exists Without The
                         Informant's Information ............ 17

                    c.   Officer Beall Did Not Intentionally
                         Or Recklessly Omit The Source of
                         Some of   His Observations .......... 18

                    d.   Officer Beall Did Not
                         Mischaracterize Defendant's
                         Physical Description ................ 21

                    e.   Agents Did Not Know Who Was
                         Registered To Room 220 Until After
                         Defendant Was Arrested .............. 22

-i-

**TABLE OF CONTENTS CONTINUED**

PAGE

C.   The Search Was Constitutional Because It Was
     Conducted With Good Faith Reliance On The Search
     Warrant ......................................... 23

D.   Defendant's Statements Should Not Be Suppressed .... 25

IV.  CONCLUSION ............................................. 27

**TABLE OF AUTHORITIES**

PAGE(S)

**FEDERAL CASES**

Franks v. Delaware,
     438 U.S. 154 (1978) ................................. *passim*

Illinois v.  Gates,
     462 U.S. 213 (1983) ............................. 8, 9, 10

Massachusetts v. Upton,
     466 U.S. 727 (1984) ................................... 9

New York v. Quarles,
     467 U.S. 649 ......................................... 26

Spinelli v. United States,
     393 U.S. 410 (1969) ................................. 10

United States v. Angulo-Lopez,
     791 F.2d 1394 (9th Cir. 1986) ........................ 10

United States v. Bertrand,
     926 F.2d 838 (9th Cir. 1991) .......................... 9

United States v. Bishop,
     264 F.3d 919 (9th Cir. 2001)(interpreting Gates) ....... 10

United States v. Brady,
     819 F.2d 884 (9th Cir. 1987) ......................... 26

United States v. Clark,
     31 F.3d 831 (9th Cir. 1994) ........................... 9

United States v. Davis,
     714 F.2d 896 (9th Cir. 1983) ...................... 18, 19

United States v. Fowlie,
     24 F.3d 1059 (9th  Cir. 1994) ..................... 23, 24

United States v. France,
     886 F.2d 223 (9th Cir. 1989) ......................... 10

United States v. Greany,
     929 F.2d 523 (9th Cir. 1991) .......................... 9

United States v. Hall,
     113 F.3d 157 (9th Cir. 1997) ......................... 16

United States v. Hernandez-Escarsega,
     886 F.2d 1560 (9th Cir. 1989) ......................... 9

**TABLE OF AUTHORITIES CONTINUED**

PAGE(S)

**FEDERAL CASES**

United States v. Hove,
    848 F.2d 137 (9th Cir. 1988) ........................... 24

United States v. Kyllo,
    37 F.3d 526 (9th Cir. 1994),
    reversed on other grounds by Kyllo v. United States,
    533 U.S. 27 (2001) ....................................... 18

United States v. Leon,
    468 U.S. 897 (1984) ............................... *passim*

United States v. Martinez-Garcia,
    397 F.3d 1205 (9th Cir. 2005) ......................... 23

United States v. Peacock,
    761 F.2d 1313 (9th Cir. 1985) ......................... 10

United States v. Reilly,
    224 F.3d 986 (9th Cir. 2000) ..................... 26, 27

United States v. Sitton,
    968 F.2d 947 (9th Cir. 1992) .......................... 20

United States v. Stanert,
    762 F.2d 775 ........................................... 15

United States v. Steed,
    465 F.2d 1310 (9th Cir. 1972) ................. 21, 22, 23

United States v. Taylor,
    716 F.2d 701 (9th Cir. 1983) .......................... 10

United States v. Taylor,
    774 F. Supp. 41 (D. Me. 1991) ......................... 16

United States v. Viers,
    251 Fed. Appx. 381, 383 (9th Cir. 2007) ................ 17

**FEDERAL STATUTES**

18 U.S.C. § 924 ....................................... *passim*

21 U.S.C. §§ 841 .......................................... 2