GEORGE S. CARDONA
Acting United States Attorney
SHERI PYM
Assistant United States Attorney
Chief, Riverside Branch Office
JERRY C. YANG
Assistant United States Attorney
California Bar Number 241323
Riverside Branch Office
     3880 Lemon Street, Suite 210
     Riverside, California 92501
     Telephone: (951) 276-6221
     Facsimile: (951) 276-6202
     E-mail: jerry.yang@usdoj.gov

Attorneys for UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>     v.<br><br>CALVIN COLBERT,<br><br>          Defendant. | CR No. 09-901-GW<br><br>GOVERNMENT'S TRIAL MEMORANDUM<br><br>Trial<br>Date: December 15, 2009<br>Time:  8:30 a.m. |

Plaintiff United States of America, by and through its attorney of record, Assistant United States Attorney Jerry C.

///

Yang, hereby submits the attached Trial Memorandum.

DATED: December 13, 2009

                                        Respectfully submitted,

                                        GEORGE S. CARDONA
                                        Acting United States Attorney

                                        SHERI PYM
                                        Assistant United States Attorney
                                        Chief, Riverside Branch Officer

                                          /s/
                                        JERRY C. YANG
                                        Assistant United States Attorney
                                        Attorneys for Plaintiff
                                        United States of America

**TRIAL MEMORANDUM**

**I.   INTRODUCTION**

On March 10, 2009, after receiving a tip from a confidential informant, San Bernardino Police Officer Gerald Beall observed defendant Calvin Colbert conduct what appeared, based on Officer Beall's training and experience, to be a hand-to-hand drug transaction at the parking lot of the Economy Inn motel in San Bernardino. The following morning, on March 11, 2009, agents from the Alcohol Tobacco and Firearms and officers from the San Bernardino Police Department (collectively, "agents") returned to the Economy Inn to attempt an undercover purchase from defendant. Agents observed defendant use two females as "runners" to sell crack cocaine out of Economy Inn motel rooms 217 and 220 (respectively, "Room 217" and "Room 220"). After undercover officer Tony White successfully purchased $20 worth of crack cocaine from defendant, agents obtained a state search warrant to enter the room. When agents entered the room, they found defendant in the act of counting his money while sitting at a table with a pile of 21.31 grams of crack cocaine in little baggies in front of him.

Agents immediately detained defendant. In the interest of agents' and defendant's safety, Officer Beall asked defendant if he had any weapons. Defendant responded that he had a gun and motioned towards a dresser near the entrance of the room. Agents recovered a loaded .22 caliber Ruger semi-automatic firearm with a round chambered from the dresser and 32 rounds of live ammunition near the bed.

**II. STATUS OF CASE**

    A.    Trial is set for December 15, 2009.

    B.    The estimated time for the government's case-in-chief is two days. The government anticipates calling four witnesses in its case-in-chief, including two expert witnesses: a forensic chemist and a law enforcement officer who will give expert testimony as to narcotics transactions and distribution quantities.

    C.    The government may present up to 30 exhibits, including the physical evidence referred to below, pictures, and audio/video recordings. The government has proposed stipulations to defendant regarding: 1) the weight and purity of the drugs; and 2) admissibility of almost all of the physical evidence. If defendant stipulates to the above, the government anticipates that it would require only one of the experts to testify and would only require three witnesses at trial; additionally, the government would need to present far fewer exhibits. As of the filing of this trial memorandum, defense counsel has not yet responded to the government's proposal.

    D.    The government has received no discovery from defendant, and therefore has no basis for estimating the length of defendant's case-in-chief.

    E.    Defendant is detained pending trial.

    F.    An interpreter is not needed.

    G.    Defendant has not waived trial by jury.

    H.    The three-count indictment was filed on March 27, 2009 charging defendant with violating 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(iii): Possession With Intent to Distribute Cocaine

Base in the Form of Crack Cocaine (Count One); 18 U.S.C. § 924(c)(1): Possession of Firearm in Furtherance of a Drug Trafficking Crime (Count Two); and 28 U.S.C. § 2461(c): Criminal Forfeiture (Count Three).

    I.    On October 28, 2009, defendant filed a Motion to Suppress Evidence recovered pursuant to the search warrant. Defendant argues the search warrant was defective because it: 1) lacked probable cause; and 2) contained false statements and material omissions. Defendant also argues that the statements he made about the gun should be suppressed because he was not <u>Mirandized</u>. The Court held hearings on this Motion on December 7 and 11, 2009. The Motion remains pending before the Court and is scheduled to be heard on December 14, 2009.

    J.    At the hearing on December 11, 2009, defendant extensively questioned Officers Beall and Ricardo Landeros regarding their use of inflammatory names to describe one of the female drug runners used by defendant. On December 13, 2009, the government filed a motion in limine to preclude such evidence and reference at trial. This motion remains pending before the Court.

**III. ELEMENTS OF THE CHARGED OFFENSE**

    A.    <u>Count One: 21 U.S.C. § 841(b)(1)(B)(iii): Possession With Intent to Distribute Cocaine Base in the Form of Crack Cocaine</u>

        1)    defendant knowingly possessed cocaine base in the form of crack cocaine;

        2)    defendant possessed it with the intent to deliver it to another person; and

          3)    defendant knew that it was cocaine base in the form of crack cocaine or some other prohibited drug.

<u>Ninth Circuit Criminal Model Jury Instructions</u>, 9.13 (2003 ed.).

    B.    <u>Count Two: 18 U.S.C. § 924(c)(1): Possession of Firearm in Furtherance of a Drug Trafficking Crime</u>

          1)    defendant committed the crime of possessing cocaine base in the form of crack cocaine with the intent to deliver it to another person, as charged in count one of the indictment;

          2)    defendant knowingly possessed a firearm; and

          3)    defendant possessed the firearm in furtherance of the crime.

<u>Ninth Circuit Model Jury Instructions</u>, 8.65 (2003 ed.).

## II. STATEMENT OF FACTS

The government intends to prove at trial the following facts, among others.

    A.    <u>Initial Surveillance on March 10, 2009</u>

On March 10, 2009, a confidential informant reported to San Bernardino Police Officer Gerald Beall that a black male in his mid-late 20's, known as "Cal," was staying at the Economy Inn motel in downtown San Bernardino and selling cocaine base in the form of crack cocaine. The informant described "Cal" as approximately 5'10" tall, with medium complexion and average build.

Officer Beall drove to the Economy Inn with the informant. The informant pointed to a person in the parking lot and identified this person as "Cal," later identified as defendant.

Officer Beall surveilled defendant. After approximately five minutes, Officer Beall observed defendant engage in what appeared to be a hand to hand narcotics transaction.

A short while later, Officer Beall returned to the Economy Inn with additional agents and Officer Tony White, who would act as an undercover officer in order to purchase crack cocaine from defendant. Over the next two hours, agents saw numerous individuals go to Room 217, knock on the door and receive no response. During those two hours, agents were unable to purchase crack cocaine from defendant.

B.   <u>Surveillance on March 11, 2009</u>

The very next morning, on March 11, 2009, agents returned to the Economy Inn. They positioned themselves on the northeast and west sides of the rooms. Minutes later, defendant arrived and opened the door to Room 217. Agents observed defendant briefly talk to a black female. Defendant and the black female then went inside to Room 220, where defendant entered the room with a key card without knocking. Approximately one minute later, defendant came out of Room 220, and went into Room 217, also using a key card without knocking. The black female came out of Room 220 and stood near Sixth Street, which borders the motel.

A few minutes later, defendant came out of Room 217, walked over to the black female, and handed her an unknown object through the fence. They had a brief conversation. At approximately 10:00 a.m., undercover Officer Beall was approached by one of the black females as he was parked near the motel. The black female asked Officer Beall if he wanted to purchase a cellular phone for $20. Officer Beall responded, "no," but that

1  he was waiting for a friend and they would like to purchase some
2  crack cocaine.  The black female said she could obtain crack
3  cocaine.

4       C.   <u>Undercover Buy From Defendant</u>

5       A short while later, Officer White, who was also operating
6  undercover and wearing audio and video recording equipment,
7  arrived.  He gave the black female a pre-recorded $20 bill
8  (serial number EF85620576D) and requested to purchase crack
9  cocaine.  The black female took Officer White to the fence below
10 Room 217.  The black female yelled up to Room 217 to defendant.
11 Officer White observed defendant wore a white jacket, had medium
12 complexion, and appeared to be approximately 5'8" tall, 170
13 pounds, and had a short, "Afro"-style hair.  Officer White also
14 observed the black female tell defendant that she needed a "dub."
15 He came to the edge of the stairwell, looked at Officer White,
16 and responded, "I don't know him."  The black female told Officer
17 White to walk down the street to the corner of Sixth Street and G
18 Street.

19      As the black female continued to negotiate the transaction
20 with defendant, a second black female approached Officer White.
21 She asked Officer White who wanted the "dub."  Officer White
22 responded that he wanted the "dub."  The second black female said
23 she had it, and that "he" gave it to her.  She instructed Officer
24 White to get his money from the first black female.  Officer
25 White walked back towards the first black female and told her the
26 second black female had gotten the "dope" and that he needed the
27 $20 back.

28      The first black female returned the $20 to Officer White.

6

Officer White handed the money to the second black female. The second black female handed Officer White two prepackaged baggies of suspected crack cocaine. The second black female explained to Officer White that defendant was "cool," and that he just did not know Officer White. She also stated that the black male [appearing to refer to defendant] was her nephew and that he had sent her to Officer White with the "dope."

Both of the black females accompanied Officer White across the street. The first black female asked if Officer White was going to give her one of the rocks of crack cocaine. In response, Officer White gave her a pre-recorded $10 bill (serial number DJ01816340A). The first black female walked back across the street and conducted what appeared to be a second transaction with defendant. Specifically, defendant threw a small object, consistent with the size of a baggie of crack cocaine, to her from the second floor near his room. She searched the nearby bush for several minutes for the object.

D.   <u>Execution of State Search Warrant on Room 220</u>

A few hours later, based on his affidavit setting forth the above-facts, Officer Beall obtained a state search warrant. While Officer Beall was coming back to the Economy Inn with the search warrant, agents observed defendant move personal items from Room 217 into Room 220. Agents also observed a cleaning crew clean Room 217 after defendant moved his belongings into Room 220.

Around noon, agents began to execute the warrant. As they passed Room 217, they could see that the door to Room 217 was wide open and the drapes on the window were tied back, indicating

7

1 that the room was vacated.  Based on this observation, agents
2 skipped Room 217 and moved towards Room 220.
3     Upon arriving at Room 220, Officer Beall knocked on the wall
4 and announced, "San Bernardino Police Department.  We have a
5 search warrant and demand entry."  Another agent then breached
6 the door.  Defendant was sitting in a chair with a stack of money
7 in front of him and in his hands, and appeared to be in the
8 middle of counting the money.  In addition, there was a pile of
9 individual baggies of crack cocaine on the table in front of him.
10     Officer Beall immediately ordered defendant to the ground,
11 to which he complied.  The agents cleared the room to ensure that
12 no one else was inside Room 220.  Prior to searching defendant,
13 Officer Beall asked if he had any weapons, and he responded,
14 "yes."  Officer Beall asked for the location of the weapon.
15 Defendant motioned towards the dresser and said, "it's over
16 there."  Officer Beall asked defendant whether he had any weapons
17 on his person, and defendant responded, "no, it's in the drawer."
18     Agents recovered a .22 caliber Ruger MK2 semi-automatic
19 handgun with a loaded magazine and one round chambered inside an
20 otherwise empty dresser next to the entrance of the room.  Agents
21 searched defendant and found no weapons.  Agents also found the
22 following in the room:
23    1)   21.31 grams of cocaine base in the form of crack
24         cocaine in approximately 54 individual baggies and
25         larger bags;
26    2)   32 rounds of ammunition for the handgun in a cup next
27         to the bed;
28    3)   a digital scale with a white residue that field tested-

|   |   |   |
|---|---|---|
| 1 |    | positive for cocaine; |
| 2 | 4) | a room pass keycard marked "220" with a white residue |
| 3 |    | consistent with cocaine base on one edge of the card; |
| 4 | 5) | $957 in United States currency, including a $20 pre- |
| 5 |    | recorded bill (serial number EF85620576D) given by |
| 6 |    | Officer White to the first black female, and a $10 pre- |
| 7 |    | recorded bill (serial number DJ01816340A) given by |
| 8 |    | Officer White to the first black female; |
| 9 | 6) | razor blade with white residue that field tested |
| 10 |    | positive for cocaine base; |
| 11 | 7) | a box of sandwich bags; |
| 12 | 8) | a cellular phone; and |
| 13 | 9) | leather wallet containing identification cards in the |
| 14 |    | name of "Calvin Charles Colbert" and "Keith Roy |
| 15 |    | Zeigler" and a Social Security card issued to "Calvin |
| 16 |    | Charles Colbert." |

After defendant was arrested, agents obtained the receipts of Rooms 217 and 220 from the Economy Inn manager.

E.   Defendant's Statements

Defendant spoke to Officer Beall after his arrest. He admitted that he started the day with about two ounces of cocaine base in the form of crack cocaine, and had about 3/4 ounce left. When told that he had sold crack cocaine to a police officer, defendant thought for a moment, then responded, "oh yeah. Now I know what you're talking about." Defendant added, "I can take the charges, I'll do the time." He also stated that agents would find approximately $1,000 in cash in the room.

9

F.   <u>Drug Testing</u>

In March 2009, Drug Enforcement Administration Forensic Chemist Lon D. Anderson tested all of the drugs found in Room 220. Mr. Anderson's tests revealed: 1) one of the baggies of substance contained 4.4 grams of cocaine base in the form of crack cocaine; 2) one of the baggies of substance contained 3.1 grams of cocaine base in the form of crack cocaine; 3) one of the baggies of substance contained 13.7 grams of cocaine base in the form of crack cocaine; 4) one of the baggies of substance contained 0.11 grams of cocaine base in the form of crack cocaine; and 5) one of the baggies of substance contained 0.32 grams of cocaine base in the form of crack cocaine. Altogether, there was 21.31 grams of cocaine base in the form of crack cocaine.

**III. LEGAL AND EVIDENTIARY ISSUES**

A.   <u>Expert and Lay Testimony Regarding Narcotics Trafficking</u>

Absent stipulations, the government intends to call two expert witnesses at trial: 1) DEA Forensic Chemist Lon D. Anderson; and 2) San Bernardino Police Department Narcotics Investigator Gerald Beall, an expert on drug trafficking crimes. These experts and their anticipated testimony, along with a summary of their training and experience, have been disclosed to defense counsel.

If specialized knowledge will assist the trier of fact in understanding the evidence or determining a fact in issue, a qualified expert witness may provide opinion testimony on the issue in question. Fed. R. Evid. 702. Expert opinion may be

10

based on hearsay or facts not in evidence, where the facts or data relied upon are of the type reasonably relied upon by experts in the field.  Fed. R. Evid. 703.  An expert may also provide opinion testimony even if it embraces an ultimate issue to be decided by the trier of fact.  Fed. R. Evid. 704.

The Ninth Circuit has held that the admissibility of expert testimony generally turns on the trial court answering the following questions:

a. Whether the opinion is based upon scientific, technical, or other specialized knowledge;

b. Whether the expert's opinion would assist the trier of fact in understanding the evidence or determining a fact in issue;

c. Whether the expert has appropriate qualifications;

d. Whether the testimony is relevant and reliable;

e. Whether the methodology or technique the expert uses "fits" the conclusions; and

f. Whether is probative value is substantially outweighed by the risk of unfair prejudice, confusion of issues, or undue consumption of time.

See United States v. Hankey, 203 F.3d 1160, 1168 (9th Cir. 2000); United States v. Alatorre, 222 F.3d 1098, 1101 (9th Cir. 2000).

The government intends to call Lon D. Anderson, a forensic chemist with the DEA Southwest Laboratory.  Mr. Anderson will testify to the composition and weight of the cocaine base in the form of crack cocaine.  Mr. Anderson's testimony will be based upon his chemical analysis and examination of the narcotics and chemicals seized in this case.

The government intends to call San Bernardino Police Department Narcotics Investigator as an expert witness to testify on the issues of distribution and sales of drugs and the use of

11

firearms in furtherance of drug trafficking crimes.  Officer Beall has 7 years experience as Narcotics Investigator and has participated in hundreds of narcotics investigations.  He will testify about the following topics, among others:

1. That the amount of the narcotics at issue and the packaging is consistent with distribution;
2. The street names and value of the drugs found in defendant's possession;
3. The role of firearms in protecting and furthering drug transactions; and
4. The role of scales, packaging materials, and the use of hotel and motel rooms for distribution;
5. The history and current trend of drug sales activities in the area surrounding the Economy Inn; and
6. The characteristics of "hand-to-hand" drug transactions and high drug trafficking areas.

The Ninth Circuit has repeatedly held that expert testimony regarding drug trafficking characteristics, such as distribution quantities, number of doses, and the wholesale market and retail value of the drugs, is both relevant and admissible in drug cases.  See e.g., United States v. Murillo, 255 F.3d 1169, 1176 (9th Cir. 2001) (expert permitted to testify about the value of drugs found in defendant's rental car, number of doses that such an amount constituted, *modus operandi* of drug couriers, and whether traffickers entrust large quantities of drugs to unknowing transporters), cert. denied, 535 U.S. 948 (2002); United States v. Theodoropoulous, 866 F.2d 587, 591 (3d Cir. 1989) (the various roles played by the defendants in a drug trafficking conspiracy).  An experienced narcotics agent may testify in the form of an opinion even if that opinion is based in part on information from other agents familiar with the issue.

12

United States v. Beltran-Rios, 878 F.2d 1208, 1213 n.3 (9th Cir. 1989); United States v. Golden, 532 F.2d 1244, 1248 (9th Cir. 1976). A participant in a narcotics-related conversation may properly testify regarding his understanding of statements made to him by the defendant. United States v. Brooks, 473 F.2d 817, 818 (9th Cir. 1973) (per curium).

B.   Defendant's Knowledge of Type of Controlled Substance

A defendant who is charged with distributing or possessing a controlled substance under 21 U.S.C. § 841(a) need not know the type and quantity of drugs in his possession to be subject to the sentencing enhancements contained in 21 U.S.C. § 841(b), as long as defendant believed it was a controlled substance. See United States v. Carranza, 289 F.3d 634, 644 (9th Cir. 2002); see also United States v. King, 345 F.3d 149, 153 (2003) (citing other circuit cases with same holding).

Therefore, a defendant who is convicted of possessing with intent to distribute what turns out to be cocaine base in the form of crack cocaine is subject to the penalties for cocaine base in the form of crack cocaine, even if the defendant claims he had intended to distribute some other controlled substance.

C.   Chain of Custody

The government intends to introduce numerous items of physical evidence seized in this case. The test of admissibility of physical objects connected with the commission of a crime requires a showing that the object is in substantially the same condition as when the crime was committed (or the object seized). See Fed. R. Evid. 901(a) ("[t]he requirement of authentication or identification as a condition precedent to admissibility is

satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims").

Rule 901(a) only requires the government to make a prima facie showing of authenticity or identification "so that a reasonable juror could find in favor of authenticity or identification." United States v. Chu Kong Yin, 935 F.2d 990, 996 (9th Cir. 1991). Factors to be considered are the nature of the article, the circumstances surrounding its preservation and custody and the likelihood of inter-meddlers tampering with it. There is, however, a presumption of regularity in the handling of exhibits by public officials. United States v. Kaiser, 660 F.2d 724, 733 (9th Cir. 1981), overruled on other grounds, United States v. De Bright, 730 F.2d 1255, 1259 (9th Cir. 1984) (en banc).

The government is not required, in establishing chain of custody, to call all persons who may have come into contact with the piece of evidence. Reyes v. United States, 383 F.2d 734 (9th Cir. 1967); Gallego v. United States, 276 F.2d 914, 917 (9th Cir. 1960). The district court may admit physical evidence if there is a "reasonable probability the article has not been changed in important respects." United States v. Harrington, 923 F.2d 1371, 1374 (9th Cir. 1991) (quoting Gallego, 276 F.2d at 197).

D.   Party Admissions

Defendant made inculpatory statements to Officer Beall. Those statements are summarized supra. The government intends to introduce these statements in its case-in-chief, through the testimony of Officer Beall.

Defendant's out-of-court statements are not hearsay if they

14

are offered against him and they are his own statements. Fed. R. Evid. 801(d)(2)(A); United States v. Ortega, 203 F.3d 675, 682 (9th Cir. 2000) (defendant's "self-inculpatory statements, when offered by the government, are admissions by a party-proponent and are therefore not hearsay"). Furthermore, the government's introduction of defendant's prior statement does not open the door for him to introduce his own prior out-of-court statements. When offered by defendant, such statements are inadmissible hearsay. Fed. R. Evid. 801(c); Ortega, 203 F.3d at 682. This is true even if defendant's non-self-inculpatory statements were made contemporaneously with other self-inculpatory statements. Ortega, 203 F.3d at 682 (citing Williamson v. United States, 512 U.S. 594, 599 (1994)).

### E. Photographs

The government intends to introduce photographs taken by law enforcement officers during the execution of the March 11, 2009 search at the Economy Inn Motel and arrest of defendant, including pictures of the evidence seized. The foundation for the admissibility of photographs is the testimony of a witness, who was present at the time of the taking of the photograph, and who testifies that the photograph is a fair and accurate representation of the event depicted therein. United States v. Oaxaca, 569 F.2d 518, 524-25 (9th Cir. 1978). There is no requirement under the federal rules that the person who took the photograph testify. Nor is there any requirement that the witness laying the foundation for the pictures be able to specify the precise time at which the pictures were taken.

F.  Audio Recordings and Transcripts

As the Court is aware, the parties are in possession of certain recordings of video and radio calls.  The government does not intend to introduce these recordings in its case-in-chief. The government may, however, use such recordings in rebuttal, or on re-direct of certain witnesses if necessary under Fed. R. Evid. 801(d)(1)(B) (prior consistent statements), depending upon the defenses defendant raises at trial.  In the event that the government seeks to introduce such recordings, the government will lay an appropriate foundation, and transcripts will be provided to the Court.

G.  Defendant's Statements Regarding His Gun

Should the Court suppress defendant's statements regarding his gun, the government will still be able to use such statements for impeachment purposes.  See Harris v. New York, 401 U.S. 222 (1971) (rejecting as an "extravagant extension of the Constitution," the theory that a defendant who had confessed under circumstances that made the confession inadmissible, could thereby enjoy the freedom to "deny every fact disclosed or discovered as a 'fruit' of his confession, free from confrontation with his prior statements" and that the voluntariness of his confession would be totally irrelevant.)

**IV. ANTICIPATED DEFENSES**

On April 10, 2009, the government requested notice from defendant regarding any intent to rely upon an alibi or entrapment defense under Fed. R. Crim. Proc. 12.1, and all discovery to which the government was and remains entitled under Rules 16(b) and 26.2 of the Federal Rules of Criminal Procedure.

Defendant has provided no such notice, and has not produced any discovery to the government as of this date. On the facts of this case, the government does not anticipate that defendant will attempt to present evidence of an alibi or entrapment defense.

DATED: December 13, 2009

Respectfully submitted,

GEORGE S. CARDONA
Acting United States Attorney

SHERI PYM
Assistant United States Attorney
Chief, Riverside Branch Officer


 /s/
JERRY C. YANG
Assistant United States Attorney
Attorneys for Plaintiff
United States of America