LARRY M. BAKMAN (SBN #088964)
10100 Santa Monica Boulevard
Suite 300
Los Angeles, California 90067
Telephone: (310) 772-2233
Facsimile: (310) 772-2234
Email: lbakman@lbakmanlaw.com

Attorney for: Defendant

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA<br><br>　　　　　Plaintiff,<br><br>　vs.<br><br>CALVIN COLBERT,<br><br>　　　　　Defendant | CASE NO: CR 09-301-GW<br><br>NOTICE OF MOTION AND MOTION TO REQUIRE PRODUCTION OF LAW ENFORCEMENT PERSONNEL FILES; COMPLAINT RECORDS AND INVESTIGATION RECORDS; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF COUNSEL IN SUPPORT THEREOF<br><br>DATE: April 12, 2010<br>TIME: 11:00 a.m.<br>CTRM: Honorable George H. Wu |
|---|---|

　　　To United States Attorney, Andre Birotte Jr., and to Assistant United States Attorney, Jerry Yang:

　　　Notice is hereby given that on April 12, 2010, at 11:00 a.m. or as soon thereafter as the matter may be heard, in the Courtroom of the George H. Wu, Defendant, CALVIN COLBERT will move the court for an order requiring the production of the following:

　　1. Any and all documents in the personnel records of the investigating officers from

　　　the San Bernardino County Sheriff Department that the government intends to call

　　　or has called to date as witnesses in the suppression hearing, the government's

-1-

case in chief or its rebuttal case. Said individuals include but are not limited to the following individuals from the San Bernardino County Sheriff – **_Officer Gerald Beall_**; **_Officer Anthony White_**; **_Officer Taack_**; **_Officer Landeros_**; **_Officer Everett_**; **_Officer Roebuck;_** and **_Officer Everett_**; Said documents are to include but are not limited to the following: any complaint registered with the agency by any inmate, fellow officer, or private citizen alleging any acts demonstrating racial or ethnic prejudice, illegal or false arrest, improper tactics, dishonesty, false imprisonment, false police reports and illegal search and seizure.

2. The names, address and telephone numbers of all persons who filed complaints described in Paragraph 1.

3. The names, addresses, and telephone numbers of all persons interviewed by the agency during the investigation of said complaints.

4. All statements, written or oral made by persons who brought said complaints.

5. All statements, written or oral made by persons interviewed during the investigation of said complaints.

6. All tape recordings and/or transcriptions thereof, notes and memoranda by investigating personnel of the agency made pursuant to investigations described in paragraph 1.

7. The names and assignments of investigators and other personnel employed by the agency in investigations described in Paragraph 1.

8. All investigative reports made as a result of said complaints, excluding any "conclusions" reached by any officer investigating the complaint.

9. All test records, reports and statements including but not limited to letters, reports and oral conversations of psychiatrists, psychologists and fellow officers pertaining to the above identified officers and their engaging in or propensity to engage in conduct described in Paragraph 1.

10. Any and all documents that record disciplinary action commenced or imposed against either officer because of conduct described in Paragraph 1.

11. Any statements by any of these officers to investigators in internal affairs regarding the events that form the basis of the criminal charges in this case.

This motion is made on the grounds that a defendant has a right to the production of exculpatory evidence in the possession of the government. This right, protected by the Due Process Clause of the Fifth Amendment, requires the government to turn over any information about its witnesses that could cast doubt upon their credibility. This motion is also brought under Federal Rules of Criminal Procedure, Rules 16.

This motion is based upon this notice and the accompanying points and authorities and such additional points and authorities as may be filed hereafter, all of the files and records in this case and such witnesses, testimony and other evidence as may be presented at the time of the hearing on this motion.

`

March 19, 2010

_____
Larry M. Bakman
Attorney for Defendant

# MEMORANDUM OF POINTS AND AUTHORITIES

## I

## INTRODUCTION

### *A. SUMMARY OF CHARGES*

Mr. Colbert is charged in Count One of the indictment with Possession of Cocaine Base with the Intent to Distribute and in Count Two of the indictment with Possession of a Firearm in Furtherance of a Drug Trafficking Crime.

### *B. SUMMARY OF FACTS IN THE INSTANT CASE:*

On March 11, 2009, Gerald J. Beall, a police officer for the San Bernardino Police Department ("Officer Beall"), submitted an affidavit in support of a search warrant to Judge Michael Smith of the San Bernardino Superior Court. [Exhibit A, Affidavit in Support of Search Warrant is attached to defendant's previously filing entitled Notice of Motion and Motion to Suppress filed October 28, 2009].

Officer Beall's affidavit alleged that there was probable cause to believe that "there is. now located at 685 W. 6th Street, #217, City of San Bernardino, County of San Bernardino, State of California, cocaine base" and "there is now located at 685 W. 6th Street, #217, City of San Bernardino, County of San Bernardino, State of California, cocaine base." *Id.* Based upon the affidavit, Judge Smith issued a warrant for the search of both rooms in the "Economy Inn" motel. *Id.*

Officer Beall's statement of probable cause alleged that: (1) On March 10, 2009, at 4:00 p.m., a "confidential reliable informant (CRI)" notified him that a "Black male in his mid to late 20's, approximately 5'10" tall, with a medium complexion and average build, staying at the "Economy Inn" motel [was] selling cocaine base"; (2) Officer Beall went to the Economy Inn with the CRI and the CRI pointed to someone who matched the description and identified him as "Cal"; (3) Officer Beall saw a Black male on a bicycle ride up to "Cal" and "a small object"

was exchanged by both at the corner of the motel parking lot; (4) other officers saw "numerous individuals go to room #217, knock on the door and receive no response"; (5) On March 11, 2009, at about 9:30 a.m., Officer Beall suggested he saw a Black female go to room #217, where "Cal" allegedly spoke to her, then went to room #220 together and he then opened the door using a pass key; "Cal" left a minute later and went back to room #217; the Black female later left the room and the motel lot; the Black male then left room #217, walked over to the Black female and gave her something through the fence; (6) Officer Beall suggests he saw Officer White, who was wearing audio and video recording equipment, go to the fence "along 6th Street below room #217" and saw a Black female speak to a Black male wearing "a white jacket, had a medium complexion, appeared to be approximately 5'08" tall, 170 lbs., and had short, Afro-style hair." She asked him for some "dub", he came to the edge of the stairwell and the Black male said, "I don't know him."; (7) Officer Beall suggests that he saw the Black female allegedly continue to negotiate the drug transaction with the Black male who was standing at the stairwell; (8) a second Black older female appeared from the west side of the motel and approached Officer White and asked who wanted the "dub." Officer White said he did and she said she had it and that "he" had given it to her. She wanted Officer White to get the $20 back from the first Black female which she did and he gave the second Black female the $20 and he then got the two baggies of suspected cocaine base; (9) the second Black female told Officer White that the Black male was "cool", he didn't know Officer White, the male was her "nephew" and that "the Black male has sent her to Officer White's location with the dope"; and (10) the first Black female and Officer White walked to the Greyhound station and met Officer Beall; Officer White then gave the first woman $10; Officer Beall then suggests he saw her walk to the "area of the vacant lot east of the motel and conducted what appeared to be a second transaction with the Black male subject." Appendix A, at 4-5.

Although Officer Beall relied on the "CRI" in his statement of probable cause, Officer Beall did not identity the "CRI", nor did he specifically state why the informant was "reliable". Appendix A, at 3-5.

Officer Beall described the premises to be searched. Appendix A at 5. Officer Beall described the hotel and the rooms. *Id.* Specifically, he stated that the number "217" and "220" was "affixed to [the door]."

The Police Report and the Audio and Video Recording.

On the morning of March 11, 2009, undercover police officers in the narcotics unit of the San Bernardino Police Department conducted an operation designed to ascertain the identity of and arrest a crack dealer. [Exhibit B, Police Report at 1 attached to defendant's prior filing entitled Notice of Motion and Motion to Suppress Evidence filed on October 28, 2009]

The officers set up this operation based on a tip that an unidentified informant had given them the previous afternoon. Exhibit A, at 2. Pursuant to the plan, Officer Beall was stationed in a Greyhound bus parking lot near the suspected location from which the dealer was selling crack, namely, the Economy Inn at 685 W. 6th Street in San Bernardino. Exhibit B, at 1.

Shortly thereafter, an unidentified black female approached Officer Beall and attempted to sell him a cellular phone for twenty dollars. Exhibit B, at 2. He declined and asked whether she could procure some crack for him instead. Id The unidentified female said she could, and Officer Beall asked her to wait with him until his "friend" arrived, i.e., Officer White. *Id.* When Officer White arrived, the three of them had a conversation, which was video-recorded. *Id.* Then, Office White gave the unidentified female twenty dollars and she went over to the Economy Inn, apparently to ask someone if they would sell crack to her for him. *Id.*

The person with whom the female spoke looked at Officer White, became angry and said he did not know him. Exhibit B, at 2. Officer White then had a conversation with an unidentified male standing nearby, who allegedly told him that the female would "be right back." *Id.* at 3. Then, a second unknown female walked out of the motel and told Officer White to get his money back from the first unidentified female. Id. Once he did this, the second woman took the money and gave him some crack. *Id.* Officer White then gave the first woman ten dollars for helping to facilitate the transaction. *Id.* According to another officer, Officer Landeros, the first woman apparently used the ten dollars to immediately purchase crack from "Cal". *Id* at 3.

1  Officers Beall and White then left the area, and Officer Beall wrote the search warrant,
2  which was signed by the Honorable Judge Smith. Exhibit B, at 3. When Officer White and
3  Officer Beall returned to the office to write the affidavit, Officer Beall said: **"I'll have you help**
4  **me spew some of that shit out to write my affidavit," and "As far as I'm concerned, he**
5  **fucking threw at you from the fucking room upstairs."** *See* Exhibit C and Exhibit D, at 11.
6  Once they had the search warrant, and were driving back to the Economy Inn, Officer
7  Landeros informed the officers that it appeared as if someone was moving their belongings
8  from room #217 to room #220 at the Economy Inn. Exhibit B, at 3. Officers Beall and White
9  then arrived at the Inn, where a detective, two other officers, and two Agents working for the
10 Bureau of Alcohol, Tobacco, and Firearms joined them, and proceeded to execute the search
11 warrant on rooms #217 and #220. *Id.* They observed that room #217 was clean and empty. *Id.*
12 The officers, detective, and agents then walked to room #220, used a ram to bust open the
13 door after issuing a verbal warning, and entered the room. *Id.* No information is contained in
14 the report regarding any time given to respond or any furtive noises. *Id.* Once they busted the
15 door open, they saw Mr. Colbert sitting in a chair. *Id.* Officer Beall ordered him to the ground,
16 and he complied. *Id*, at 4.

17 Before any *Miranda* warnings were given, Officer Beall asked Mr. Colbert if there were
18 any weapons in the room. Mr. Colbert allegedly said "yes". *Id.* at 4. Officer Beall then asked
19 where the weapon was and Mr. Colbert allegedly said, "It's over there; motioning toward the
20 dresser, and then said, after further questioning, "It's in the drawer." Exhibit B, at 4. Thereafter,
21 a gun was discovered in the dresser drawer. *Id.*

22 The search of room #220 also revealed $957.00, 24 grams of crack, plastic baggies, a
23 scale, a man's wallet, and a cellular phone. Exhibit B, at 4. The only item actually found on Mr.
24 Colbert's person was $18, which was seized after being discovered in his shirt pocket. *Id.* The
25 other items seized during the search were found in different locations throughout room #220.
26 *Id.*

Mr. Colbert was arrested for possession of crack cocaine with intent to distribute and possession of a firearm. Exhibit B, at 7. Before being taken to the detention center, Mr. Colbert was Mirandized and made a statement in which he denied selling crack. *Id.*, at 8.

After Mr. Colbert's arrest, the officers failed to identify and locate both of the woman they interacted with during the undercover investigation, even though these women were the only people with whom they made contact in the events leading up to Mr. Colbert's arrest. Exhibit B, at 7. The second woman whom the officers failed to identify and locate was the person who allegedly handed Officer White the substance later identified as crack. Moreover, neither of the people who were registered to room #220 (as indicated on the Economy Inn registration cards) have been located or questioned, even though all of the seized contraband was found in room #220, and no contraband whatsoever was found in the room registered to Mr. Colbert (room #217). Exhibit B, at 7; *see also* Exhibit E, Discovery, Bates No. 14. Additionally, the officers failed to identify and locate the unidentified male who told Officer White that the first unidentified female would "be right back" when he was trying to negotiate a drug transaction with her. Exhibit D, at 5. This unidentified male interacted with Officer White for at least a couple of minutes, and appeared to have material knowledge of both narcotics transactions; yet, there is no evidence that any effort was made to locate or identify this man once Mr. Colbert was arrested.

In fact, in both the Police Report and the Affidavit in Support of Search Warrant, no mention at all is made of this man's existence or presence on the scene at the time of the investigation. Exhibit B, at 2; see also Exhibit A, at 3-5.

### *C: PRIOR FINDING BY THE HONORABLE ROBERT H. WHALEY, UNITED STATES DISTRICT COURT JUDGE AS TO OFFICER BEALL'S LACK OF VERACITY*

On February 18, 2010, the Honorable Robert H. Whaley, made an order granting defendant's motion to suppress evidence in the matter entitled United States v. Vincent Young, Case No. ED-CR-09-081-RHW.

-8-

In a factual scenario similar to the instant case, Officers from the San Bernardino Police Department narcotics United received information from anonymous and unamed sources stating that a person named Vince Young sold cocaine base and drove a red mini-pick up truck.

On January 6, 2009, a briefing was held with members of the Narcotic Unit for a planned surveillance at Mr. Young's residence. It was decided that in the event Mr. Young was seen, Officer S. Aranda and A. Castro, who were standing by in a full uniform and in a marked patrol unit, would follow Mr. Young. In the event a traffic violation occurred, they would initiate a traffic stop.

Officer Beall [the same Officer Beall as in the instant case] orchestrated the surveillance, by following the mini truck and directing the marked unit to make a a traffic enforcement stop.

An alleged "consent" search of the driver and the passenger ensued. A search of the passenger disclosed a substance officers believed was cocaine base at which time Officer Beall arrived on scene. At some point Officer Beall asked for and obtained defendant's key ring and proceeded to his residence wherein a search of the residence occurred and contraband was discovered. Based upon the discovered contraband, law enforcement applied for a federal arrest warrant on March 26, 2009 and defendant was arrested. At the time of his arrest, 40 grams of base cocaine were found in a black plastic bag inside defendant's trunk.

Defendant moved to suppress all evidence obtained by the government after his initial arrest.

In a sixteen page written opinion, Judge Whaley found that 1) the anonymous information was unreliable; 2) law enforcement violated defendant's fourth amendment rights given the warrantless search of his residence prior to the issuance and receipt of a search warrant; and most importantly 3) Officer's Beall was found by the court to lack credibility given discrepancies between Officer Beall's time line of events and the provided CAD log as well as inconsistencies in Beall's testimony as to material points.

Ultimately Judge Whaley made a specific factual finding that he did not believe Officer Beall's testimony nor Beall's attempt to justify his changed testimony. Judge Whaley went on to state:

> **"Officer Beall has not been truthful and did not act in good faith in obtaining the warrant and relying on its issuance."**

As a result of Beall's lack of veracity, the Court found that the good faith exception as found in *United States v. Leon*, 468 U.S. 897 was inapplicable to the case given **the "search warrant affidavit was "so lacking in indicia of probable cause as to render official belief in its existence objectively unreasonable".   A copy of Judge Whaley's written opinion is attached hereto as Exhibit 1.**

Defendant in the instant case would argue that Judge Whaley's findings in the Vincent matter serves as a "directional beacon" when considering whether to grant the eleven requests made herein.

## II.

## ARGUMENT

**The obligation of the government is to turn over material that is or may be material to the defense.**

The genesis of the defendant's request is that under *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963), a defendant has a right to the production of exculpatory evidence in the possession of the government. This right, protected by the Due Process Clause of the Fifth and Fourteenth Amendments, requires the government to turn over any information about its witnesses that could cast doubt upon their credibility. See *United States v. Bagley,* 473 U.S. 667, 67677, 87 L. Ed. 2d 481, 105 S. Ct. 3375 (1985); *Giglio v. United States,* 405 U.S. 150, 154, 31 L. Ed. 2d 104, 92 S. Ct. 763 (1972).

In *United States v. Henthorn*, 931 F.2d 29; 1991 (9th Cir. 1990) the Ninth Circuit applied this requirement to a defendant's request that the prosecution "produce the personnel files of

all law enforcement witnesses whom it intends to call at the trial . . . for evidence of perjurious conduct or other like dishonesty." Having made the request, the obligation to examine the files arises by virtue of the making of a demand for their production. However, following that examination, the files need not be furnished to the defendant or the court unless they contain information that is or may be material to the defendant's case.

Subsequent cases such as *United States v. Jennings*, 960 F.2d 1488; 1992 (9th Cir. 1992) have addressed the question of whether or not the United States Attorney, personally, or some other entity must make the review of the file. In *Jennings* the court was notified by counsel for the government that the Department of Justice had instituted a policy designed to implement the holding of *Henthorn*. Under this policy, the files of law enforcement officers are to be examined by the appropriate agency's attorney or his staff. The agency legal staff will notify the federal prosecutor assigned to the case if any potential *Brady* material is found, and the AUSA will then determine whether the information should be disclosed or whether an in camera review by the district court is appropriate. (*Jennings*, Fn 3.) In its ruling the court went on to state that, "However, the presumption is that official duty will be done, and hence that the procedure instituted by the Department of Justice to ensure compliance with *Henthorn* will be tailored to those concerns. Adherence to this procedure would indicate that the AUSA is fulfilling his responsibility for ensuring government compliance with *Brady*. Personal review by the AUSA after being alerted to the presence of potential *Brady* material by agency staff lessens the chance that exculpatory information will go undiscovered by personnel unfamiliar with the facts of the case or the relevant criminal law involved. In addition, the court and the government understand that the prosecutor's duty to the court extends to ensuring the government's compliance with our decision in *Henthorn. See Chanen, 549 F.2d at 1313 n.5* (recognizing prosecutor's good faith duty to comply with the law)."

///

///

# III

**Defendant herein has made a prima facie showing that the discovery requested most likely exists and is material to the defense.**

At least one court has held that evidence is material as long as there is a strong indication that it will "play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony or assisting impeachment or rebuttal *United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993). Under Ninth Circuit law evidence is material if it might have been used to impeach a government witness, because if disclosed and used effectively, it may make the difference between conviction and acquittal." *Carriger v. Stewart*, 132 F.3d 463, 481 (9th Cir. 1997) The defense request is limited to records of "any complaint registered with the agency by any inmate, fellow officer, or private citizen alleging any acts demonstrating racial or ethnic prejudice, illegal or false arrest, improper tactics, dishonesty, false imprisonment, false police reports and illegal search and seizure."

The records requested would bear directly on the credibility of Officer Beall and the other narcotic officers who claim to have observed Mr. Colbert's purported illegal activities.

If previous actions by any individual officer demonstrate racial or ethnic prejudice, illegal or false reports, improper tactics, dishonesty, false imprisonment, false reports or illegal search and seizure activities they are directly related to the issues that exist in this case.

## CONCLUSION

Defendant's showing herein established plausible justification for production of the materials sought. In light of what the defense has brought to light, there simply is no basis to deny the defendant the opportunity to review the complaints and the other related information asked for in this motion. Accordingly, the Court should grant defendant's request for production of the documents listed in the eleven categories contained herein.

///

///

Respectfully submitted,

March 19, 2010

_____
Larry M. Bakman
Attorney for Defendant