ANDRÉ BIROTTE JR.
United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
SHERI PYM
Assistant United States Attorney
Chief, Riverside Branch Office
JERRY C. YANG/JENNIFER L. WILLIAMS
Assistant United States Attorneys
California Bar Number 241323/268782
    3880 Lemon Street / 312 North Spring Street
    Riverside, California 92501 / Los Angeles, California 90012
    Telephone:  (951) 276-6221 / (213) 894-5862
    Facsimile:  (951) 276-6202 / (213) 894-0142
    E-mail: jerry.yang@usdoj.gov / jennifer.williams6@usdoj.gov

Attorneys for UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CR No. 09-301-GW |
| | ) |
| Plaintiff, | ) GOVERNMENT'S SUPPLEMENTAL |
| | ) BRIEFING RE: (1) DEFENDANT'S |
| v. | ) STANDING TO CHALLENGE SEARCH |
| | ) AND (2) APPLICABILITY OF |
| CALVIN CHARLES COLBERT, JR., | ) PUBLIC SAFETY EXCEPTION |
| aka "Cal," | ) |
| | ) Hearing Date: October 21, 2010 |
| Defendant. | ) Hearing Time: 10:00 a.m. |
| | ) |

    Plaintiff United States of America, by and through its

counsel of record, the United States Attorney for the Central

District of California, hereby submits supplemental briefing

regarding (1) defendant's standing to challenge the search at

//

//

issue and (2) the applicability of the public safety exception to this case.

Dated: October 14, 2010          Respectfully submitted,

ANDRÉ BIROTTE JR.
United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division

SHERI PYM
Assistant United States Attorney
Chief, Riverside Branch Office


                              _____/s/_____
                              JERRY C. YANG
                              JENNIFER L. WILLIAMS
                              Assistant United States Attorney
                              Attorneys for Plaintiff
                              United States of America

## I. INTRODUCTION

On March 11, 2009, San Bernardino Police Department officers and Bureau of Alcohol Tobacco and Firearms agents (collectively, "officers") conducted an undercover purchase of crack cocaine from defendant Calvin Charles Colbert, Jr. at the Economy Inn. Officers obtained a search warrant.  Upon entering Room #220 of the Economy Inn, officers found defendant seated in a chair, with a stack of cash and crack cocaine in front of him, as well as money in his hands.  See San Bernardino Police Department Report ("Police Report"), attached as Exhibit B to Defendant's Motion to Suppress, p. 4).  Officers ordered defendant to the ground and handcuffed him.  Police Report p.4.  At that point, prior to searching his person, Officer Gerald Beall asked defendant (1) if defendant had any weapons; (2) where the weapon was; and (3) whether defendant had any weapons on his person.  Defendant responded: (1) "yes"; (2) "It's over there," motioning to the dresser; and (3) "No, it's in the drawer."  Police Report p.4; 9/21/10 Beall Declaration ¶7, Clerk's Record Number 103, hereinafter, "9/21/10 Beall Decl.").  Officers recovered a loaded Rugar MK2 .22 caliber semi-automatic handgun with one live round in the chamber.  Police Report, pp.4-6.

Defendant's challenges regarding the physical evidence fail because (1) he did not have a reasonable expectation of privacy in room #220 (and does not, therefore, have standing to raise the issue); and (2) in any event, the search warrant sets forth probable cause and defendant can not make a substantial showing of a material intentional or reckless false statement or

1  commission.  With respect to defendant's statements, defendant's

2  challenge fails because Officer Beall's questions arose out of an

3  objectively reasonable need to protect the police or the public

4  from any immediate danger associated with a weapon, preliminary

5  Miranda warnings were not required.

6      On October 6, 2010, defendant and Officer Beall testified to

7  facts relating to the standing issue and the Miranda public

8  safety exception, respectively.  In conclusion, the Court

9  requested that the parties submit additional briefing as to (1)

10  whether the fact that room #220 was being used for an unlawful

11  purpose affects defendant's standing and (2) binding case law

12  finding the public safety exception applicable where defendant

13  had already been restrained in the manner used here (i.e., laying

14  on the ground with hands cuffed behind back).

15                          **II. ARGUMENT**

16  A.   THERE IS NO LEGITIMATE EXPECTATION OF PRIVACY IN A HOTEL
          ROOM OBTAINED BY A THIRD PARTY AND WHICH IS USED FOR AN
17        UNLAWFUL PURPOSE

18      A defendant's right to claim the protection of the Fourth

19  Amendment depends on whether he has a legitimate expectation of

20  privacy in the area searched.  Minnesota v. Olson, 495 U.S. 91,

21  95-96 (1990); Rakas v. Illinois, 439 U.S. 128, 148 (1978).  The

22  defendant bears the burden of showing that he had a legitimate

23  expectation of privacy, see United States v. Salvucci, 448 U.S.

24  83, 95 (1980); Rawlings v. Kentucky, 448 U.S. 98, 104 (1980), and

25  self-serving statements alone are insufficient to sustain such

26  burden.  United States v. Armenta, 69 F.3d 304, 308 (9th Cir.

27  1995) (defendant lacked standing to challenge search of house,

28
                                 2

1  despite claim that he was an overnight guest there).

2      A legitimate expectation of privacy triggering Fourth

3  Amendment scrutiny exists when (1) the defendant had an actual

4  expectation of privacy, i.e., he sought to preserve something as

5  private; and (2) the expectation of privacy is one that society

6  is prepared to recognize as reasonable.  Bond v. United States,

7  529 U.S. 334, 338 (2000).  A court must consider all of the facts

8  and circumstances of the case in determining whether a

9  defendant's subjective expectation of privacy is legitimate.

10  Salvucci, 448 U.S. at 91-93.

11      A person's legitimate expectation of privacy may differ

12  based upon the location of the search.  United States v. Paopao,

13  469 F.3d 760 (9th Cir. 2006).  Although a place need not be a

14  person's "home" in order for that person to have a legitimate

15  expectation of privacy therein, Olson, 495 U.S. at 91, the

16  Supreme Court has suggested that a visitor to a temporary

17  dwelling place usually lacks a rightful expectation of privacy

18  unless the visitor stays overnight.  Minnesota v. Carter, 525

19  U.S. 83, 89-91, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998) ("an

20  overnight guest in a home may claim the protection of the Fourth

21  Amendment . . . one who is merely present with the consent of the

22  householder may not.") (citing Olson, 495 U.S. at 98-99).

23      The Carter Court also indicated that a visitor to another's

24  home for "commercial" purposes – unlawful or otherwise – retains

25  only a limited privacy interest, because "[a]n expectation of

26  privacy in commercial premises ... is different from, and indeed

27  less than, a similar expectation in an individual's home."  Id.

28
                                3

at 90 (quoting <u>New York v. Burger</u>, 482 U.S. 691, 700, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987)).  Accordingly, the Court held that the defendant, who was in a friend's apartment for two and a half hours for a commercial purpose of bagging cocaine to sell, lacked a sufficient privacy interest.  <u>Id.</u>; <u>see</u> <u>also</u> <u>Paopao</u>, 469 F.3d at 760 (defendant had no reasonable expectation of privacy in apartment where no one lived and was used commercially as an illegal gambling room).

In this case, as in <u>Carter</u>, defendant lacked a legitimate expectation of privacy in room #220: his self-serving testimony is not credible and in any event, has not established that he was an overnight guest in room #220, as a lessee or a guest of the lessee; instead, the evidence shows that he was there only for commercial purposes, i.e., to traffic in crack cocaine.  He cannot, therefore, challenge the search of the room.

Defendant testified that he checked into the Economy Inn on March 9, 2009, where he registered as a guest, paid $55 for the night, and was assigned room #217.  Defendant stated that on March 10, 2009, he paid $50 for an additional night, to check out on the 11th before noon.  RT 10/06/2010[1]: 20.  Defendant, however, claims that he left #217 between 11:00 a.m. and 12:00 noon on the 11th, and "took over" room #220, which had been registered to Jamine Marshell.  RT 10/06/2010: 21.  Defendant testified that he talked to Marshell about leaving things in Marshell's room until

---

[1] A copy of the transcript of the hearing on October 6, 2010 is attached.

4

defendant could get some money,[2] but then "it just came about to where I gave him [Jamene] $25 and then I just took over the room [#220]". RT 10/06/2010: 21. (In direct contradiction to officer surveillance on the 10th, during which they observed defendant go in and out of #220 in addition to #217, defendant said he did not rent 220 before taking it over on the 11th and "was never even in 220 on the 10th." RT 10/06/2010: 32).

Remarkably, defendant claims that this exchange took place before the hotel manager, who "had problems with Jamine himself." RT 10/06/2010: 24. Defendant stated that Marshell had already paid for #220 for the night of the 11th, and so defendant handed $25 to Marshell in front of the manager and also agreed to pay the manager $25 for the remote control and room key that Marshall lost for #220. RT 10/06/2010: 23-25. This story makes little sense: defendant could have stayed in #217 for the same price, but instead moved his belongings in #220, a room to which the key had been lost, and, according to defendant, still had the belongings of Marshell, someone defendant knows a little about other than that Marshell has a crack problem and "loiters in the area a lot." RT 10/06/2010: 23, 30, 40.

Defendant's lack of credibility is also illustrated in his time line of events, through which, in an effort to have it both ways, he attempts to assert an expectation of privacy in the room he apparently "took over" from Marshell without establishing that

---

[2]At the time officers entered #220 to execute the warrant, defendant was sitting in a chair with a stack of money in front of him, appearing to be in the middle of counting the money, despite his testimony that he moved into #220 because he had run out of money.

he actually "took over" the room (for fear, of course, of linking
himself to the drugs and firearm found in the room).  Defendant
stated that he moved out of #217 and into #220 between 11:00 a.m.
and 12:00 p.m. on the morning of the 11th.  RT 10/06/2010: 21, 28.
The agreement with Jamine, says defendant, did not happen until
"20 minutes after everything was already settled in [to #220]."
RT 10/06/2010: 22.  Here is where defendant's story diverges:  On
the one hand – to assert a reasonable expectation of privacy in
the room – defendant testified that "a least about a few hours,
like three, three, maybe four" passed between the agreement with
Marshell and the execution of the warrant.  RT 10/06/2010: 23.
(According to the law enforcement officers, the search warrant
was executed around noon on the 11th.  Police Report p. 3.)  On
the other hand, however – to distance himself from the items in
the room – defendant then testified, that after reaching the
agreement with Marshell and receiving the key to #220, "the
understanding was that he [Marshell] would eventually come back
within **a few minutes** so he could get his belongings" and that
when Marshell came back the search was already being executed.
RT 10/06/2010: 37, 47.  Thus, whether defendant was in the room
for a few minutes or a few hours depends entirely on the issue he
is trying to avoid.

     In short, defendant's testimony is not credible.  Outside of
his bald, self-serving assertion that he obtained room #220
through an informal transaction with Marshall, there is no
evidence that he legitimately leased room #220 as an overnight
guest.  To the contrary, the evidence shows that, like the

defendants in <u>Carter</u>, defendant was in the room, which was registered to Marshell — someone about whom defendant could offer little detail – with cash, drugs, a gun, and trafficking supplies.  Defendant was in the room for commercial purposes only.  Because defendant had the burden to establish standing and advanced no credible evidence on this issue, his challenge to the search of the room fails.[3]

B.   OFFICE BEALL'S QUESTIONING OF DEFENDANT WAS OBJECTIVELY
     REASONABLE TO PROTECT OFFICERS AND THE PUBLIC FROM AN
     IMMEDIATE DANGER

     Generally, a suspect under custody must be <u>Mirandized</u> prior to questioning from law enforcement agents.  However, in <u>New York v. Quarles</u>, the Supreme Court held that testimonial evidence obtained from a suspect in custody is admissible despite a failure to give <u>Miranda</u> warnings when a threat to public safety necessitated immediate questioning.  In <u>Quarles</u>, a woman alleged that an armed man had raped her and had entered a store.  <u>New York v. Quarles</u>, 467 U.S. 649, 655-657. (1984).  An officer went into the store, saw a man matching the woman's description, and pursued him to the back of the store.  <u>Id.</u>  After he apprehended the suspect, the officer noticed that the suspect's shoulder holster was empty.  <u>Id.</u>  The officer handcuffed and frisked the suspect asked him where the gun was.  <u>Id.</u>  The suspect nodded toward some empty cartons and said, "the gun is over there."  <u>Id.</u> It was.  <u>Id.</u>  The Supreme Court held that neither the statement

---

[3] Were this Court to decide that defendant can challenge the search of the room, the government submits, based on previous filings with this Court (Clerk's Record No. 39, 50, 54), that defendant's challenge nevertheless fails on the merits.

1  nor the gun need be suppressed.  Id.

2      Quarles, however, was not intended to be limited to the

3  particular facts of that case.  United States v. Brady, 819 F.2d

4  884, 888 (9th Cir. Cal. 1987)  In Brady, the Ninth Circuit

5  considered the spectrum of cases concerning the public safety

6  exception and noted,

7          The case before us falls between the polar cases of

8          Quarles, which illustrates questioning exempt from

9          Miranda, and Orozco v. Texas, 394 U.S. 324, 22 L. Ed.

10          2d 311, 89 S. Ct. 1095 (1969), which illustrates

11          questioning subject to Miranda.  In Orozco, police

12          arrested the suspect in his bedroom at 4:00 a.m. to ask

13          him about his whereabouts at the time of a murder and

14          whether he owned a pistol.  394 U.S. at 325.  The

15          questions were investigatory and sought to elicit

16          testimonial evidence.  They were not aimed at

17          controlling an immediate threat to public safety.

18          Therefore Orozco was entitled to a Miranda warning.

19  Id.

20      Here, the fact that defendant was handcuffed and on his

21  stomach does not mean that, as a matter of law, the situation was

22  no longer volatile or that Officer Beall did not face any

23  exigency in determining whether there were weapons present.  Both

24  of the defendants in Quarles and Brady were handcuffed prior to

25  being questioned without Miranda warnings.  See Quarles, 467 U.S.

26  at 657; Brady, 819 F.2d at 887; cf. United States v. Brathwaite,

27  458 F.3d 376, 382 (5th Cir. 2006) (in a prosecution for a felon-

28  in-possession, public safety exception did not apply where both

occupants of house were handcuffed and police performed two safety sweeps of house before first asking defendant about his criminal history which included a felony and then about the presence of guns).

More importantly, based on Officer Beall's training and experience, a handcuffed, but unsearched suspect such as defendant here, still posed a considerable danger as suspects sometimes have weapons hidden on their persons, such as in their backpockets, waistbands, or belt loops. RT 10/06/2010: 82. Such weapons are still accessible to a handcuffed suspect and thereby pose a threat to both officers and suspect. RT 10/06/2010: 78, 82; Supplemental Declaration of Gerald Beall Re <u>Miranda</u> Issue ("9/21/10 Beall Decl."), ¶¶ 8-10. Moreover, defendant could have also accessed a weapon hidden in the vicinity of the bed. 9/21/10 Beall Decl., ¶¶ 8-10.

The fact that several officers and agents were armed inside Room 220 did not obviate the need for Officer Beall to quickly question defendant about the existence of weapons without first taking the time to administer <u>Miranda</u> warnings. In <u>Reilly</u>, the Ninth Circuit upheld a suspect's un-<u>Mirandized</u> statement that was made while three agents aimed a shotgun, handgun, and submachine gun at the suspect. <u>United States v. Reilly</u>, 224 F.3d 986, 993 (9th Cir. 2000). The court noted, "[o]ur decision is not altered by the fact that at least three officers had their weapons drawn at the time of questioning. The officer in <u>Brady</u> drew his gun before posing his question, as did the officer in <u>Fleming</u>." <u>Id.</u>

The court in <u>Reilly</u> specifically warned that, "[i]t is a difficult exercise at best to predict a criminal suspect's next

9

move, and it is both <u>naive and dangerous</u> to assume that a suspect will not act out desperately despite the fact that he faces the barrel of a gun." <u>Id.</u> (Emphasis added). The court also cautioned,

> The officers' actions must be analyzed according to demands of the moment rather than hindsight analysis. To refuse to apply the public safety exception simply because an officer wields his weapon defensively is to both overestimate the compliance of some suspects and deny the doctrine its full and intended application.

<u>Id.</u>

Likewise, in the instant matter, the fact that several of the officers and agents were armed and inside Room 220 did not make it safe for Officer Beall to take the time to administer <u>Miranda</u> warnings[4] before asking defendant about the presence of weapons. Indeed, rather than engage in a scuffle, or possibly a gun fight after it begins inside a crowded motel room, the safer approach is to defuse the volatile situation, in part, by determining the existence and location of any weapons. Therefore, in some instances such as the one here, the officer's un-<u>Mirandized</u> questions regarding the existence and location of weapons may possibly deter defendant from resisting.

Finally, although defendant at the moment was lying on his stomach, that position could have quickly changed, e.g. defendant

---

[4] The very act of <u>Mirandizing</u> defendant not only increases the danger to the officers, but as the Supreme Court noted in <u>Quarles</u>, in such situations, "if the police are required to recite the familiar <u>Miranda</u> warnings before asking the whereabouts of the gun, suspects in Quarles' position might well be deterred from responding." <u>Quarles</u>, 467 U.S. at 657.

1  could have gotten up onto his feet, he could have rolled around
2  onto his back, etc.  RT 10/06/2010: 82.  Such a change in
3  position could have allowed defendant to access a firearm or
4  other weapon hidden nearby or on his person.  RT 10/06/2010: 82.
5  This could all occur in a matter of seconds.

6      Like the officer in Reilly, Officer Beall's question was not
7  a "subterfuge for collecting evidence" and "not investigatory."
8  Reilly, 224 F.3d at 993.  This was not a situation where Officer
9  Beall used the public safety exception as pretext to get
10 defendant to make incriminating statements.  Instead, Officer
11 Beall had just finished handcuffing defendnant and was about to
12 search defendant.  9/21/10 Beall Decl., ¶¶ 7-8.  Just prior to
13 doing so, he asked defendant narrow questions designed to
14 minimize the safety risk at hand.  He asked defendant if
15 defendant had any "guns, bombs, knives, needles, or hand
16 grenades, or anything that is going to poke me, stick me, or stab
17 me."  9/21/10 Beall Decl., ¶ 7; RT 10/06/2010: 66.  When
18 defendant indicated yes, Officer Beall immediately tried to
19 ascertain the seriousness of the danger and minimize the risks by
20 asking if the weapon was on defendant's person, and where the
21 weapon was.  RT 10/06/2010: 67.  Unlike the agent in Brathwaite,
22 458 F.3d 376, 382, who first asked the handcuffed defendant about
23 his criminal convictions, and then followed up with questions
24 about the presence of a gun, Officer Beall's questions were not
25 designed to elicit testimonial responses.

26     As such, prior to Mirandizing defendant, Officer Beall never
27 once asked any questions about what was the purpose of the gun,
28 whether defendant was the one who sold the crack cocaine, or

whether defendant was using the gun to protect himself during the crack transactions, etc[5].  Instead, Officer Beall's questions were narrowly-tailored to not only minimize the risks to himself and the other officers in that crowded room, but also to deter a physical confrontation that would have endangered everyone in that room, including defendant.

The risk of weapons was particularly grave given that officers had just observed defendant sell crack cocaine to not only Officer Tony White via the first black female, but also to the female herself when defendant threw the crack cocaine at her and onto the ground.  Declaration of Gerald Beall in Support of Government's Opposition to Motion to Suppress ("Beall Decl."), ¶ 9; see also, Reilly, 224 F.3d at (citing United States v. Edwards, 885 F.2d 377, 384 (7th Cir. 1989) (upholding questioning of suspected drug dealer regarding existence of weapons because "drug dealers are known to arm themselves, particularly when making a sale, in order to protect themselves, their goods and the large quantities of cash often associated with such transactions").)

Accordingly, Officer Beall here faced a situation where he knew: 1) defendant was selling crack cocaine out of the motel; 2) drug dealers, especially in the Downtown San Bernardino area,

---

[5] By contrast, once officers rendered Room 220 safe and had a chance to search defendant, Officer Beall took defendant outside, Mirandized him, and only then asked him about the crack cocaine and money found in the room.  See Police Report, p. 8. Although an officer's subjective motivation does not affect whether the public safety exception applies, there was no indication that Officer Beall's questioning was intended to elicit incriminating evidence.

1  frequently protect themselves with firearms[6]; 3) defendant had not

2  yet been searched[7]; 4) Room 220 had not yet been searched[8]; 5)

3  defendant was lying down in a crowded room within arm's reach of

4  many hidden areas[9]; 6) defendant could have hidden hazards in his

5  pockets, such as exposed razor blades, knives, firearms with cut

6  out trigger guards, syringes, etc.[10]; 7) defendant could have

7  hidden a weapon in areas on his person that were accessible even

8  though he was handcuffed such as in the back of his pants, back

9  pockets, or belt loops[11]; 8) defendant could quickly changed

10  positions by rolling over, getting up, or flipping onto his side

11  and thereby accessing weapons located in the vicinity[12]; and 9)

12  although officers were inside Room 220, someone could have tried

13  bursting through into the room and possibly taken a weapon[13].

14  Faced with these circumstances, although he was not guaranteed a

15  truthful answer, it was nonetheless objectively reasonable for

16  Officer Beall to at least attempt to defuse the volatile

17  situation by asking defendant if he had any weapons.

---

20  [6] 9/21/10 Beall Decl., ¶¶ 5-6.

21  [7] 9/21/10 Beall Decl., ¶ 8; RT 10/06/2010: 73.

22  [8] RT 10/06/2010: 73.

23  [9] 9/21/10 Beall Decl., ¶¶ 7-8.

24  [10] RT 10/06/2010: 82.

25  [11] RT 10/06/2010: 82.

26  [12] RT 10/06/2010: 82.

27  [13] RT 10/06/2010: 73.  Indeed, defendant himself testified
28  that Jamine Marshell came back during the execution of the search
warrant.  RT 10/06/2010: 47.

13

**III. CONCLUSION**

For the reasons set forth above, the United States respectfully submits that the Court should deny defendant's motion to suppress.

Dated: October 14, 2010                Respectfully submitted,

                                       ANDRÉ BIROTTE JR.
                                       United States Attorney

                                       ROBERT E. DUGDALE
                                       Assistant United States Attorney
                                       Chief, Criminal Division

                                       SHERI PYM
                                       Assistant United States Attorney
                                       Chief, Riverside Branch Office


                                       _____/s/_____
                                       JERRY C. YANG
                                       JENNIFER L. WILLIAMS
                                       Assistant United States Attorney
                                       Attorneys for Plaintiff
                                       United States of America

14

## TABLE OF CONTENTS

I.    INTRODUCTION.. . . . . . . . . . . . . . . . . . . . 1

II.   ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . 2

      A.    THERE IS NO LEGITIMATE EXPECTATION OF
            PRIVACY IN A HOTEL  ROOM OBTAINED BY
            A THIRD PARTY AND WHICH IS USED FOR AN
            UNLAWFUL PURPOSE. . . . . . . . . . . . . . . . . 2

      B.    OFFICE BEALL'S QUESTIONING OF DEFENDANT
            WAS OBJECTIVELY  REASONABLE TO PROTECT
            OFFICERS AND THE PUBLIC FROM AN IMMEDIATE
            DANGER. . . . . . . . . . . . . . . . . . . . . . 7

II.   CONCLUSION.. . . . . . . . . . . . . . . . . . .  14

i

1

2

## **TABLE OF AUTHORITIES**

3

**FEDERAL CASES**                                                      **PAGE**

4

5  Bond v. United States,
   529 U.S. 334 (2000).. . . . . . . . . . . . . . . . . 3

6  Minnesota v. Carter,
   525 U.S. 83, 119 S. Ct. 469, 142 L. Ed. 2d 373 (1998).. . passim
7
   Minnesota v. Olson,
8  495 U.S. 91 (1990). . . . . . . . . . . . . . . . 2, 3

9  New York v. Burger,
   482 U.S. 691, 107 S. Ct. 2636, 96 L. Ed. 2d 601 (1987). . . 3, 4
10
   New York v. Quarles,
11 467 U.S. 649 (1984).. . . . . . . . . . . . . . . passim

12 Orozco v. Texas,
   394 U.S. 324, 22 L. Ed. 2d 311, 89 S. Ct. 1095 (1969).. . . . . 8
13
   Rakas v. Illinois,
14 439 U.S. 128 (1978).. . . . . . . . . . . . . . . 2

15 Rawlings v. Kentucky,
   448 U.S. 98 (1980). . . . . . . . . . . . . . . . 2
16
   United States v. Armenta,
17 69 F.3d 304 (9th Cir. 1995).. . . . . . . . . . . . . 2

18 United States v. Brady,
   819 F.2d 884 (9th Cir. Cal. 1987).. . . . . . . . . . 8, 9
19
   United States v. Brathwaite,
20 458 F.3d 376 (5th Cir. 2006). . . . . . . . . . . . 8, 11

21 United States v. Edwards,
   885 F.2d 377 (7th Cir. 1989). . . . . . . . . . . . . 12
22
   United States v. Paopao,
23 469 F.3d 760 (9th Cir. 2006). . . . . . . . . . . . 3, 4

24 United States v. Reilly,
   224 F.3d 986 (9th Cir. 2000). . . . . . . . . . . . passim
25
   United States v. Salvucci,
26 448 U.S. 83 (1980). . . . . . . . . . . . . . . . 2, 3

27

28

ii

```
 1                UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3                       WESTERN DIVISION

 4          THE HON. GEORGE H. WU, JUDGE PRESIDING

 5

 6   UNITED STATES OF AMERICA,        )
                                      )
 7                     Plaintiff,     )
                                      )
 8          vs.                       ) No. CR 09-00301-GW
                                      )
 9   CALVIN CHARLES COLBERT, JR.,     )
                                      )
10                     Defendant.     )
     _____)
11

12

13

14       REPORTER'S DAILY TRANSCRIPT OF FRANKS HEARING

15               Los Angeles, California

16          Wednesday, October 6, 2010; 1:25 P.M.

17

18

19

20

21               Wil S. Wilcox, CSR 9178
             Official U.S. District Court Reporter
22             312 North Spring Street, # 430
               Los Angeles, California 90012
23                 Phone: (213) 290-2849
                   Fax:   (818) 286-3910
24             Email: wswilcox@pobox.com

25
```

2

1    APPEARANCES OF COUNSEL:

2

3    FOR THE PLAINTIFF:    GEORGE S. CARDONA
                           ACTING UNITED STATES ATTORNEY
4                          BY:   JERRY YANG
                           Assistant United States Attorney
5                          1400 United States Courthouse
                           312 N. Spring Street, 12th Floor
6                          Los Angeles, California 90012
                           (213) 894-2690
7

8    FOR THE DEFENDANT:    LAW OFFICES OF LARRY BAKMAN
                           BY: LARRY BAKMAN
9                          Attorney at Law
                           10100 Santa Monica Boulevard
10                         Suite 300
                           Los Angeles, California 90067
11                         (310) 772-2234

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                            I N D E X

 2                   WEDNESDAY OCTOBER 6, 2010

 3            CHRONOLOGICAL INDEX OF WITNESSES

 4

 5                                                         VOIR
                                                          VOIR
 6   WITNESS              DIRECT CROSS REDIRECT RECROSS DIRE VOL

 6   Calvin Colbert         19     27               46        1

 7   Gerald Beall           56     69     83        86        1

 8

 9

10            ALPHABETICAL INDEX OF WITNESSES

11                                                         VOIR
12   WITNESS              DIRECT CROSS REDIRECT RECROSS DIRE VOL

13   Beall, Gerald          56     69     83        86        1

14   Colbert, Calvin        19     27               46        1

15

16                          EXHIBITS

17                              FOR            IN
18   EXHIBIT    DESCRIPTION    IDENTIFICATION  EVIDENCE  VOL

19

20   A          Photograph                     62        2

21

22

23

24

25
</pre>

WIL S. WILCOX, OFFICIAL FEDERAL REPORTER

4

```
 1        LOS ANGELES, CA.; WEDNESDAY, OCTOBER 6, 2010; 1:25 P.M.

 2                              -oOo-

 3

 4            THE COURT:  All right.  Let me call the matter of

 5   United States v. Colbert.

 6            Let me have appearance of counsel.

 7            MR. YANG:  Good afternoon, Your Honor.  Jerry Yang

 8   on behalf of the United States.  And present with me at

 9   counsel table is Assistant United States Attorney

10   Jennifer Williams, and also ATF Special Agent Angie Kagan.

11            THE COURT:  Okay.

12            MR. BAKMAN:  And good afternoon, Your Honor.

13   Larry Bakman on behalf of Mr. Colbert, who is present in

14   court in custody.

15            THE COURT:  All right.  We are here, I guess, on a

16   continuation of these motions to suppress.  And let me just

17   ask.  Looking over the materials, it's a little bit unclear

18   as to the status of some of the rulings that I've made in

19   this case, in other words, whether or not they were final or

20   not final, et cetera.

21            And I just wanted to make sure that, for example,

22   as to the issue as to standing, defendant's standing, I

23   issued a tentative.  However, I don't know whether or not I

24   made my tentative my final.

25            MR. BAKMAN:  No, Your Honor.
```

1      THE COURT:  Okay.  Let me indicate that my

2  tentative, which was issued on September 9th, 2010, the

3  tentative ruling was to agree with the government that the

4  defendant has not shown standing to challenge the search as

5  to Room No. 220 of the particular hotel, or motel.

6      However, I did leave it open for additional

7  submissions.  And I don't think the defendant did submit

8  anything in addition.  Certainly, not by the way of his

9  declaration or anything of that sort.

10      MR. BAKMAN:  Correct, Your Honor.  If the Court

11  remembers, I was going to put him on the stand.

12      THE COURT:  Okay.

13      MR. BAKMAN:  And he was going to be subjected to

14  cross-examination.  And I think the Court's comments at the

15  time were that, in lieu of the declaration, he was able to

16  take the stand.

17      THE COURT:  Obviously, you can always provide live

18  testimony in lieu of a declaration.  Is that his intention

19  at this point in time?

20      MR. BAKMAN:  It is, Your Honor.

21      THE COURT:  Okay.  All right.  So I will leave it

22  open still and I will allow the questioning at this point in

23  time.

24      And then there was a question as to ruling in

25  regards to the statements as to, I guess, what would be

1    called the questioning that was done vis-a-vis the presence

2    of the gun.

3            Was that also something that we were going to take

4    testimony on at this point?

5            MR. BAKMAN:  I think we should take testimony by

6    Officer Beall.  I think there was a supplemental filing or a

7    supplemental declaration by Officer Beall that had been

8    filed by the government on October 1st relating to his prior

9    experience in that area and the reasons why he asked those

10   questions.

11           THE COURT:  All right.

12           MR. BAKMAN:  Whether that gets around the public

13   safety exception to Miranda is unclear at this time, but I

14   would ask the Court for permission to be able to examine him

15   as to that.

16           THE COURT:  Let me ask.  Is he here?

17           MR. YANG:  Yes, Your Honor.

18           THE COURT:  All right.  That's not going to be a

19   problem.

20           What else?

21           MR. BAKMAN:  I think primarily -- I'm assuming,

22   Your Honor, if in fact we get by standing today, I don't

23   anticipate reopening the examination as to the four corners

24   of the search warrant.  I read through Your Honor's

25   questions in the transcript as well as Ms. Torres.

1          THE COURT:  Okay.

2          MR. BAKMAN:  And I think they were covered.  I

3     think it's primarily one of argument at that point in time.

4          THE COURT:  Okay.  All right.  In that case, then,

5     do you want to start with the defendant first or do you want

6     to start with Officer Beall first?

7          MR. BAKMAN:  I'd like to start with Mr. Colbert

8     first.  But before I do that, Your Honor, I was going to ask

9     the court to indulge me if I could take a waiver from

10    Mr. Colbert.  There was an offer made by the government

11    today.  We've been in plea negotiations.

12         THE COURT:  All right.

13         MR. BAKMAN:  And i don't want to make the court

14    part of that pursuant to Rule 11.  But I have advised my

15    client that after review of his case, by me I feel it's in

16    his best interests to accept the offer and not to proceed to

17    trial, and I want to make sure that he understands the offer

18    and that he is rejecting that knowingly, intelligently and

19    voluntarily.

20         THE COURT:  Okay.  Why don't we do this.  I don't

21    think we need to put on the record what the offer is, but

22    just indicate the potential insofar as the consequences of

23    not accepting the plea.  I think that would be sufficient.

24         Because I presume Mr. Colbert did hear the terms

25    of what the offer was?

1          MR. BAKMAN:  He did, Your Honor.

2          THE COURT:  Okay.  All right.

3          MR. YANG:  Your Honor, just to clarify one point.

4    The offer was not a firm offer in terms of that it has not

5    been approved by my supervisors yet.  It was merely

6    preliminary discussions regarding an offer.

7          THE COURT:  Okay.

8          MR. YANG:  And defendant has rejected those

9    preliminary discussions.

10          THE COURT:  Well, let me ask this.  I presume, and

11    maybe this is presumptuous on my part, that the government

12    is indicating that if the defendant goes forward with the

13    present inquiry, that the offer would be withdrawn, or will

14    the offer still be on the table even if he goes forward with

15    the present discussion insofar as the discovery and motions

16    to suppress.

17          MR. YANG:  Your Honor, to the extent that the

18    discussions between defense counsel and I that occurred

19    earlier today, to the extent that can be characterized as a

20    form of an offer wherein defendant, if he accepts, then we

21    have a plea agreement.  I don't think that that could be

22    characterized as such.  However, to the extent there would

23    be any offers whatsoever, today would be the last --

24          THE COURT:  Day.

25          MR. YANG:  I'm trying to characterize it as an

WIL S. WILCOX, OFFICIAL FEDERAL REPORTER

9

1   offer but it really -- it has not been approved.

2           THE COURT:  Unless he indicates an inclination to

3   accept an offer, that there will be no further offers today.

4           MR. YANG:  That's correct, Your Honor.

5           THE COURT:  It's not necessarily that the offer

6   you have on the table is the final of what an offer would

7   be.  It's just that if he's not willing to discuss, you

8   know, terms and conditions for the acceptance of an offer,

9   that the government would not be inclined to make another

10  one.

11          MR. YANG:  Yes, Your Honor.

12          THE COURT:  Okay.

13          MR. YANG:  I think that the fair way to

14  characterize it would be this would be the last opportunity

15  to try to reach any sort of offer with the government.

16          THE COURT:  Okay.  All right.  Let me ask,

17  Mr. Bakman.  Is that your understanding as well?

18          MR. BAKMAN:  It is, Your Honor.  I think that's

19  well put that not only will the government not extend any

20  offer in this case, but they will not go to their

21  supervisors to ask or see if what we have previously

22  discussed is even within the realm of possibility.

23          THE COURT:  Okay.  All right.  Let me ask,

24  Mr. Bakman.  Are you going to do the inquiry of your client?

25          MR. BAKMAN:  I can do that, Your Honor.

```
1          THE COURT:  Okay.
2          MR. BAKMAN:  Mr. Colbert, you and I have had
3   certain discussions today regarding the possibility of an
4   offer made by the government to resolve this case; is that
5   correct?
6          THE COURT:  And did you understand everything that
7   I told you today.
8          THE DEFENDANT:  Yes.
9          THE COURT:  And did you also understand that I in
10  fact advised you that we should proceed down that road, so
11  to speak, and inquire if the supervisors in the U.S.
12  attorney's office would be willing to make such an offer to
13  you?
14         THE DEFENDANT:  Yes.
15         MR. BAKMAN:  And did you understand when I
16  indicated to you that the adverse consequence of you
17  proceeding to trial, if in the event there were to be a
18  conviction in this case, that the adverse consequence could
19  amount to as much as five years additional time for you?
20  Did you understand that?
21         THE DEFENDANT:  Yes.
22         THE COURT:  And understanding that, is it still
23  your desire to proceed to trial and have me negate any
24  further settlement discussions today with the government?
25         THE DEFENDANT:  Proceed to trial, yes.
```

```
 1            THE COURT:  That's what you want to do?
 2            THE DEFENDANT:  Yes.
 3            THE COURT:  And do you feel that you understood
 4   the settlement discussions that I've entertained with the
 5   government, do you believe that you fully understood those?
 6            THE DEFENDANT:  I understood them.
 7            MR. BAKMAN:  All right.  No further questions,
 8   Your Honor.
 9            THE COURT:  Let me ask this question of the
10   government.  As currently charged, what is the defendant
11   facing in terms of a maximum sentence and a mandatory
12   minimum sentence?
13            MR. YANG:  Your Honor, if I could just have a
14   moment to look at the maximum sentence.
15            THE COURT:  Yes.
16            MR. YANG:  Your Honor, the maximum sentence will
17   be life in imprisonment.  The mandatory minimum may be as
18   much as 10 years imprisonment on both of the counts.
19            THE COURT:  Okay.  I just want to make sure that
20   the defendant understands.  I can't force you to settle, nor
21   am I trying to twist your arm to get you to settle, but I
22   just want to make sure that you understand the consequences
23   of rejecting any sort of settlement offer.
24            In other words, at this point in time, the case
25   that has been brought against you, the maximum sentence I
```

1    could sentence you to is, if the government succeeds in

2    proving its case as delineated in the indictment, is life

3    imprisonment.

4              That's not to say that automatically if you are

5    convicted that you would get a life sentence, because

6    obviously, I have to consider all the factors that are

7    included in the guidelines.  Although the guidelines are not

8    controlling on me, I have to consider those factors.  I have

9    to consider your criminal history, background, and other

10   things.

11             However, at this point in time as the charges are

12   brought against you, there is what is called a mandatory

13   minimum sentence.  In other words, if the government does

14   succeed in proving its case, even though I may feel that you

15   don't deserve a lengthy sentence because the crimes that are

16   involved in your case, however, under the federal law, I'm

17   obligated to sentence you to a minimum of 10 years, unless

18   there is some exception, but the exceptions are very, very

19   small, let's just put it that way.

20             In other words, there is something called a safety

21   valve, but in order to meet the safety valve, you have to do

22   certain things.  And so far it's my understanding that --

23   let me ask Mr. Bakman.  At this point in time, is there any

24   evidence that he would qualify for the safety valve?

25             MR. BAKMAN:  I don't know, Your Honor.

13

```
1              THE COURT:  Okay.
2              MR. BAKMAN:  I don't have an answer to that
3    question at this point in time.
4              THE COURT:  All right.  Let me ask the government.
5    Is the government's position that the defendant qualifies
6    for the safety valve?
7              MR. YANG:  The government's position is that he
8    does not qualify for safety valve based on the presence of
9    the firearm.
10              THE COURT:  Okay.  And so the problem is that if
11   you are convicted and if the government proves the amount of
12   drugs that is alleged and if the government proves the
13   presence of a firearm, then you will not qualify for the
14   safety valve, and so I would have to sentence you to a
15   minimum of 10 years in prison.
16              Do you understand that?
17              THE DEFENDANT:  As far as the -- yeah.
18              THE COURT:  Okay.
19              THE DEFENDANT:  I understand the trial part.
20              THE COURT:  Okay.  Sorry.  You understand what?
21              THE DEFENDANT:  I understand what you are saying
22   about with the trial, with the trial proceedings.  But what
23   my questions are, does this mean that I'm not allowed to
24   protect my Fourth Amendment rights?
25              THE COURT:  Oh, no.  You are allowed.  But the
```

```
 1    problem is, is that the government has indicated -- in other
 2    words, I cannot force you to admit that you committed any
 3    particular crime.  I can't force the government to make you
 4    an offer.
 5              In other words, the only people that can present
 6    an offer to a defendant to dispose of the case without going
 7    to trial is the government, and the government is indicating
 8    that if you do not accept a plea agreement today, that they
 9    are not going to go forward and attempt to get any sort of
10    plea for you.
11              Although, let me ask the government this question,
12    I guess, if there is like a timeline.  You indicated that if
13    he doesn't accept today or indicate a willingness to settle
14    today, if he goes forward with this hearing and I make a
15    ruling, will the government still at the end of that be
16    agreeable to extending him an offer, a plea agreement?
17              Obviously, if I ruled against the government on
18    everything, then he wouldn't have to because, you know, I
19    will have excluded portions of the evidence, but assuming
20    that I do not, would the government still make him an offer?
21              MR. YANG:  At the moment, Your Honor, based on
22    what I understand, the government will not be making any
23    offers past today, past this hearing.
24              THE COURT:  But let me just ask, if you go through
25    the hearing, will you still make him an offer?
```

1      MR. YANG:  To clarify, Your Honor is asking if the

2    hearing --

3      THE COURT:  Right now it's about 1:35.  If this

4    thing is over by 2:35, depending upon my rulings, and he at

5    that point in time says to you I'm interested, will you make

6    him an offer?

7      MR. YANG:  No.

8      THE COURT:  Okay.  So, in other words, you

9    withdraw any offers if he goes forward with the hearing?

10      MR. YANG:  Yes, Your Honor.  Assuming the hearing

11    goes forward today, the government will not be making any

12    further offers.

13      THE COURT:  Okay.

14      MR. YANG:  And we will be proceeding to trial

15    unless defendant, I suppose, has the right to plead open to

16    the court.

17      THE COURT:  Sure.  He always has that right.

18      Let me ask, Mr. Bakman.  Anything else for the --

19      MR. BAKMAN:  Well, Your Honor, I want to make sure

20    Mr. Colbert understands that, that if we proceed with the

21    hearing, the government will not extend any offers other

22    than what we call a straight-up plea where you either plea

23    to the charges in the indictment or you go forward to trial.

24    Do you understand that, Mr. Colbert?

25      THE DEFENDANT:  Yes.  Is it all right if I can

16

1   speak to Mr. Bakman?

2          THE COURT:  Yes.  At any point in time -- in fact,

3   why don't -- I will suggest that.  Why don't we take about

4   another five minutes and let him talk to you.  Because,

5   frankly, these are difficult decisions and, you know, he may

6   not have understood fully all the consequences.  So that's

7   not's problem.

8          MR. BAKMAN:  Very good.

9               (Pause in the proceedings.)

10         THE COURT:  All right.  Mr. Bakman.

11         MR. BAKMAN:  Our situation is Mr. Colbert has one

12  further area of inquiry that he'd like to explore with the

13  court if the court would be willing to.

14         THE COURT:  All right.  Sure.

15         MR. BAKMAN:  Mr. Colbert and I have had -- we had

16  a discussion last time we were here, Your Honor, where I

17  advised Mr. Colbert that if he were to take the stand in

18  support of the suppression hearing with respect to

19  establishing standing, that if in fact my advice to him --

20  without waiving attorney-client privilege, but there was a

21  discussion that involved impeachment by the government of

22  what Mr. Colbert would say on the stand in the suppression

23  hearing, whether that could be used against him during

24  trial.

25         My inclination to Mr. Colbert is if he were to

1    take the stand in trial in his own defense and he were to

2    testify differently than what he testified to at the

3    suppression hearing, it is my opinion that those statements

4    could be used to impeach him at the time of trial.

5           And Mr. Colbert wanted to seek clarification from

6    the court on that issue.  I told him it is not in front of

7    Your Honor at present.  It would have to be raised subject

8    to objections on a question-by-question basis as we

9    proceeded during trial.  And he wanted to seek clarification

10   if the court were so willing.

11          THE COURT:  Is he asking me, generally, if he

12   elects to testify in this motion to suppress whether or not

13   his statements can be used against him to impeach him?

14          MR. BAKMAN:  -- at trial.  And I have indicated to

15   him they cannot be used against him if he were not to take

16   the stand.  However, if he were to take the stand at trial,

17   they could be used against him if they were different.

18          THE COURT:  Yes.  Let me ask.  I presume that's

19   the government's position?

20          MR. YANG:  That is the government's position,

21   Your Honor.

22          THE COURT:  In fact, the government would probably

23   want to do more, but I don't know if -- at a minimum, the

24   government would do that.

25          So, yes, in other words --

```
 1          THE DEFENDANT:  That's not the question I want to
 2   ask.
 3          THE COURT:  Oh, okay.  But just for an abundance
 4   of care, let me just ask you to speak to Mr. Bakman.  I
 5   don't mind you asking questions, but I just want to make
 6   sure that you don't say something on the record that you
 7   shouldn't.
 8          (Counsel and his client conferred.)
 9          MR. BAKMAN:  All right.  I believe Mr. Colbert's
10   questions have been answered, Your Honor, and I believe that
11   it is his decision to go forward with the standing issue.
12          THE COURT:  All right.  Let me just make sure
13   that, Mr. Colbert, that you have had all your questions
14   answered at this point in time vis-a-vis the, I guess,
15   process that we are involved in at this point?
16          THE DEFENDANT:  Yes.
17          THE COURT:  Okay.
18          MR. BAKMAN:  All right.  With that said, Your
19   Honor, I would call Calvin Colbert to the stand.
20          THE COURT:  All right.
21          THE CLERK:  Please raise your right hand.
22          Do you solemnly swear that the testimony you shall
23   give in the cause now before this court shall be the truth,
24   the whole truth, and nothing but the truth, so help you God?
25          THE DEFENDANT:  Yes, sir.
```

19

```
 1              THE CLERK:  Okay.  Have a seat.
 2              State your name and spell your last name for the
 3    record.
 4              THE DEFENDANT:  It's Calvin Colbert.  Last name
 5    C-O-L, B as in boy, E-R-T.
 6              MR. BAKMAN:  May I, Your Honor?
 7              THE COURT:  Yes.
 8                        DIRECT EXAMINATION
 9    BY MR. BAKMAN:
10    Q    Mr. Colbert, turning your attention to March 10th of
11    last year, 2009, did you have occasion to stay at the
12    Economy Inn located on Sixth and G Street in the city of
13    San Bernardino?
14    A    As a correction, it was the 9th of 2009, March.
15    Q    So let me ask you this to clarify, then.  When was it
16    that you first went to that hotel in March, was it on the
17    9th?
18    A    It was on the 9th.
19    Q    All right.  And on the 9th, did you register at the
20    hotel as a guest?
21    A    Yes, sir.
22    Q    And when you did that, were you given a room?
23    A    Yes.
24    Q    And what room number were you given?
25    A    Room 217.
```

```
 1  Q     And when you registered for Room 217, did you register
 2  under your name?
 3  A     Yes.
 4  Q     And what time -- or strike that.
 5        What day was the -- let me go back.
 6        The terms of that stay, how long was that stay for in
 7  Room 217?
 8  A     Well, the stay was initially for one day, and then I
 9  continued it for another day.
10  Q     So the initial -- at the time you registered on the
11  9th, you were to vacate the room on the 10th; is that right?
12  A     Yes.
13  Q     And then you extended that stay for another day?
14  A     For another day.
15  Q     And so you were to vacate on the 11th; is that correct?
16  A     On the 11th.
17  Q     And how much did you pay, do you remember?
18  A     On the 9th, I paid $55.
19  Q     And on the 10th, do you remember how much you paid?
20  A     I paid 50.
21  Q     And had you stayed at that motel before?
22  A     Yes.
23  Q     And had you had contact with the manager of that motel
24  on prior occasions?
25  A     Yes.
```

21

1    Q    And turning to the date of March 11th, did you have

2    occasion to vacate Room 217?

3    A    Yes.  I left 217 about an hour before checkout.

4    Q    And before checking out, did you have any contact with

5    someone you knew that had also stayed at that motel on prior

6    occasions?

7    A    Yes.

8    Q    And do you know that individual's name?

9    A    I know his first name, Jamene.

10   Q    And did you have a conversation with Jamene?

11   A    Yes.

12   Q    And what was the conversation about?

13   A    Well, initially, I was talking to Jamene about leaving

14   my things at his room until I would be able to get some

15   money or to get another ride to go back home.  And what

16   happened was that I decided to -- I think it just came about

17   to where I gave him $25 and then I just took over the room.

18   Q    All right.  So let me clarify again.  You left Room 217

19   at some point in time on March 11th, correct?

20   A    Yes.

21   Q    And then when you left Room 217 you were going to place

22   your belongings in Jamene's room; is that right?

23   A    Yes.

24   Q    And what room was that?

25   A    That was 220.

1    Q    And when you indicated that you were going to leave

2    belongings in Room 220, let me delineate those belongings.

3    Did you have suitcases?

4    A    I had bags full of clothes and I had an overnight bag

5    too, an overnight bag and plastic bags.

6    Q    Did the overnight bag include toiletries?

7    A    Yes.  Hygiene items, I'll say.

8    Q    And what kind of hygiene items?

9    A    Deodorant, shampoo, body wash.  That was in the

10   overnight.  And my charger for my phone.

11   Q    Now, at some point in time on March 11th, did you

12   actually move the bags and all your bathroom goods, the

13   toiletries, into Room 220?

14   A    Yes.  I moved the bags of toiletry and my clothes.

15   Q    And at the time you actually moved those items into

16   Room 220, had you reached an agreement with Jamene that you

17   were going to take over Room 220?

18   A    Well, not exactly yet.  It didn't happen until about,

19   like, I'd say about 20 minutes after everything was already

20   settled in.

21   Q    Now, at some point in time later that day, there was a

22   search warrant that was executed on Room 220; is that right?

23   A    Yes.

24   Q    And you were present at the time officers broke down

25   the door and entered Room 220.

WIL S. WILCOX, OFFICIAL FEDERAL REPORTER

1    A    Yes.

2    Q    How much time before the officers arrived on scene and

3    executed the warrant had you made the agreement with Jamene

4    that you were going to take over Room 220?

5    A    It was about -- at least about a few hours, like three,

6    three, maybe four.

7    Q    And did you actually pay money to someone so that you

8    could spend the night in Room 220?

9    A    Yes.  I paid Jamene.

10   Q    And was the manager present when you paid Jamene?

11   A    Yes.  I paid him at the front desk.  We went to the

12   front desk together because there was a problem involving

13   the key.  There was a problem involving the key.

14   Q    All right.  Let me back you up.  The initial rate that

15   you paid for Room 217 was $55 on 9th and the 10th, correct?

16   A    Yes.

17   Q    How was it that you were able to get Room 220 for $25.

18   A    Well, okay.  $55 is -- you pay $5 for the key deposit.

19   So in case you was to lose a key, you would have to pay that

20   $5.  Well, they will take your $5.  It's like an insurance

21   or something.

22        And the next day was at $50 because I already paid the

23   $5 key deposit my first time.  So when I went down to the

24   manager, I had $5 from the manager.  The manager gave me

25   five bucks back.  And then I still had I think about $30

1  left.

2      So Jamene had a problem with his key where someone had

3  his key and he gave me a deal like, well, instead of just

4  keeping your stuff in there, you can just keep the room for

5  $25.

6  Q    And so when you handed over to Jamene the money, the

7  $25, that was in the presence of the business manager?

8  A    Yes.

9  Q    And was that with the permission of the business

10 manager?

11 A    Yes.

12 Q    So the business manager knew that you were going to

13 take over Room 220 on March 11th, correct?

14 A    Yes.  Because come to find out, it was more to it than

15 the key.  There was a remote control that Jamene lost too.

16 This is how he kind of, like, lured me into this because

17 there was a remote control that was lost.

18     So the manager had problems, not with just the key

19 because it would have just been $5, but he just had problems

20 with Jamene himself.  So he --

21 Q    Okay.  Let me see if I can clear it up for the court

22 for just a moment.

23     Had Jamene paid the $50 for Room 220 that day?

24 A    Yeah, he paid for -- yes, he paid for two days, I

25 believe.

25

1   Q    So March 11th had been paid for by Jamene?

2   A    Yes.

3   Q    As to Room 220, correct?

4   A    Yes.

5   Q    And Jamene, based on your knowledge, he had lost the

6   remote control and he had lost the key; is that right?

7   A    Yes.

8   Q    And so the charges that he incurred to the motel for

9   the lost remote and the lost key was approximately $30; is

10  that right?

11  A    25.

12  Q    Ask so Jamene said to you, did he not, that if you pay

13  the manager the $25 for the remote and the key, you can have

14  Room 220 for March 11th; is that right?

15  A    Yes.  That was just for that moment.  That moment was

16  the $25 -- I was still -- I still kind of owed him $10 or

17  so.  That would be later on, later on whenever I had got it,

18  I would give him 10 more dollars.

19  Q    And so when you paid that money and you went back into

20  Room 220, did you go back in knowing that you would be

21  spending the night there in Room 220 as an overnight guest?

22  A    Yes.  When I went back in, I plugged in my phone

23  because my batteries were kind of low, so I plugged in my

24  phone.  I charged my phone.  And then I made some calls, and

25  I was basically expecting a guest to come over that day,

| | |
|---|---|
| 1 | letting her know that I would still be in San Bernardino for |
| 2 | an additional day. |
| 3 | Q    Had you taken out any of your toiletries, the body |
| 4 | wash, the deodorant, the shampoo? |
| 5 | A    Yes.  I had used the restroom.  I took a shower. |
| 6 | Q    And at the time that you took the shower, prior to the |
| 7 | time the officers executed the search warrant, did you have |
| 8 | an expectation of privacy for that room? |
| 9 | A    Well, I don't really understand what expectation of |
| 10 | privacy is, but what I know is that during the time I took |
| 11 | the shower, I was the only one in the room taking the |
| 12 | shower.  And, of course, I don't want nobody to come in and |
| 13 | see me taking a shower or nothing like that.  But I did have |
| 14 | items in there and clothes and other stuff, personal |
| 15 | belongings that was in there. |
| 16 | Q    And what was your intention as to the date you would |
| 17 | vacate that room, would it have been before the officers |
| 18 | executed the warrant or would you have vacated the room |
| 19 | after the officers came with the warrant? |
| 20 | Do you understand my question? |
| 21 | A    No, not really. |
| 22 | Q    How long were you going to stay in Room 220? |
| 23 | A    Probably -- no, I would have left the next day. |
| 24 | MR. BAKMAN:  No further questions. |
| 25 | THE COURT:  All right.  Cross? |

```
 1            MR. YANG:  Your Honor, may I?

 2            THE COURT:  Yes.

 3                     CROSS-EXAMINATION

 4   BY MR. YANG:

 5   Q    Mr. Colbert, you rented Room 217 from the Economy Inn;

 6   is that correct?

 7   A    Yes, sir.

 8   Q    And that was on March 9th, 2009, right?

 9   A    Yes, sir.

10   Q    I'm going to show you a document.  I'm going to zoom

11   into it.  It's been previously marked as Government

12   Exhibit E.  You can see it on the monitor in front of you.

13   A    Okay.

14   Q    Can you see this?

15   A    Yes, I see it.

16   Q    Okay.  I'm referring to the bottom registration slips

17   on Exhibit E.

18        And that's your name where it says Calvin Colbert; is

19   that correct?

20   A    Yes.

21   Q    And that's your address, right, 1155 East Adam

22   Boulevard, Los Angeles, California, 90011?

23   A    Yes.

24   Q    Okay.  And that's your date of birth, right,

25   December 30th, 1984?
```

28

```
 1   A     No.  Mine is December 30th, '87.

 2   Q     Okay.  So that's an '87 on the form, not an '84?

 3   A     Yeah, that seems like the number's kind of wrong, yes.

 4   Q     Okay.  It's a little unclear, but you are saying it's

 5   '84?

 6   A     No, I'm saying it's 87.

 7   Q     Okay.  And that's your signature on the very bottom?

 8   A     Yes.

 9   Q     Okay.  And you didn't vacate this room until the

10   afternoon of March 11th, 2009; isn't that correct?

11   A     I left the room at 12:00 -- 12:00, 11:00, 2009.

12   Q     You are saying around noon?

13   A     Yes, around noon.

14   Q     Of March 11th, 2009?

15   A     March 11th, 2009.

16   Q     So up until that point, you had stayed in Room 217?

17   A     No, I wouldn't -- yes, yes, around up to that point,

18   yes.

19   Q     Okay.  So just to clarify, from March 9th, 2009, until

20   March 11th, 2009, at approximately noon, you had stayed in

21   Room 217, right?

22   A     From March 9th to March 11th, I stayed in Room 217.

23   Q     Okay.  And you knew a Jamene Marshall, right?

24   A     Yes.

25             MR. BAKMAN:  Objection.  Outside the scope.
```

```
 1    Irrelevant to the issue of standing, Your Honor.
 2              THE COURT:  Well, I will allow a little bit of
 3    questioning in this regard.  I presume, are you going to be
 4    asking whether or not Jimmy Marshall is Jamene Marshall?
 5              MR. YANG:  I'm sorry, Your Honor, Jamene Marshall.
 6              THE COURT:  I had thought that that was the name
 7    on the registration.
 8              MR. YANG:  It's Jamene.  It's a little vague, but
 9    I think it's Jamene.
10              THE COURT:  Okay.  Jamene.  I thought you said
11    Jimmy Marshall.
12              MR. YANG:  Oh, I'm sorry, Your Honor.
13    Jamene Marshall.
14              THE COURT:  Oh, okay.
15              All right.  I presume there's no objection to
16    that?
17              MR. BAKMAN:  No objection.
18              THE COURT:  Okay.
19    BY MR. YANG:
20    Q    You knew a Jamene Marshall, correct?
21    A    Yes.
22    Q    And you knew a Jamene Marshall prior to March 9th --
23    A    Yes.
24    Q    -- 2009, right?
25    A    Yes.
```

30

```
1   Q    And you knew Jamene Marshall has a crack problem,
2   right?
3            MR. BAKMAN:  Objection.  Outside the scope.
4   Irrelevant.
5            THE COURT:  Overruled.
6   BY MR. YANG:
7   Q    You can answer the question.
8   A    When you say crack, you mean as in a drug problem?
9   Q    Yes, a crack cocaine problem.
10       He uses crack cocaine, right?
11  A    Yeah, he uses -- I think he used drugs.
12  Q    Okay.  And you knew that Jamene Marshall was homeless,
13  right?
14  A    I don't know about that.
15           MR. BAKMAN:  Same objection.  Same grounds.
16           THE COURT:  Overruled.
17  BY MR. YANG:
18  Q    You can answer the question.
19  A    I wouldn't know if he was homeless.  I know he had the
20  room, though, the motel room.
21  Q    Okay.  And you recall March 11, 2009, the day you got
22  arrested, right?
23  A    Yes.
24  Q    Okay.  The day before you were arrested, March 10th,
25  2009, you rented a room in the Economy Inn with
```

1    Jamene Marshall's name; isn't that right?

2    A     No.

3            MR. BAKMAN:  Same objection, Your Honor.  It's

4    outside the scope relating to the issue of standing for

5    Room 220.

6            THE COURT:  Maybe I just didn't understand the

7    question.  Let me have the reporter read back the question.

8                    (Record read back.)

9            THE COURT:  I don't think that was your question.

10   Repeat your question.

11           MR. YANG:  Certainly.

12           THE COURT:  Okay.

13   BY MR. YANG:

14   Q     The day before you were arrested, March 10th, 2009, you

15   rented a room at the Economy Inn using Jamene Marshall's

16   name, isn't that right?

17           MR. BAKMAN:  And, again, Your Honor, the objection

18   is it's irrelevant to the issue of his standing on

19   March 11th with respect to Room 220.

20           THE COURT:  Overruled.  He can ask him -- the

21   witness whether or not he rented the room.  I presume you

22   are talking 220, or 217?

23           MR. YANG:  220, Your Honor.

24           THE COURT:  He can ask him whether or not he

25   rented the room using Mr. Marshall's name on March the

1    10th, 2009.

2              Let me ask the witness.  Do you understand the

3    question?

4              THE DEFENDANT:  Is he trying -- no, I don't.

5              THE COURT:  He's asking you whether or not you in

6    fact rented Room No. 220 on March the 10th, 2009, using

7    Jamene Marshall's name?

8              THE DEFENDANT:  No.  I was never even in 220 on

9    the 10th, '09.

10             MR. YANG:  Okay.  That's fine.

11   BY MR. YANG:

12   Q    So your testimony is that you did not pay for that room

13   on March 10th, 2009?

14   A    No.

15   Q    Your testimony --

16   A    I don't even think he had the room on --

17             MR. BAKMAN:  Objection.  There is no question

18   pending.

19             THE COURT:  I will sustain the objection.  But,

20   really, I think you would probably say you want to speak

21   with your client.

22             MR. BAKMAN:  I would like that, please,

23   Your Honor.

24             THE COURT:  Okay.  All right.

25             (*Counsel and his client conferred.*)

33

```
 1              MR. BAKMAN:  Thank you, Your Honor.
 2              THE COURT:  All right.
 3   BY MR. YANG:
 4   Q    Mr. Colbert, just to clarify, then.  Referring to
 5   Room 217, the room in your name, you stayed in that room on
 6   the night of March 9th, 2009; isn't that right?
 7   A    Yes.
 8   Q    And you stayed in that room on March 10th, 2010, the
 9   night of, right?
10   A    Yes.
11   Q    Okay.
12              THE COURT:  You meant to say to March 10th of
13   2009.  You said March 10th, 2010.
14              MR. YANG:  I'm sorry.  Yes, Your Honor, 2009.
15              THE COURT:  Why don't you re-ask the question?
16              MR. YANG:  Certainly.
17   BY MR. YANG:
18   Q    And you stayed in Room 217 the night of
19   March 10th, 2009, right?
20   A    Yes.
21   Q    Okay.  And it's your testimony that you vacated
22   Room 217 on March 11, 2009, sometime around noon, right,
23   shortly before you were arrested?
24   A    Not shortly.
25   Q    Around noon that day?
```

1    A    Yes.

2    Q    Okay.  And you had a key to Room 220, isn't that right?

3         Let me clarify.  On March 11, 2009 --

4    A    Yes.

5    Q    -- you had a key to that room?

6         But you had not yet slept over in Room 220 as of

7    March 11, 2009, right?

8    A    I took a rest there, but I hadn't spent the night, if

9    that's what you are trying to ask me.

10   Q    Yes.  That's what I'm trying to ask you?

11   A    Yes.

12   Q    Okay.  And by the time you had gotten Room 220 from

13   Jamene Marshall on March 11, 2009, he had given you full

14   control of that room; isn't that right?

15   A    I wouldn't say -- like full, like, as in exclude him

16   from the room --

17   Q    Yes.

18   A    -- or as full as in we shared the room?

19   Q    Could you exclude him from the room at that time?

20   A    No.

21             MR. BAKMAN:  I'm going to object.  That calls for

22   a legal conclusion.

23             THE COURT:  I will sustain the objection.

24   BY MR. YANG:

25   Q    Did you have the ability to allow him to be in that

```
 1    room by the time he handed you the keys to that room?

 2             MR. BAKMAN:  The same objection.

 3             THE COURT:  Why don't you rephrase the question.

 4    BY MR. YANG:

 5    Q    Was he in the room after he had handed you the keys to

 6    that room?  Did he go back into the room?

 7    A    Yes.

 8    Q    He did go back into the room?

 9    A    Yes.

10    Q    Okay.  And when he went back into the room, what did he

11    do in the room?

12             MR. BAKMAN:  And I'm going to object.  This is

13    outside the scope of this hearing.

14             MR. YANG:  Your Honor, it's probative of

15    defendant's dominion and control over the room.

16             MR. BAKMAN:  I don't think that's the issue.  I

17    think the issue is whether he had a reasonable expectation

18    of privacy, had an understanding he was going to be an

19    overnight guest at the location.

20             What these questions really are is a fishing

21    expedition to negate any possible defense at the time of

22    trial based on what was found in the room.

23             THE COURT:  Rephrase the question.

24    BY MR. YANG:

25    Q    After Jamene Marshall gave you the key to Room 220, did
```

1    you allow him to go back into the room?

2    A     Yes.

3    Q     And when Jamene Marshall went back into the room, what

4    did he do in the room?

5              MR. BAKMAN:  And, again, same objection.  Same

6    grounds.

7              THE COURT:  Let me ask the government counsel.

8    What is the point of those questions?

9              MR. YANG:  Your Honor, the point of the question

10   is that the defendant needs to take steps to show that he

11   had a reasonable expectation of privacy.  If he got the key

12   from some random person that he hardly knows and they were

13   allowed to come in and out of the room as they pleased, then

14   he didn't have a reasonable expectation of privacy.

15             THE COURT:  Why not, if in fact there had been the

16   exchange of funds in front of a manager of the particular

17   facility and the manager gives him a key?

18             MR. YANG:  Your Honor, Jamene Marshall, by being

19   able to go into the room, diminishes defendant's

20   expectation.

21             THE COURT:  But it doesn't preclude it.  In other

22   words, people can share rooms and both have the expectation

23   of privacy vis-a-vis law enforcement.

24             MR. YANG:  Well, Your Honor, I'm trying to

25   establish here if defendant in fact did have full dominion

1    and control over that room?

2         THE COURT:  Why does he have to have full dominion

3    and control?  Why isn't it sufficient if he has some

4    dominion and control?

5         MR. YANG:  And I'm trying to ascertain how much

6    dominion and control.

7         THE COURT:  Why would asking what Mr. Marshall

8    supposedly did when he went into the room show some division

9    of dominion and control?

10        MR. YANG:  Well, Your Honor, I think what I'm

11   trying to do is I'm trying to ascertain the status of that

12   room at that time.  It's unclear whether or not defendant

13   had assumed --

14        THE COURT:  Just ask him what the extent of the

15   occupancy of the room or use of the room as between

16   Mr. Colbert and Mr. Marshall.  You can ask him that.

17        MR. YANG:  I will phrase that question,

18   Your Honor.

19        THE COURT:  Okay.

20   BY MR. YANG:

21   Q    Mr. Colbert, after you received the keys to Room 220,

22   what was the understanding between you and Jamene Marshall

23   as to the use of the room?

24   A    Well, the understanding was that he would eventually

25   come back within a few minutes so he can get his belongings.

```
 1   Q    And which of the belongings at that point in his room?
 2              MR. BAKMAN:  Objection.  Relevance for the
 3   purposes of this hearing.
 4              THE COURT:  I will sustain the objection.
 5   BY MR. YANG:
 6   Q    Mr. Colbert, when the officers executed the search
 7   warrant, everything in Room 220 belonged to you, didn't it?
 8              MR. BAKMAN:  Objection.  Irrelevant for purposes
 9   of this hearing.
10              THE COURT:  I will sustain the objection.
11   BY MR. YANG:
12   Q    Mr. Colbert, your belongings in Room 220, you didn't
13   take any efforts to hide the belongings, did you?
14              MR. BAKMAN:  Objection.  Vague and ambiguous as to
15   what belongings counsel is talking about.
16              THE COURT:  Well, the problem is you are not going
17   to allow him to ask which specific ones are his, are you?
18              MR. BAKMAN:  Again, I would submit to the court
19   that, for purposes of the scope of this hearing, it's
20   irrelevant under 403.
21              We all know what's going on here.  This is a
22   fishing expedition to attempt to impeach him or lock him
23   into a story should he take the stand at trial, and it
24   really is outside the scope and purpose of this hearing.
25              THE COURT:  I will sustain the objection.
```

1  BY MR. YANG:

2  Q    Mr. Colbert, you had your clothes in Room 220 at the

3  times the officers executed the search warrant; isn't that

4  right?

5         MR. BAKMAN:  Same objection.  A continuing

6  objection.

7         THE COURT:  Let me stop you, Counsel.  He

8  testified to that on direct, so I don't think you really can

9  object to that question on cross.

10        MR. BAKMAN:  All right.

11        THE COURT:  Except unless you were to argue asked

12  and entered.

13        THE DEFENDANT:  Yes.

14 BY MR. YANG:

15 Q    And you had your wallet in that room at the time of the

16 search warrant; isn't that right?

17 A    Yes, sir.

18 Q    And inside the wallet was your driver's license; isn't

19 that right?

20 A    Yes, sir.

21 Q    Besides your clothes and your wallet, you had

22 additional belongings in that room; isn't that right?

23 A    Yes.

24 Q    This included a Samsung cell phone, right?

25 A    Yes.

```
 1   Q    This included a digital scale, right?
 2   A    No.
 3             MR. BAKMAN:  Again, I'm going to object.  403.
 4             THE COURT:  I will sustain the objection.
 5   BY MR. YANG:
 6   Q    This included $957 in cash; isn't that right?
 7             MR. BAKMAN:  Same objection.
 8             THE DEFENDANT:  No.
 9             THE COURT:  I will sustain the objection.
10             Let me indicate to, Counsel.  I'm going to sustain
11   them each time you ask them, so there is no sense wasting my
12   time, your time.
13             MR. YANG:  No further questions, Your Honor.
14             THE COURT:  All right.
15             MR. BAKMAN:  Nothing further.
16             THE COURT:  Let me ask the witness a couple of
17   questions.
18             How do you know Mr. Jamene Marshall?
19             THE DEFENDANT:  Well, I knew him about three --
20   two months, two months prior to this.  I knew him.  I seen
21   him in the area.  He kind of, like, you know, kind of, like,
22   loiters around the area a lot.  So I've seen him in the
23   motel rooms or by the bus stops.
24             THE COURT:  Let me ask.  The address that's on the
25   registration that was up -- that had been put up by the
```

```
 1   A.U.S.A., was your address at that time, 1155 East Adams
 2   Boulevard?
 3              THE DEFENDANT:  Yes, sir.
 4              THE COURT:  And what were you doing in this
 5   particular motel in Riverside, or San Bernardino?
 6              THE DEFENDANT:  Well, I had a female friend that
 7   stayed in San Bernardino and I was there visiting her.  I
 8   didn't want her to come back to my house because I was
 9   staying with my auntie at the time, my auntie and my mom.
10   So I was visiting my female friend who was out there.
11              THE COURT:  All right.  And you just happened to
12   come across Mr. Marshall how, at that point in time?
13              THE DEFENDANT:  Well, months ago --
14              THE COURT:  I'm not asking months ago.  I'm
15   talking about the day of.  In other words, you are
16   indicating that you exchanged rooms -- or not exchanged
17   rooms, but you got permission to go to his room.  How did
18   you meet him during that period of time either on March 9th,
19   10th, or 11th?
20              THE DEFENDANT:  Oh, I'm sorry.  I seen him on
21   March 9th.  March 9th he didn't have a room and I seen him
22   March 10th.  I didn't think he had -- he didn't have a room
23   on March 10th.  But that night around March 11th, I seen him
24   that night, and that night there was some activity going
25   around next door.  So that's how I knew he had that room
```

42

1    next door -- well, a couple of doors down.

2          And then in the morning of March 11th -- and when

3    I say morning, I mean, like, I think it was 6:00 o'clock or

4    7:00 o'clock around that morning.  Because that night when I

5    saw him it was at 12:00 midnight, so it was really in the

6    morning of March 11th when I saw him.

7          THE COURT:  All right.

8          THE DEFENDANT:  So during that time is when we

9    began talking about -- just about where he'd been and where

10   I'd been and what I was up to and what he was doing.  It was

11   just some social talking.

12         And then we didn't get a chance to talk about the

13   room until around 10:00 o'clock when I started running out

14   of money.  I told him I was running out of money and that I

15   would need to put my things in his room until I could get a

16   ride to take me to the MetroLink.

17         THE COURT:  So it was your understanding that at

18   least as to the night of March 11th, that Mr. Marshall had

19   already paid for the room?

20         THE DEFENDANT:  Well, March 11th, the morning,

21   like around 12:00 or 12:00 or 11:00 in the morning.  Like

22   12:00 o'clock in the morning, like midnight, late.

23         MR. BAKMAN:  I'm not certain if he understood the

24   court's question, Your Honor.

25         THE COURT:  Let me just ask you.  What I am asking

WIL S. WILCOX, OFFICIAL FEDERAL REPORTER

1  you is, is, in other words, you talked with Mr. Marshall

2  supposedly on the 11th of March and there was an agreement

3  made where you would go into Room 220 and you would pay him

4  approximately $25 to take over his room.

5           Was it your understanding that you were taking

6  over his room for the night of -- in other words, from that

7  point in time on March the 11th through March the 12th and

8  you would check out on March the 12th?

9           THE DEFENDANT:  Yes.  Yes.

10          THE COURT:  And so, in other words, it was your

11 understanding that he had already paid for that room on what

12 would be the night of March the 11th?

13          THE DEFENDANT:  Yes.  Yes.  Yes, sir.

14          THE COURT:  And you encountered him the day before

15 at the hotel, so, in other words, he had also rented a room

16 there for the night of March the 10th?

17          THE DEFENDANT:  Well, he rented it -- okay.  On

18 the 10th, it was 12:00 o'clock midnight, so that's why I say

19 it's the 11th, because it's technically the 11th if it's

20 midnight.  So on midnight is when he rented room.

21          THE COURT:  He rented the room on midnight --

22          THE DEFENDANT:  On like around midnight, around

23 that time.  It was like 11:00 or 12:00 o'clock.  It was kind

24 of late.

25          THE COURT:  On the 11th.

44

1          THE DEFENDANT:  But on the 10th.

2          THE COURT:  But on the 10th.

3          THE DEFENDANT:  Yes.

4          THE COURT:  In other words, when you say -- let's

5     put it this way.  Let's not talk about midnight because it's

6     somewhat confusing.  Let's talk about 10 minutes after

7     midnight.

8              At 10 minutes after midnight, which would make it

9     the -- if you are saying the 10th of March, so are you

10    saying at the 10th of March at 10 minutes after midnight, he

11    had rented that room?

12         THE DEFENDANT:  Yes.

13         THE COURT:  Okay.  And you expected to stay in

14    that room the night of the 11th of March; is that correct?

15         THE DEFENDANT:  This is -- no.  This is around

16    9:00 o'clock, 9:00 o'clock of March, during that day.

17         THE COURT:  So 9:00 o'clock in the morning?

18         THE DEFENDANT:  Yes.

19         THE COURT:  So, in other words, you just moved

20    into the room and you expected to have -- do you know when

21    the checkout normally was in that --

22         THE DEFENDANT:  The checkout would be for

23    tomorrow, which would be the 12th.

24         THE COURT:  Okay.  So, in other words, you

25    expected to stay in that room on the night of the 11th?

45

```
 1              THE DEFENDANT:  Yes.
 2              THE COURT:  Okay.  Do you happen to know why
 3   Mr. Marshall was renting that hotel room, or motel room?
 4              THE DEFENDANT:  He -- I don't really --
 5              MR. BAKMAN:  I'm going to object to the court's
 6   question, Your Honor.
 7              THE COURT:  The answer can be either yes or no.
 8   Either the answer is, yes, he does know or the answer is,
 9   no, he doesn't know.  And if the answer is yes, then I will
10   lay a foundation as to how he knows, and if the answer is
11   no, then he answered no.
12              MR. BAKMAN:  Well, I think it calls for
13   speculation.
14              THE COURT:  Well, I'm asking him.  In other words,
15   I'm asking your client, Mr. Colbert, if he knows why
16   Mr. Marshall was renting a motel room.
17              And let me ask, Mr. Colbert.  Do you know why
18   Mr. Marshall was renting the hotel room -- motel room?
19              THE DEFENDANT:  Maybe because he has no place to
20   stay and he rented the room.
21              THE COURT:  Okay.  So you don't know what
22   Mr. Marshall does for a living?
23              THE DEFENDANT:  No.
24              THE COURT:  Okay.  And let me ask.  Can you put
25   the registration thing on the screen again.
```

| | |
|---|---|
| 1 | Let me just ask you.  Is that your driver's |
| 2 | license number? |
| 3 | THE DEFENDANT:  No. |
| 4 | MR. YANG:  Your Honor, if I may interject.  Would |
| 5 | the court like the bottom registration or the top?  There's |
| 6 | two. |
| 7 | THE COURT:  I want his, in other words, |
| 8 | Mr. Colbert's.  Is that his? |
| 9 | Let may ask.  Is that your driver's license? |
| 10 | THE DEFENDANT:  Yes. |
| 11 | THE COURT:  It is? |
| 12 | THE DEFENDANT:  Yes. |
| 13 | THE COURT:  All right.  Thank you. |
| 14 | Any other questions from either side? |
| 15 | MR. BAKMAN:  Not from the defense, Your Honor. |
| 16 | MR. YANG:  Just two quick questions, Your Honor. |
| 17 | THE COURT:  All right. |
| 18 | **RECROSS-EXAMINATION** |
| 19 | BY MR. YANG: |
| 20 | Q    Mr. Colbert, it's your testimony that at the time -- by |
| 21 | the time of the search warrant was executed, Jamene Marshall |
| 22 | had come into Room 220 to pick up his belongings, right? |
| 23 | MR. BAKMAN:  Asked and answered. |
| 24 | THE COURT:  Overruled.  He can answer that |
| 25 | question. |

47

```
1              THE DEFENDANT:  No.
2    BY MR. YANG:
3    Q    That's not your testimony?
4    A    He didn't come -- you are saying when the officers came
5    in and the officers executed the warrant, they were
6    searching the warrant, did Jamene come prior to the search?
7    Q    That's correct, yes.
8    A    No.  He came during the search.
9    Q    Oh, Jamene Marshall came during the search warrant?
10   A    And turned right around.
11              MR. YANG:  Okay.  No further questions, Your
12   Honor.
13              THE COURT:  All right.  The witness is excused.
14              Thank you very much.
15              And the next witness?
16              MR. BAKMAN:  At this point in time, Your Honor,
17   the defense rests with respect to the standing issue.
18              THE COURT:  All right.
19              Any witnesses for the government on the standing
20   issue?
21              MR. YANG:  No.  Yes, Your Honor, the government
22   would rest.
23              THE COURT:  No, there are no witnesses and so the
24   government rests?
25              MR. YANG:  That's correct, Your Honor.  I
```

1    apologize.

2              THE COURT:  All right.  Let me ask the government.

3    Did you ever check the driver's licenses on these

4    registration forms to determine whether or not they were in

5    fact valid driver's licenses?

6              MR. YANG:  With respect to Calvin Colbert or

7    Jamene Marshall, Your Honor?

8              THE COURT:  Preferably as to both.

9              MR. YANG:  We can check right now actually, Your

10   Honor.

11             Yes, Your Honor, both appear to be correct.

12             THE COURT:  That's not my question.  My question

13   was, did the government check the driver's licenses to make

14   sure that they were in fact valid licenses?

15             MR. YANG:  Prior to today, Your Honor?

16             THE COURT:  Yes.

17             MR. YANG:  Well, Your Honor, I don't know if this

18   answers the court's question, but the government did go and

19   pull the driver's license of Jamene Marshall and also

20   Calvin Colbert.

21             THE COURT:  Okay.  And is the number for

22   Jamene Marshall, is that the driver's license for

23   Jamene Marshall?

24             MR. YANG:  The numbers match up, yes, Your Honor.

25             THE COURT:  Okay.  What about the address, does

49

1    the address line up?

2         MR. YANG:  Yes, Your Honor, the address matches.

3         THE COURT:  For both?

4         MR. YANG:  For both parties.

5         THE COURT:  Okay.  So, apparently Mr. Marshall

6    had, at some point in time, lived -- well, at least at the

7    time he got his driver's license, he lived at 7012 Victoria?

8         MR. YANG:  That's what the records say,

9    Your Honor.  I don't know if that's in fact true.

10        THE COURT:  All right.  What next?

11        MR. BAKMAN:  I would argue to the court, submit to

12   the court that I believe that the issue of standing is now

13   resolved.  He has --

14        THE COURT:  Well, it depends on whether or not I

15   find his testimony to be credible.  If I find it to be

16   credible, then it might give rise to an issue of standing.

17   If I find it not to be credible, then he loses out.

18        MR. BAKMAN:  True.

19        THE COURT:  But then the other question is, is

20   if -- there were two arguments that the government raised.

21   I only rested the standing issue on one.  The other issue is

22   the issue as to whether or not the room was used for an

23   unlawful purpose, and I did not rule on that.  Because of

24   the fact that I have found that the evidence as to standing

25   was insufficient.

```
 1              So are we going to get into that one now, or are
 2    we going to wait until later?
 3              MR. BAKMAN:  I can argue it now.
 4              THE COURT:  Let me put it this way.  I will give
 5    you guys, both sides a chance to supplement your contentions
 6    in that regard in light of what was supposedly testified to
 7    here today.
 8              MR. BAKMAN:  All right.
 9              THE COURT:  All right.  So that takes care
10    temporarily of the issue of standing.
11              Now, the other issue -- and then I presume you are
12    calling Officer Beall to testify as to the issue of?
13              MR. BAKMAN:  The issue as to the public exception.
14              THE COURT:  Okay.
15              MR. BAKMAN:  Public safety exception to Miranda.
16              THE COURT:  Okay.
17              All right.  Let me have the officer stand right
18    there and my clerk will swear him in.
19              THE CLERK:  Please raise your right hand.
20              Do you solemnly swear that the testimony you shall
21    give in the cause now before this court shall be the truth,
22    the whole truth, and nothing but the truth, so help you God?
23              THE WITNESS:  I do.
24              THE CLERK:  Please have a seat.
25              State your name and spell your last name for the
```

 1    record.

 2              THE WITNESS:  Gerald Beall, G-E-R-A-L-D,

 3    B-E-A-L-L.

 4              THE COURT:  All right.

 5              MR. YANG:  Your Honor, I apologize.  But it wasn't

 6    clear to me why we were moving beyond the standing issue,

 7    which is a threshold issue, and moving on to the next issue.

 8    It wasn't clear to me.

 9              THE COURT:  Well, because there is more than one

10    issue that needs to be addressed.

11              MR. YANG:  The reasonable expectation of privacy

12    issue, Your Honor.

13              THE COURT:  Well, as I've indicated -- unless you

14    want to call him back yet again on another different day.  I

15    wouldn't think you would want to do that.  But if that is

16    what your intent is, in other words, if you want me to wait

17    until I make a ruling on standing.

18              I've indicated the problem is, is that there are

19    two aspects of standing.  One was the fact that the

20    defendant did not have a reasonable expectation of privacy,

21    but I thought that the government also made an argument in

22    regards to use of the premises for an unlawful purpose as

23    barring some entitlement to standing.

24              And on that one I was not ready to rule because I

25    didn't rule initially on that.  I indicated that I wasn't

1    addressing that point.  And, you know, at this point in

2    time, unless both sides are going to be presenting me all

3    the evidence and all the arguments on that issue now, then I

4    suppose I could address it now.

5              But if the answer is no, you are not going to be

6    doing that now, then either we are going to have to call

7    this officer back again, or we could just do it now.  I

8    don't care which, frankly.

9              MR. YANG:  Well, Your Honor, as far as the

10   government is concerned, we were not planning to present

11   additional evidence with respect to the standing issue and

12   we are ready to submit on the papers and on the evidence

13   that's been presented.

14             THE COURT:  Let me ask the defense.

15             MR. BAKMAN:  I'm happy to argue it, Your Honor.

16   It sounds to me as if that's a waiver of the unlawful

17   purpose argument in this case.

18             There is no evidence that -- the government has

19   put forth no evidence to show that the standing would be

20   vitiated based on knowledge or an understanding of my

21   client's part that the premises had been used by an unlawful

22   purpose by someone other when he took over that room.

23             THE COURT:  Well, but the problem is, is that at

24   the time he was in the room by himself with no other person

25   there, he was seen at the time the officers walked in

 1    counting money at a desk with drug paraphernalia and drugs

 2    in the room.  So there is always that.

 3            MR. BAKMAN:  Well, there is that, but then the

 4    question becomes -- the question really is whether or not my

 5    client was involved in any unlawful activity when he moved

 6    his belongings in there.  And mere presence is simply not

 7    enough.

 8            Now, I did not focus -- in all candor, I didn't

 9    focus on that aspect because I thought our threshold issue

10    was whether or not there was an expectation of privacy

11    because of the overnight guest status.

12            THE COURT:  No, I --

13            MR. BAKMAN:  So I can take another look at that.

14            THE COURT:  Well, but that's what I was asking.

15    In other words, if you are saying that you are not prepared,

16    then you are not prepared.  I understand that.

17            MR. BAKMAN:  I'm not.

18            THE COURT:  Because, frankly, I think I caught

19    both sides unaware.

20            MR. BAKMAN:  Yes.

21            THE COURT:  But if you read my tentative, my

22    tentative indicated I was just deciding the standing issue

23    on the reasonable expectation of privacy, but I'd also

24    indicated that there was a second argument that the

25    government made which I was not addressing because I was

54

1  relying on that point.

2          MR. BAKMAN:  And, frankly, I looked for the

3  tentative and I can't find it.

4          THE COURT:  September 9th.

5          MR. BAKMAN:  Yeah, I thought it was on PACER, and

6  I went on PACER before the hearing to find it and I couldn't

7  find it on PACER.

8          THE COURT:  It was on PACER.

9          MR. YANG:  It is on PACER, Your Honor.

10         MR. BAKMAN:  That's what I thought.

11         THE COURT:  It's an attachment to the minutes of

12  the September 9th hearing.

13         MR. BAKMAN:  All right.

14         MR. YANG:  Your Honor, I think the issue here is

15  the government did raise the illegal purpose use argument in

16  its original papers back in February of 2010.  Defendant's

17  had more than a fair opportunity to respond to that issue at

18  this point.

19         If the court will recall, at the last hearing,

20  defendant wanted to take a wait-and-see approach as to

21  whether or not he was going to testify.  The court shouldn't

22  allow him to do this by piecemeal.  He's had opportunities

23  to respond to these issues.  The government's raised them

24  timely.  The court's recognized this issue, issued a

25  tentative, and defendant has failed to respond to the issue.

55

1          THE COURT:  Yes, but my tentative didn't address

2    the issue.  So, again -- frankly, I don't think it makes

3    much difference except for the issue as to whether or not we

4    are going to go forward with Officer Beall's testimony now

5    or whether or not we are going to bring him back later for

6    the other portion, depending upon how I rule on standing.

7          MR. YANG:  If I understand correctly, Your Honor,

8    on what the court is saying is that either way the court is

9    not ready to rule on the standing issue as of today, so

10   rather than bring Officer Beall and all the other officers

11   back to question them about the Miranda issue --

12         THE COURT:  Let me just ask.  Do we have more than

13   one officer here today?

14         MR. YANG:  We have all the officers here today.

15         THE COURT:  Well, in that case, yes, that is the

16   point.  Do you want to bring them all?  I was just thinking

17   about Officer Beall's convenience, but actually now I'm

18   saying all the officer's convenience.

19         I mean, again, it doesn't bother me one way or the

20   other because I'm here most days of the week anyway, so I

21   mean its -- but the officers, I presume, have to drive from

22   further away and so they may want to do it now.

23         But, however, I'm not going to insist.  If you

24   feel that I should resolve the standing issue absolutely

25   first -- which, you know, if I resolve it against the

1    defendant then, you know -- even if I resolve it against the

2    defendant, there still would be the Miranda point.

3          But at this point in time, the Miranda point would

4    be simply as to about the gun and, you know, the -- let me

5    just ask the defendant counsel.

6          You know, even if I rule against the government on

7    the Miranda point, why doesn't the gun come in?  I mean,

8    there may be less evidence to associate the gun with the

9    defendant, but the gun still comes in.

10          MR. BAKMAN:  I agree with that analysis.  I think

11   it's simply whether or not there is going to be an admission

12   of his statements made at the time that indicate knowledge

13   of where the gun was located.

14          MR. YANG:  Your Honor, I think we are ready, then,

15   to proceed on the Miranda issue with Officer Beall's

16   testimony.

17          THE COURT:  All right.  Then let's go ahead.

18          MR. BAKMAN:  May I?

19          THE COURT:  Yes.

20                    **DIRECT EXAMINATION**

21   BY MR. BAKMAN:

22   Q    All right.  Officer Beall, directing your attention to

23   March 11th of 2009, you had occasion to execute a warrant at

24   the Economy Inn in San Bernardino?

25   A    That's correct.

57

1    Q    And did you make the initial entry into Room 220, sir?

2    A    I was part of the entry team, that's correct.

3    Q    And when you made your initial entry, did you see

4    Mr. Colbert inside the room?

5    A    Yes.

6    Q    Where was he?

7    A    Seated in the chair, and I believe it would be the

8    southwest corner of the room next to a table.

9    Q    And when you made entry into the room -- were you the

10   first one in?

11   A    I believe I was.  I think I was the first one in.

12   Q    Did you issue any commands to Mr. Colbert upon making

13   entry?

14   A    Yes.

15   Q    What did you tell him?

16   A    I told him to get down on the ground.

17   Q    Did you have your weapons drawn?

18   A    Yes.

19   Q    What type of weapon did you have?

20   A    A 45 caliber handgun.

21   Q    Were there any shotguns on scene?

22   A    Not that I recall, no.

23   Q    And did Mr. Colbert comply?

24   A    He did.

25   Q    Did he comply immediately?

58

1    A     Yes.

2    Q     What did he do?

3    A     As I recall, I think he screamed and then lied down on

4    his stomach facing in a what would be -- I guess it would be

5    a northeast direction because of the way that the bed and

6    other furniture in the room was laid out.

7    Q     Was there one bed or two beds in the room?

8    A     You know, it's -- I believe there was one.  I may be

9    incorrect, but I believe there was one.

10   Q     And when Mr. Colbert hit the floor, would that be a

11   fair statement, he hit the floor based on your command?

12   A     He laid down on the floor.

13   Q     And when he laid down on the floor, did you have a view

14   of his hands?

15   A     Yes.

16   Q     Did you shout to him show me your hands?

17   A     I don't recall that.  No.

18   Q     Is that something that you learned in training?

19   A     If a person has their hands concealed, yes, that is

20   something we learn in training.

21   Q     And --

22   A     You tell them to show us their hands.

23   Q     And would it be safe for me to say that if you have no

24   recollection of indicating to him or stating to him show me

25   your hands, you must have been able to see his hands when

59

1    you made entry; is that right?

2    A    I don't want to make an assumption.  However, it was a

3    small room, and in the amount of time it took for him to get

4    down on the ground and me to move through the room towards

5    him, we would have ended up in the same place in

6    approximately the same time.

7         So did I see his hands the entire time, I think is the

8    question you are asking.  I couldn't tell if I recall that

9    or not, but I don't remember having to tell him show me your

10   hands.

11              THE COURT:  Let me stop you and let me ask a quick

12   question, if I might.

13              MR. BAKMAN:  Sure.

14              THE COURT:  Just utilizing the photographs that

15   were attached to the officer's -- to the government's

16   supplemental declaration of Officer Beall, because it has

17   photographs of the room.  And if you don't mind, can I ask

18   him in this one picture where the defendant was and where

19   the defendant laid down?

20              MR. BAKMAN:  Not at all, Your Honor.

21              THE COURT:  And let me ask -- and for the record

22   what I'm doing is referring to Document No. 103, and there

23   are three photographs in order.  I'm asking him to look at

24   the first photograph of the three as they are placed in that

25   particular document.

```
 1              And let me ask the witness.  Sir, do you recognize
 2    what this photograph depicts?
 3              THE WITNESS:  That does appear to be the room
 4    where we located Mr. Colbert.
 5              THE COURT:  In other words, 220?
 6              THE WITNESS:  Yes, Your Honor.
 7              THE COURT:  Okay.  And you said that when you
 8    immediately entered he was seated at a desk or table.  Is
 9    that depicted?
10              THE WITNESS:  Yes, Your Honor.  That would be this
11    table here (indicating).  This, based on the layout of the
12    room, would be west in this direction, south over here, and
13    then north this way (indicating).
14              THE COURT:  Okay.  And for the record, the officer
15    has identified there are two, like, small chairs and there
16    is a small table in between those two chairs, like it looks
17    like a coffee table.  And he was in one of those chairs, is
18    what you are saying?
19              THE WITNESS:  Yes, Your Honor.  It would have been
20    this one in the far corner (indicating).  That would be the
21    southwest corner.
22              THE COURT:  Okay.  And so when you told him to lie
23    down, I presumed he laid down or lied down next to the chair
24    and table?
25              THE WITNESS:  In kind of an angle at the corner of
```

1    the bed.  Here, his head was somewhere in this area below

2    this dresser here (indicating).

3            THE COURT:  Okay.  Was the drawer opened at the

4    time you encountered him?

5            THE WITNESS:  No, Your Honor.

6            THE COURT:  Okay.  So at the time, then, his feet

7    would be towards the small table and his head would be

8    towards the edge of the bed; is that correct?

9            THE WITNESS:  Yes, Your Honor.  Somewhere right

10   in -- right there off the corner of the bed there.

11           THE COURT:  Okay.  Thanks.

12           Let me ask defense counsel.  You can proceed.

13           MR. BAKMAN:  Your Honor, could we mark that

14   photograph as an exhibit?

15           THE COURT:  Sure.  What do you want to call it?

16           MR. BAKMAN:  Defendant's A is fine.

17           THE COURT:  Okay.  We will call it Defendant's A.

18   And what I will do for ease of reference, I will just take

19   apart -- since I have a copy, I will take apart the copy

20   that I have and I will just give it to my clerk and have him

21   mark it as Exhibit A.

22           MR. BAKMAN:  Thank you, Your Honor.  And I'd move

23   it into evidence for purposes of the hearing.

24           THE COURT:  I presume there is no objection?

25           MR. YANG:  No objections, Your Honor.

62

```
1            THE COURT:  Okay.  Thanks.
2            (Exhibit A received in evidence.)
3   BY MR. BAKMAN:
4   Q    Now, Officer Beall, you indicated to me that you didn't
5   want to make assumptions with respect to what you may or may
6   not do in the room, is that an accurate statement of your
7   testimony?
8   A    That's what I just said I believe.  Yes.
9   Q    Now, you prepared a supplemental declaration, I'm
10  assuming at the request of Mr. Yang in this case, that was
11  dated by you on September 21st of this year; is that right?
12  A    That's correct.
13  Q    And that supplemental declaration listed a number of
14  assumptions that you made when you went into Room 220 that
15  day; is that right?
16  A    I don't know.  You'd have to show it to me and point
17  out what you are referring to.
18  Q    Well, when's the last time you read the declaration
19  officer?
20  A    The date that it was signed/
21  Q    Did you read it today before your testimony here today?
22  A    No.  I do not have a copy of it.
23  Q    Well, do you recall -- who wrote the declaration, was
24  it you or was it one of the government attorneys in this
25  case?
```

WIL S. WILCOX, OFFICIAL FEDERAL REPORTER

1   A      I wrote it with the assist of Mr. Yang.

2   Q      And how much of it did you actually write as opposed to

3   the government counsel in this case?

4   A      I'm not sure what you are asking.

5   Q      Well, let's talk about some of the items.  You

6   indicated that, in your declaration, you had eight years '

7   experience as a law enforcement officer, correct?

8   A      Again, I don't have a copy of it in front of me.  I

9   don't know what you are reading from.

10  Q      Well, in your declaration, I'm asking you,

11  Officer Beall, if you have an independent recollection of

12  placing in there the fact that you are an eight-year veteran

13  of law enforcement, yes or no?

14  A      I have a recollection of placing in there something

15  referring to my years of service, that's correct.  But

16  I'm --

17  Q      How many years of service, sir?

18  A      Right now, approximately eight and a half.  Eight and

19  four months, somewhere around there.

20  Q      How long were you working narcotics in those eight and

21  a half years?

22  A      Since October of '07.

23  Q      And at some point in time you testified before

24  Judge Whaley, United States district court judge of the

25  federal bench, have you not, sir?

64

1    A    I did.

2    Q    And you were found to be uncredible by Judge Whaley; is

3    that right?

4    A    He did make some rulings where he stated that my

5    testimony was not credible, that's correct.

6    Q    He found that you lied; is that right, sir?

7    A    No.

8    Q    Were you disciplined by your department as a result of

9    your lack of credibility findings by Judge Whaley?

10              MR. YANG:  Objection, Your Honor.  Relevance.

11              THE COURT:  What is the relevance of this?

12              MR. BAKMAN:  I will move on.

13              THE COURT:  Okay.  Is that the answer to my

14   question?

15              MR. BAKMAN:  Yes.

16              THE COURT:  Okay.  Thank you.

17   BY MR. BAKMAN:

18   Q    Now, you indicated in your declaration, did you not --

19   and I'm asking you based on your independent recollection as

20   you sit here today, sir.  You indicated in your declaration

21   that you asked Mr. Colbert where the gun was because while

22   he was laid out and sprawled out on the floor he could still

23   have reached the weapon; is that right?

24   A    That's correct.

25   Q    Now, tell me, when you told him to get down on the

WIL S. WILCOX, OFFICIAL FEDERAL REPORTER

1   floor and he complied with your instruction, did you go over

2   to him and handcuff him?

3   A    Yes.

4   Q    And did you handcuff his hands behind his back?

5   A    I did.

6   Q    And it was after he was handcuffed by you that you

7   decided to ask him questions about a gun; isn't that right?

8   A    That's correct.

9   Q    So let me make sure that I get this right.  The man is

10  sprawled out on the floor, hands behind his back, he's

11  handcuffed, and you believed he was still a danger to the

12  public and to you; is that right?

13  A    Absolutely.

14  Q    And you believed that it was a necessity for you to

15  then question him after having handcuffed him to determine

16  whether there was a weapon on him; is that right?

17  A    That's correct.

18  Q    Tell me the order of questions that you asked him with

19  regards to weaponry?

20  A    If I may, I could actually demonstrate for you.

21  Q    No.  I'm asking you to tell me the order of questions,

22  sir, that you asked him with respect to the weapons.

23  A    After he was handcuffed, the first question I asked him

24  was do you have any weapons, to which he, as I recall,

25  replied yes.

1   Q    Without his response, sir, tell me what was the next

2   question you asked him with respect to the weapons?

3   A    He said yes.

4            MR. BAKMAN:  Objection.  Nonresponsive.  Motion to

5   strike his answer.

6            THE COURT:  Let me just indicate to the witness,

7   what he's asking for is just the order in which you asked

8   the questions, not what the defendant's responses were or

9   why you asked the next question.  He just wants to know what

10   were the questions in order, if you can recall.

11            THE WITNESS:  Yeah, that's what I was trying to

12   answer, Your Honor.

13            THE COURT:  Well, but you are throwing in

14   something that he doesn't want.

15            THE WITNESS:  I'm sorry.

16            THE COURT:  Which is what the defendant's response

17   was to your questions.  He doesn't need that nor does he

18   want it.  All he wants is just what your questions were.

19   Okay?

20            THE WITNESS:  I'm sorry, Your Honor.

21            The second question, as I recall, was any weapons

22   on his person, most specifically any hands -- I'm sorry, any

23   guns, bombs, knives, needles, hand grenades, things of that

24   nature, is what I asked.

25

```
 1    BY MR. BAKMAN:

 2    Q     And what was the third question?

 3    A     Where was it?

 4    Q     Now, at the time you asked him the first question, sir,

 5    how many other officers were present in the room?

 6    A     I'm sorry.  Which question, the first?

 7    Q     The first question.

 8    A     The entire entry team.

 9    Q     How many people comprised the entry team that day?

10    A     I'd have to refer to my report to be sure I could name

11    off the officers.

12    Q     More than three?

13    A     Yes.

14    Q     More than five?

15    A     I believe there was five.

16    Q     All with weapons drawn?

17    A     They were behind me.  I don't know.

18    Q     Well, let's talk about assumptions again, shall we,

19    officer.  When somebody makes entry based on the execution

20    of a search warrant on someone suspected of dealing drugs,

21    you indicated in your declaration that you assumed, based

22    upon your experience, that that person is typically armed;

23    is that right?

24    A     That's correct.

25    Q     So would it not figure, so to speak, that one of the
```

68

1   assumptions we can make from your training and your

2   experience is that when you are going to serve a search

3   warrant on a narcotics suspect, the rest of your entry team

4   is going to have their weapons drawn, even though they are

5   behind you; is that right?

6          MR. YANG:  Objection, Your Honor.  Calls for

7   speculation.

8          THE COURT:  Well, let me ask the counsel this

9   question.  How much more questioning is there going to be in

10  this regard?  I mean, I think we have what is in essence the

11  outlines of the argument that I understand the defense is

12  going to make and that I presume the government is going to

13  be responding to.

14         And that is, is that if the defendant is

15  handcuffed and is lying on his stomach at that point in

16  time, and I presume the handcuffs -- let me ask the witness.

17  The handcuffs were behind the back?

18         THE WITNESS:  Correct, Your Honor.

19         THE COURT:  Whether or not the questioning at that

20  point in time insofar as the weapons was proper without

21  Mirandizing the defendant first.  I presume that's the

22  argument.

23         MR. BAKMAN:  That's the argument.  That's it in a

24  nutshell, Judge.

25         MR. YANG:  Yes, your Honor.

69

```
 1              THE COURT:  Let me just ask.  I presume that the
 2    defense has finished with his questioning.
 3              MR. BAKMAN:  Yes, Your Honor.
 4              THE COURT:  Let me ask the government.  Do you
 5    have any questions of the witness?
 6              MR. YANG:  Just a couple questions, follow-up
 7    questions, Your Honor.
 8              THE COURT:  Sure.  Not a problem.
 9                        CROSS-EXAMINATION
10    BY MR. YANG:
11    Q    Officer Beall, when you asked the defendant if he had
12    any guns, bombs, knives, needles, hand grenades or anything
13    that's going to poke me, stick me, or stab me, were you
14    concerned only about firearms?
15    A    No.
16    Q    What else were you concerned about?
17    A    Sharp objects, like syringes, razor blades, knives,
18    make-shift sharp objects, a number two pencil with a sharp
19    point on it.  A number of items aside from just a firearm.
20    Q    Have you ever heard of any instances of defendants
21    resisting arrest after they've been handcuffed?
22              MR. BAKMAN:  Objection.  Irrelevant for purposes
23    of this hearing.
24              THE COURT:  I will allow you to ask that question
25    as modified.  You can ask him whether or not he's known of
```

1    any of incidents where a suspect who is handcuffed and lying

2    on his stomach has attempted to inflict some sort of injury

3    with a weapon on an officer.

4              MR. YANG:  Certainly, Your Honor.

5    Q    Officer Beall, do you know of any instances where a

6    suspect lying on the ground with his hands behind his back

7    handcuffed where that suspect --

8              THE COURT:  On his stomach.

9    BY MR. YANG:

10   Q    Lying on his stomach, where that suspect has attempted

11   to resist arrest?

12             MR. BAKMAN:  And I'm going to ask that the

13   question be limited to what's within this man's personal

14   knowledge, not what somebody else has related to him.

15             THE COURT:  I will agree.  He can testify on the

16   basis of his own knowledge.

17             MR. YANG:  Your Honor, just to clarify, own

18   knowledge as in it's happened to Officer Beall, or he's

19   heard of it?

20             THE COURT:  Why don't we start with his own

21   knowledge and then I will allow you to ask the next question

22   as to whether or not, you know, persons, either supervisors

23   or someone else or somebody he's supervising has informed

24   him of incidents.  But let's start with his own personal

25   experience first.

1          MR. YANG:  Certainly.

2     Q    Officer Beall, do you understand the question?

3     A    I think so, yes.  Based on my own personal experience,

4     I think the number one thing that's going to come to mind

5     is, as I went through the academy part of our training was

6     various handcuffing techniques, some of which were after

7     performing the lateral vascular neck restraints.

8          In other words, the -- to put a person unconscious.

9     And what they did in that training was we simulated

10    performing that move on somebody else in our class at which

11    time they pretended to go unconscious and I think they gave

12    us three seconds to get that person handcuffed, and the

13    person who was pretending to be unconscious was instructed

14    at the end of the three seconds to begin fighting to try and

15    break free.

16         THE COURT:  No, I understand that.  But, again,

17    that's not answering the question because I think what we

18    are trying to find out here is whether or not in your own

19    personal experience were in the situation where somebody is

20    in fact handcuffed.

21         THE WITNESS:  That's what I'm getting to,

22    Your Honor.  Maybe I just stretched it out a little bit.

23         THE COURT:  Okay.

24         THE WITNESS:  Well, in this case in numerous

25    occasions after the person was handcuffed, I had plenty of

72

```
1    people in my training class who were much larger than I am,
2    like Mr. Colbert is, and they were more than easily -- or
3    very easily able to throw me off their back, get up on their
4    feet, and at which point I'm now vulnerable to somebody
5    coming at me, kicking me in the head, maybe pulling a weapon
6    from the back of their pants because I haven't searched them
7    yet.  I mean, there was numerous times.
8              I'm not that big of a person.  Mr. Colbert I guess
9    is like six-two, 200-and-some pounds.  He could have easily
10   thrown me off of his back.
11             THE COURT:  I think he's lost weight since he's
12   been in custody.
13             MR. BAKMAN:  I would ask the court to take
14   judicial notice of that, contrary to Officer Beall's initial
15   description of the suspect in the search warrant, he was
16   five-nine and 170 pounds.
17             THE COURT:  Well...
18   BY MR. YANG:
19   Q    Officer Beall, have you heard from your supervisors of
20   any other officers who's been involved in attempting to
21   subdue a suspect after the suspect has been handcuffed and
22   lying on their stomach?
23             MR. BAKMAN:  Objection.  Irrelevant.  Hearsay.
24             THE COURT:  I will allow him to answer the
25   question.
```

73

| | |
|---|---|
| 1 | THE DEFENDANT:  I've heard of numerous occasions |
| 2 | where subjects have been injured by somebody who has been |
| 3 | placed in handcuffs.  However, I cannot tell you that those |
| 4 | specific instances I heard of was from somebody who was |
| 5 | proned out on their stomach on the ground. |
| 6 | THE COURT:  All right. |
| 7 | BY MR. YANG: |
| 8 | Q    And, Officer Beall, at the time you asked that question |
| 9 | to defendant, had you searched his person yet? |
| 10 | A    No. |
| 11 | Q    Had the entire room been searched yet? |
| 12 | A    No. |
| 13 | Q    Were any other third parties, not members of the entry |
| 14 | team, not defendant, were any third parties able to come |
| 15 | into the room while you guys were executing the search |
| 16 | warrant at that moment? |
| 17 | A    No. |
| 18 | Q    So the front door had been secured? |
| 19 | A    Correct.  Officers were standing behind me blocking the |
| 20 | doorway. |
| 21 | Q    Could someone in theory have rushed into the room if |
| 22 | they tried? |
| 23 | A    I guess someone could if they wanted to try and rush |
| 24 | in, yes. |
| 25 | Q    Officer Beall, you testified on cross that you had your |

WIL S. WILCOX, OFFICIAL FEDERAL REPORTER

74

1   weapon drawn, right?

2   A    Correct.

3   Q    Okay.  And it's possible the other officers and agents

4   also had their weapons drawn?

5   A    It's possible, yes.  But as I mentioned, they were out

6   of my view.  They were behind me.

7   Q    Would it have been dangerous to, either for yourself or

8   for someone else in that room, to begin discharging your

9   weapon?

10         MR. BAKMAN:  Objection.  Speculation.  Irrelevant.

11         THE COURT:  I will sustain the objection.

12   BY MR. YANG:

13   Q    Officer Beall, where defendant was lying on the ground,

14   were there areas that he could have been able to access a

15   hidden weapon?

16         MR. BAKMAN:  Speculation.

17         THE COURT:  While handcuffed?

18   BY MR. YANG:

19   Q    While handcuffed.

20   A    Yes.

21         MR. BAKMAN:  Your Honor, I'm going to object.

22   It's speculative unless Beall wants to now say that my

23   client was going to access a weapon with his teeth or his

24   toes.

25         MR. YANG:  Your Honor, I think that's more for

1    argument.  But I think what's important here is --

2              THE COURT:  Let me just stop you.  The

3    arguments -- I mean, I understand that, you know, obviously

4    the presence of weapons are a concern, but the real question

5    is, is that if the person is proned on the ground,

6    handcuffed, before asking the questions, should they be

7    Mirandised?

8              MR. YANG:  I understand, Your Honor.  And the

9    point I'm trying to illustrate here is that just because,

10   from a layperson's perspective, just because somebody is

11   laid down on the ground, handcuffed, from a lay perspective,

12   that appears that that person is under control.  But I

13   think --

14             THE COURT:  Similarly, however, if one were to

15   take that line of reasoning, why do you think that asking

16   him questions would cause him to give you the correct

17   answers?

18             MR. YANG:  Sometimes the defendant --

19             THE COURT:  Yes.

20             MR. YANG:  -- tells the truth.

21             THE COURT:  Yes.  And, so?

22             MR. YANG:  And says, yes, I do have a weapon in my

23   pocket.

24             THE COURT:  I mean, again -- in other words, if

25   you are making up this theory that people are handcuffed are

WIL S. WILCOX, OFFICIAL FEDERAL REPORTER

1    dangerous and susceptible to grabbing weapons, those people

2    aren't going to answer the questions truthfully in regards

3    to is there a weapon around here, are they?

4              MR. YANG:  I don't think that's always the case,

5    Your Honor.  They may tell the truth sometimes.  They may

6    lie sometimes.  But it's certainly worth a question to

7    protect both officer's safety and the defendant's safety.

8              THE COURT:  The real question is whether or not

9    prior to engaging in that form of questioning they should be

10   advised of their rights.

11             You know, frankly, it's an interesting question

12   because I do understand the arguments on both sides.  On the

13   one hand I do think that there is a potential of some risk.

14   You know, obviously, because nothing is absolutely

15   risk-free.

16             But conversely, however, on the defense side, they

17   are going to say, well, why, you know, in terms of the

18   degree of risk, why shouldn't there be an advisal first.

19   Because if you give the advisal and there's -- after that

20   point in time you can ask any questions you want.

21             And it seems to me that there may be a case out

22   there somewhere that has the answer to this, or not.

23   Although, there is lots of cases out there, so maybe some

24   court has considered the issue.

25             So I do understand the nature of the position on

1    both sides.  And I have not made up my mind one way or the

2    other at this point in time, but conversely, however, I

3    don't know if this questioning is particularly helpful.

4            MR. YANG:  Well, I think it is helpful, Your

5    Honor, because I think we have a trained law enforcement

6    officer here who will tell us, the lay people here, that

7    when they are in these situations it's not as simple as --

8            THE COURT:  For example -- now, he could have

9    testified.  I'm not saying that he should have testified

10   this way, but he could have testified this way that one of

11   the risks is whether or not the handcuffs actually had been

12   properly applied, and therefore, you know, in certain

13   situations one may think they have handcuffed somebody and

14   in fact they haven't.

15           I understand things of that sort.  The officer

16   didn't testify, but I can understand that as a situation.

17   So, again, unless he's going to say something that is

18   something that is unexpected to someone who has heard and

19   dealt with case upon case upon case of arrests of various

20   sorts of resisting arrests of one sort or another and all

21   the panoply that has happened.

22           You know, again, if you think that you are going

23   to tell me something that you don't think I already know,

24   then, please, you know, let's get to it.  But if you are not

25   going to tell me anything that I don't already know, then

WIL S. WILCOX, OFFICIAL FEDERAL REPORTER

1   what's point?

2          MR. YANG:  Well, I think, Your Honor, the point

3   here is that just because somebody is handcuffed does not

4   mean that, as a matter of law, they are rendered safe.

5          THE COURT:  Okay.

6          MR. YANG:  They are still a risk out there.

7   That's all I'm trying to establish here.

8          THE COURT:  But what is the risk?

9          MR. YANG:  Again, I'm trying to have Officer Beall

10  testify as to what the risk is, because to a layperson, yes,

11  it seems like he's proned out, he's handcuffed, what's the

12  risk?  But Officer Beall may be able to explain to us what

13  the risk is.

14         THE COURT:  Let me ask him.  What is the risk?

15         THE WITNESS:  I've come across numerous subjects

16  that have been handcuffed behind their back that are able

17  to, I don't know if their shoulders are double-jointed, move

18  their arms up over the front.

19         THE COURT:  I understand that, but we are talking

20  about proned, proned on the ground.  I do understand if he

21  has just been handcuffed, I view that as a different

22  situation.  Handcuffed standing I view entirely as a

23  different situation than handcuffed proned.  Because even if

24  one is double-jointed handcuffed proned, you know -- let's

25  put it this way.

1   Between the time that he attempts to pull his

2   hands over his head, you are basically going to be standing

3   on his head because you are that close.  So I understand the

4   situation.  But if you are going to tell me what is the risk

5   when the person is handcuffed behind his back, proned on his

6   stomach, I'm perfectly willing to listen to all the

7   testimony that you have on it.  But it has to be that

8   situation because that is the situation that we have here.

9         MR. YANG:  And, Your Honor, I think the assumption

10   here is that they remain in that position.  And I can have

11   Officer Beall testify, they don't have -- and I think we

12   don't even need Officer Beall to testify.  Just because

13   someone is proned doesn't mean they can't turn around, they

14   can't wiggle out.

15         THE COURT:  Yes.  But we also already have the

16   testimony that there is at least five officers there, you

17   know, all of them are armed, this officer was armed with a

18   gun, and I presume at that point in time he's pointed the

19   gun at the defendant, and he's asking him questions.

20         Now, the question is, in that situation, should

21   the defendant at first be Mirandized before asking him other

22   questions.

23         MR. YANG:  And, Your Honor --

24         THE COURT:  Counsel, all you are doing is arguing.

25         MR. YANG:  I understand, Your Honor.  But I'm

1    trying to explain to the court my line of questioning.

2          THE COURT:  I understand your line of thought.

3    But you keep on saying, well, I want him to provide you

4    evidence, but he is not providing me with evidence because

5    he hasn't testified as to any evidence.

6          If he wants to talk about situations where -- and

7    I think he's already testified that he doesn't know of any

8    situation where the individual was proned on his stomach,

9    handcuffed behind his back.  That's what I want him to talk

10   about.  But if he doesn't have any testimony in that regard,

11   what can I say?

12         MR. YANG:  Would the court allow me to ask

13   Officer Beall, then, if suspects who are prone on their

14   stomach, handcuffed --

15         THE COURT:  Yes.

16         MR. YANG:  -- if they can change positions, for

17   example, getting up?

18         THE COURT:  But, again, would asking them

19   questions about whether or not their weapons in the near

20   vicinity prevent them from turning, et cetera?

21         MR. YANG:  Your Honor, I think I can proffer

22   Officer Beall's testimony that one of the things that the

23   officers want to know when they enter into a room is, first,

24   where are the bodies in the room, where are all the people,

25   and second, if there are the presence of any weapons,

1    especially in the vicinity, and also throughout the room.

2            And, Your Honor, I think the problem here is that

3    we tend to look at these situations as a static situation

4    where everybody is --

5            THE COURT:  I don't look at them as a static

6    situation.  I was in the U.S. attorney's office and I've

7    represented situations where officers were accused of using

8    excessive force, and the question is, at that point in time,

9    you don't look at 20/20 hindsight.  You look at the

10   situation in the shoes of the officer, what are the risks.

11           I understand the law.  It's just that you have to

12   give me evidence.  You don't have to give me argument.

13   Argument comes later.  What is the evidence?

14           MR. YANG:  If Your Honor would permit, I would try

15   to get Officer Beall to testify as to that.

16           THE COURT:  You keep on saying that.  Of course I

17   keep on interrupting you so it does make it sort of

18   lengthier.  But just ask the question.  Let me see what

19   comes out.

20           MR. YANG:  Certainly, Your Honor.

21   Q    Officer Beall, do you know of any situations -- well,

22   let me strike that.

23       A suspect that is on the ground, that's prone, that's

24   handcuffed, does that mean they are rendered entirely

25   controlled by the officers?

1   A       No.

2   Q       Please explain.

3   A       A subject that's on the ground, handcuffed, lying on

4   his stomach or any other position has the ability to move

5   very quickly, change position, reach down the back of their

6   pants to access a weapon maybe concealed in their pants,

7   their back pocket.  A razor blade, a knife, or any other

8   object beneath the belt, which is around the back of their

9   waist.

10      I had a personal experience with that where someone

11  pulled a razor blade out from underneath his belt loop and

12  actually sliced his own wrist while he was handcuffed.

13      He is able to flip on his side, access a weapon, maybe

14  concealed under something that's next to him.  All of this

15  can happen extremely rapidly and often before my chance to

16  react to his action.

17      By the time I recognized that he's actually moving and

18  doing something, the time for me to react is substantially

19  behind that and may give him time to access a weapon,

20  whether it's on his person or somewhere nearby in his

21  immediate area.

22  Q       And when you ask these questions do you have a weapon,

23  et cetera, et cetera, does the suspect sometimes tell you

24  that they do?

25  A       Yes.

83

```
1          MR. BAKMAN:  Well, objection.  Relevance and 403.
2          THE COURT:  Well, I will overrule it.  I mean, he
3    can testify as to his personal experience.
4    BY MR. YANG:
5    Q    Officer Beall?
6    A    Yes.  I've had persons tell me, yes, they have a weapon
7    on their person.  Numerous times.
8    Q    And during those times, did you search the person and
9    actually discover a weapon?
10   A    Yes.
11   Q    Okay.  But sometimes they don't tell you the truth,
12   right?
13   A    That's correct.
14          MR. YANG:  No further questions, Your Honor.
15          THE COURT:  All right.  Anything else.
16          MR. BAKMAN:  Just a couple.
17                    REDIRECT EXAMINATION
18   BY MR. BAKMAN
19   Q    Let's go back to question number one, the first one you
20   asked Mr. Colbert.
21          When you asked that question there were five other
22   officers in the room; is that right?
23   A    I believe there was four.
24   Q    And where was your knee, was it making contact with the
25   back of Mr. Colbert when you asked the first question?
```

WIL S. WILCOX, OFFICIAL FEDERAL REPORTER

84

1   A    No.

2   Q    Did you ever put your knee down on him when you were

3   restraining him?

4   A    I believe I had, when I was placing the handcuffs on

5   him, my left knee on his upper back.

6   Q    And that was so you could control him; is that right?

7   A    Correct.

8   Q    And in relationship to the first question being asked,

9   when did the knee come off his back?

10  A    Oh, long before that.  Probably a couple of minutes.

11  Q    And what were the other officers doing in that couple

12  minute period of time?

13  A    Oh, I would say -- I don't think I could say.  I don't

14  want to make assumptions.  I don't know what they were all

15  doing behind me.  And it was over a year ago, I don't

16  recall.

17  Q    Well, Officer Beall, we've got a room in a motel -- and

18  by the way, is that a small room, a medium room, a large

19  room?  Tell me, just characterize that, if you could, small,

20  medium, or large.

21          THE COURT:  That's ambiguous.  Why don't you just

22  ask him if he can estimate the dimensions of the room.

23          MR. BAKMAN:  All right.  Fair enough.

24  Q    Can you estimate the dimensions of that room for me?

25  A    Estimated at 20 by 10, 25 by 10 maybe.  That's an

1   estimation.

2   Q    And tell me, was there a lot of room for five police

3   officers to be able to maneuver in that room?

4   A    I wouldn't play volleyball in there.  I mean, everybody

5   could walk around the bed.  There was enough room to pass

6   side by side, but you couldn't stand three or four wide

7   around the bed.  I mean, is that what you're...

8   Q    Well, I'm trying to visualize in my mind if you've got

9   five officers packed in the room, you've got the defendant

10  felony proned out on the ground with his hands handcuffed

11  behind his back, how much movement was the defendant able to

12  have in that two-minute period of time between the time you

13  cuffed him, put your knee on his back to control him, and

14  the time that you asked him the first question?

15  A    There was plenty of room for him to make two movements

16  that I was concerned with.

17  Q    Was there something that prevented you once you cuffed

18  him, gained control of him, did something prevent you from

19  moving him out of the room and then Mirandizing him before

20  you asked him the questions?

21  A    Yes.

22  Q    What was that?  The other four officers in the room?

23  A    My training and experience.

24  Q    Did the other four officers in the room block your exit

25  and prevent you from taking the defendant out into the hall

86

```
 1    to Mirandize him?
 2              THE COURT:  Counsel, really, that's argumentative.
 3              MR. BAKMAN:  No further questions.
 4                      RECROSS-EXAMINATION
 5    BY MR. YANG:
 6    Q    Officer Beall, going back to that point where defendant
 7    was proned out on the ground and you asked him those
 8    questions.  Was it a good idea to get him up, take him out
 9    of the room without searching him, and ask him -- and
10    Mirandizing him and then ask him?
11              MR. BAKMAN:  I'm going to object.
12              THE COURT:  Why don't you ask him why he didn't?
13    BY MR. YANG:
14    Q    Why didn't you do that?
15    A    Because at that point he, his person had not been
16    searched for weapons yet, and the last thing I'm going to
17    do, based on my training and experience, is stand him up
18    without being searched and walk him through four other
19    officers or walk him by myself past civilians or people in
20    the neighborhood without him having been searched for
21    weapons.
22         He could have easily pulled a weapon from behind his
23    waistband or somewhere in that area as we were walking and
24    brought his arms up to his side and shot four officers
25    before I could have stopped him.
```

1  Q     Okay.  And, Officer Beall, at the time the search

2  warrant was executed and defendant was arrested, did you

3  know the room was registered to someone else?

4           MR. BAKMAN:  Objection.  Relevance.

5           MR. YANG:  Your Honor, it's relevant because --

6           THE COURT:  Let me stop, again.  I don't want a

7  response.  I'm thinking about the objection.  I will

8  overrule the objection.

9  BY MR. YANG:

10 Q     You can answer the question, Officer Beall.

11 A     No.  I did not know who the room was registered to.

12          MR. YANG:  No further questions, Your Honor.

13          THE COURT:  All right.

14          MR. BAKMAN:  Nothing further.

15          THE COURT:  So let me ask the officer this

16 question:  Why didn't you search the defendant prior to

17 asking him about weapons?

18          THE WITNESS:  I'm sorry, Your Honor?

19          THE COURT:  Why didn't you search the defendant

20 prior to asking him about weapons?

21          THE WITNESS:  Because I do not want to reach into

22 his pant pocket and find a syringe and get stuck in the

23 finger, open knife blade.

24          Some of the weapons that we usually find on gang

25 members and drug dealers are often in very poor condition.

1 Some of which I've found that have no trigger guard.  I

2 could reach in there, activate the trigger, shoot him in the

3 leg, shoot myself, shoot my partner.

4        There is so many variables when it comes to

5 weapons being on somebody's person.  I will not reach into

6 somebody's pocket before I ask those questions to at least

7 give them an opportunity to tell me I wouldn't reach in that

8 pocket if I were you.

9        THE COURT:  Okay.  Thank you.

10        Anything else from either side?

11        MR. BAKMAN:  No, Your Honor.

12        MR. YANG:  With respect to the Miranda issue, no,

13 Your Honor.

14        THE COURT:  All right.  What are the other

15 officers here for?

16        MR. YANG:  Your Honor, I spoke to defense counsel.

17 He wanted the other officers here for the Franks issue.  But

18 apparently they're --

19        MR. BAKMAN:  The court had initially afforded me

20 the opportunity -- your Honor, I think you had initially

21 afforded me the opportunity to reopen Mrs. Tores' cross.

22 And I was considering doing that.  And in an abundance of

23 caution, I wanted the officers here.

24        But I don't believe it's necessary.  I believe

25 that after a review of Your Honor's questions, as I

1    indicated at the beginning of this, I think Your Honor's

2    questions and the questions asked by Ms. Tores adequately

3    addressed that.

4              THE COURT:  Okay.  Let's do this, then.  We are

5    going to get, I guess, a little bit more further briefing on

6    those issues of the unlawful use and standing as to that and

7    then I'll decide the standing issue.

8              And then as to this Miranda issue, I would want

9    counsel on both sides to give me the best three cases that

10   you have on the point.  Obviously, if you find me a case

11   where somebody is proned, handcuffed, and that would seem to

12   be the best, but barring that, then the best that you can

13   give me.

14             But, obviously, I do understand that, that where

15   you would have a situation of this sort, there is a risk --

16   there are risks involved.  And I really have not made up my

17   mind in this regard.  But I think it's an interesting issue.

18             I mean, because on the one hand, you know, if one

19   takes the perhaps 30 seconds to Mirandize the defendant

20   before asking him these questions, you know, would that

21   increase the risk to the officers, and it's obviously a

22   serious risk because obviously I do accept the initial

23   testimony of Officer Beall that when persons are dealing in

24   drugs, not obviously street transactions, et cetera, but if

25   they are dealing in transactions on a more localized level

1    which usually will mean that there are more drugs involved

2    and obviously more money, there is more incentive for those

3    persons to protect themselves and their profits, and that

4    protection usually is in the form of having a weapon of one

5    sort or another.  Not necessarily a gun, but at least some

6    weapon.

7              I accept that as not an uncredible explanation of

8    the situation.

9              MR. BAKMAN:  Let me, if I might, Your Honor, since

10   Mr. Yang has pretty much argued his position in this case.

11   Let me leave you with one thought.

12             In listening to Officer Beall and his last

13   comments made to the court in response to the court's

14   question, or one of Mr. Yang's, I believe, why he wouldn't

15   search somebody --

16             THE COURT:  That was actually my question.

17             MR. BAKMAN:  You know, when the answer is I won't

18   put my hands in their pockets because I'm afraid to get

19   stuck by a hypodermic, doesn't that really defy the logic of

20   a Terry pat down search?  You know, he's limiting it --

21   we've gone from somebody who is felony proned out,

22   handcuffed behind their back, four other officers in the

23   room.  He's standing over this guy, probably with his knee

24   on his back or at least in such close proximity that he --

25             THE COURT:  Let me stop you.  I understand your

```
 1    argument is, is that his explanation as to why he wouldn't
 2    do his search isn't applicable here because it is not the
 3    type of situation where that risk, for example, the --
 4             MR. BAKMAN:  The unknown.
 5             THE COURT:  Not the unknown.  When something is
 6    capped.
 7             MR. BAKMAN:  Oh, the hypodermic.
 8             THE COURT:  The uncapped hypodermic or something
 9    of that sort is not really at play here.
10             I mean, I think there are good arguments to be
11    made on both sides.  But I will see what's the best case you
12    guys give me.  And, you know, whichever one is the most
13    controlling is the one I will follow --
14             MR. BAKMAN:  Very well.
15             THE COURT:  -- according to the ninth circuit.
16             MR. YANG:  Your Honor, to the extent the court is
17    still considering the credibility of Officer Beall, I would
18    like to bring to the court's attention that in the case of
19    the United States versus Vincent Young, Judge Whaley issued
20    a modified order retracting a significant amount of the
21    credibility findings against Officer Beall.
22             If the court would like, I can --
23             THE COURT:  Let me put it this way.  I don't find
24    Officer Beall to be uncredible.  In fact, some of the things
25    he said are not particularly helpful to the government, so I
```

92

```
1   know that he's not attempting to phrase everything in a
2   manner to bolster the government's case.  You know, he said
3   some things that -- so I don't find his credibility to be
4   particularly at issue.
5           Now, Mr. Colbert's credibility, however, is going
6   to be something that I'm going to think about because, you
7   know, that is going to be a question.  So I will consider
8   it.  Yes.
9           MR. YANG:  Well, then, Your Honor, I will sit
10  down.
11          THE COURT:  Okay.  Thank you.
12          All right.  When can you get me these materials?
13          MR. YANG:  Well, Your Honor, defense counsel
14  indicated to me last night that he may be requesting the
15  court to continue the trial on the basis that he's not had
16  sufficient time to prepare.  The government really does not
17  take a position.  If that's the case, then that's fine.
18          THE COURT:  That's fine.  And I can understand
19  that because I have not obviously ruled on these things yet
20  either and that will obviously affect trial preparation.
21          Let me ask the defense counsel.  What are you
22  talking about in terms of a continuance?
23          MR. BAKMAN:  Your Honor, I was looking for two
24  weeks.  We were talking about either the 19th or the 26th.
25  I'd prefer the 26th, quite frankly.
```

93

```
1              THE COURT:  Of October?

2              MR. BAKMAN:  Yes.

3              THE COURT:  Okay.

4              MR. BAKMAN:  I could use the time.

5              THE COURT:  Let me ask the defendant.  Sir --

6              But we will treat that as what of what?

7              MR. BAKMAN:  That would have been the T-MAX time,

8   Your Honor.

9              THE COURT:  I understand that, but I would want

10  the T-MAX date to be extended.  I don't want a situation

11  where I am jammed up.  So I have no problems with granting a

12  continuance.  But let's put it this way.  The 12th would

13  have been what of what?

14             MR. YANG:  I'm sorry, Your Honor, the question

15  was?

16             THE COURT:  This matter was -- I thought it was

17  currently scheduled for the 12th.

18             MR. YANG:  That's correct.

19             MR. BAKMAN:  Yes.

20             THE COURT:  Okay.  So the 12th would have been

21  what of what, in other words, what would be the T-MAX after

22  the 12th?

23             MR. YANG:  I believe two weeks, Your Honor.

24             THE COURT:  Two weeks.  Okay.  So, in other words,

25  then can I get -- if we continue the trial to the 26th, can
```

94

```
 1    we get two weeks such that I would have to bring him to

 2    trial by November the 9th if we can't go forward on the

 3    26th?

 4              MR. BAKMAN:  That's fine, Your Honor.  And

 5    Mr. Colbert indicates he's willing too.

 6              THE COURT:  Let me get the waivers.  Let me ask,

 7    Mr. Colbert.  Do you understand that you have a right to a

 8    speedy trial?  Normally that means you have to be brought to

 9    trial within 70 days of the later of two dates, either the

10    date that the charges against you are initially filed or the

11    date of your first appearance in court.

12              However, your matter has been continued a number

13    of times, each time with your time waiver taken.  And at

14    this point in time --

15              MR. YANG:  Your Honor, I'm sorry to interrupt.

16    May I consult with the agents just to make sure that

17    everybody's --

18              THE COURT:  Oh, available?

19              MR. YANG:  Yeah, available on that date.

20              THE COURT:  All right.

21              MR. YANG:  And we are looking at October 26th,

22    Your Honor.

23              THE COURT:  In other words, you don't know today

24    whether or not it's doable?

25              MR. YANG:  I don't know, Your Honor.  There is a
```

95

```
1    number of witnesses.
2              THE COURT:  Why don't we do this.  Let's talk --
3    well, let's do this.  Let's talk about, when can you get me
4    the stuff?
5              MR. BAKMAN:  I'd like 10 days, Your Honor.
6              THE COURT:  From today's date?
7              MR. BAKMAN:  Yes.
8              THE COURT:  10 days from today's date would be the
9    14th.
10             MR. BAKMAN:  That's fine.  Could I submit it on
11   the 15th, Your Honor.
12             THE COURT:  The 15th by noon, and give me a
13   courtesy copy.  And I want simultaneous briefing on this.
14   So both sides by the 15th, and then both sides again --
15   wait, just a second.  That would be sort of short.
16             Well, both sides again to give me any sort of
17   reply -- well, actually, let's do it a little earlier.
18   Let's do it on the 14th.  By noon the 14th.  And then have
19   both sides give me a response by the 19th at noon, courtesy
20   copy in my box by noon, and I will make a ruling on the
21   21st.
22             MR. BAKMAN:  What was the response date, Your
23   Honor, the 19th?
24             THE COURT:  Yeah.
25             The 21st will be the hearing date because I will
```

1    make a ruling on everything at that point in time.

2         And, also, let me do this.  Let me actually do get

3    a time waiver for the 28th but with the understanding that

4    if there is a major time in terms of scheduling by either

5    side, both sides will agree on a further, let's say, brief

6    continuance to accommodate the schedules for both sides.  So

7    if the defense needs somebody that they want or the

8    government has a witness problem.

9         But on the 21st I want to discuss the trial date.

10   Because I don't mind putting the matter on for trial on the

11   26th with the expectation that -- although, let me just ask

12   one other thing.

13        Let's go off the record for just a second.

14             (Discussion held off the record.)

15        THE COURT:  So with the understanding that I will

16   put it on the 26th of October, but with the understanding

17   that both sides will be agreeable to a brief further

18   continuance if either side needs it, but the 26th would be,

19   again, with an additional two weeks for the T-MAX.  Okay?

20        MR. BAKMAN:  That's fine, Your Honor.  Mr. Colbert

21   is in agreement with that.

22        THE COURT:  Well, before we do, I still have to go

23   through the whole thing, okay.  I just want to make sure he

24   understands.

25        All right.  So at this point in time, Mr. Colbert,

1    you've heard we are considering continuing your trial date

2    from the 12th to the 26th with the understanding that if you

3    are not brought to trail on the 26th, the court would have

4    an additional two weeks by November 9th to bring you to

5    trial.

6            However, if either side needs an additional brief

7    continuance, both sides have indicated that they are willing

8    to give a brief continuance to accommodate unexpected

9    developments by one side or another in terms of witnesses.

10           Do you understand everything I've said?

11           THE DEFENDANT:  Yes.

12           THE COURT:  Do you have any questions at this

13   point in time about your right to a speedy trial?

14           THE DEFENDANT:  No.

15           THE COURT:  Do you agree to waive your right to a

16   speedy trial and agree that I can continue the trial date in

17   this matter to October the 26th with the understanding that

18   if you are not brought to trial on the 26th, that you will

19   be brought to trial by the 9th of November?

20           THE DEFENDANT:  Yes.

21           THE COURT:  Counsel join?

22           MR. BAKMAN:  Join.

23           THE COURT:  All right.  The government also?

24           MR. YANG:  Yes, Your Honor.

25           THE COURT:  Okay.  Anything else we need to do?

1          MR. BAKMAN:  Your Honor, if I might bring up one

2    issue.  And I know it's premature, but the government filed

3    a motion in limine on October 1st, I believe, to preclude me

4    from calling in my case in chief, Officer Beall.

5          THE COURT:  Well, let me just ask the government.

6    What basis could I bar the defense from calling a witness

7    who is a percipient witness?

8          MR. YANG:  Well, Your Honor, Officer Beall would

9    offer no relevant testimony to defendant other than for the

10   purpose of him calling Officer Beall to impeach him.

11         THE COURT:  I understand that's your position.

12   Normally, that is done in terms of raising objections at the

13   time of trial, or, you know, I suppose if we are at trial,

14   and depending upon the nature of the government's case, it

15   might very well be at that point in time that I can say for

16   certain that Officer Beall could have nothing to add to the

17   situation and then I would require an offer of proof from

18   defense counsel.

19         But at this point in time, what you are asking me

20   to do is even prior to the start of the trial to exclude a

21   percipient witness and a very important percipient witness

22   in the sense that he was there at every stage of the

23   particular events on the day of the 11th and a majority of

24   the events on the day of the 10th.

25         Now, it might very well be that all the other

1  stuff would be covered by other witnesses, and maybe that is

2  true, but at this point in time I can't say that I'm going

3  to be excluding the defense from being allowed to present

4  him as a witness.

5        MR. YANG:  I think, Your Honor, the court's

6  proposed, I guess, plan to deal with this issue I think is

7  reasonable, that depending on how the government's case

8  proceeds, if defense wants to call Officer Beall in its case

9  in chief, then the court would take an offer of proof from

10  counsel.

11        But I think absent a sufficient offer of proof,

12  Officer Beall would be called to testify only for the

13  purpose of impeaching him by defense.

14        THE COURT:  Maybe yes.  Maybe no.  Let me ask,

15  Mr. Bakman.  I do agree with the government to some extent

16  that -- I don't want to waste your time, my time, your

17  client's time, and my reporter's time if in fact you are

18  going to be asking Officer Beall to come into testify and

19  everything that you are going to be asking him, I'm going to

20  sustain an objection to.

21        MR. BAKMAN:  Well, I don't see it that way, Your

22  Honor.  And I can pretty much give a proffer at this point

23  in time just one example of a proffer.

24        There is an undercover -- there is a recording

25  that's going on between Beall and one of the other

1  percipient officers in which Beall suggests that he's

2  fabricating evidence in this case.

3          A statement on the Channel 7 recording is as far

4  as I know, he threw that shit out at you, and the fact that

5  he didn't see that personally is certainly a defense that

6  the officers lied in this case, and that's a valid defense.

7          Credibility of the law enforcement investigation

8  in this case is fair game on cross-examination and for a

9  defense case.

10          THE COURT:  I would agree with you if this was the

11  tossed rock case.  But this is not the tossed rock case.

12  This is a situation where he's basically charged, I presume,

13  primarily with the materials that were found in the motel

14  room.

15          MR. BAKMAN:  Au contraire.  Their allegation is

16  that he tossed a rock from the second story balcony landing

17  to one of the black females down below on a street level.

18  So it is a tossed rock case.

19          MR. YANG:  Your Honor, the two counts here are

20  possession with intent to distribute and the possession of

21  the gun in furtherance of that count.  The testimony that

22  the government is going to be relying on is the testimony of

23  Special Agent Angie Kagan upon entry into the room.

24          Officer Beall's testimony is not being relied on

25  and the only purpose of introducing his testimony is for the

1    purpose of confusing the issue by being able to attack him.

2          THE COURT:  Let me put it this way.  I agree with

3    the government that if in terms of their case if they don't

4    present any testimony about a supposed tossing of a rock to

5    a purchaser down below, you are not going to be allowed to

6    call Officer Beall to testify as to that point which has not

7    been brought in the government's case in chief so to impeach

8    him with the recording.  I would agree with the government

9    on that.

10          MR. BAKMAN:  Well, I will rethink it, Your Honor.

11          THE COURT:  Okay.  And as I said, it would

12   obviously depend upon what the government presents by way of

13   the case in chief because it might very well be that they

14   are opening the door for some relevant testimony from

15   Officer Beall.  And I can't preclude that at this point in

16   time because, again, he is a percipient witness.

17          MR. BAKMAN:  My initial reason for bringing this

18   up is I am hoping that the government will make Beall and

19   others available to me without the necessity of my having to

20   expense CJA funds and have those people subpoenaed.

21          THE COURT:  He will let you know by the 21st.

22          MR. BAKMAN:  Your Honor, that won't give me enough

23   time to get an investigator out to subpoena them.

24          THE COURT:  All right.  How long do you need to

25   have -- do you need to know?

1        MR. BAKMAN:  I'd like to know by the end of this

2   week, if I can.

3        THE COURT:  Okay.  He will let you know by the end

4   of this week, by Friday.

5        MR. YANG:  Your Honor, I can let the court and

6   defense counsel know now.  If defense counsel intends on

7   attempting to put him up for -- in defendant's case in

8   chief, the government will be objecting.  But if the court

9   allows his testimony, then the government will secure his

10  presence at trial.

11       THE COURT:  Well, let's put it this way.  Why

12  don't you secure his presence.  And I'm not saying that I'm

13  going to allow him or not allow him at this point in time.

14  But the problem is, is that, you know, he's going to

15  subpoena Officer Beall anyway if you don't agree.

16       And so there is no sense in wasting everybody's

17  time and money because by making him, quote, voluntary but

18  committed, you know, if there is changes in scheduling, then

19  both sides don't have to expend the extra funds or

20  inconvenience in that regard.  So why don't you guys both

21  agree to play nice.

22       MR. BAKMAN:  Very well.

23       THE COURT:  Okay.  Anything else that we need to

24  talk about?

25       MR. BAKMAN:  No, I don't believe so.

1          THE COURT:  So at this point in time, then, I will

2     see you back here on the 21st for me to resolve all the

3     remaining issues.  And let me have you guys come back at,

4     let's say, 10:00 o'clock.

5          MR. YANG:  The government will submit a proposed

6     order regarding the excludable time, Your Honor.

7          THE COURT:  Okay.  Great.  Thanks.

8          Thank you.

9          MR. BAKMAN:  All right.  Thank, Your Honor.

10

11          (At 3:31 p.m. proceedings were adjourned.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              --oOo--

2                            CERTIFICATE

3

4

5          I hereby certify that pursuant to Section 753,

6    Title 28, United States Code, the foregoing is a true and

7    correct transcript of the stenographically reported

8    proceedings held in the above-entitled matter and that the

9    transcript page format is in conformance with the

10   regulations of the Judicial Conference of the United States.

11

12   Date:  October 9, 2010

13

14

15          _____

16                        WIL S. WILCOX
                         U.S. COURT REPORTER
17                        CSR NO. 9178

18

19

20

21

22

23

24

25

WIL S. WILCOX, OFFICIAL FEDERAL REPORTER