1  LARRY M. BAKMAN (SBN 88964)
   1901 Avenue of the Stars
2  Suite 200
   Los Angeles, California 90067
3  Telephone:  (310) 461-1555
   Facsimile:  (310) 461-1556
4  Email:  lbakman@lbakmanlaw.com

5  Attorney for: Defendant

6

7

8                    UNITED STATES DISTRICT COURT

9            FOR THE CENTRAL DISTRICT OF CALIFORNIA

10

11  UNITED STATES OF AMERICA          CASE NO:  CR 09-301-GW

12                    Plaintiff,      SUPPLEMENTAL BRIEFING RE:
                                      FRANKS HEARING
13        vs.
                                      DATE:   November 4, 2010
14                                    TIME:   1:30 p.m.
    CALVIN COLBERT,                   CTRM:   Honorable George H. Wu
15
                    Defendant
16

17

18        Pursuant to the Court's request, defendant by and through his attorney of record, Larry

19  M. Bakman hereby submits this supplemental briefing describing discrepancies relating to

20  Officer Gerald Beall.

21        Defense counsel refers herein to the following documents:

22      1.  The crime/arrest report authored by Beall attached to Document 35 entitled Notice of

23          Motion and Motion to Suppress commencing at page 40 of 72;

24      2.  The search warrant affidavit authored by Beall attached to Document 35 entitled

25          Notice of Motion and Motion to Suppress commencing at page 31 of 72;

26      3.  Beall's declaration in support of the government's opposition to defendant's

27          suppression motion, document 39 commencing at page 30 of 41;

28      4.  Reporter's transcript of Franks Hearing, Friday, December 11, 2009, document 88;

29

                              -1-

*CONTENTIONS:*

**1. *BEALL INTENTIONALLY AND/OR RECKLESSLY OMITTED INFORMATION RELATING TO THE CONFIDENTIAL INFORMANT AND THE SUSPECT'S DESCRIPTION:***

A. The search warrant affidavit omits any information concerning the reliability of the informant including but not limited to the number of times said informant was used in the past, the general type of information obtained from the informant, whether such information was corroborated and the manner by which said information was corroborated.

B. Despite having responded to the Court's question as reflected in the Court Reporter's Transcript page 7 of 214, dated December 11, 2009 as follows; Q-Why did you use the term confidential reliable Informant? A-This is a confidential informant I had used on numerous occasion and had been proven reliable, No such corroboration of this testimony can be found in Beall's arrest report in that the arrest report commencing on page 40 of 72 and again on page 41 of 72 begins with activity occurring on March 11, 2009 rather than March 10, 2009 omitting any reference to a confidential reliable informant.

C. The search warrant affidavit omits critical discrepancies as between the Confidential Informant's description of the suspect given as a black male, late 20s, five foot ten inches tall wherein defendant was at the time the affidavit was authored 21 years of age, over 200 pounds and six foot two inches tall.  Most importantly, a further reading of the affidavit page three, third paragraph, suggests that on March 11, 2009, Beall returned to the Economy Inn and observed a Black male matching the description of "Cal" who opened the door to room 217 and had a brief conversation. This is patently false given the male that opened the door, if in fact the defendant,

did not in any way match the description of Cal given by the informant.  Further misleading is the suggestion that Beall *identified* the person opening the door to Room 217 as being the suspect when in fact Beall did not have line of sight from his position at the Greyhound Terminal, leaving in question who actually made the identification and what the identification was made upon if in fact the description provided by the informant was materially different than that observed. ***The affidavit falsely suggests to the magistrate that Beall made an identification of the defendant on March 11, 2009 and that identification was both consistent with the informant's description and Beall's observation the day prior, both of which are patently false. As a footnote, one has to wonder why on March 11th Beall positioned himself at the Greyhound bus station, and left the identification of Cal up to officers who had not seen Cal on the previous day, rather than Beall taking position on the N/E side of the motel so that he could positively identify the individual in Room 217 or 220 as the individual observed the previous day conducting what Beall believed to be a hand to hand sale.***

### 2. BEALL DECLARATION FALSELY STATES THAT ON MARCH 10, 2009 FROM HIS VANTAGE POINT ON THE NORTH EAST SIDE OF THE ECONOMY INN, HE OBSERVED A BLACK FEMALE GO INTO ROOMS 217 AND 220

A. Subsequent to defendant's motion to suppress calling into question Beall's credibility by specifically referencing the mischaracterization of defendant's physical description and more importantly the video taped conversation in which Beall is heard stating to Officer White shortly before authoring the search warrant affidavit, **"I'll have you help me spew some of that shit out to write my affidavit," and As far as I'm concerned, he fucking threw at you from the fucking room upstairs",** Beall submits a declaration that apparently attempts to "back pedal" and supply needed probable cause. The declaration begins on paragraph 4 by referencing

Beall's observation with the informant on March 10, 2009 and proceeds in paragraph 5 to discuss the suspicious activity involving an apparent hand to hand transaction. Problematic for Beall is the fact that he then claims from his vantage point on the N/E side of the Economy Inn **he observed defendant** and a black female go into Room 217 and later into Room 220.

This statement under penalty of perjury is inconsistent with his own search warrant affidavit in which there is no mention that he was ever at the N/E side of the Economy Inn on March 10th, nor any mention of seeing any individuals go into Room 217 or 220. In direct response to the Court's question relating to his time at the Economy Inn with the informant, [page 8 of 214]

Q- And upon arriving at the Economy In, where did you park?

A- I parked at the Greyhound bus station across the street.

Q- All right, And did the person who he pointed out to you as Cal match the description of being a black male, mid to late 20s, approximately five foot ten feet tall, medium complexion, and average build?

A- Based on my opinion at the time he did, sir.

Nor can Beall claim that after having dropped off the informant and returning to the location later that day with Officer White that he ten saw defendant and a black female come and go from the Rooms at the Economy Inn. **Quite the opposite, Beall's affidavit states that after having dropped the informant off, he returned to the location with Officer White but that defendant was not seen again. (Page 3, paragraph 2). Beall's testimony to the Court on December 11th further corroborates that defendant was not observed again on March 10th.**

**Q- All right, And there was an approximately two hour period where Cal was not seen again?**

**A- That's correct, your Honor.**

-4-

Further disconcerting is the fact that Beall in response to the Court's question as to his placement upon his return to the motel on March 10th contradicts his declaration.

[Page 10 of 214]

Q- And you have—the last sentence of this second full paragraph says, officers did see numerous individuals go to Room 217, knock on the door , and received no response. **Did you observe that as well or is it only some other officers?**

A- **To the best of my recollection, Your Honor, I was parked on the west side of the motel still at the Greyhound Parking lot, which would have been on the opposite side from Room 217, so it would have been other officers that observed that.**

Nor can the government claim that Beall's false testimony as contained in his declaration be attributed to an error between dates, confusing his March 11th observations with that of March 10th. Beall's own police report belies this argument in that Beall's report references the fact that he was parked at the Greyhound Bus Station, west of the motel, and therefore unable to see what transpired on the east side of the motel where Rooms 217 and 220 were located. Rather Beall's report claims that he relied upon Officer Landeros' observations and transmissions for that information. Simply put, Beall was never in a position to observe who came and went from rooms 217 to 220 from his location at the Greyhound Bus Station on March 11th or March 10th.

3. ***BEALL'S DECLARATION FALSELY STATES THAT THE CRACK COCAINE WAS THROWN AT THE SECOND BLACK FEMALE FROM THE SECOND FLOOR OF THE MOTEL. [Defendant contends that this story was fabricated by Beall in an attempt to explain away his statements made on the unknowing video recording – however Beall gets the fabricated story wrong]***

-5-

A.  Paragraph 9 of Beall's declaration states that Officer Landeros related to Beall that Landeros observed defendant literally throwing crack cocaine to the second black female on scene. The suspected baggie of crack cocaine landed in some busesh and the second black female searched for several minutes for it. "Therefore, because I did not personally observe the crack cocaine being handed over to Officer White, I need clarification and told him that as far as I could tell, defendant "threw at you from the (expletive) room upstairs," just as he threw the crack cocaine to the first black female"

Problematic with this testimony in Beall's declaration is the fact that the ***statement is inconsistent with Beall's police report.*** In his report Beall claims the presence of Black female number one and two. The first approached Officer White in an attempt to complete a narcotic transaction but was unable to do so. The second black female then appeared and had White obtain his twenty dollars back from the first female. Upon the return of the money, White then gave female number two the twenty who then ***handed White*** two pre-packaged pieces of suspected cocaine (later field tested positive, approximately 0.4 grams)

The report then goes on to state "after the transaction was complete, Officer White then gave the original black female a $10 bill as payment for negotiating the narcotic transaction. This black female then immediately headed back to the fence along the north side of the motel where Officer Landeros observed her to apparently purchase cocaine base from "CAL" utilizing the $10 bill. ***THE REPORT IS BARREN AS TO ANY REFERENCE THAT COCAINE WAS THROWN FROM THE SECOND FLOOR.***

***The report also contradicts Beall's declaration in that the declaration refers to female number two as being the recipient of the thrown cocaine when in fact***

-6-

*female number two is no longer in the picture after the buy was completed by*
*Officer White. As evidenced in the affidavit, page 4 bottom paragraph, "after*
*the transaction was complete, the second black female walked away*
*westbound on 6th street…"*

**4.  BEALL'S CLAIM THAT HE COULD SEE THE NARCOTIC TRANSACTION ON**
**THE NORTH SIDE OF THE MOTEL FROM HIS VANTAGE POINT WEST OF THE**
**MOTEL IS HIGHLY SUSPECT.**

A.  In his declaration, paragraph 6, Beall states "I had a direct view of this
interaction between defendant and the first black female" (referring to
Officer's White's purchase of cocaine from the first black female that occurred
on the North side of the motel).  Said statement is highly suspect and
somewhat inconsistent with respect to his testimony in response to the
Court's questioning commencing at page 28 of 214.

The witness:  Okay. At the very beginning, Your Honor, the black female stood at
the wrought iron fence below Room 217, I could see from my vantage point.

The Court:  Let me ask you, how could you see that?

The witness: If you look at the diagram, Your honor

The Court: Yes.

The witness: At the angle from where I was parked—again, this isn't necessarily
to scale—the fencing around the Economy Inn is wrought iron with big six or
eight inch open slats. I could see across through the parking lot through the
fencing.

The Court:  (after a number of other questions) All right. Now the first sentence of
Paragraph 4 of page 3 says a black female stood at the wrought iron fence below

217. The question is, how could you have seen that from your vantage point at P2?

The witness: I believe Your Honor, that maybe that sentence is being taken a little too literally or maybe on my own intentional act it sounds a little bit vague. When I say below 217 I was making that description based on the observations officer have had and had during that day…"

Beall's police report is also void of any mention that he personally observed the narcotic transaction between the black female and Officer White, thereby rendering his declaration and the statements made in the search warrant affidavit even more suspect.

Lastly, Beall claims that from his vantage point on March 11th he was able to see Landeros' vehicle [page 14 lines 12-14 of the reporter's transcript]. However Landeros testified that he was unable to see Beall's position and that he had never informed Beall of where he [Landeros was parked. [ page 77 lines 10-15, 19-12]

## 5. *BEALLS TESTIMONY BEFORE THE COURT THAT OFFICER LANDEROS WAS PRESENT DURING SURVEILLANCE ON MARCH 10TH IS CONTRADICTED BY LANDEROS' OWN TESTIMONY*

A. Landeros testified contra to Beall that he was not present at the Economy Inn on March 10th, rather having only been involved with the investigation beginning March 11, 2009. [See Landeros' testimony page 73 lines 2-13]

///
///
///

-8-

***CONCLUSION***

There is no question that Courts are loath to find that an officer intentionally lie. In this case however, the Court's analysis can lead to no other possible explanation given the inconsistencies cited to in this memorandum.

The Court's analysis should start with the government's concession that a "Davis" violation occurred in the writing of the search warrant affidavit. The only remaining question to answer is whether the omissions and misrepresentations were intentionally and/or recklessly made. In answering that question, there can be no doubt that Officer Beall was dishonest, both with respect to the writing of the search warrant affidavit and then "covering up" his dishonesty by intentionally lying in his declaration, a declaration that was inconsistent with his police report and his Court testimony.

As such, this Court cannot find any good faith exception pursuant to Leon that would salvage the propriety of the search warrant and the execution of said warrant. Accordingly, the evidence seized in this matter should be suppressed as well as the defendant's statements given they were in fact the fruits of the warrant.

Dated: November 1, 2010                    Respectfully submitted,

                                           _____
                                           LARRY M. BAKMAN

-9-