1  ANDRÉ BIROTTE JR.
   United States Attorney
2  ANTOINE F. RAPHAEL
   Assistant United States Attorney
3  Chief, Riverside Branch Office
   JERRY C. YANG
4  Assistant United States Attorneys
   California Bar Number 241323
5       3880 Lemon Street
        Riverside, California 92501
6       Telephone:  (951) 276-6221
        Facsimile:  (951) 276-6202
7       E-mail: jerry.yang@usdoj.gov

8  Attorneys for UNITED STATES OF AMERICA

9                UNITED STATES DISTRICT COURT

10          FOR THE CENTRAL DISTRICT OF CALIFORNIA

11 UNITED STATES OF AMERICA,      ) CR No. 09-301-GW
                                  )
12          Plaintiff,            ) GOVERNMENT'S RESPONSE TO
                                  ) PRESENTENCE INVESTIGATION
13          v.                    ) REPORT AND SENTENCING POSITION
                                  ) FOR DEFENDANT CALVIN CHARLES
14 CALVIN CHARLES COLBERT, JR.,   ) COLBERT, JR.
     aka "Cal",                   )
15                                ) Sentencing
            Defendant.            ) Date: May 9, 2011
16                                ) Time: 8:30 a.m.
                                  )
17 _____)

18

19      Plaintiff United States of America, by and through its

20 attorney of record, Assistant United States Attorney Jerry C.

21 Yang, hereby submits the attached Government's Response to

22 Presentence Investigation Report and Sentencing Position for

23 Defendant Calvin Charles Colbert, Jr.  The government's response

24 is based upon the attached memorandum of points and authorities,

25 the files and records in this case, the United States Probation

26 Office's Presentence Investigation Report, and any other evidence

27 ///

28

1  or argument that the Court may wish to consider at the time of

2  sentencing.

3  Dated: April 22, 2011          Respectfully submitted,

4                                 ANDRÉ BIROTTE JR.
                                  United States Attorney
5
                                  ANTOINE F. RAPHAEL
6                                 Assistant U.S. Attorney
                                  Chief, Riverside Branch Office
7

8                                 ___/s/_____
                                  JERRY C. YANG
9                                 Assistant United States Attorney

10                                Attorneys for Plaintiff
                                  United States of America
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                         2

## TABLE OF CONTENTS

I.     INTRODUCTION . . . . . . . . . . . . . . . . . . . .   1

II.    STATEMENT OF FACTS . . . . . . . . . . . . . . . . .   3

       A.    Undercover Buy From Defendant . . . . . . . . .   3

       B.    Execution of State Search Warrant on Room 220   . . . 4

       C.    Defendant's Testimony At Trial . . . . . . . . .   6

III.   GUIDELINES AND CRIMINAL HISTORY CALCULATION . . . . . .  10

       A.    Mandatory Minimum Sentence . . . . . . . . . .  10

       B.    Guidelines Calculation . . . . . . . . . . . .  10

             1.    Maintaining a drug-premises . . . . . . .  11

             2.    Obstruction of justice . . . . . . . . .  12

       C.    Criminal History Calculation . . . . . . . . .  16

IV.    APPROPRIATE SENTENCE . . . . . . . . . . . . . . . .  16

V.     CONCLUSION . . . . . . . . . . . . . . . . . . . . .  20

i

# <u>TABLE OF AUTHORITIES</u>

**FEDERAL CASES** PAGE

<u>United States v. Dunnigan</u>,
507 U.S. 87 (1993) . . . . . . . . . . . . . . . . . passim

<u>United States v. Jimenez</u>,
300 F.3d 1166 (9th Cir. 2002) . . . . . . . . . . . . 12

<u>United States v. Rafferty</u>,
911 F.2d 227 (9th Cir. 1990) . . . . . . . . . . . . 12

**FEDERAL STATUTES & REGULATIONS**

18 U.S.C. § 924(c)(1)(A) . . . . . . . . . . . . . . 2, 10

18 U.S.C. § 3553(a) . . . . . . . . . . . . . . . . 16

18 U.S.C. § 3553(a)(1) . . . . . . . . . . . . . . 17

18 U.S.C. § 3553(a)(2) . . . . . . . . . . . . . . 17

21 U.S.C. §§ 841(a)(1) . . . . . . . . . . . . . . 2, 10

-ii-

**MEMORANDUM OF POINTS AND AUTHORITIES**

I.   **INTRODUCTION**

On March 11, 2009, agents from the Bureau of Alcohol, Tobacco, Firearms and Explosives and officers from the San Bernardino Police Department ("SBPD")(collectively, "agents") went to the Economy Inn motel in San Bernardino to attempt an undercover purchase of cocaine base (also referred to as "crack cocaine") from defendant Calvin Charles Colbert, Jr. ("defendant").  Agents observed defendant going in and out of motel rooms 217 and 220 and conducting what appeared to be hand-to-hand drug transactions with others.  After undercover SBPD officer Anthony White successfully purchased $20 worth of crack cocaine from defendant through defendant's use of a female "runner" who brought the crack cocaine out of the motel for Officer White, agents obtained a state search warrant to search the motel rooms.  When agents entered room 220, they discovered defendant in the act of counting nearly $1,000 in cash, while sitting at a table with a digital scale, baggies, and 21.31 grams of cocaine base packaged into distribution amounts.

Agents also recovered a loaded .22 caliber Ruger semi-automatic handgun, with a round chambered, inside the dresser drawer.  In addition, agents located 32 rounds of live ammunition near the bed.  Agents also found in the room a motel keycard with white residue, a razor blade with residue, plastic sandwich bags used to package cocaine base, a cell phone, and defendant's wallet containing, among other things, his identification.  At trial, defendant took the stand and claimed

1

1   that agents framed him by staging the drugs, cash, and drug
2   paraphernalia inside room 220.

3       On November 23, 2010, after the five-day trial, a jury
4   convicted defendant of violating 21 U.S.C. §§ 841(a)(1),
5   841(b)(1)(B)(iii): Possession With Intent to Distribute At Least
6   5 Grams of Cocaine Base in the Form of Crack Cocaine ("crack
7   cocaine") ("count one") and 18 U.S.C. § 924(c)(1)(A): Possession
8   of a Firearm in Furtherance of a Drug Trafficking Crime ("count
9   two"). On January 31, 2011, the United States Probation Office
10  ("USPO") disclosed the Presentence Investigation Report ("PSR")
11  for defendant and its Sentencing Recommendation advising that the
12  Court sentence defendant to a high-end sentence of 138 months of
13  imprisonment.

14      The government does not object to the facts set forth in the
15  PSR, nor the USPO's calculation of defendant's criminal history.
16  The government, however, submits that because defendant testified
17  and lied under oath, a two-level enhancement for obstructing
18  justice applies under U.S.S.G. § 3C1.1. Based on defendant's
19  conduct and criminal history, which includes a drug conviction
20  for nearly identical conduct where defendant was selling crack
21  cocaine out of a motel room while armed with a loaded handgun,
22  the government concurs with the USPOS's recommendation and
23  respectfully requests that the Court sentence defendant to a mid-
24  end sentence of: 1) 87 months' imprisonment on count one to be
25  followed by 60 months' imprisonment on count two; 2) five years
26  of supervised release; and 3) a $200 special assessment.
27  ///

28

## II.   STATEMENT OF FACTS

### A.   Undercover Buy From Defendant

On March 10, 2009, based on a tip from a confidential informant that a subject known as "Cal" was selling drugs, agents conducted surveillance at the Economy Inn and observed what appeared to be a hand-to-hand drug transaction between "Cal" and another male.  Affidavit of Gerald Beall in Support of Search Warrant No. 2009-08274 ("Beall Aff.") attached as Exhibit A to defendant's Motion to Suppress Evidence, p. 2.  Agents also observed numerous individuals go to room 217, knock, and receive no response.  Id.  Agents returned with undercover officers and unsuccessfully attempted to purchase crack cocaine.  Id.

The next day, agents returned to try again.  At approximately 10:00 a.m., Officer White, who was operating in an undercover capacity and wearing an audio/visual recording device, walked into the Greyhound bus station parking lot across the street from the Economy Inn in San Bernardio.  PSR, ¶ 11. Officer White asked a black female wearing a maroon-colored tracksuit if she had the "fire" – a street term used in this context for high-quality crack cocaine.  Id.  Office White gave the female a pre-recorded $20 bill (serial number EF85620576D) and the two of them walked across the street to the Economy Inn near a fence below Rooms 217 and 220.  PSR, ¶ 12.  There, the female yelled up to the second floor of the hotel (toward rooms 217 and 220).  Id.  Officer White observed defendant come towards the stairwell, look at Officer White, and respond, "I don't know that dude."  Id.  Officer White walked back toward the Greyhound parking lot while the female in the tracksuit continued to try to

3

talk to defendant, who ultimately went back inside room 217.  <u>Id.</u>

A few moments later, a second black female, wearing a brown-colored jacket, left room 217, walked across the motel parking lot, and approached Officer White.  PSR, ¶ 13.  Officer White stated he was the one who asked for the crack cocaine and he went back towards the female in the tracksuit to retrieve his $20. <u>Id.</u>  He then gave the money to the female in the brown-colored jacket and she handed him two prepackaged baggies of suspected crack cocaine.  <u>Id.</u>

The female in the tracksuit followed Officer White back to the Greyhound parking lot.  Officer White would not give her a share of the crack cocaine, but instead gave her a pre-recorded $10 bill (serial number DJ01816340A).  SBPD Officer Ricardo Landeros, who was surveilling rooms 217 and 220 from across the street, observed the female in the tracksuit head back to the motel where she appeared to purchase crack cocaine from defendant using that $10.  PSR, ¶ 14.  Defendant threw something towards the female, which caused her to be on her hand and knees looking for it.

B.   <u>Execution of State Search Warrant on Room 220</u>

After the successful undercover purchase, some of the agents went to obtain a state search warrant while other agents maintained surveillance on the rooms.  PSR, ¶ 15.  During this time, Officer Landeros observed defendant move personal items from room 217 into room 220 and later, a cleaning crew clean room 217.  <u>Id.</u>

Around noon, agents began to execute the warrant.  Upon entering room 220, agents found defendant sitting in a chair with

a stack of money in front of him and in his hands, and appearing to be in the middle of counting the money. <u>See</u> PSR, ¶ 16. In addition, there was a pile of individual baggies of crack cocaine on the table in front of him. <u>Id.</u>

Defendant was ordered to the ground, and he complied. Prior to being searched, defendant was asked if he had any weapons, and he responded, "yes." <u>See</u> PSR, ¶ 16. Upon being asked whether the weapons were on him, defendant motioned toward the dresser and said, "it's over there." <u>Id.</u> Defendant was asked whether he had any weapons on his person, and he responded, "no, it's in the drawer." <u>Id.</u>

Inside an otherwise empty dresser next to the entrance of the room, agents recovered a .22 caliber Ruger MK2 semi-automatic handgun with a loaded magazine and one round chambered. PSR, ¶ 19. Agents also found the following in the room:

1)   21.31 grams of cocaine base in the form of crack cocaine: 19 pieces were individually packaged ready for sale; 35 pieces were unpackaged, but consistent in size with $20 pieces; two larger pieces were in a separate plastic bag;

2)   32 rounds of ammunition for the handgun in a cup next to the bed;

3)   a digital scale with a white residue that field tested-positive for cocaine;

4)   a room pass keycard marked "220" with a white residue consistent with cocaine base on one edge of the card;

5)   $957 in United States currency, including the $10 and $20 pre-recorded bills used in the undercover operation

5

6)    a razor blade with white residue that field tested
      positive for cocaine base;

7)    a box of sandwich bags;

8)    a cellular phone; and

9)    a leather wallet containing identification cards in the
      name of "Calvin Charles Colbert" and "Keith Roy
      Zeigler" and a Social Security card issued to "Calvin
      Charles Colbert."

PSR, ¶ 17-22.

    After defendant was arrested, agents obtained the
registration cards of rooms 217 and 220 from the Economy Inn
manager. PSR, ¶ 23. Room 217 was registered to defendant and
Room 220 to Jamine Marshell. Id. Altogether, the crack cocaine
found in Room 220 weighed 21.31 grams. PSR, ¶ 22.

    Defendant was Mirandized and initially stated that agents
would find approximately an ounce to an ounce and half of cocaine
base. Police Report attached as Exhibit A ("Exh. A"), Bates No.
22. He subsequently revised that estimate to "[m]aybe three
quarters of an ounce." Id. He stated that he had started the
day with two ounces of cocaine base. Id. Upon being advised
that he had sold cocaine base to a police officer, defendant
acknowledged he knew which one of his customers was the
undercover police officer, and stated, "I can take the charges,
I'll do the time." Id. Defendant also stated that there would
be approximately $1,000 found in room 220. Id.

    C.   Defendant's Testimony At Trial

    At trial, defendant testified in his defense. During direct
examination, defendant testified the crack cocaine found in room

1   220 did not belong to him:

2         **Defense Counsel:** Were you at the motel to sell drugs?

3         **Defendant:** No, sir.

4         Q. The cocaine that's in the pictures that were found

5         when you were in room 220, is that your cocaine?

6         A. No, sir.

7   11/19/2010(a) RT: 108[1].  Defendant further stated he never even

8   touched the crack cocaine:

9         Q. When the police came into the room and they executed

10        the search warrant, did you have any cocaine residue on

11        your hands?

12        A. No, sir.

13        Q. Had you ever touched any cocaine in room 220?

14        A. I never touched any cocaine at all.

15  11/19/2010(a) RT: 112.  Defendant also claimed that the gun found

16  in room 220 did not belong to him:

17        **Defense Counsel:** The gun that the police found in room

18        220, was that yours?

19        **Defendant:** No, sir.

20        Q. Had you ever touched it?

21        A. I never touched it.

22  11/19/2010(a) RT: 108-109.  Defendant also testified that he was

23  not the person on the second floor landing who negotiated the

24  crack cocaine transaction with the first female on behalf of

25  _____

26     [1] "11/19/2010(a) RT" refers to the Reporter's Transcript for
the court proceedings on November 19, 2010 during the morning
session and "11/19/2010(b) refers to the transcript for the court

27  proceedings on November 19, 2010 during the afternoon session.
Both citations are followed by applicable page references.  Both

28  transcripts are attached as Exhibit B.

Officer White.  11/19/2010(a) RT: 107.

Defendant claimed that when the agents entered into room 220, he was not sitting at the chair counting money, but instead on the cell phone:

> **Defense Counsel:** When you were in there and the police were breaking down the door, you've heard testimony that you were in a chair counting money?
>
> **Defendant:** No, I wasn't.  I would never be in a chair counting money.
>
> Q. Where were you when the police broke down the door?
>
> A. Well, when the police broke down the door I was standing next to the TV.  I was still on my phone.  I had my phone in the charger.  My phone was dying out on me, so I was on the phone talking.  And now when I heard the police knocking and screaming I put down the phone.  I went to the door, and they knocked down the door.  Then I turned around.  I turned around to make sure my back was facing them, and then I laid down on the floor.

11/19/2010(a) RT: 109-110.

On cross-examination, defendant explained that agents framed him by staging the crack cocaine on the table.  He claimed he saw agents take the crack cocaine out of Jamine Marshell's sandwich bag box and carefully staged it over the entire table:

> **Government counsel:** You never saw the drugs at all that day?
>
> **Defendant:** I never saw the drugs.  I saw that when the police did the search.  They took the drugs out the

8

1     box.

2     Q. Out of what box?

3     A. The sandwich box right there.

4     Q. So your testimony is that the police took piles of

5     crack cocaine out of the box?

6     A. My testimony is that the police took piles of crack

7     cocaine out of the box, took the scale off the other

8     table, brought that scale over there, and then weighed

9     the drugs just like the picture show.

10     Q. Were you in the room at that time?

11     A. Yes.

12     Q. And you watched the police that it out of the box?

13     A. I watched.  There's another picture where she took a

14     picture of my shoe.

15 11/19/2010(b) RT: 26.  He claimed that agents "took out the bag,

16 the sandwich bag.  They spread -- they opened it up and rocks

17 were falling around.  They put it on a table; and then he went to

18 the -- went to one of the other sides or something and grabbed --

19 and grabbed a scale."  11/19/2010(b) RT: 31.  Defendant also

20 testified that the unidentified black object on the dresser

21 depicted in government's exhibit 10 was the digital scale and

22 that agents moved it to the table.  11/19/2010(b) RT: 32.  See

23 also, Government's Trial Exhibit 10, attached as Exhibit 10

24 ("Exh. 10").

25     Moreover, defendant claimed that sitting in the courtroom

26 that day, he could specifically visualize the scale being moved

27 by the agent.  11/19/2010(b) RT: 36.  However, he was uncertain

28 whether it was Agent Kaighin (a female) or Officer Beall (a male)

1 who moved the scale because "[t]hey kind of look the same."
2 11/19/2010(b) RT: 35-36.

3     Agents also recovered a blue Samsung cellular phone in room
4 220.  The phone contained a text message from "Monae" sent on
5 March 11, 2009 at 7:14 a.m. stating "No U need that dope you be
6 sale'n U don't need me."  Government's Trial Exhibit 14, attached
7 as Exhibit 14 ("Exh. 14").  Defendant claimed that although he
8 had a blue Samsung cellular phone and he saw agents looking
9 through the cellular phone during the search, he does not know a
10 "Monae" and that he did not receive that text message.
11 11/19/2010(b) RT: 27-29.

12 III.  **GUIDELINES AND CRIMINAL HISTORY CALCULATION**

13     A.   Mandatory Minimum Sentence

14     Count one, which charges a violation of 21 U.S.C. §§
15 841(a)(1), 841(b)(1)(B)(iii): Possession With Intent to
16 Distribute At Least 5 Grams of Cocaine Base in the Form of Crack
17 Cocaine, carries a mandatory minimum sentence of five years'
18 imprisonment.  Count two, which charges a violation of 18 U.S.C.
19 § 924(c)(1)(A): Possession of a Firearm in Furtherance of a Drug
20 Trafficking Crime, carries a mandatory five-year consecutive
21 sentence to count one.

22     B.   Guidelines Calculation

23     The government concurs with the Guidelines calculation set
24 forth on the PSR:

25     Base Offense Level  :    22[2]        [U.S.S.G. § 2D1.1(c)(9)]

26 _____

27     [2]  Under the version of the Guidelines in effect at the time
   of the instant offense (2009 ed.), defendant's base offense level
28 would be 26 without a two-level enhancement for maintaining a

                                10

Maintained a Drug
Premises        :      +2         [U.S.S.G. § 2D1.1(b)(12)]

In addition, for reasons set forth below, the Court should apply a two-level enhancement for obstructing justice under U.S.S.G. § 3C1.1 because defendant lied under oath.

### 1.   Maintaining a drug-premises

Defendant should receive a two-level enhancement under U.S.S.G. § 2D1.1(b)(12) for maintaining rooms 217 and 220 as drug premises.  The evidence showed that defendant's primary purpose in maintaining those rooms was to sell crack cocaine. Defendant's driver's license listed him at an address on Adams Boulevard in Los Angeles.  PSR, ¶ 37.  The evidence showed that rooms 217 and 220 were not long-term residence because defendant had few personal belongings in room 220- a few articles of clothing, some toiletries, etc.  PSR, ¶ 37.  Instead, the vast majority of his belongings inside room 220 appeared to be related to his drug sales, e.g. 19 pieces of crack cocaine, individually packaged and ready for sale; 35 pieces of crack cocaine, unpackaged, but in sizes consistent with $20 pieces of crack cocaine, two large rocks of crack cocaine, baggies, scale, razor, $957 in cash, and the Ruger firearm and 32 rounds of ammunition. PSR, ¶¶ 17-32.  Altogether, defendant already had approximately

---

drug premises pursuant to U.S.S.G. § 2D1.1(b)(12), which was introduced in the 2010 edition of the Guidelines.  The Court, however, should use the 2010 edition of the Guidelines.  See U.S.S.G. § 1B1.11(b)(1) (the edition of the Guidelines in effect at the time of sentencing is to be used); see also U.S.S.G. § 1B1.11(b)(2) (the particular edition of the Guidelines should be applied in its entirety, rather than co-mingling sections from different editions).

11

54 pieces of individually-portioned crack cocaine rock-- as well as many more that could have been portioned from the two larger rocks of crack cocaine.  This demonstrated defendant's intent to sell many doses of crack cocaine out of room 220.

Consistent with this, the agents observed many individuals going to defendant's room and spending a short time there, probably to engage or attempting to engage in drug sales.  Beall Aff., ¶ 2.  Lastly, defendant had the female in the brown jacket working for him by collecting money and delivering crack cocaine to customers, including Officer White.  PSR, ¶ 13.

### 2.   Obstruction of justice

A two-level enhancement for obstructing justice should also apply under U.S.S.G. § 3C1.1 because defendant took the witness stand and lied under oath.  The Sentencing Guidelines provide for a two-level upward adjustment in offense level where the defendant obstructed justice.  U.S.S.G. § 3C1.1.  The commentary to this Guideline lists among the types of conduct qualifying for the adjustment, which includes "committing, suborning, or attempting to suborn perjury."  U.S.S.G. § 3C1.1, comm. n. 4(b).

An upward adjustment for obstruction of justice properly applies where the Court finds, by a preponderance of the evidence:[3] "(1) that the defendant gave false testimony under oath (2) concerning a material matter (3) with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory."  United States v. Jimenez, 300 F.3d

_____

[3]   United States v. Rafferty, 911 F.2d 227, 231 (9th Cir. 1990) (preponderance of evidence is standard of proof for application of obstruction adjustment under U.S.S.G. § 3C1.1).

12

1166, 1170 (9th Cir. 2002) (citing <u>United States v. Dunnigan</u>, 507

U.S. 87, 94 (1993)).  Each of these three elements is met here.

First, defendant lied when he claimed that he did not: 1) receive a text message from "Monae" on March 11, 2009; 2) know a "Monae"; and 3) know whether the blue Samsung phone was his.  The text message from Monae whereby Monae stated that all defendant cared about was the "dope" he was "sale'n" was recovered from the only cell phone recovered in the room on that day.  Although defendant admitted he had a cell phone and that his phone was also a Samsung and also blue in color, he refused to admit that particular phone belonged to him.  11/19/2010(b) RT: 27-29.

Defendant also lied about not receiving the text message from "Monae."  The text message was from a sender labeled as "Monae."  It is common knowledge that a cellular phone does not identify a caller by name unless the phone number was stored inside the phone under that name.  Otherwise, if the number is not stored in the phone book of the cellular phone, the cellular phone merely displays an incoming phone number with no associated name.  Therefore, the fact that the incoming text message was labeled as being from "Monae" shows that the sender's number was saved as "Monae," and defendant knew Monae.  Defendant lied when he claimed he did not know a Monae and did not receive a text message from her.

Perhaps more importantly, defendant lied about the crack cocaine.  He contended that he was not the one standing on the landing negotiating with the first female as Officer White stood nearby.  11/19/2010(a) RT: 107.  He also lied to the jury that the crack cocaine did not belong to him.  11/19/2010(a) RT: 108-

13

109.   In fact, he asserted that he never even touched the drugs. Id.   Instead, he claimed that he was merely at the wrong place at the wrong time.   But defendant here did not merely only lie about the ownership of the crack.   Rather, he went well beyond that by emphatically and unequivocally accusing the agents of staging the entire scene in the motel room.   11/19/2010(b) RT: 5-9, 26, 31.

This was no lapse of memory because defendant claimed that he could specifically recall seeing the agents take the crack cocaine out of the sandwich box, and spread it on the table along with the scale.   11/19/2010(b) RT: 26, 31, 32-34.   In fact, sitting in the courtroom that day, defendant testified that he specifically recalled seeing the scale originally located on the dresser near the entrance, only to be moved onto the table by an agent.   11/19/2010(b) RT: 32-32, 35-36.   When pressed by the government's cross-examination, in spite of his claim merely seconds earlier that he specifically remembered seeing the agent move the scale, he then asserted that he was not sure whether it was Agent Kaighin (a female) or Officer Beall (a male) who moved the scale because "[t]hey kind of look the same."   11/19/2010(b) RT: 35-36.   He was caught in his lie.

These were all lies.   First, defendant's trial testimony disavowing ownership of the crack cocaine and money contradicted his post-arrest statements to agents.   While at the scene of the arrest, defendant told agents that he had been selling crack cocaine and that agents would find approximately three quarters ounce of crack cocaine, that is, approximately 21 grams.   Exh. A, Bates No. 22.   As predicted, agents found 21.31 grams of crack cocaine in room 220.   Id.   Defendant also stated that agents

14

would find approximately $1,000 of cash in the room.   Id.   Agents
found $957.   Id.

Just as importantly, the jury rejected his story and found
him guilty of possessing the crack cocaine.   The jury
instructions required that in order for the jury to find
defendant guilty, the jury necessarily had to find that defendant
knew about the presence of the crack cocaine in room 220, and
possessed it with the intent to distribute it.   See Preliminary
Instructions, pp. 4-5.   In addition, the entry-video taken by
agents shows that defendant was lying.   The video clearly showed
that the unidentified black object sitting on the dresser, which
defendant claimed was the scale he saw the agent move, was
actually a separate item than the scale on the table.   See
Government's Trial Exhibit 29 attached as Exhibit 29, compare
time stamp 1:20 with 1:57.

Defendant's unequivocal assertion on the stand that the
crack cocaine was not his and that he specifically recalled
either Agent Kaighin or Officer Beall move the scale from the
dresser table to the table showed that these lies were willful
and not the result of confusion, mistake, or faulty memory.
11/19/2010(b) RT: 35-36.   Moreover, these lies were all material
because they all concerned the main actual issue in dispute,
namely, did the crack cocaine and gun found in room 220 belong to
defendant?   As such, defendant obstructed justice by testifying
falsely.

Defendant certainly has the right to go to trial and make
the government prove its case against him.   Defendant also has
the right to testify at trial.   The obstruction of justice upward

adjustment does not punish defendant for the exercise of these constitutional rights.   But defendant does not have the right to take the stand, lie, and falsely accuse the agents of manufacturing evidence and framing him.   The obstruction of justice enhancement properly accounts for defendant's lies under oath.   <u>Dunnigan</u>, 507 U.S. at 96-98.   Consequently, the obstruction of justice enhancement is appropriately applied in this case.

Because each of the three elements of perjury are present here, the government respectfully asks the Court to make explicit findings as to each of the three elements, and to find that defendant committed perjury, thus qualifying him for a two-level upward adjustment based on obstruction of justice.

C.   <u>Criminal History Calculation</u>

The government concurs with the USPO's calculation that defendant is a criminal history category III.   With a criminal history category III and offense level 26, the Guidelines range is 78-97 months imprisonment on count one, followed by a consecutive 60 months' imprisonment on count two.

IV.   **APPROPRIATE SENTENCE**

The government recommends that the Court sentence defendant to a mid-end sentence of: 1) 87 months' imprisonment on count one to be followed by 60 months' imprisonment on count two.   As more fully set forth below, such a sentence is both appropriate and reasonable in light of the factors set forth in 18 U.S.C. § 3553(a).   Defendant has a relatively significant criminal history, especially given his age.   He has four criminal history points stemming from two drug-related convictions, and three

16

prior arrests.  One of these prior convictions involved conduct that was remarkably similar to the conduct here, namely, selling crack cocaine out of a motel room while armed with a loaded firearm.  As such, the government's recommended sentence is necessary to protect the community and deter defendant from future criminal conduct.

18 U.S.C. § 3553(a)(1) requires the Court to consider the nature and circumstances of the offense and the history and characteristics of defendant.  18 U.S.C. § 3553(a)(2) requires the Court to consider the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of defendant, and to provide defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

The offense here was serious.  Defendant here dealt crack cocaine out of a motel room and protected his operations with a Ruger .22 caliber semi-automatic handgun that was not only loaded, but had a round chambered-- ready to fire.  He rented room 220 for the purpose of dealing crack cocaine.  He used at least one female runner to assist him in selling crack. Defendant was successful in selling crack as evidenced by the agents' observation of numerous people going to rooms 217 and 220 on two separate days.  Indeed, when defendant was arrested, he sat at a table with 19 pieces of individually packaged crack cocaine ready for sale, 35 pieces of yet unpackaged crack cocaine, and two larger rocks of crack cocaine.  Not counting the

two larger rocks of crack cocaine that had not yet been broken down into individual sizes, defendant possessed at least 54 pieces of crack cocaine to be sold.

In fact, by his own admission, defendant started with two ounces of crack cocaine- approximately 56 grams.  Defendant sold Officer White a $20 quantity, approximately 0.32 grams.  Those two ounces could be broken down into 175 pieces of $20 packages of crack cocaine.  The amount of crack that defendant was caught with, along with his own confession, show that he intended to and was selling crack to many people in that area.

With respect to defendant's history and characteristics, defendant has managed to earn a Criminal History III category by the age of 21.  Both of his convictions were drug-related and although only one of them resulted in a drug-trafficking conviction (Cal. Health & Safety Cod. § 11352(a): Sell/Transport a Controlled Substance on September 16, 2003), both did, in fact, involve defendant's sale of drugs.  Indeed, defendant's conviction for violating Cal. Health & Safety Cod. § 11350(a): Possession of a Controlled Substance arose of conduct nearly identical to the conduct here.  PSR, ¶ 54.  In that case, with the help of his mother, defendant had rented a motel room to sell crack cocaine.  PSR, ¶ 56.  Officers performed a consent search of the room and found 11.6 grams of crack cocaine, 34 individually wrapped rocks of crack cocaine, and 20 individually wrapped rocks of crack cocaine.  Id.  Moreover, just like in the instant case, defendant also possessed a firearm, a loaded 9mm Lorcin semi-automatic handgun.  Id.

For his actions, defendant was sentenced to the California

18

Youth Authority ("CYA"), where he spent the next four years. PSR, ¶ 54. This sentence, however, had little effect on defendant's behavior, particularly his drug activities. Because less than two months after he was discharged from parole in that case, defendant was caught in the instant action, again, in a motel room selling crack cocaine, and again, using a loaded firearm to further those sales. PSR, ¶ 54. Only this time, defendant appeared to have honed and improved his drug selling skills by using a female runner to attenuate himself from the conduct. The CYA sentence had no deterrent effect on defendant.

Indeed, this Court witnessed first-hand defendant's disregard and contempt for the law when he took the stand at trial and lied. Among other things, he lied about: 1) ownership of the crack cocaine; 2) selling the crack cocaine to Officer White; 3) ownership of the cellular phone and the text message he received on that phone; and 4) not being at the table counting money when agents breached the door and executed the search warrant.

However, as previously discussed, defendant did not merely testify and falsely deny ownership of the crack cocaine. Instead, he went further and falsely made serious accusations that the agents staged the whole scene and framed him with Jamine Marshell's crack cocaine. In light of this, and given that a prior 48-month sentence at CYA had no deterrent effect, a mid-end sentence of 87 months' imprisonment on count one to be followed by 60 months' imprisonment on count two is necessary to deter defendant from future criminal activity, and to protect society from defendant.

1   V.   **CONCLUSION**

2       For foregoing reasons, the government respectfully requests

3   that the Court sentence defendant to: (a) 87 months' imprisonment

4   on count one to be followed by 60 months' imprisonment on count

5   two; (b) five years of supervised release; and (c) pay a $200

6   special assessment.

7   Dated: April 22, 2011       Respectfully submitted,

8           ANDRÉ BIROTTE JR.
        United States Attorney

9

10          ANTOINE F. RAPHAEL
        Assistant U.S. Attorney
        Chief, Riverside Branch Office

11

12             /s/
        JERRY C. YANG

13          Assistant United States Attorney

14          Attorneys for Plaintiff
        United States of America

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT

A

POLICE DEPARTMENT  CA0_____000                                         09-08274

SAN BERNARDINO, CALIFORNIA

PAGE 1

H&S 11351.5/11352/11370.1

STATE OF CALIFORNIA

## INVOLVED OFFICERS:

Detective ROEBUCK
Officer BEALL
Officer TAACK
Officer LANDEROS
Officer WHITE
Officer EVERETT
ATF S.A. KAIGHIN
ATF S.A. MICHALIK

## SUSPECT INFORMATION:

COLBERT, CALVIN CHARLES, JR.
MONIKER: "CAL"
DOB: 12/30/87
1155 E. Adams Blvd.
Los Angeles CA 90011

## ASSIGNMENT:

On Wednesday, 3/11/09, at approximately 0900 hours, members of the San Bernardino Police Department Narcotic's Unit held a briefing for a surveillance at 685 W. 6th Street in the downtown area of the City of San Bernardino. This surveillance was being conducted based on observations I had made of apparent narcotic transactions the day before. Those observations were of a Black male identified to me by a CRI as "CAL" who was selling cocaine base. Officers would attempt to locate the subject I had seen the day prior. This subject was known as "CAL" and he was staying at the "Economy Inn" located at 685 W. 6th Street in the City of San Bernardino, possibly in room #217 or #220.

During the briefing, team members discussed all known and suspected hazards, as well as assignments. The plan for the operation was to conduct surveillance and in the event "CAL" was seen to the front of the motel, Officer WHITE would work in an undercover capacity and attempt to purchase cocaine base from him. I would then author a search warrant for the room "CAL" was observed coming and going from. The warrant would then be executed by the aforementioned officers.

The aforementioned officers then set up surveillance around the location. I was parked in the "Greyhound" bus station parking lot directly west of the motel and had "point". Other officers positioned themselves around the motel, with a view of both sides as well as the major traffic thoroughfares.

| BEALL/50524/JN | |
|---|---|
| REVIEWED BY:            DATE: | RECORDS USE ONLY |
| SBPD CR-2a | |

GOVT00015



POLICE DEPARTMENT  CA0_0_000

SAN BERNARDINO, CALIFORNIA

09-08274

PAGE 2

H&S 11351.5/11352/11370.1

STATE OF CALIFORNIA

## ARRIVAL:

On Wednesday, 3/11/09, at approximately 0915 hours, the above listed officers arrived at the location and set up surveillance around the "Economy Inn" motel.

On 3/11/09, at approximately 0930 hours, I was sitting in the parking lot of the "Greyhound" bus station, wearing plain clothes and in an unmarked vehicle. I began to observe numerous subjects walking up and down the street to the front of the motel and some were loitering in the parking lot. I observed a Black female walk into the motel and out of sight. Officer LANDEROS, who had a view of the east side of the motel, advised this Black female had gone to room #217. After she knocked on the door, a Black male fitting the description of "CAL," opened the door and they had a brief conversation. These two subjects then went from room #217 to room #220 where the CAL opened the door using a pass key, without knocking, and entered as if he resided in this room. Approximately one minute later, CAL exited room #220 and walked back to room #217, also opening the door with a pass key and without knocking. CAL then went into the room and closed the door. The unknown Black female was then observed to walk out of the motel, through the parking lot and around on to 6th Street, which borders the north side of the motel.

The Black female then stood at the north fence of the motel, which is on the south sidewalk of 6th Street, right below room #220. This Black female stood at the fence for a few moments and officers observed the CAL exit room #220, walk down the stairs and to the fence where the female was standing. CAL then appeared to hand the female an unknown object through the fence and the two of them had a brief conversation before the CAL went back up to his room.

At about 1000 hours, as I was parked in the "Greyhound" parking lot, one of the Black females (wearing a maroon track suit with white stripes on the shoulders) I had observed earlier loitering to the front of the "Economy Inn" approached me and attempted to sell me a cellular telephone for twenty dollars. I declined the purchase and asked this unknown Black female if she could obtain some cocaine base for me, to which she stated she could. I then advised this female I was waiting for a friend and if she did not mind, to wait in the parking lot until he got there, to which she agreed. A few minutes later, Officer WHITE arrived, wearing audio and video recording equipment and Officer WHITE struck up a conversation with the unknown Black female. This unknown Black female subsequently took Officer WHITE to the fence below room #220 of the "Economy Inn" where she yelled up to the room and made contact with the subject officers had been surveilling; CAL.

Officer WHITE gave the Black female a pre-recorded $20 bill (reference serial number EF85620576D). The Black female attempted to negotiate a purchase of cocaine base with the Black male known as "CAL" in room #220; however, he apparently became angry, looking at Officer WHITE stating he did not know this person. Officer WHITE was then told to step back and wait for a minute. Officer WHITE then walked to the corner of 6th and "G" Street where he stood by.

| BEALL/50524/JN | |
| --- | --- |
| REVIEWED BY:            DATE: | RECORDS USE ONLY |

SBPD CR-2a

GOVT00016

POLICE DEPARTMENT  CA00 000 

09-08274

SAN BERNARDINO, CALIFORNIA

PAGE 3

H&S 11351.5/11352/11370.1

STATE OF CALIFORNIA

A few moments later, a second unknown Black female (wearing a brown track suit) walked out of the motel, came up to Officer WHITE and asked who wanted the "dub." Officer WHITE advised he was the person who wanted the "dub" and he was then advised that "he" (referring to "CAL" in room #220) had given it to her. The unknown Black female told Officer WHITE to get the money back from the original unknown Black female who had taken him to the location. Officer WHITE then retrieved the $20 from the Black female, walked back to the second Black female and gave her the $20. This Black female then handed Officer WHITE two pre-packaged pieces of suspected cocaine base (later field tested positive, approximately 0.4 grams). The Black female then advised "CAL" was "cool," he just did not know who Officer WHITE was and it made him nervous about him coming to purchase cocaine from him. She also advised the male was her "nephew." The Black female stated "CAL" had sent her to Officer WHITE'S location with the "dope."

After the transaction was complete, Officer WHITE then gave the original Black female a $10 bill (reference serial number DJ01816340A) as payment for negotiating the narcotic transaction. This Black female then immediately headed back to the fence along the north side of the motel where Officer LANDEROS observed her to apparently purchase cocaine base from "CAL" utilizing the $10 bill.

Officer WHITE then returned to my vehicle and the two of us left the area. I then headed to the Narcotics Office where I authored a search warrant for room #220 and room #217.

The search warrant was subsequently signed by the Honorable Judge SMITH.

As I was en route to the location after having the search warrant signed, Officer LANDEROS, who was moni-toring the location from his position of surveillance, advised he had observed the subject known as "CAL" moving personal items from room #217 to room #220. It appeared as if "CAL" was moving out of room #217. Officer LANDEROS based this opinion on the fact the cleaning crew came into room #217 after "CAL" moved his items and apparently cleaned/prepped the room for a new occupant.

At approximately 1200 hours, Detective ROEBUCK, Officer TAACK, Officer EVERETT, SA KAIGHIN, SA MICHALIK and I arrived at 685 W. 6th Street to execute the search warrant. As officers made their way along the rear balcony toward room #220, we passed by room #217, finding the front door wide open and the drapes on the front window open. It appeared as if the room had been vacated. Officers continued past this room to room #220.

On arrival, I knocked on the wall, stating in a loud and clear voice, "San Bernardino Police Department. We have a search warrant and demand entry." At this time, Officer TAACK utilized the ram to breach the door of the motel room. As I entered the room, I immediately came upon a Black male (later identified as CALVIN COLBERT) seated in a chair in the southwest corner of the room with a stack of money in front him, as well as

| | |
|---|---|
| BEALL/50524/JN | |
| REVIEWED BY:          DATE: | RECORDS USE ONLY |
| SBPD CR-2a | |

POLICE DEPARTMENT  CA0_\_000                                     09-08274

SAN BERNARDINO, CALIFORNIA

PAGE 4

H&S 11351.5/11352/11370.1

STATE OF CALIFORNIA

money in his hands.  It appeared as if COLBERT was counting this money.  I immediately ordered COLBERT to the ground, to which he complied.  Officers then cleared the room and found no one else inside.

Prior to searching his person, I asked COLBERT if he had any weapons and he stated, "Yes."  I then asked COLBERT where the weapon was because I did not want to get injured and he stated, "It's over there," motioning with his head toward the dresser.  I asked if he had a weapon on his person and he stated, "No.  It's in the drawer."  I then searched COLBERT'S person and found only $18 of U.S. currency in his left front shirt pocket.  COLBERT was then handcuffed and seated on the balcony to the front of the motel room.

**SEARCH:**

During a search of COLBERT'S person, officers located approximately $18 of U.S. currency in his shirt pocket.

During a search of room #220, officers located approximately $957 of U.S. currency in denominations consistent with street-level narcotic sales, a loaded .22 caliber handgun and approximately 24 grams of suspected cocaine base, packaged for sales as well as in "bulk", apparently waiting to be broken down and packaged.  Also located was a men's wallet with identification belonging to CALVIN COLBERT, was well as a second subject by the name of KEITH ROY ZEIGLER.

On the dresser along the north wall of the motel room, I located a blue and black "Samsung" cellular phone.  Upon going through the text message inbox, I located numerous text messages apparently from a female by the name of "MONAE."  Following along through the text messages, which were all dated with today's date (3/11/09), it appeared CALVIN COLBERT was having relationship problems with the female.  I found one message dated 3/11/09, at 0714 hours from "MONAE," stating, "No U need that dope U be sale'n U don't need me."

Officers also located a box of clear sandwich bags, a digital scale and thirty-two live rounds of .22 caliber ammunition.  This ammunition was found to "rim-fire" ammunition, consistent with the handgun found.

Officers searched room #217 and found no items of evidence in the room.  This room had been vacated and cleaned.

**EVIDENCE:**

During a search of the involved party and location, team members located the following items of evidence:

1.      Located by me on a table along the west wall of the motel room was approximately thirty-five pieces of unpackaged suspected cocaine base.

| BEALL/50524/JN | |
|---|---|
| REVIEWED BY:           DATE: | RECORDS USE ONLY |

SBPD CR-2a

GOVT00018

POLICE DEPARTMENT  CA0_____000                                    09-08274

SAN BERNARDINO, CALIFORNIA
                                                                   PAGE 5

H&S 11351.5/11352/11370.1

STATE OF CALIFORNIA

These pieces were all consistent in size with pieces I am familiar with as being sold as $20 pieces.  I weighed the approximate thirty-five pieces and found them to weigh approximately 4.8 grams.  These pieces of cocaine base were subsequently field tested with a positive result for cocaine.  The suspected cocaine base was recovered, placed in an envelope and labeled with the letter "A."

2.     Located on a table along the west wall of the motel room by me was nineteen pieces of suspected cocaine base, all individually packaged in pieces consistent with $20 pieces of cocaine.

I weighed the suspected cocaine base and found it to weigh approximately 4.3 grams with packaging.  The suspected cocaine base was field tested with a positive result for cocaine.  The suspected cocaine base was recovered and secured in an envelope labeled with the letter "B."

3.     Located on a table along the west wall of the motel room by me was a clear plastic bag that contained two larger, off-white pieces of a substance consistent with that of cocaine base.

The suspected cocaine base was field tested with a positive result for cocaine.  I later weighed the suspected cocaine base and found it to weigh approximately 15.2 grams with packaging.  The suspected cocaine base was recovered and secured in an envelope labeled with the letter "C."

4.     Located on the bed inside the motel room by SA KAIGHIN was a clear plastic bag with a white residue coating the interior, as well as numerous small pieces of what appeared to be suspected cocaine base.

The suspected cocaine base was field tested with a positive result for cocaine.  I later weighed the suspected cocaine base and found it to weight approximately 1.3 grams with packaging.  The suspected cocaine base was recovered, placed in an envelope and labeled with the letter "D."

     *The aforementioned items (A, B, C and D) were all secured in one larger envelope and then given to SA KAIGHIN for future testing at the DEA Crime Lab.

5.     An operable black digital scale with a white residue (field test positive for cocaine) was located on the table along the west wall of the motel room by me.

6.     Located on top of the table along the west wall of room #220 by me was a room pass key (with the number "220" handwritten on it).

This room pass key was found to have a white residue consistent with cocaine base on one edge of it, as if someone had been using it to scrape/manipulate cocaine on the table.

| BEALL/50524/JN | |
|---|---|
| REVIEWED BY:            DATE: | RECORDS USE ONLY |

SBPD CR-2a

POLICE DEPARTMENT  CA03 000 

09-08274

SAN BERNARDINO, CALIFORNIA

PAGE 6

H&S 11351.5/11352/11370.1

STATE OF CALIFORNIA

7.   Approximately $957.00 in U.S. currency consisting of one $100 bill, one $50 bill, twenty-one $20 bills, five $10 bills, forty-three $5 bills, three $2 bills and one hundred sixteen $1 bills was located on the nightstand in the southeast corner of the room by me.  (See additional information heading for further information regarding the U.S. currency.)

8.   A box of clear plastic sandwich bags was located on the table along the west wall of room #220 by me.

9.   Approximately $18 of U.S. currency consisting of eighteen $1 bills located in the right front shirt pocket of CALVIN COLBERT by me.

10.   A razor blade with a white residue (field test positive for cocaine) and numerous clear plastic baggies, all of which had a white residue on the interior, located on the table along the west wall of room #220 by me.

11.   A polished metal with black handgrips "Ruger" MK2, .22 caliber, semi-automatic handgun (serial number 21489816) located in the top left dresser drawer along the north wall by me.

This handgun was found to be loaded with one live round in the chamber, as well as ten live rounds in the magazine which was inserted into the handgun.

12.   Thirty-two live rounds of .22 caliber ammunition located in a plastic cup on the bed by SA KAIGHIN.

13.   A black leather men's wallet containing identification cards in the name of "CALVIN CHARLES COLBERT," DOB: ████/87, and "KEITH ROY ZEIGLER," DOB ████/90, as well as miscellaneous ATM cards and a social security card in the name of "CALVIN CHARLES COLBERT" located on top of the dresser along the north wall by me.

14.   An operable cellular phone, blue and black in color, was located on top of the dresser along the north wall by me.

*All of the aforementioned items of evidence were given to SA KAIGHIN for retention and possible federal prosecution.

**ADDITIONAL INFORMATION:**

| BEALL/50524/JN | |
|---|---|
| REVIEWED BY:                DATE: | RECORDS USE ONLY |

SBPD CR-2a

POLICE DEPARTMENT  CA05‑1000                                                 09-08274

SAN BERNARDINO, CALIFORNIA

PAGE 7

H&S 11351.5/11352/11370.1

STATE OF CALIFORNIA

Thirty dollars of U.S. currency located among the bills recovered was found to be a $20 bill and a $10 bill of pre-recorded money used by Officer WHITE for the narcotic transaction.  This money was photographed and returned to Officer WHITE/San Bernardino City funds.

Officers later went back to the downtown area surrounding the "Economy Inn" motel and attempted to search for the two Black females who had assisted in the narcotic transaction with Officer WHITE.  Officers spent approximately two hours searching, however were unable to locate these two unknown Black females.

The video of the controlled buy performed by Officer WHITE was copied onto a DVD and provided to SA KAIGHIN.

**DISPOSITION OF SUSPECT:**

CALVIN COLBERT was subsequently arrested and lodged at the Central Detention Center with a federal prosecution hold.

**RECOMMENDATIONS:**

SBPD narcotic officers conducted a controlled buy of suspected cocaine base utilizing Officer ANTHONY WHITE in an undercover capacity.  Officer WHITE was successful in purchasing $20 worth of cocaine base from a Black female who had obtained it from CALVIN COLBERT. This purchase was documented on video. Officers later executed a search warrant on the motel room of CALVIN COLBERT and located approximately 24 grams of suspected cocaine base, a loaded firearm and evidence of narcotic sales/packaging, as well as the pre-recorded San Bernardino City funds utilized by Officer WHITE.

I recommend the San Bernardino County District Attorney's Office proceed with charges of H&S 11351.5 (POSSESSION OF COCAINE BASE FOR SALES), H&S 11352 (SALES OF COCAINE BASE), and H&S 11370.1 (POSSESSION OF A FIREARM WHILE IN POSSESSION OF A CONTROLLED SUBSTANCE).

I also recommend the District Attorney's Office proceed with asset forfeiture of the $957.00 of U.S. currency located during a search of room #220 per H&S 11470.1.

| BEALL/50524/JN | |
|---|---|
| REVIEWED BY:            DATE: | RECORDS USE ONLY |

SBPD CR-2a

GOVT00021

POLICE DEPARTMENT  CA0360000                                         09-08274

SAN BERNARDINO, CALIFORNIA

PAGE 8

H&S 11351.5/11352/11370.1

STATE OF CALIFORNIA

## STATEMENT OF SUSPECT – CALVIN COLBERT:

I advised CALVIN COLBERT of his rights per a department issued Miranda card while at 685 W. 6th Street #220 at about 1218 hours.  I then asked COLBERT if he understood each of the rights as I had read them to him, to which he stated, "Yes."  I then began asking COLBERT questions, which he freely answered, showing me an implied waiver of his Miranda rights.  The following is a summary of my interview.

I asked COLBERT how much cocaine base officers would find in the room and he stated, "About an ounce, ounce and a half."  CALVIN COLBERT then paused for approximately ten seconds and stated, "Not even that. Maybe three quarters of an ounce."  I then asked COLBERT how much cocaine base he started with when he began selling today and he stated, "About two ounces."

I then advised COLBERT he had sold cocaine base to a police officer and he appeared to be thinking to himself for a moment and then stated, "Oh yeah.  Now I know what you're talking about."  COLBERT then stated, "I can take the charges, I'll do the time."

I asked COLBERT how much money officers would find in the room and he stated, "About a thousand."  I asked COLBERT if he had earned all of this money from selling cocaine base and he stated, "I don't sell cocaine, I just smoke."  I again advised COLBERT he had sold cocaine base to a police officer and he became uncooperative.

I then concluded my interview with COLBERT.

| BEALL/50524/JN | |
|---|---|
| REVIEWED BY:          DATE: | RECORDS USE ONLY |

SBPD CR-2a

GOVT00022

EXHIBIT

B

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

THE HON. GEORGE H. WU, JUDGE PRESIDING

UNITED STATES OF AMERICA,           )
                                    )
                    Plaintiff,      )
                                    )
        vs.                         ) NO. CR 09-301-GW
                                    )
CALVIN CHARLES COLBERT, JR.,        ) Pages 1 - 85, 98 - 112
                                    )
                    Defendant.      )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Los Angeles, California

Friday, November 19, 2010; 2:04 A.M.

JURY TRIAL (DAY FOUR)

MORNING SESSION

                            Wil S. Wilcox, CSR 9178
                            Official Federal Reporter
                            312 North Spring Street
                            Suite 430
                            Los Angeles, California 90012
                            Phone:(213) 290-2849
                            Email: wil.s.wilcox@gmail.com

2

```
 1    APPEARANCES:

 2


 3    FOR THE PLAINTIFF:      ANDRÉ BIROTTE JR.
                              UNITED STATES ATTORNEY
 4                            BY:   JERRY YANG
                              AND:  JENNIFER WILLIAMS
 5                            ASSISTANT UNITED STATES ATTORNEYS
                              1400 United States Courthouse
 6                            312 N. Spring Street, 12th Floor
                              Los Angeles, California 90012
 7                            (213) 894-2690

 8


 9    FOR THE DEFENDANT:      LAW OFFICES OF LARRY BAKMAN
                              By:   LARRY BAKMAN
10                            Attorney at Law
                              10100 Santa Monica Boulevard
11                            Suite 300
                              Los Angeles, California 90067
12                            (310) 772-2234

13

14

15

16

17

18

19

20

21

22

23

24

25
```

WIL S. WILCOX, OFFICIAL FEDERAL REPORTER

3

I N D E X

FRIDAY NOVEMBER 19, 2010; VOLUME 4

CHRONOLOGICAL INDEX OF WITNESSES

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE | VOL |
|---|---|---|---|---|---|---|
| Angie Kaighin | | 19 | 34 | 46 | | |
| Angie Kaighin | | | 47 | | | |
| Fred Roberts | 49 | 59 | 67 | | | 4 |
| Calvin Colbert | 102 | | | | | 4 |

ALPHABETICAL INDEX OF WITNESSES

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE | VOL |
|---|---|---|---|---|---|---|
| Colbert, Calvin | 102 | | | | | 4 |
| Kaighin, Angie | | 19 | 34 | 46 | | |
| Kaighin, Angie | | | 47 | | | |
| Roberts, Fred | 49 | 59 | 67 | | | 4 |

EXHIBITS

| EXHIBIT | DESCRIPTION | IN EVIDENCE | VOL |
|---|---|---|---|
| 23 | Drugs from Undercover Buy | 41 | 4 |
| 24 | Drugs Recovered from Room 220 | 41 | 4 |
| 41 | Photograph | 38 | 4 |

WIL S. WILCOX, OFFICIAL FEDERAL REPORTER

4

1          LOS ANGELES, CA.; FRIDAY, NOVEMBER 19, 2010; 9:04 A.M.

2                              -oOo-

3          THE COURT:  All right.  On the matter of United

4   States vs. Colbert, let me have appearance of counsel.

5          MR. YANG:  Good morning, Your Honor.  Jerry Yang

6   on behalf of the United States, and present with me at

7   counsel table is AUSA Jennifer Williams and also ATF Special

8   Agent Angela Kaighin.

9          THE COURT:  All right.

10         MR. BAKMAN:  And good morning, Your Honor, Larry

11  Bakman on behalf of the defendant Calvin Colbert who is

12  present in court in custody.

13         THE COURT:  Let me ask.  Is there anything we need

14  to discuss before I bring the jury in?

15         MR. YANG:  Just one thing very briefly, Your

16  Honor.

17         Yesterday there was some cross-examination of

18  Agent Kaighin that basically attacked her failure to print

19  the objects that she recovered from the room that day.

20         Based on Agent Kaighin's understanding at the

21  time, part of the reason she didn't print the items was

22  because she was under the understanding that the defendant

23  had indeed confessed to the drugs.  With respect to the gun,

24  she was present in the room when the gun was recovered.

25         If defense counsel is attacking her for failing to

WIL S. WILCOX, OFFICIAL FEDERAL REPORTER

5

1    do this, part of her answer for why she failed to do this is

2    because there was overwhelming evidence including

3    defendant's own statements and confession.  So based on

4    that, Your Honor, I think --

5                THE COURT:  Let me ask.  If there was a

6    confession, why wasn't the confession offered in the course

7    of the trial?

8                MR. YANG:  Because if the entire confession were

9    to come in, it would have to come in through the testimony

10   of Officer Beall.  Agent Kaighin was only in and out of the

11   room as the confession was occurring as Officer Beall was

12   questioning the defendant.

13               THE COURT:  So in other words, the government's

14   not offering the confession in its case in chief as evidence

15   because you don't want to offer Officer Kaighin as a

16   witness?

17               MR. YANG:  Officer Beall.

18               THE COURT:  Sorry -- Officer Beall as a witness,

19   but you want to have Officer Kaighin indicate that the

20   reason why she didn't have the items fingerprinted is

21   because she overheard the defendant confessing to Officer

22   Beall?

23               MR. YANG:  Essentially, Your Honor, it's an effect

24   on the listener, the listener being Agent Kaighin.  She was

25   under the understanding that there was a confession from

WIL S. WILCOX, OFFICIAL FEDERAL REPORTER

1    defendant.  She overheard parts of it but not enough where

2    we feel comfortable putting her on the stand to testify

3    based on her personal knowledge.

4              THE COURT:  Well, but then she doesn't know

5    whether or not a confession was made then?

6              MR. YANG:  Correct, but she had a reasonable

7    belief that it was made because that's what she was told,

8    and that's why she acted accordingly, including among other

9    things not printing the gun.

10             THE COURT:  Let me hear from the defense counsel.

11             MR. BAKMAN:  Well, Your Honor, I'm not sure if

12   *Miranda* was appropriately given in this case.  I'm not sure

13   what happened.  They haven't offered Beall.  That hasn't

14   been litigated, and it hasn't been litigated because from

15   day one they've indicated they are not offering Gerald Beall

16   as a witness in their case in chief.

17             They can't pick and choose who they want to

18   proffer to the case and then have somebody else come in and

19   explain why they didn't print any of the evidence because,

20   oh, I heard parts of what Mr. Colbert had said to Officer

21   Beall, didn't hear it all, don't know if there was a proper

22   foundation of *Miranda* being given, but let's bring that in

23   as an excuse for us not to have printed the weapon, not to

24   print any of the items that were seized.

25             Under just a 403 analysis --

**WIL S. WILCOX, OFFICIAL FEDERAL REPORTER**

1          THE COURT:  Let me stop.  I agree with the

2    defense.  In other words, you have to fish or cut bait.  If

3    you want to get the confession in, you get the confession

4    in, but you don't get the confession in indirectly to

5    justify another act.  The decision not to do something

6    because you think there might be a confession out there is

7    not really a sufficient explanation.

8          MR. YANG:  It seems like that should go to weight.

9    Defense would be able to cross.

10          THE COURT:  Bring Beall in.  If you want the

11    confession to come in, bring Beall in.  If you are not

12    bringing Beall for the confession, it's not coming in.

13          MR. YANG:  All right, Your Honor.  It won't come

14    in then.

15          But there is a second issue.  There was a cell

16    phone that was recovered, as the Court is aware.  On the

17    cell phone, Agent Kaighin saw a picture of the text message

18    that was on the cell phone.  And it's from what appears to

19    be defendant's girlfriend, significant other.  It basically

20    says something to the effect of:  You don't need me, you

21    just need that dope you are selling.

22          That, Your Honor, defense counsel has attacked

23    Agent Kaighin for failure to go through the phone -- for

24    looking through the phone for any evidence of defendant's

25    possession of the drugs.  I think on that, Your Honor,

1  defendant has opened the door for Agent Kaighin at least to

2  explain what she saw.

3          MR. BAKMAN:  I disagree.  The questions were, was

4  there anything you did to determine that that was the

5  defendant's cell phone, that he owned that cell phone.  She

6  said, yeah, he testified to it in a hearing.

7          Now if we are going to get into text messaging on

8  the phone, that's subject to a motion to suppress because

9  there was no search warrant obtained to go into the

10  telephone.

11         MR. YANG:  Your Honor, defense specifically

12  attacked Agent Kaighin about looking through the phone doing

13  her due diligence through the phone.

14         THE COURT:  Where was the phone found again?

15         MR. YANG:  It was found in the room, I believe, on

16  the dresser next to his wallet.  There is a picture of the

17  text message that the government can admit.

18         MR. BAKMAN:  Your Honor, they are trying to get in

19  hearsay now.  They are offering a text message by somebody

20  else that was found on the phone.

21         THE COURT:  Let me just stop.  If she's testified

22  that she's looked into the phone, again, I don't understand.

23  What is the evidence that connects the phone to this

24  particular defendant?

25         MR. YANG:  Well, Your Honor, first of all, the

WIL S. WILCOX, OFFICIAL FEDERAL REPORTER

1   phone was found next to defendant's wallet, social security

2   card, credit cards, California identification.  Second,

3   defendant has admitted to possessing that phone.  He

4   admitted it during the motion to suppress hearing which that

5   later came out when defense attacked Agent Kaighin for

6   knowing the ownership of the phone.

7          The jury at least right now is left with the

8   impression that there was no due diligence done on the

9   phone, that there is nothing in that phone that connects

10  defendant to the drugs.

11         The text message is not offered for the truth of

12  the matter asserted.  It's just offered to show that Agent

13  Kaighin looked through the phone, saw that text message and

14  had sufficient evidence to believe that defendant --

15         THE COURT:  I will allow her to testify as to

16  having gone through the phone and what she saw in the phone,

17  but I don't understand what the connection is with the

18  defendant other than what you've just said that the phone

19  was found next to his wallet.  I suppose from that there

20  could be circumstantial evidence that it is his phone.

21         MR. BAKMAN:  They are trying to get in a specific

22  text message that says from somebody to the possessor of the

23  phone.  There is a text message from a female that says:

24  You want your drugs more than you want our relationship.

25  That's basically it.  They are trying to get that specific

```
 1   hearsay.
 2             THE COURT:  I didn't say that, that could come in.
 3             MR. BAKMAN:  That's what they are asking you to
 4   do.
 5             THE COURT:  I'm not allowing that in.  Again, the
 6   thing that you apparently want to address is what steps they
 7   took to determine whether or not the phone was the
 8   defendant's.  And, again, first of all, I don't really
 9   understand what really that has to do with this case, no
10   offense to Mr. Bakman.
11             MR. YANG:  Well, Your Honor, defendant was found
12   in a room with drugs with many of his personal belongings.
13             THE COURT:  Yes.
14             MR. YANG:  Most, if not all.
15             THE COURT:  Yes.
16             MR. YANG:  Agent Kaighin finds a phone.
17             THE COURT:  Yes.
18             MR. YANG:  Or somebody else finds a phone.  Agent
19   Kaighin is aware that on that phone there is a text message
20   that says to the possessor --
21             THE COURT:  That doesn't rebut the defense
22   argument that there were no steps taken as to who that phone
23   belonged to.  The mere fact that you find a phone that has a
24   message on it that says you care more about drugs than me,
25   how do you know it's a girlfriend?
```

1      MR. YANG:  It's circumstantial evidence, Your

2  Honor.  The drugs are found in the same room as the phone as

3  defendant was found in.  It's circumstantial evidence.

4      THE COURT:  The point is that -- first of all, I

5  don't understand what's the significance of the phone to

6  begin with.  What's the significance of the phone?

7      MR. YANG:  Your Honor, this is all in the context

8  of Agent Kaighin's -- an attack on Agent Kaighin's failure

9  to properly investigate this case.

10      THE COURT:  Why was there a failure to investigate

11  vis-a-vis the phone?

12      MR. YANG:  Because there was overwhelming evidence

13  that that phone was defendant's, defendant was in that room,

14  the drugs were in that room.

15      THE COURT:  Let me stop you.  The wallet was

16  there, and it's his wallet, right?  It has the evidence that

17  belonged to him.

18      MR. YANG:  Right.

19      THE COURT:  So it's not a situation where there is

20  nothing in the room to connect him other than his presence.

21  There is other things to connect him with the room.

22      Basically you want to argue something about the

23  defense's attack vis-a-vis the cell phone.  You have the

24  defendant in the room.  You have the wallet in the room.  If

25  the defense want to attack a cell phone, I don't understand

12

1    what the point is.

2            MS. WILLIAMS:  It's the defense overall attack on

3    why Agent Kaighin didn't submit every single thing in the

4    room for fingerprints.  It's unfair to attack her without

5    her being able to explain that there was other evidence in

6    her head.

7            THE COURT:  But the problem is that if the

8    government chooses not to put in the items, certain items,

9    as a basis for her understanding directly, I'm not going to

10   allow -- in other words, if you want to bring Beall in to

11   offer the thing about the confession, I can understand that.

12           MS. WILLIAMS:  Well, Beall did not have anything

13   to do with the cell phone.

14           THE COURT:  The cell phone doesn't have anything

15   to do with the case.  You basically are trying -- no offense

16   to the government.  Well, I'm not going to comment.  What

17   can I say.  I've made my ruling.

18           Yes.  Anything else?

19           MS. WILLIAMS:  Your Honor, with respect to that

20   ruling, would Agent Kaighin be permitted to explain that

21   part of her analysis in choosing whether or not to exercise

22   her discretion in submitting items for fingerprints include

23   the totality of the circumstances and based on the totality

24   of the circumstances --

25           THE COURT:  She can give an explanation as to why

13

1   she didn't fingerprint, but I will not allow her to proffer

2   the confession aspect since the confession aspect is

3   otherwise not being proffered by the government.

4           MS. WILLIAMS:  Of course, and I wasn't asking

5   about the confession.  But specifically, with respect, could

6   she even be permitted to say based on the content in the

7   cell phone without getting into what it is, that that was

8   part of her analysis, based on the content of the cell

9   phone, based on the identification in the room, based on the

10  defendant's sole presence in the room.  There were many

11  factors that go into what she does next in the

12  investigation.

13          The defense counsel is trying to pick and choose

14  where he attacks this case as well, and it's unfair to the

15  government to not be able to explain.

16          THE COURT:  She can testify as to why she did not

17  have the phone fingerprinted.

18          MR. BAKMAN:  Your Honor, first off, typically I

19  don't mind when there is two government counsel at the

20  table, but I do mind when she is Mr. Yang's witness.

21  Mr. Yang gets up.  He gives it his best shot, and then

22  Ms. Williams gets up and takes another shot.

23          THE COURT:  You don't want to be double teamed?

24          MR. BAKMAN:  Well, I don't care about that.

25          THE COURT:  I thought you welcomed any sort of

14

```
 1    opposition.
 2           MR. BAKMAN:  I do, but why don't we confine it to
 3    whoever's witness it is and have them -- they get two bites
 4    out of the apple consistently in this case.  But the real
 5    concern is --
 6           THE COURT:  Let me stop you.  I often hear that,
 7    and I don't allow double teaming in terms of questioning in
 8    front of the jury.  If I order what you are saying, what
 9    will happen is that she will be passing him notes and it
10    takes twice as much time.  So since we are out of the
11    presence of the jury I'm not going to agree to that, and if
12    they are in front of the jury they have not been double
13    teaming in an unacceptable manner.  It's always allowed that
14    one attorney can pass a note to a questioning attorney to
15    suggest something else.  That is entirely all right.
16           MR. BAKMAN:  That's fine.
17           Can we find out what Agent Kaighin's response is
18    going to be because I don't know where she's going to go
19    with the telephone?
20           THE COURT:  I will allow you to do that simply for
21    the fact that I don't want to have a situation where we have
22    to unring a bell.  I agree with the danger in that.  So you
23    can ask her the question and see what her answer is.
24           MR. BAKMAN:  I'm not going there.  I'm not going
25    back to the telephone.  That's come and gone in my opinion.
```

**WIL S. WILCOX, OFFICIAL FEDERAL REPORTER**

```
 1            THE COURT:  Let me ask the government to preview
 2   what the question and answer will be.
 3            MR. YANG:  Your Honor, so on redirect it would be
 4   something to the effect of:  Agent Kaighin, why didn't you
 5   print the cell phone?
 6            AGENT KAIGHIN:  The same reason I didn't print
 7   anything else in the room.
 8            MR. YANG:  And what is that?
 9            AGENT KAIGHIN:  Given all of the evidence that I
10   knew at that time, there was no reason.  There was no
11   question of who committed this crime.
12            MR. YANG:  Specifically what evidence are you
13   referring to?
14            AGENT KAIGHIN:  On the cell phone I saw a text
15   message that clearly indicated he was selling drugs.
16            MR. BAKMAN:  There we go.
17            THE COURT:  I would agree.  I would agree with
18   that.  There is a problem there.
19            MS. WILLIAMS:  Perhaps we can limit it to:  Agent
20   Kaighin, can you explain to the jury why items of evidence
21   were not fingerprinted, and then she can speak more
22   generally as to it is her discretion, given the totality of
23   circumstances in this case, the content on the cell phone,
24   without stating that there was a text message on the cell
25   phone, the content on the cell phone, the fact that the
```

```
 1   defendant was there by himself, the fact that other agents
 2   had seen the defendant sell drugs just two hours before.
 3            THE COURT:  But you know, counsel, in essence all
 4   of that stuff is already in there.  In essence you are
 5   basically asking her a question which is going to be your
 6   argument to rebut the argument that Mr. Bakman is about to
 7   make in front of the jury at closing argument.
 8            You know, the situation is the situation.  This is
 9   not a difficult case.  The case is what it is.  And the
10   problem is that the more you guys argue with each other the
11   more I wind up basically saying one thing or another, which
12   in effect assists one side or the other which is not my role
13   in this case.  So I think that if you want to ask the
14   question you are free to ask the question, but the problem
15   is you may raise a problematic area.  Let's put it that way.
16            MR. BAKMAN:  I'm going to ask the Court
17   specifically to order the government to -- or to order Agent
18   Kaighin not to mention one word about content in that cell
19   phone.  The content is hearsay.  It's not before the jury.
20            THE COURT:  Let me put it this way.  They can
21   question her as to whether or not she examined the contents
22   of the phone.  And if you want to challenge her as to what
23   she did thereafter, then it's your problem.  But they are
24   perfectly free to question her did you look at the contents
25   of the phone.
```

1        MR. BAKMAN:  Again, before that question comes in,

2   I believe I have a right to litigate whether or not she was

3   able to even look at the contents of that phone absent a

4   search warrant such that she can comment on it in trial.  I

5   don't believe she can.

6        There was no search warrant, and I would ask at

7   this point in time to raise a suppression motion, to be able

8   to bring a suppression motion with regards to word one about

9   content of the cell phone absent a search warrant to look

10  into that phone.

11       MR. YANG:  Your Honor, the search warrant does

12  include the seizure of cell phones.

13       THE COURT:  I'm looking at it now.  I'm trying to

14  see if it does.

15       MR. YANG:  And defense counsel has had almost two

16  years to raise this particular issue.

17       THE COURT:  Well, it does say that the search

18  warrant does include recordings and notes of any incoming

19  phone calls that might be related to sales of a controlled

20  substance or narcotics transactions including incoming

21  messages contained on electronic communication devices such

22  as pagers, telephone answering machines, et cetera.

23       It seems to me that she is within the search

24  warrant by looking into the contents of the phone.  So I

25  will allow them to question her on whether or not she did.

WIL S. WILCOX, OFFICIAL FEDERAL REPORTER

18

```
 1    However, that is not to say that I will allow them to
 2    question her on what she specifically read, but as part of
 3    the investigation she did look into the phone.  All right.
 4              Have we discussed this sufficiently now?
 5              MR. BAKMAN:  Yes.
 6              MR. YANG:  Yes, Your Honor.
 7              THE COURT:  Thank you.  Let me have the clerk
 8    bring in the jury.  Let me ask, while my clerk is doing
 9    that.  How many more witnesses from the government other
10    than the fingerprint expert?
11              MR. YANG:  That's it, Your Honor.  Just Agent
12    Kaighin's cross and that.
13              THE COURT:  Just out of curiosity, has defense
14    made a decision in regards to witnesses?
15              MR. BAKMAN:  I tried to see Mr. Colbert this
16    morning and was unable to.  I'd like to have a little more
17    time than our typical 10 minute break so that I can spend it
18    with him.
19              THE COURT:  Okay.  All right.
20              THE COURT:  All right.
21              THE CLERK:  All rise for the jury.
22                 (The jurors entered the courtroom.)
23              THE COURT:  Let me have the witness back on the
24    witness stand, and as she is approaching I will simply
25    remind her.  You were placed under oath in this matter
```

**WIL S. WILCOX, OFFICIAL FEDERAL REPORTER**

```
 1   yesterday.  That oath is still applicable at this point in
 2   time.  Do you understand that?
 3              THE WITNESS:  Yes, sir.
 4              THE COURT:  All right.  We will continue with the
 5   cross.
 6                   CROSS-EXAMINATION (Continued)
 7   BY MR. BAKMAN
 8   Q    Yesterday when we broke we were discussing the
 9   registration form for Room 220.
10        Did you in fact at any point in time confirm Jamine
11   Marshell's address as being this address on the registration
12   form?
13   A    I'm told he's homeless.
14   Q    That wasn't my question, Agent Kaighin.
15        Did you understand my question?
16   A    I did not go to that address.  No.
17   Q    Did you send somebody out.  As the case agent and the
18   fact finder of this case, did you send somebody out to this
19   address to determine whether or not the address was a
20   legitimate address for Jamine Marshell?
21   A    I did not because we did speak with him, and he told us
22   he was homeless.
23   Q    When did you speak with him?
24   A    Another member of our team spoke with him a few weeks
25   prior to trial.
```

20

```
1    Q    Were you present?
2    A    I was not.
3    Q    So you had no idea what he said to this other member
4    based on personal knowledge; is that right?
5    A    I read the report.
6    Q    Were you present?  Did you have personal knowledge as
7    to what Marshell told somebody else, yes or no?
8    A    I was not present.
9    Q    So the answer to my question is what, yes or no?
10   A    I was not present.
11   Q    So what is the answer to my question?
12        Do you have personal knowledge as to what Marshell told
13   another agent, yes or no?
14   A    No.
15   Q    Did you send any agent out to this address to verify
16   whether Jamine Marshell lived there presently, past or had
17   intended to live there in the future?
18   A    No, I did not.
19   Q    Did you compare the handwriting on this to any
20   handwriting exemplars of Mr. Colbert?
21   A    I am not a handwriting expert.
22   Q    But you heard the so-called government expert in this
23   case, Sergeant Walker.  He testified about some drug dealers
24   using multiple rooms, did you not?
25        MR. YANG:  Objection, Your Honor, argumentative.
```

WIL S. WILCOX, OFFICIAL FEDERAL REPORTER

```
 1              THE COURT:  I don't understand.
 2              MR. YANG:  The so-called part.
 3              THE COURT:  Rephrase the question.
 4    BY MR. BAKMAN
 5    Q    Sure.  Were you present when Sergeant Walker told the
 6    jury that drug dealers at motels in connection with the
 7    managers at the motels that rent multiple rooms to avoid
 8    detection.  Were you present when he testified to that,
 9    ma'am?
10    A    I was.
11    Q    Tell me, given that a drug dealer will rent the
12    multiple rooms and given the government's allegation that
13    Mr. Colbert was the drug dealer, did you ever think to check
14    this handwriting on the registration for Room 220 to see if
15    it was Colbert's or somebody else?
16              MR. YANG:  Objection, Your Honor, argument.
17              THE COURT:  Overruled.  She can answer that
18    question if she can.
19              THE WITNESS:  I did not compare any handwriting.
20    BY MR. BAKMAN
21    Q    So you don't know whether or not this handwriting is
22    Mr. Colbert's or is really Jamine Marshell's, do you?
23    A    I have no idea.
24    Q    And we have another registration form here in the name
25    Calvin Colbert referring to Room 217; is that correct,
```

1   ma'am?

2   A    Yes.

3   Q    And does the address on this registration form, does

4   that match the address on Mr. Colbert's driver's license?

5   A    I believe it does.

6   Q    So Mr. Colbert when he checked into the room, he's

7   using real identification and a real address; is that right?

8        MR. YANG:  Objection, Your Honor, calls for

9   speculation, lack of foundation.

10       THE COURT:  I will sustain the objection unless

11  you can lay a foundation.

12  BY MR. BAKMAN

13  Q    Did you ever verify the address on this registration as

14  to in regards to Mr. Colbert?

15  A    How do you mean?

16  Q    Well, did you ever go out to the location and knock on

17  the door and see who answered and see if Mr. Colbert lived

18  at that address that's notated on this registration form?

19  A    I did not.

20  Q    Now, given Mr. Colbert had a registration for Room 217,

21  let me ask you this.  When you and your team made entry to

22  serve the search warrant on Room 220, did you go into Room

23  217 to see if there was any cocaine residue that was present

24  in Room 217?

25  A    I was told the room was vacated.  We did not go into

23

1  Room 217.

2  Q    So you knew the man had a registration for Room 217,

3  correct?

4  A    I learned after the search warrant.

5  Q    Well, that's not entirely true, is it, Agent Kaighin?

6  The search warrant called for a search of both room 217 and

7  220; is that right?

8  A    I didn't learn about this registration until after the

9  search warrant.

10  Q    Agent Kaighin, what rooms were you directed to search

11  pursuant to the search warrant?

12  A    We were going to search Room 217 and Room 220.

13  Q    Did you ever search 217?

14  A    We did not.

15  Q    Did you ever go into Room 217 to see if there was any

16  drug paraphernalia, any drug residue?  Did you go into that

17  room to see what was going on in that room?

18  A    I did not go into 217.

19  Q    Did you direct any team member to go into Room 217?

20  A    No.

21  Q    Did you compare the handwriting belonging to Calvin

22  Colbert on the registration card for Room 217 to the

23  handwriting that was on the registration card for Room 220

24  to see if it even looked alike?

25  A    I believe I did at one point compare it to the driver's

**WIL S. WILCOX, OFFICIAL FEDERAL REPORTER**

24

1   license.

2   Q    But my question was did you compare the two

3   registration cards to one another to see if it appeared that

4   the same drug dealer so to speak filled out both

5   registration cards consistent with Sergeant Walker's

6   testimony?

7           MR. YANG:  Objection, Your Honor, calls for expert

8   opinion.

9           THE COURT:  Overruled.  He's asking what she did.

10          THE WITNESS:  I did not attempt to compare

11  handwriting from either card to each other.

12  BY MR. BAKMAN

13  Q    Who recovered the money in Room 220; was it you?

14  A    I don't believe I was the one that put it in the

15  envelope, no.

16  Q    It was Beall, wasn't it?

17  A    I can't specifically say who put it in the envelope.

18  Q    Well, you've got Beall's eight-page police report in

19  this case, don't you?

20  A    I did.

21  Q    Why don't you take a look at that and tell me if

22  Beall's eight-page report -- let's take a look at tab number

23  four for me.

24          MR. YANG:  Objection, Your Honor.  This is

25  improper impeachment.  This is not Agent Kaighin's report.

```
 1            MR. BAKMAN:  I can use whatever document I'd like
 2   to refresh her recollection, Your Honor.
 3            MR. YANG:  I assume he's about to impeach her with
 4   the document.
 5            THE COURT:  Well, don't presume until such time as
 6   it comes about.  I will allow him to have the witness look
 7   at the report, and we will see what the question is at that
 8   point.
 9   BY MR. BAKMAN
10   Q    Take a look for me on tab four.  Let me ask you some
11   questions about this document.
12        Do you recognize the document?
13   A    I do.
14   Q    And you've reviewed this document before coming into
15   court to testify; is that right?
16   A    I have.
17   Q    And what is this document?
18   A    This is San Bernardino Police report number 09-08274.
19   Q    And this report is what you used as a basis to prepare
20   your two-page synopses of what occurred on March 11th; is
21   that right?
22   A    That's correct.
23   Q    And so in using this report and in reviewing this
24   report, I'd like you to direct your attention to page 6 of
25   this report.
```

**WIL S. WILCOX, OFFICIAL FEDERAL REPORTER**

1     At the very top there is a paragraph seven that

2   discusses the recovery of the money in Room 220.  Please

3   take a look at that.  Read it to yourself.

4     And let me ask you whether or not that refreshes your

5   recollection that Beall was the one who recovered the money

6   in this case?

7   A     It does.

8   Q     And who was it that recovered the money from Room 220?

9   A     Officer Jerry Beall.

10  Q     And tell me, can you tell the jury whether or not Beall

11  was the one who allegedly recovered the prerecorded $20 bill

12  and the $10 bill?

13          MR. YANG:  Objection, Your Honor, calls for

14  speculation, lacks foundation.  It's already been asked and

15  answered.

16          THE COURT:  If she doesn't have knowledge of the

17  answer to that question, she can state it.

18          THE WITNESS:  I'm sorry.  Can you ask the question

19  again?

20  BY MR. BAKMAN

21  Q     Who recovered or who allegedly recovered the

22  prerecorded $20 and $10 bill; was it Beall?

23  A     Yes.

24  Q     And where did the prerecorded bills first surface after

25  execution of the warrant?  Was that at the police station

1  some time later?

2  A    Well, I was able to tell one of the 20s in the

3  photograph that I took.

4         MR. BAKMAN:  Objection, nonresponsive.

5         THE COURT:  Overruled.  She's answering your

6  question.  Finish the answer.

7         THE WITNESS:  In one of the photographs that I

8  took I was able to see at least five or six numbers and

9  letters from one of the prerecorded bills found in the room

10  on the nightstand prior to us even touching it.

11  BY MR. BAKMAN

12  Q    Which bill?

13  A    I believe it was a 20.

14  Q    Where was the 10?  Is it photographed?

15  A    I'm not sure about the 10.

16  Q    And when you took the photograph Beall had already been

17  over to handle the cash; had he not?

18  A    That is not true.  I took it before anything had been

19  touched.

20  Q    Well, we have audio tapes of drug transactions, do we

21  not, of the transactions that occurred on March 11th, do you

22  not?

23  A    We do.

24  Q    And you've got videotape of the alleged drug

25  transactions that occurred on March 11th; is that right?

28

```
1    A    We do.

2    Q    And you were the one that went in.  You immediately

3    went into the room after Beall went into the room; is that

4    right?

5    A    I was either right behind him or very shortly after

6    him, yes.

7    Q    And you had your camera in hand, did you?

8    A    No.

9    Q    Well, tell me, the statements that you claim you

10   overheard from Mr. Colbert with respect to the gun, did

11   those statements happen to make it on tape?

12   A    We weren't wearing recorders when we were entering the

13   room.

14          MR. BAKMAN:  Objection, nonresponsive to the

15   question.  Motion to strike her answer.

16          MR. YANG:  Objection, Your Honor, assumes a fact

17   not in evidence.

18          THE COURT:  Overruled as to both.  Her answer

19   comes in.

20   BY MR. BAKMAN

21   Q    Was Mr. Colbert's alleged statements relating to the

22   gun captured on audiotape, yes or no?

23   A    No.

24   Q    Was it captured on videotape, yes or no?

25   A    No.
```

WIL S. WILCOX, OFFICIAL FEDERAL REPORTER

1   Q    So Colbert's statements regarding the gun is really the

2   only piece of evidence that wasn't captured on tape that

3   day; is that right?

4   A    I wouldn't agree with that statement.

5   Q    Who obtained the cocaine from the bedroom?  It was

6   Beall; was it not?

7   A    It was officer Beall.

8   Q    Who obtained the scale from the bedroom, was it Beall?

9   A    Yes, it was.

10  Q    Who obtained the money from the bedroom, was it Beall?

11  A    Yes, it was.

12  Q    When did Beall hand off the money and the dope to you

13  that day?

14  A    I received everything when we got back to the office.

15  Q    So Beall had everything in his possession on the drive

16  back to the office; is that right?

17  A    It's typically kept in the van.

18  Q    Yes?

19  A    I can't recall if he had it in his car or if we had it

20  in the van.

21  Q    Did you notate who had custody of the dope and the

22  money in any report that you authored?

23  A    I did not.

24  Q    Where was the money counted if you know?

25  A    I believe at the scene.

1  Q    Looking at page 6 of Beall's report again, paragraph
2  seven or numeral seven, there is a breakdown of the
3  currency; is that correct?
4  A    That's correct.
5  Q    Did you do that?
6  A    I did not.
7  Q    Did Beall do it?
8  A    It's on the exterior of the envelope.
9  Q    Did Beall do it?
10 A    I believe he did.  I did not do it.  It's on the
11 envelope.
12 Q    Beall was the lead investigator in this case, wasn't
13 he?
14 A    He was.
15 Q    When's the last time you spoke to him?
16 A    Several days ago.
17 Q    How many days ago?  Strike that.
18      Let me ask you this.  Have you spoken to him since this
19 trial started?
20 A    I texted him last night telling him to be on standby.
21 Q    So he's around, correct?
22 A    Probably in San Bernardino.
23 Q    Did you ever make any follow-up attempts to contact
24 either of the two black females that White had contact with
25 that day?

31

```
 1   A     We did.

 2   Q     Did you interview them?

 3   A     We attempted to locate one of them at her last known

 4   address, and we were told that she was no longer residing at

 5   that address.

 6   Q     Did you get a follow-up address?

 7   A     They did not have a follow-up address for her.

 8   Q     Were you there?

 9   A     I was not.

10   Q     So, again, you don't have any personal knowledge of

11   this conversation you are now relaying to this jury, do you?

12   A     I was not present.

13   Q     Who conducted the follow-up investigation?

14   A     Officer Tony White.

15   Q     So then what, Tony White told you allegedly what had

16   happened when he tried to go to one of the female's

17   residences?

18   A     He typed it in an e-mail.

19   Q     Do you have that with you?

20   A     We do.

21   Q     May I see it?

22             MR. YANG:  Your Honor, it's been produced in

23   discovery.

24             THE COURT:  All right.

25             MR. BAKMAN:  It may have, but I don't have it.  So
```

**WIL S. WILCOX, OFFICIAL FEDERAL REPORTER**

32

1    my question stands.  May I see it?

2              THE WITNESS:  If I can go to my file, sir.

3              THE COURT:  Sure.

4              MS. WILLIAMS:  I may have a copy, Your Honor.

5              Here.

6              MR. YANG:  And, Your Honor, just to clarify, it

7    was produced as basically cut and pasted from an e-mail into

8    a document.  The e-mail tags are not in there, but the

9    substance is.

10             MR. BAKMAN:  Your Honor, am I going to be calling

11   Mr. Yang to the stand since he likes to testify?

12             THE COURT:  Good question.

13   BY MR. BAKMAN

14   Q    Now Rosemary Jackson's mother lived at the location

15   that White went to; is that right?

16   A    I believe so.

17   Q    And to your knowledge did White ever go back and see if

18   Rosemary Jackson was present at the mother's residence?

19   A    He did not go back.

20   Q    When was this -- when did White conduct the follow-up

21   investigation?  There is no date on this e-mail.  Do you

22   know when that occurred?

23   A    Within the past couple of weeks.

24   Q    So the first time that anybody from the government side

25   of the table decided to go out and track this woman down was

1    a year and a half after the events occurred?

2    A    Yes, in preparation for trial.

3    Q    It didn't cross anybody's mind on the investigation

4    team to go out and track these people down closer in time to

5    March 11th of 2009 and ask the woman, hey, who did you get

6    the dope from?  That never occurred?

7    A    We did not feel it was necessary.

8    Q    Who recovered the gun at the scene?

9    A    I believe Officer Beall.

10   Q    And did Beall identify this gun in any way with his

11   initials on an evidence tag?

12   A    Those are my evidence tags.  I'm not sure.

13   Q    Were there any evidence tags placed on any of the

14   evidence by Beall?  And when I talk about evidence I'm

15   talking about the evidence that Beall himself recovered.

16   A    No tags.  I don't believe San Bernardino police had put

17   any tags.

18   Q    What else did Beall recover that day from the room?

19   A    Beall, being the case agent, would have recovered all

20   of the evidence that either we found or we told him to take.

21   Q    Did you interview the manager of the motel that day to

22   find out who actually registered for Room 220?

23   A    I did not.

24            MR. BAKMAN:  May I have a moment?

25            THE COURT:  Yes.

1                          (Pause.)

2    BY MR. BAKMAN:

3    Q    The photographs that you took of the evidence in this

4    case, was that after Mr. Colbert was removed from the room?

5    A    One of them I can still see his shoes, so I know he was

6    still in the room.

7    Q    And the remaining photos?

8    A    They were either as he was being taken out or as he was

9    in the room or as he was right outside the door.  I can't

10   say for certain.

11            MR. BAKMAN:  No further questions.

12            THE COURT:  All right.  Redirect.

13            MR. YANG:  Thank you, Your Honor.

14            MR. YANG:  May I proceed, Your Honor?

15            THE COURT:  Yes.

16                    REDIRECT EXAMINATION

17   BY MR. YANG:

18   Q    Agent Kaighin, why didn't you fingerprint the gun?

19   A    We had just purchased crack cocaine from the defendant.

20            MR. BAKMAN:  I'm going to object to the form of

21   the answer "we."  The woman was not present when any

22   transaction -- her first time on scene was at the hotel or

23   the motel.

24            THE COURT:  All right.  Rephrase that first

25   portion of your answer.

WIL S. WILCOX, OFFICIAL FEDERAL REPORTER

1          THE WITNESS:  San Bernardino Police Department

2    had just purchased crack cocaine from the defendant.  We

3    had eyes on the room while other officers went back to write

4    up a search warrant.  When we executed the search warrant,

5    the only person that was found in this room was the

6    defendant.

7          He was sitting at the table counting money with

8    crack all across the table with a scale, with a razor blade,

9    with baggies.  He told us he had a firearm.  He told us it

10   was in the drawer.  I did not feel there was any need to

11   waste resources on fingerprinting anything.

12   Q    Agent Kaighin, at that point did you have any idea of

13   the identity of the person that possessed those drugs and

14   the gun?

15          MR. BAKMAN:  Objection, vague and ambiguous,

16   unintelligible.

17          THE COURT:  Rephrase the question.

18   BY MR. YANG

19   Q    Agent Kaighin, how often have you submitted items for

20   fingerprinting?

21          THE COURT:  That's been asked and answered in

22   cross.

23   BY MR. YANG

24   Q    Agent Kaighin, were there any circumstances that you

25   would have fingerprinted the gun?

**WIL S. WILCOX, OFFICIAL FEDERAL REPORTER**

1          MR. BAKMAN:   Objection, speculation.

2          THE COURT:   You can attempt to rephrase the

3    question.

4    BY MR. YANG:

5    Q     Agent Kaighin, if you were certain -- if you were not

6    certain about the identity of the owner -- of the possessor

7    of the gun, would you have fingerprinted it?

8    A     Yes.

9    Q     But here were you certain of the possessor of the gun?

10   A     There was no doubt in my mind.  He said it was his.

11   Q     Agent Kaighin, turning your attention to the stack

12   formation prior to the entry into the room, I believe you

13   testified earlier that you were close to Officer Beall.  Why

14   were you close to Officer Beall?

15   A     I know I had to be close to Officer Beall because upon

16   entry when we flowed into the room, I became his close cover

17   when he was interacting with the defendant.

18   Q     What does "close cover" mean?

19   A     Meaning I knew he was going hands-on to put the

20   handcuffs on.  Therefore, I was remaining with my firearm on

21   the defendant to insure safety.

22   Q     Did you become alarmed when defendant indicated that he

23   had a weapon?

24   A     Absolutely.

25   Q     Why is that?

```
 1              MR. BAKMAN:  Objection, relevance.
 2              THE COURT:  Overruled.
 3              MR. BAKMAN:  It's outside the scope.
 4              THE COURT:  Overruled.
 5  BY MR. YANG
 6  Q    Why is that?  Why were you alarmed?
 7  A    Typically, people don't tell you that they have a
 8  firearm, don't answer "yes" to that question.
 9  Q    Agent Kaighin, turning your attention to Daryl Sean
10  Montoya, you had earlier stated during your
11  cross-examination that it was impossible that he was the
12  other unidentified black male on the corner.  Why did you
13  say that?
14  A    Because from my research Mr. Daryl Montoya is white,
15  and he's deaf.
16              MR. YANG:  Your Honor, government moves to publish
17  Government's Exhibit 41 which I believe defendant actually
18  admitted into evidence.
19              THE COURT:  Let me ask the clerk.  Is 41 in?
20              THE CLERK:  No.  It's only been identified.
21              THE COURT:  All right.  Do you want to move 41 in?
22              MR. YANG:  Yes, Your Honor.
23              THE COURT:  Any objection to Exhibit 41?
24              MR. BAKMAN:  Relevance.
25              THE COURT:  Let me ask.  I don't have a copy of
```

WIL S. WILCOX, OFFICIAL FEDERAL REPORTER

```
1    41.  Let me take a look at it.

2                          (Pause.)

3               THE COURT:  Overruled.  I will admit Exhibit 41.

4         (Exhibit 41 received in evidence.)

5               MR. YANG:  Your Honor, I'm going to publish for

6    the jury.

7    Q    Agent Kaighin, have you seen this document before,

8    Exhibit 41?

9    A    I have.

10   Q    What is this?

11   A    This is a booking photo of Mr. Montoya.

12   Q    And when did you see this booking photo?

13   A    I believe a few months ago

14   Q    Was this part of when you referred to your efforts to

15   look him up?

16   A    Yes.

17   Q    Was there any -- did you direct any follow-up attempts

18   to locate Mr. Montoya?

19   A    Yes, I did.

20   Q    What did you do?

21   A    Officer Beall and I learned that he was deaf, so we had

22   to make arrangements to get an interpreter.  The last known

23   address that we had found for him was in LA.  Officer Beall

24   went to LA to that address and found out that it was a

25   homeless shelter, and they were aware of Mr. Montoya.
```

WIL S. WILCOX, OFFICIAL FEDERAL REPORTER

1    However, they hadn't seen him in approximately 12 days.

2    Then Officer Beall went to the LA Police Department and

3    spoke with officers that worked that beat.

4            MR. BAKMAN:   Objection, Your Honor, nonresponsive,

5    no personal knowledge for that portion of her answer.   If

6    they want to bring in Officer Beall to testify what he did,

7    that's fine.

8            THE COURT:   I will allow the witness to answer the

9    question, not for the truth of the statements but to

10   indicate her knowledge as to the steps that were purportedly

11   taken by persons to locate this particular individual to

12   demonstrate her understanding and her apparent reliance on

13   those.

14   BY MR. YANG:

15   Q    Agent Kaighin, you were about to finish.

16   A    Yes.   Contact was made with LAPD, the officers that

17   worked that beat, and asked them to keep a lookout for

18   Mr. Montoya and contact us when they have located him.

19   However, we have not been contacted again by LAPD.

20   Q    Agent Kaighin, I'm going to show you -- regarding

21   Exhibit 24 and 23, the crack cocaine --

22   A    Yes.

23   Q    -- turning your attention to that, did you receive the

24   drugs from San Bernardino Police Department on March 11,

25   2010?

WIL S. WILCOX, OFFICIAL FEDERAL REPORTER

1   A    2009.  Yes, I did.

2   Q    2009.  And what did you do once you received the crack

3   cocaine?

4   A    I put my case number and what exhibit number I was

5   going to give it on the exterior of all of the envelopes and

6   then I placed it into heat-sealed bags and then I forwarded

7   that to the DEA Laboratory.

8           MR. YANG:  Your Honor, may I approach the witness

9   with the exhibit?

10          THE COURT:  All right.

11  BY MR. YANG:

12  Q    Agent Kaighin, did you write on any of those envelopes?

13  A    I wrote on all of them.

14  Q    What did you write?

15  A    In the red marker I put my ATF case number and what ATF

16  exhibit it was going to become, and I printed out ATF

17  labels.  Then I put it in these envelopes, and I heat sealed

18  it and signed the envelopes.  Per DEA's instruction, you

19  have to do the heat seal break tags, and then I forwarded

20  those to the lab.

21          MR. YANG:  Your Honor, at this point government

22  moves to admit Exhibits 23 and 24 into evidence?

23          THE COURT:  All right, any objection?

24          MR. BAKMAN:  No objection.

25          THE COURT:  All right.  They are admitted.

```
 1              (Exhibits 23 and 24 received in evidence.)
 2   BY MR. YANG:
 3   Q    Agent Kaighin, you were asked about Room 217.  Why
 4   didn't you go into Room 217?
 5              THE COURT:  Sorry.  Why did or why didn't you?
 6              MR. YANG:  Why did you not go into Room 217?
 7              THE WITNESS:  I believe I recall hearing that it
 8   was vacated.
 9              MR. BAKMAN:  Objection, hearsay.
10              THE COURT:  Again, I will allow her to testify,
11   not for the truth, but as the explanation of her
12   understanding to explain why she didn't do something.
13              MR. BAKMAN:  Objection then, relevance and 403.
14              THE COURT:  Overruled.
15   BY MR. YANG:
16   Q    Agent Kaighin, why did you not go into Room 217?
17   A    It had been vacated and I was told to proceed to 220.
18   Q    Agent Kaighin, describe how once a room is secured how
19   does a search warrant actually get carried out.
20              MR. BAKMAN:  Objection, outside the scope.
21              THE COURT:  Overruled.
22              THE WITNESS:  Typically, each member has an
23   assignment.  Obviously, this is always subject to change
24   because things happen.  Things are fluid.  Sometimes you
25   have children, and some people are better with children than
```

42

```
 1    others.   Some people have detainees, some don't.
 2            Assignments are given.   Somebody is assigned to do
 3    the entry and exit video.   The case agent typically goes to
 4    the target or suspect in the investigation and starts an
 5    interview while the other members of the team conduct a
 6    search of the room or premise or residence.
 7    Q    Who actually collects the evidence?
 8    A    The case agent is the collector.   The other agents and
 9    officers find it, show the case agent where they were
10    located so that he can notate that in his report, and then
11    he is the collector.
12    Q    And Agent Kaighin --
13            MR. YANG:   Your Honor, may I approach the witness
14    with an exhibit?
15            THE COURT:   Yes.
16    BY MR. YANG
17    Q    Agent Kaighin, can you take out the Exhibit 19, the
18    firearm?
19    A    (The witness complies.)
20    Q    Were you in the room when this was recovered?
21    A    I was.
22    Q    Was this the firearm that was depicted in the
23    photograph that you took?
24    A    It is.
25    Q    Agent Kaighin, can you take out Exhibit 25, the cash?
```

WIL S. WILCOX, OFFICIAL FEDERAL REPORTER

43

1    Is this the cash that was recovered in the Economy Inn on

2    March 11, 2009?

3    A    It is.

4    Q    Were you in the room when it was recovered?

5    A    I was.

6    Q    Do you have any reason to believe that the cash in that

7    bag is not the cash that was in the photographs that you

8    took?

9    A    There is no reason for me to believe that.

10   Q    Agent Kaighin, the female with the tracksuit, were

11   there any attempts made to locate her?

12   A    I get them confused.  What was her name?

13   Q    Her name was Kim Miles I believe.

14   A    Yes, we found out that she was actually in custody.

15             MR. BAKMAN:  I'm going to object to the we found

16   out.

17             THE COURT:  All right.  Rephrase.

18   BY MR. YANG:

19   Q    Did you find or did your team find out the location and

20   current whereabouts of Kim Miles?

21             MR. BAKMAN:  Objection, speculation, hearsay.

22             THE COURT:  Let me have counsel on sidebar.

23             (The following was held at the bench:)

24             THE COURT:  You guys are making this so difficult.

25   She's a member of an investigative team.  The team acts

**WIL S. WILCOX, OFFICIAL FEDERAL REPORTER**

1   based on information that individual members get from each

2   other.  Why don't you simply ask her that?

3           It's not going to be offered necessarily for the

4   truth of the matter asserted, but it explains why she did

5   certain things upon hearing information.

6           Is that so hard?  Thank you.

7           (End of conference held at the bench.)

8   BY MR. YANG:

9   Q    Agent Kaighin, were there any attempts made by your

10  team to locate Kim Miles?

11  A    Yes.

12  Q    Was any member of your team able to speak to Kim Miles?

13  A    No.  We were not.

14  Q    Was Kim Miles in that room when you went into room 220?

15  A    She was not.

16  Q    Ms. Wilkerson, the female in the brown jacket, were

17  there any attempts made to locate her?

18  A    Yes, there were.

19  Q    Were those attempts successful?

20  A    Unfortunately not.

21  Q    Was she in the room, in room 220 when you entered into

22  the room?

23  A    No, she wasn't.

24  Q    And lastly, Jamine Marshell, were there any attempts

25  made to locate Jamine Marshell?

**WIL S. WILCOX, OFFICIAL FEDERAL REPORTER**

45

1    A    Yes, there was.

2    Q    Was that successful?

3    A    Yes, an interview was done with Mr. Marshell.

4    Q    Was Mr. Marshell in that room when you entered into

5    room 220?

6    A    He was not.

7    Q    And Daryl Montoya, was he in that room when you entered

8    into that room?

9    A    He was not.

10   Q    Agent Kaighin, why wasn't the original breach of the

11   door videotaped?

12   A    We don't have -- we are not going to carry a video

13   camera when our safety is in jeopardy.  That's our first and

14   foremost concern.  We are going to have our guns in our

15   hands, not a video recorder.

16           MR. YANG:  Your Honor, if I just may have one

17   minute.

18           THE COURT:  All right.

19                    (Pause.)

20   BY MR. YANG:

21   Q    Agent Kaighin, one last question.  Were you in the room

22   when the laser, the scale, the sandwich bags and the keycard

23   were found in room 220?

24   A    I was.

25           MR. YANG:  Your Honor, the government moves to

1    admit Exhibits 17, 18, 26 and 27 into evidence.

2              THE COURT:  Any objection?

3              MR. BAKMAN:  We have 17, 18 --

4              MR. YANG:  -- 26 and 27.

5              I'm sorry.  17 and 18.

6              It's a moot question, Your Honor, I think

7    everything's been admitted.

8              THE COURT:  Let me ask.  However, there were

9    certain exhibits that were attempted to be offered through

10   this witness that we indicated because of the defense

11   objection that we would decide on those at this point.

12             MR. BAKMAN:  I waive that objection.  I think that

13   was 23 and 24.

14             THE COURT:  Okay.

15             MR. YANG:  Yes, Your Honor.

16             THE COURT:  All right.  So those are then admitted

17   then.

18             MR. BAKMAN:  Yes.

19             MR. YANG:  No further questions, Your Honor.

20             THE COURT:  All right, recross.

21                        RECROSS-EXAMINATION

22   BY MR. BAKMAN:

23   Q    If you'd look at the defense folder, please, and turn

24   to tab 15.  Do you have that?

25   A    I do.

47

1    Q    That's your two-page report?

2    A    It is.

3    Q    And in your two-page report nowhere does it say that

4    Calvin Colbert admitted that the gun was his, does it?

5    A    It does not.

6    Q    And you wrote an affidavit.  Turn, please, to tab 14 in

7    the defense exhibit book.

8         Do you have that?

9    A    I do.

10   Q    What is that?

11   A    This is my affidavit in support of the criminal

12   complaint.

13   Q    You wrote that?

14   A    I did.

15   Q    And nowhere in that document do you state that Calvin

16   Colbert said that the firearm was his, does it?

17   A    It does not.

18            MR. BAKMAN:  No further questions.

19            THE COURT:  All right.  I presume there is no

20   further questions.

21            MR. YANG:  Just one question, Your Honor.

22            THE COURT:  I sometimes presume incorrectly.  All

23   right.

24                    FURTHER REDIRECT EXAMINATION

25

WIL S. WILCOX, OFFICIAL FEDERAL REPORTER

48

1  BY MR. YANG:

2  Q    Agent Kaighin, looking at Exhibit 15, the one you were

3  just looking at.

4  A    Yes.

5  Q    This is the search warrant -- I'm sorry -- the

6  affidavit that you -- your affidavit?

7  A    I'm sorry, 15?

8  Q    Or is it 14.  I can't tell with the tabs.

9  A    The one before it is my affidavit.

10  Q    Which exhibit is that?

11  A    I believe it's 14.

12  Q    Okay.  Agent Kaighin, if you could turn to the second

13  page of that -- I'm sorry -- paragraph three.  So first page

14  continuing on to the second page.

15  A    Number three?

16  Q    Yes.

17  A    Okay.  Yes.

18  Q    And read that to yourself.

19  A    Yes, sir.

20  Q    Agent Kaighin does your -- in creating that affidavit,

21  what is the purpose for that affidavit?

22  A    It's a statement of probable cause.

23  Q    Does it purport to set forth all of the knowledge of

24  your investigation into this matter?

25  A    It does not.

49

1          MR. YANG:  No further questions, Your Honor.

2          THE COURT:  All right.  Anything further?

3          MR. BAKMAN:  Nothing further.

4          THE COURT:  All right.  The witness is excused.

5    Thank you.  The next prosecution witness.

6          MS. WILLIAMS:  The United States calls Fred

7    Roberts to the stand.

8          THE COURT:  All right.

9          THE CLERK:  Please raise your right hand.

10          Do you solemnly swear that the testimony you shall

11   give in the cause now before this court shall be the truth,

12   the whole truth, and nothing but the truth, so help you God?

13          THE WITNESS:  I do.

14          THE CLERK:  Please have a seat.  State your name

15   and spell your last name for the record.

16          THE WITNESS:  Fred Roberts, F-R-E-D R-O-B-E-R-T-S.

17          MS. WILLIAMS:  May I proceed, Your Honor?

18          THE COURT:  Yes.

19                   DIRECT EXAMINATION

20   BY MS. WILLIAMS:

21   Q    Good morning, sir.  Where are you employed?

22   A    I'm a employee of the Los Angeles County Sheriff's

23   Department.

24   Q    What's your position there?

25   A    I am a fingerprint expert.

WIL S. WILCOX, OFFICIAL FEDERAL REPORTER

1  Q      A fingerprint expert?

2  A      Yes, ma'am.

3  Q      What do you do as a fingerprint expert there?

4  A      I get latent prints and compare them to known prints to

5  see if I can make a match.

6  Q      How long have you worked as a fingerprint expert?

7  A      18 years.

8  Q      Prior to that -- let me back up.

9         Prior to your position with the sheriff's department,

10  where did you work?

11  A      Four years of Garden Grove Police Department, Garden

12  Grove, California as a forensic fingerprint identification

13  expert.

14  Q      Okay.  And prior to that were you also in law

15  enforcement in any capacity?

16  A      Yes.

17  Q      What did you do?

18  A      Uniformed Services Los Angeles Police Department for 21

19  years.

20  Q      So how long have you worked in law enforcement in

21  total?

22  A      Approximately 41, 42 years.

23  Q      And the last 18 years have been as a fingerprint

24  expert?

25  A      Yes.

**WIL S. WILCOX, OFFICIAL FEDERAL REPORTER**

1    Q    What is your educational background?

2    A    I have an AA in administration of justice, a bachelor's

3    degree in behavioral science and a masters degree in human

4    behavior with additional graduate courses.  I've attended

5    the basic and advanced FBI fingerprint courses.

6         I've attended the Mississippi State Crime Lab palm

7    print comparison courses.  I've completed the year program

8    of study on fingerprint identification and chemical

9    processing at Garden Grove Police Department.  I've

10   completed the 1900 hour training program that the

11   Los Angeles County Sheriff's Department puts on.  I've

12   examined probably 250,000 fingerprints and worked seven and

13   a half years in the chemical processing unit.

14   Q    Sir, have you ever taught any classes or workshops on

15   fingerprint analysis?

16   A    Yes, I have.  I've taught fingerprint classes in

17   chemical processing, fingerprints evaluation and currently

18   teach criminal justice and forensic psychology.

19   Q    Have you previously testified as an expert in the

20   subject matter of fingerprint analysis?

21   A    Yes.

22   Q    And about how many times?

23   A    500.

24   Q    Have you ever met or spoken to the defendant in this

25   case?

52

1   A     No, I have not.

2   Q     Do you know who he is?

3   A     No, I do not.

4   Q     Were you involved in the investigation in any way?

5   A     No, I was not.

6   Q     Okay.  I want to ask you about a couple of terms that

7   you mentioned earlier.  You mentioned latent fingerprints.

8   What does that mean?

9   A     A latent fingerprint is that fingerprint that we as

10  humans would touch an item regardless of the surface, and

11  until we process it using chemicals and/or some form of

12  powder it cannot be seen with the naked eye.

13  Q     Okay.  So you said that as part of your job you compare

14  latent prints to known prints.  And what is a known print?

15  How did that compare to a latent print?

16  A     A known print is that fingerprint.  For example, if you

17  are a schoolteacher, if you are in some types of businesses,

18  you have to be fingerprinted for your business.  That's

19  where you apply ink to the fingers, to the palms and then

20  press it on an eight-by-eight inch fingerprint card, and

21  that is a known ink print.

22  Q     So latent prints are prints you can't see without some

23  sort of chemical analysis?

24  A     Chemical or powder, yes, ma'am.

25  Q     Chemical or powder analysis.  When developing latent

**WIL S. WILCOX, OFFICIAL FEDERAL REPORTER**

1    prints -- I'm sorry.

2        What does it mean to develop latent prints then?

3    A    Well, to develop a latent print it means you actually

4    apply a powder to a surface or a chemical to a surface to

5    enhance that print and bring it up so that you can see it

6    with the naked eye and then visibly compare it to a known

7    print.

8    Q    I see.  Have you developed latent prints before?

9    A    Yes.

10   Q    Around how many times conservatively speaking?

11   A    20,000.

12   Q    Are all latent prints that you develop usable for

13   identification?

14   A    No.

15   Q    Why is that?

16   A    On a lot of surfaces you will not always get a full

17   print or a partial print that's identifiable or usable

18   because of the material that's being examined or processed,

19   because of the fingerprints of the individual that you are

20   trying to locate.  It can be any number of things that would

21   cause you not to get a usable or what I would call an

22   identifiable fingerprint.

23   Q    Okay.  And I will probably ask you about some of those

24   factors in a minute.  But whenever someone touches something

25   with their fingers or with their palms, do they leave behind

1   a usable latent print in your experience?

2   A    Not always.

3   Q    Is it similar to what you may have seen on CSI or other

4   TV shows?

5   A    No.

6   Q    How is it different?

7   A    Well, that is TV and entertainment and it's done so

8   that you can watch a program, get enjoyment out of it, and

9   they accomplish things in minutes or a half an hour that

10  takes us sometimes years to accomplish.

11  Q    Sir, you led into this a little bit, but what factors

12  determine whether a latent print can be developed and then

13  used to compare with a known print?

14  A    Well, if I may start, I will start with an individual.

15  For example, for those of you in the jury box that may work

16  in construction trades, for those of you that may do a lot

17  of cooking or in the cook services type trades, if your

18  hands are around hot water, if your hands are around a lot

19  of lime and lye for the construction trades like masons and

20  bricklayers work around concrete, if you were a carpenter,

21  if you are an electrician and things like that, what happens

22  is that with the constant wear and tear on the fingerprints

23  they will either callus over, as we all know, or they will

24  have a tendency to swell up or be blocked with dirt, grease,

25  any number of substances that can prevent a fingerprint from

1  being left on an object.

2       Now to go to the object type of thing, it depends a lot

3  on the surface of the individual -- I'm sorry -- the surface

4  of the material, the finish of the material, the particular

5  type of material that's being tested.  For example, if I

6  were to handle a knife and say it's a table knife, I would

7  expect to leave a fingerprint on a table knife.

8       If I were handling a surface that had a very porous

9  material like a gun butt or a shotgun that has the slides

10  that have the grooves and things on them, I would not expect

11  to get a fingerprint because of the configuration of that

12  particular material and the moisture or the amino acids and

13  water that are left by the fingerprints would completely run

14  off or dissipate off of those type of surfaces.

15  Q    You mentioned a porous surface, what does that mean?

16  A    A porous surface would be like paper.  That's a very

17  porous surface.  Any paper product is a porous surface.

18  Money is a porous surface.  Shopping bags are porous

19  surfaces, things like that.

20  Q    Okay.  And I'd like to turn your attention to

21  specifically your experience about recovering latent prints

22  from firearms, and would you say that it's common to recover

23  usable latent prints from firearms?

24  A    I'm sorry.  Would you repeat that, please?

25  Q    I would.  Would you say that it's common to recover

1    usable latent prints from firearms?

2    A     No.

3    Q     Why is that?

4    A     Well, it depends on several things, again as I

5    mentioned.  It depends on the surface of the material.  Is

6    it a polished like a shiny mirrored finish, what we call a

7    nickel finish?  Is it a stainless steal?  Which is -- if you

8    are not familiar with weapons, a stainless steal is like a

9    brushed surface like somebody went over it with a brush, and

10   it's not really polished or a really fine surface.

11        Is it a blue steal that is really smooth?  Is it a

12   semi-automatic like a machine pistol that has a very rough

13   called a mate surface to it?  I would not expect to get a

14   print off those.

15        However, it also depends a lot on, how is it packaged?

16   Where is it found?  How is it carried?  Whether it's outside

17   or inside.  Climatic conditions have a lot to do with it.

18   Is it carried in a paper bag or a paper towel or a waistband

19   or in a gun case?

20        Fingerprints being about 98 and a half percent water,

21   the minute you touch them against any material such as your

22   clothing, bedding, towels or whatever, those fingerprints

23   are almost instantaneously gone.  As likewise, if you touch

24   it with your bare hands, it takes a few moments for those

25   amino acids and waters and fluids to start secreting again.

1    Q     In your career, sir, how many firearms would you say

2    that you have analyzed to recover latent prints?

3    A     Approximately 2,000.

4    Q     And of those 2,000 how many times have you been able to

5    recover latent prints?

6    A     Latent prints themselves maybe 60, 100 times.

7    Q     And of those 60 or 100 times of recovering latent

8    prints how many of those would be usable in comparing to a

9    known print?

10   A     Maybe two or three would be a conservative estimate.

11   Q     So out of 2,000, two or three times you've been able to

12   recover a print that's usable?

13   A     That I could use an identifiable print, yes, ma'am.

14   Q     What about ammunition?

15   A     I beg your pardon?

16   Q     Ammunition, have you analyzed ammunition for

17   fingerprints?

18   A     Oh, yes, I have.

19   Q     Are the factors similar in analyzing ammunition?

20   A     Yes, with a couple of known factors, additional things.

21   If the ammunition is fired, I would not expect to get a

22   fingerprint off a fired cartridge.  If it's a cartridge case

23   that's under a .45 caliber, I would not expect to get a

24   fingerprint because it's too small to get any real

25   fragmentation of a fingerprint ridges and things like that

1    on it.  You might get a smudge.  You might get a little bit

2    of fingerprint, but you would not get one that's usable for

3    a comparison identification.

4    Q    And you've said that's a cartridge that's smaller than

5    a .45 caliber?  Did I get the wording right?

6    A    Yes, ma'am.

7    Q    And is a cartridge the same thing as a bullet?

8    A    No, ma'am.

9    Q    So, I'm sorry.  I'm not familiar.  If you could explain

10   the difference between a cartridge and a bullet.

11   A    Yes.  A bullet is one that has not been fired yet

12   that's got the cartridge case, the primer in the end of it

13   and the full metal jacket case or lead ball or lead whatever

14   the bullet itself is.

15        When it's fired out of a weapon, whether it's a

16   handgun, a pistol, semiautomatic, shotgun, rifle or

17   whatever, once that firing pin strikes that primer, it

18   creates an explosion and a primer also ignites the powder

19   charge that's inside the cartridge.

20        Now once that happens you have a tremendous amount of

21   pressure, heat and flame that sends that bullet down the

22   barrel and out the muzzle of that particular weapon.  Now

23   you also have an equal and opposite back pressure with that

24   same amount of flame and heat and gases coming back that

25   causes a round in a semiautomatic to be extracted and

1    ejected out of that round.

2         But also, again, the fingerprints have so much water in

3    them -- instant evaporation.  And if it's a revolver it

4    completely encircles the cylinder and almost evaporates all

5    fingerprints that would be on those cartridges in that

6    revolver cylinder.

7         If it's a semiautomatic, the heat, the flame, the gases

8    in the backward motion travel down the butt where the weapon

9    magazine is put in and would also almost instantaneously

10   evaporate all signs of prints on all of those unfired

11   bullets.

12   Q    Is a .22 caliber ammunition smaller than a .45 caliber

13   ammunition?

14   A    Yes, it is.

15   Q    Have you ever been able to develop prints, useable

16   prints from .22 caliber ammunition?

17   A    No.

18            MS. WILLIAMS:  One moment, Your Honor.

19                      (Pause.)

20            MS. WILLIAMS:  No further questions.

21            THE COURT:  All right.  Cross.

22                    CROSS-EXAMINATION

23   BY MR. BAKMAN:

24   Q    Mr. Roberts, good morning.

25   A    Good morning, counsel.

60

1    Q    Tell me, Mr. Roberts, do you know whether or not the

2    San Bernardino Police Department has fingerprint experts

3    such as yourself working for them?

4    A    I can only presume, counsel.  They are a large agency.

5    I would presume they do.

6    Q    What about the ATF, the federal agency, do you think

7    they've got their own fingerprint experts too?

8    A    I know they do.  I have a friend that is employed by

9    them.

10   Q    Do you know why you were brought here to testify?  You

11   are from LA County Sheriff; is that right?

12   A    Yes, sir.

13   Q    You didn't have anything to do with this case, did you?

14   A    No, sir, I did not.

15   Q    Do you know why they picked you to come in?

16   A    Yes, sir, I do.

17   Q    Why is that?

18   A    Because of my expertise in negative testimony.

19   Q    And you don't think there is anybody in San Bernardino

20   that has the same expertise as you?

21   A    I would presume there is.

22   Q    And what about ATF?

23   A    I would presume there is also, sir.

24   Q    All right.  In this case, tell me something.  Since you

25   didn't have anything to do with the investigation, did you

**WIL S. WILCOX, OFFICIAL FEDERAL REPORTER**

1    ever examine any of the evidence recovered in this case?

2    A    I looked at the weapon yesterday, counsel.

3    Q    What about other evidence that was recovered?

4    A    I looked at the .22 caliber casings yesterday.

5    Q    Anything else?

6    A    I looked at the magazine yesterday also that fits in

7    above the semiautomatic.

8    Q    Okay.  So other than the gun, did you look at anything

9    else that was recovered in this case?

10   A    No, sir, I did not.

11   Q    Okay.  So you don't know what kind of surfaces there

12   are on any of the other evidence that was recovered in this

13   case; is that right?

14   A    That's correct.

15   Q    And no one asked you to attempt to lift a latent print

16   from the gun in this case, did they?

17   A    No, they did not.

18   Q    When you came in yesterday and you looked at the gun,

19   who was present with you?

20   A    The United States attorney generals that are sitting at

21   the people's table.

22   Q    I think you've elevated them up to generals.

23            MS. WILLIAMS:  Thank you.

24            THE WITNESS:  And ATF Agent, Ms. Kaighin, sitting

25   also at the table.

62

BY MR. BAKMAN:

Q    All right.  And so when you came in yesterday and you looked at the gun, did they ask you to try and lift a print?

A    No, sir, they did not.

Q    Did they ask you to dust it to see if there was a print?

A    No, sir, they did not.

Q    Did they tell you where the gun was found when it was seized?

A    Yes, they did.

Q    What did they say to you?

A    I understand that it was found in I believe a dresser or a drawer of some form in a room.

Q    All right.  So it wasn't found wrapped in a towel that would have absorbed the water from the latent print, correct?

A    That's my understanding, sir.

Q    It wasn't found inside somebody's waist band that again would absorb the water making a usable print unusable, was it?

A    That's my understanding, sir.

Q    And they didn't indicate to you that it had been fired just prior to the time it was found such that the heat or the pressure would destroy any prints that were on the surface of the weapon; is that right?

63

```
1   A    Yes, sir.  That's right.
2   Q    And they did not indicate to you -- Let me ask you
3   about the magazine.
4        Was the magazine stainless steel?  We've got it here if
5   you need to take a look at it.
6   A    If I may look at it, but I believe it is not a
7   stainless steel magazine.  It's a standard metal magazine --
8   Q    Sure.
9   A    -- with a spring.
10  Q    And so the magazine itself --
11       Is the gun a stainless steel gun, first off, or is it
12  nickel plate?
13  A    Yes, it appears to be stainless steel.
14  Q    And you've told us that stainless steel because of the
15  type of surface is difficult to get a latent print from it?
16  A    Yes.
17  Q    Not so with the magazine however, correct?
18  A    Oh, the magazine is the same way, sir.
19  Q    Well, does it matter if the magazine's blue steel
20  versus stainless steel?
21  A    No, it does not.
22  Q    Let me ask you this too, Mr. Roberts, if I could.
23  You've told us you've got a tremendous amount of experience
24  and you have -- I think you have examined or analyzed some
25  20,000 latents in your time; is that right?
```

1    A    Yes, sir.

2    Q    How many times do you think you've been called to a

3    stand in a criminal case to testify about fingerprints?

4    Let's start there.

5    A    I've been declared an expert over 500 times.

6    Q    So would you say -- just so that we are clear, would

7    you say that you've testified 500 times?

8    A    Yes, sir.  That's on the stand 500 times.

9    Q    Okay.  And out of those 500 times --

10            THE COURT:  Let me stop you for just a second.  I

11   just want to clarify.

12            You are saying that you testified 500 times as an

13   expert or testified 500 times during the course of, let's

14   say, a case you were actually involved in as a police

15   officer?

16            THE WITNESS:  I would have to say a combination,

17   Your Honor.

18            THE COURT:  Okay.

19   BY MR. BAKMAN:

20   Q    All right.  And what I'm going to ask you to do for me,

21   Mr. Roberts, is kind of give me an estimate, give us an

22   estimate on the 500 times that you testified percent-wise

23   how many times do you think -- what percentage of those

24   times involved you getting on the stand testifying as an

25   expert saying I got a print off this and I've analyzed the

65

```
 1    print and we've made a comparison.  How many times?
 2        What percentage of those 500 times do you think you
 3    were there to testify, in other words for a positive, to
 4    show that you got a print that was usable and you were able
 5    to make some type of an identification of a number of points
 6    on the print; do you understand?
 7    A    Are we still discussing strictly ballistics, sir?
 8    Q    No.  I'm talking about just fingerprint analysis in
 9    general and your 500 times that you were called to the stand
10    to testify.
11    A    I would say probably 80 percent, 85 percent of the
12    time.
13    Q    So in 85 percent of the time that the prosecution uses
14    you, they use you to come in and explain to a jury that
15    you've obtained the print that you've been able to identify
16    a portion of the print sufficient for a comparison with the
17    defendant that's sitting at the table, at the defense table;
18    is that right?
19    A    Yes, sir.
20    Q    And so how many times then would you say or what
21    percentage of the remaining 15 percent would you say that
22    the government or the prosecution called you to prove a
23    negative to explain why you can't get a print?
24    A    The other ten to 15 percent.
25    Q    It wouldn't be the entire 15 percent, would it?
```

1    A    No, sir.

2    Q    It would be a smaller percentage than that?

3    A    Yes.

4    Q    Is that right?

5    A    Yes, sir.

6    Q    So very seldom are you called to explain a negative so

7    to speak; is that right?

8    A    I can't answer that with a yes or no.  If I may, Your

9    Honor, and counsel.  It seems like the last two, three,

10   four, five years we are getting more and more and more

11   requests to go to court and testify as why we did not get a

12   print or why prints are not obtained and if we didn't get a

13   print, why not.  It's becoming more and more prevalent to do

14   negative testimony, why we did not get prints.

15   Q    Did anybody in this case tell you that they submitted

16   the gun or they submitted other evidence for latent print

17   testing but they weren't able to get prints off it?

18   A    No, they did not.

19   Q    Did they tell you that, hey, we've decided just not to

20   do that?

21   A    No, they did not.

22   Q    Do you think that makes a difference in terms of your

23   testimony if in fact law enforcement just doesn't even

24   bother in the first instance to ask for a latent prints?

25            MS. WILLIAMS:  Objection, argumentative.

**WIL S. WILCOX, OFFICIAL FEDERAL REPORTER**

67

| | |
|---|---|
| 1 | THE COURT:  I will sustain the objection. |
| 2 | MR. BAKMAN:  No further questions. |
| 3 | THE COURT:  All right.  Redirect. |
| 4 | **REDIRECT EXAMINATION** |
| 5 | BY MS. WILLIAMS: |
| 6 | Q    Mr. Roberts, do you know how the firearm that's at |
| 7 | issue in this case was placed into the drawer? |
| 8 | A    No, I do not. |
| 9 | Q    Hypothetically speaking, if a firearm is placed into |
| 10 | the drawer from a waistband or from a bag or from -- |
| 11 | MR. BAKMAN:  Objection.  There is no fact to |
| 12 | support that hypothetical. |
| 13 | MS. WILLIAMS:  That's why it's a hypothetical. |
| 14 | THE COURT:  Let me stop.  I will allow the |
| 15 | question. |
| 16 | BY MS. WILLIAMS: |
| 17 | Q    Hypothetically speaking, if someone were to have |
| 18 | carried a gun, a firearm into a room in a bag, in a jacket, |
| 19 | in a waistband and placed it into the drawer, would that |
| 20 | affect the ability to obtain usable prints? |
| 21 | A    No, it would not.  It would be very difficult to get a |
| 22 | usable print off an item if that had been carried in or |
| 23 | packaged, as the prosecutor or the government stated, |
| 24 | because number one, as I mentioned, fingerprints are very |
| 25 | fragile. |

**WIL S. WILCOX, OFFICIAL FEDERAL REPORTER**

```
 1        If I were to take a weapon, a knife as I mentioned or
 2   any other item that has a print and wipe it or brush it
 3   against my sleeve of my coat, against the friction that's
 4   created in a waistband or in a pocket or in a towel, it
 5   would eliminate the prints.  There would be none there.
 6   Q    So it would affect the ability to obtain fingerprints.
 7   I believe you explained that, but I just wanted to clarify.
 8   A    Yes, that's right.
 9             MR. BAKMAN:  Asked and answered.
10   BY MS. WILLIAMS:
11   Q    You discussed a little bit about a firearm being fired
12   and how that affects the ability to obtain prints.
13        In that analysis, does a firearm being fired affect
14   your ability to obtain prints only if it's been fired
15   immediately before obtaining the firearm or is it at any
16   time that it's been fired?
17   A    At any time that it's been fired.
18   Q    And you mentioned that in the last four or five years
19   you've been seeing a trend towards more testifying to
20   explain a negative why fingerprints are not always
21   recovered.  Do you know why that is?
22   A    Yes, I do.
23   Q    Why is that?
24   A    Because of television series such as CSI programs
25   Forensic Files, Cold Files, things of that nature.  The
```

```
 1  public is becoming more and more aware of exactly how things
 2  are done in a chemical crime processing -- excuse me.  Let
 3  me try it again -- a chemical crime scene processing scene.
 4  And therefore, they are wanting to know more and more, and
 5  they are not just accepting no longer you didn't get
 6  fingerprints.  The juries and the people want to know why
 7  you didn't get fingerprints and why it is not like it is on
 8  CSI or Forensic Files and things like that.
 9              MS. WILLIAMS:  Thank you, sir.  No further
10  questions.
11              THE COURT:  All right.  Any other questions?
12  BY MR. BAKMAN:
13  Q    Just one question.  Why you didn't you get
14  fingerprints, Mr. Roberts, presupposes that there was a
15  request in the first place to get the prints, doesn't it?
16  A    I don't know counsel.
17              MR. BAKMAN:  Nothing further.
18              THE COURT:  All right.  Any other questions?
19              MS. WILLIAMS:  Nothing further.
20              THE COURT:  All right.  The witness is excused.
21  Thank you very much, sir.
22              THE WITNESS:  Thank you, Your Honor.
23              THE COURT:  Let me ask the government, the
24  government's next witness?
25              MR. YANG:  The government rests, Your Honor.
```

```
 1            THE COURT:  All right.  Why don't we take a break
 2   at this point in time.  Let me ask the jury.  We will
 3   probably take a 15-minute break at this point.  All right.
 4   Thank you.
 5            (The jurors exited the courtroom.).
 6            THE COURT:  Mr. Backman.
 7            MR. BAKMAN:  Yes, Your Honor, before Mr. Colbert
 8   makes his decision as to whether he wants to testify or not,
 9   he is asking whether or not the Court would consider the
10   jury instructions that I submitted both last night and this
11   morning?
12            THE COURT:  I received the ones that you submitted
13   in regards to lesser included.
14            MR. BAKMAN:  Yes.
15            THE COURT:  Are there any others, other than
16   those?
17            MR. BAKMAN:  One was mere presence and the other
18   was eye witness identification.  I think the only two that
19   are relevant to this inquiry is the lesser included and the
20   mere presence instruction.
21            THE COURT:  Okay.  To be honest, I did not see
22   your mere presence.  Although, there was a prior request
23   from prior defense counsel in regards to mere presence.  Is
24   that the same thing?
25            MR. BAKMAN:  Yes.  Mine was from the
```

1   Ninth Circuit, Your Honor.  On the filing this morning I

2   included the annotated versions.  I wasn't able to print it

3   out for, Your Honor.

4           THE COURT:  Insofar as the lesser included is

5   concerned, let me just indicate.  Let me see if I have it.

6   I was looking up some cases in that regard.  The problem I

7   have with the defendant's lesser included -- there is a

8   number of cases.  I can give you the citations.  Let me see

9   if I can find the cases.  I haven't fully looked into these

10  items.

11          The case I was looking at was *United States versus*

12  *Sitton*, S-I-T-T-O-N, which is 968 F.2d 947 around the

13  page 959.  And there the Ninth Circuit held that a defendant

14  is entitled to a lesser included offense instruction when

15  the elements of the lesser offense are a subset of the

16  elements -- I'm sorry -- are a subset of the elements of the

17  charged offense and a factual basis supports such an

18  instruction.  Simple possession of a controlled substance is

19  a lesser included offense with respect to possession with

20  intent to distribute.

21          To establish the required factual basis, the

22  defendant must show that the jury could rationally find him

23  guilty of the lesser offense while acquitting him of the

24  greater.

25          But then the court goes on to say that where there

1   are large quantities of a drug and other evidence tending to

2   establish distribution, this court has declined to require a

3   possession instruction citing to such cases as -- I don't

4   have the full citation but, *Powell*, which is at 932 F.2d at

5   1342 and the *United States versus Espinoza*, 827 F.2d 604 at

6   615.  Under such circumstances no rational jury could

7   conclude that defendant possessed the drug without also

8   concluding that he intended to distribute it.

9          So in this situation if he is found to possess, I

10  presume he would be found to possess.  The drugs are in his

11  immediate presence which is an amount which would be in

12  excess of any personal use type situation.

13         MR. BAKMAN:  Sir, I disagree.  I think a rational

14  interpretation of the evidence is he was in the room, the

15  drugs were in the room and because of his presence in the

16  room he had control and dominion over the drugs.  But if

17  they were somebody else's, one of the other black males, he

18  may have had temporary possession without harboring an

19  intent to distribute.

20         This is very different.  You have a room with a

21  different registration.  The room is registered to somebody

22  else.  It may have been somebody else's drugs.  There

23  certainly is enough question that's been called into context

24  here about the identification of the individual who was

25  earlier distributing the drugs, and again there is nothing

WIL S. WILCOX, OFFICIAL FEDERAL REPORTER

73

1  to --

2         THE COURT:  That's the problem though.  Either he

3  is in possession of the drugs or he's not in possession of

4  the drugs.  In other words, he can't claim a portion of it

5  and say the rest isn't mine.  So he's arguing nonpossession.

6  In other words, I can understand your claim that he's

7  claiming that he doesn't have any possession, they are not

8  his.  I can understand that as a claim.  But if he's going

9  to say that I had some, what some?

10        MR. BAKMAN:  He could be in the room with the

11  drugs and therefore he is in possession of those drugs but

12  doesn't have an intent to distribute them, and simply by

13  virtue of the fact --

14        THE COURT:  He would not have possession of them.

15  In other words, the mere presence of him with the drugs does

16  not show possession.

17        MR. BAKMAN:  Well, I think if you are talking

18  about dominion and control, if he is in the room and nobody

19  else is in the room the jury could find that he had the

20  sufficient dominion and control to support a conviction for

21  possession but not possession to distribute.  So the jury

22  alternatively can find, one, either mere presence and he

23  didn't have possession, or two, that he was in the room and

24  he had something to do with something but not an intent to

25  distribute.

```
 1              THE COURT:  Let me hear from the government.
 2    What's the government's response?
 3              MR. YANG:  Your Honor, I think the court's right.
 4    It seems like it's inconsistent.  He's either in possession
 5    with intent or he's not in possession.  There is no -- this
 6    gray area that defense is trying to carve out.  It's
 7    confusing.
 8              MR. BAKMAN:  If he's a temporary visitor in the
 9    room, just happened to be there when they knock down the
10    door, the argument could be made that he is in possession of
11    the drugs.
12              THE COURT:  Not legally.
13              MR. BAKMAN:  I think so.
14              THE COURT:  You have to have the intent to
15    possess.  He doesn't have the intent to possess.  In other
16    words, his mere presence in a room which has drugs in it --
17    for example, if I walk into a party and there are people
18    around the room smoking marijuana, that doesn't mean I am
19    possessing that marijuana.  I have no intent to possess that
20    marijuana, the marijuana belongs to other people.
21              MR. BAKMAN:  I think the jury could find either
22    way, Your Honor.
23              THE COURT:  I don't think the jury -- it does not
24    make sense.  Either it is not possession at that point in
25    time, in other words he has no intent to exercise any
```

75

1    dominion or control over it.

2            MR. BAKMAN:  Well, I think the jury can infer that

3    if they believe that he was counting money.

4            THE COURT:  No.  If he's counting money, then he's

5    part and parcel of an overall drug operation.

6            MR. BAKMAN:  Well, I am asking for the lesser

7    included in this case.

8            THE COURT:  I am not going to give the lesser

9    included in this particular situation because it does not

10   come into play.

11           MR. BAKMAN:  The Court will give the mere

12   presence?

13           THE COURT:  I don't know.  Let me just make sure I

14   understand what the mere presence instruction is.

15           MR. YANG:  Your Honor, I don't know if the Court

16   received the government's objections which were filed last

17   night.

18           THE COURT:  Let me take a look.  If it's Document

19   Number 137, I did receive 137.  Let me take a look.

20           MR. BAKMAN:  Your Honor, in terms of just a

21   revisit to the lesser included.

22           THE COURT:  Yes.

23           MR. BAKMAN:  I believe that this jury could find

24   that Mr. Colbert was a buyer of the cocaine, and therefore,

25   he was in the room with an intent to possess some, if not

1    all of the cocaine as a buyer.  And therefore, if in fact he

2    is a buyer of the cocaine, he's not in possession of the

3    weapon to use in furtherance of a drug activity and he does

4    not possess all of that cocaine with an intent to

5    distribute.

6              I think very easily from all of the totality of

7    the evidence in this case with the number of runners, the

8    number of buyers in the area, the testimony of Walker that

9    this is a high narcotic area where there are buyers and

10   users predominantly present in the location, the fact that

11   motels are commonly used to sell and buy narcotics, that

12   this jury could very easily find that my client was a

13   purchaser, that's why he was in the room.  And therefore, he

14   possessed some cocaine in that room for his own use.  The

15   totality of the circumstances does not diminish that

16   argument.  And I think the lesser included of simple

17   possession is appropriate in this case.

18             THE COURT:  I would disagree.  First of all, there

19   is no evidence that he's a user in the sense that he is not

20   carrying with him any indicia of use or intended use.  The

21   testimony is he has no paraphernalia to use the particular

22   item.

23             Secondly, normally when you have a buyer and

24   seller you have the presence of a buyer and seller.  There

25   is nobody else in the room but him at that point in time.

1   He's not counting out his money.  He's counting out the

2   money that's been collected from apparently drug sales.  So

3   there is no indicia of his status as a buyer.

4           MR. BAKMAN:  Well, that's because they didn't

5   search room 217.  We don't know if there was drug

6   paraphernalia or a pipe in room 217 --

7           THE COURT:  Let me stop.

8           MR. BAKMAN:  -- the room that was registered to

9   him.

10          THE COURT:  Let me stop.  We held a hearing on

11  this issue.  And let me ask, am I not to consider the

12  testimony that I heard in the other motions because we

13  already know, we already have that testimony and it's within

14  my knowledge.  So that's the problem that I have.  Are you

15  saying that I cannot consider his testimony in that regard?

16          MR. BAKMAN:  I don't believe -- I think you can

17  consider that testimony, but I think it's what can be argued

18  rationally and reasonably within the evidence that's been

19  presented by the government.  And I certainly believe that's

20  a reasonable inference from the circumstantial evidence in

21  this case.

22          THE COURT:  Because there was no evidence that

23  there was any use of paraphernalia that was found in 217,

24  and he's already testified that he had moved from 217 into

25  220 and so he's not a buyer in that sense.

**WIL S. WILCOX, OFFICIAL FEDERAL REPORTER**

1        MR. BAKMAN:  Well, I'm not going to be arguing to

2    the jury clearly what he testified to, but I am going to be

3    arguing inferences from the testimony that's been elicited

4    thus far in this case, and that is going to be an argument

5    that he was a buyer.

6        THE COURT:  Let me hear from the government.

7        MR. YANG:  Your Honor, I think he can certainly

8    argue that.  And the elements of the 841 charge, the

9    possession with intent already adequately cover what defense

10   counsel wants to argue, that is that the government has to

11   prove that he knowingly possessed cocaine base and that he

12   possessed it with the intent to distribute to deliver to

13   another person.

14       If he's going to argue that he happened to be a

15   buyer in there or whatever, then he does not possess it with

16   the intent to distribute to another person.  It's already

17   adequately covered in the elements of the instructions that

18   the Court is going to be giving.

19       THE COURT:  All right.

20       MR. YANG:  And that's the mere presence analysis

21   as cited by the government in its objection.

22       So I think, Your Honor, just to be on the safe

23   side, I don't know if the Court can properly consider the

24   evidence that was developed in the suppression hearing.  But

25   I think the Court doesn't even need to consider that.  As a

1  matter of law, the elements are covered by -- the mere

2  presence instruction is already covered by the elements of

3  the possession with intent to distribute charge and the

4  lesser included.

5          THE COURT:  I didn't catch the last part of it.

6  What did you say about the lesser included?

7          MR. YANG:  I think the lesser included and the

8  mere presence are similar is that both are adequately

9  covered by the possession.

10          THE COURT:  No they are not.  Because there is a

11  difference.  In other words, if they are adequately covered

12  I have to give the lesser included.

13          MS. WILLIAMS:  If I may, Your Honor.

14          THE COURT:  In other words, if they are adequately

15  covered I cannot, not give the lesser included.  Basically,

16  I have to make a determination that no rational juror could

17  find on the basis of the evidence that the elements of the

18  lesser are present.  So your argument is wrong.

19          MR. YANG:  Your Honor is correct.  I confused the

20  two.

21          MS. WILLIAMS:  And just to clarify.

22          MR. BAKMAN:  Two bites of the apple again, Your

23  Honor.

24          THE COURT:  Again, if it saves her from passing

25  the notes, it saves us time.

**WIL S. WILCOX, OFFICIAL FEDERAL REPORTER**

1          MS. WILLIAMS:  The instruction for the current

2    charge adequately covers the issue raised by counsel because

3    he can still argue to the jury that he did not possess it

4    with the intent to distribute.  If he wants to argue that he

5    was there as a buyer, there is no evidence to that.

6          THE COURT:  That's my point.  My point is this.

7    In other words, if he admits to possession he can't admit to

8    part in this particular situation because of what the cases

9    in the Ninth Circuit have talked about.

10          Again, he's there by himself in the room.  There

11    are all of these -- a vast quantity of drugs which is

12    clearly not a personal use type of situation.  He's counting

13    the money.  He doesn't have any individual devices to

14    utilize that contraband.  All of those things are such that

15    under the language of the *Sitton* case and the cases cited

16    therein it's not a simple possession case, and once he

17    claims possession he can't just claim part.

18          MR. BAKMAN:  Well, I take it the Court is not

19    going to prevent me from arguing that.

20          THE COURT:  I will allow you -- well, I don't

21    understand.  In other words, you are going to argue that he

22    only intended to possess something?

23          MR. BAKMAN:  I'm going to argue that he may

24    possibly have been a buyer there.

25          THE COURT:  I will allow you to argue that, yes.

```
 1    I will allow you to argue that the government has not proved
 2    beyond a reasonable doubt a possession of intent to
 3    distribute, which is obviously one of the elements of their
 4    case in chief.  Frankly, since you can argue that the lesser
 5    included -- well, I have already made my ruling on that.
 6    All right.
 7              And as to mere presence, let me just take a look
 8    at the cases.
 9                            (Pause.)
10              THE COURT:  Let me just ask, Mr. Bakman.  Even the
11    Ninth Circuit comments says:  Such a mere presence
12    instruction is unnecessary if the government's case is not
13    solely based on the defendant's presence and the jury has
14    been instructed on the elements of the crime.
15              So why would I give the mere presence instruction
16    in this particular situation?
17              MR. BAKMAN:  Well, I think their case is basically
18    premised upon his presence in that room.
19              THE COURT:  Well, it's based in part on his
20    presence in the room, but it's also based on the fact of his
21    presence in the room counting the money.  He's made a
22    statement as to where the gun was in that particular
23    situation.  Also, there is testimony that he was seen by the
24    law enforcement officers, whether or not the jury finds that
25    testimony credible or not.  There is this other testimony as
```

1    to his activities in or around the area over a period of

2    time, which is not an indicia of a buyer because a buyer

3    does not linger in that particular area.

4          MR. BAKMAN:  Those are arguments, Your Honor.  How

5    does the mere presence instruction prejudice the government

6    in any way in this case?

7          It certainly is an appropriate argument to make

8    based on the evidence, and the jury instruction itself does

9    not mislead the jury.  It does not misstate any portion --

10   it doesn't misstate the law to the jury, and it's certainly

11   supported by the evidence in this case.  A reasonable

12   argument that can be made by the defense is that the

13   defendant is merely present in the room.

14         THE COURT:  All right.  Let me hear a response

15   from the government.

16         MR. YANG:  Your Honor, the Court's correct.  The

17   elements -- first of all, the government's case is not based

18   on merely defendant's presence in that room.  Had the

19   government only presented evidence that they went into the

20   room and defendant was just sitting there and this was the

21   only evidence that the government presented, yes, then

22   perhaps the mere presence instruction should be given.

23         However, here defendant's caught sitting in a room

24   counting money, which includes among other things, Your

25   Honor, the bill that was used by Officer White to make the

1  previous purchase of crack cocaine.  Defendant indicates

2  where the gun is.  There is multiple items inside the room

3  indicating defendant's possession of the room, and then two

4  hours before that defendant was seen on the landing

5  giving -- rejecting the female in the tracksuit as Officer

6  White stood there looking at him trying to negotiate a crack

7  transaction watching the female try to negotiate a crack

8  transaction.

9          And then, Your Honor, after the crack transaction

10  was completed, Officer White gives the female with the

11  tracksuit a $10 bill that's prerecorded and that $10 bill is

12  also found in the room where defendant is.  So the

13  government's case is based much more that on mere presence.

14  There is much more than that here, and that instruction

15  should not be given.

16          MR. BAKMAN:  My point is this, Your Honor.  The

17  jury can reject everything else other than mere presence in

18  this case.  If they do reject the earlier identification and

19  they reject the notion that my client was sitting there

20  counting money as officers were trampling down the second

21  story floor and then barging into the room after giving

22  knock notice, then they are left with mere presence, and

23  without direction from the Court it's patently unfair to the

24  defense.  As I indicated, it doesn't prejudice the

25  government in any way, the giving of that instruction.

1        THE COURT:  It does in the sense that it indicates

2   that the Court at least has not found all of the other

3   evidence to be worthy of reference.  In other words, this is

4   not a mere presence case by any way, shape or form.  You can

5   argue the argument that you want to make, but I don't feel I

6   have to instruct on something which, you know, under the

7   Ninth Circuit decision *Sitton*, and I also refer to the one

8   that's cited in the comments, *United States versus Gooch*,

9   G-O-O-C-H, 506 F.3d at 1156 at page, roughly, it's about

10   1160.  It stands that it's not error for the court to refuse

11   to give such an instruction where the government's case is

12   resting on more than the defendant's presence at a location,

13   and it's clear here that the government's case is resting on

14   more than that.

15        All right.  So that's how I would rule on those

16   two jury instructions.

17        How much more time do you think you need to talk

18   with your client?

19        MR. BAKMAN:  About five minutes.

20        THE COURT:  Okay.

21        *(Counsel and his client conferred.)*

22        THE COURT:  Please remain seated and come to

23   order.

24        All right.  Let me ask.  Mr. Bakman, what's the

25   situation?

```
1              MR. BAKMAN:  Your Honor, I'd ask that we be able

2    to address the Court outside the presence of the government.

3              THE COURT:  All right.  Let me ask the government

4    to be excused for a moment.

5              MR. YANG:  Certainly, Your Honor.

6

7                   (The following proceedings from page 86

8          through 97 were ordered sealed.)

9    / / /

10   / / /

11   / / /

12   / / /

13   / / /

14   / / /

15   / / /

16   / / /

17   / / /

18   / / /

19   / / /

20   / / /

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /
```

WIL S. WILCOX, OFFICIAL FEDERAL REPORTER

1    LOS ANGELES, CA.; FRIDAY, NOVEMBER 19, 2010; 11:38 A.M.

2                              * * * * *

3                              -oOo-

4         (Proceedings resumed in open court as follows):

5         THE COURT:  Let me ask the government counsel.

6    The defendant is contemplating testifying.  If he testifies,

7    what is the government's position vis-a-vis are you going to

8    be utilizing any alleged prior convictions to attempt to

9    impeach him?

10        MS. WILLIAMS:  The government's position is it

11   wouldn't intend to introduce the prior conviction.  It may

12   use the fact that the defendant had been around drugs

13   before.

14        THE COURT:  But that would only depend upon the

15   nature -- in other words, if he denies any prior experience

16   with drugs, you would be utilizing the conviction not for

17   the purpose of just showing the conviction of him but to

18   just show that he has had prior experience with drugs?

19        MS. WILLIAMS:  Correct.

20        THE COURT:  Okay.  All right.

21        Let me ask.  Is there anything else I need to do

22   before I bring the jury back?

23        MR. BAKMAN:  I would ask the Court to inquire

24   whether or not if Mr. Colbert testifies the government

25   intends to use Officer Beall in rebuttal to discuss the

1   confession, because we will have to litigate the propriety

2   of that since it wasn't being offered in their case in

3   chief.

4           THE COURT:  All right.

5           MS. WILLIAMS:  The government would not seek to

6   call Officer Beall.

7           THE COURT:  Okay.

8           MS. WILLIAMS:  And in light of that will not ask

9   questions about the confession in cross-examination.

10  However, the text message would be inquired into for

11  purposes of cross-examination only.

12          THE COURT:  The text message on the phone?

13          MS. WILLIAMS:  The text message on the phone.

14          MR. BAKMAN:  And I would make a motion to exclude

15  any evidence of the text messages.

16          THE COURT:  On what basis?

17          MR. BAKMAN:  403.

18          THE COURT:  It depends on what he says.

19          All right.

20          MS. WILLIAMS:  Just so that everybody is clear,

21  the government would also seek to use statements that were

22  elicited at a prior hearing.

23          THE COURT:  Okay.

24          MR. BAKMAN:  If I could have a copy of the

25  transcript, please, and I think the government's going to

**WIL S. WILCOX, OFFICIAL FEDERAL REPORTER**

1   need a copy of the transcript for Mr. Colbert if they are

2   going to examine him on that.

3            THE COURT:  All right.  Do you have copies?

4            MS. WILLIAMS:  I probably can get another copy,

5   but I may need to make additional copies for the defendant.

6            THE COURT:  All right.  We are taking a break

7   around noon anyway because I have a court meeting to go to.

8   So why don't we just start.  And if it comes to a point

9   where we absolutely need the transcript and we can't go

10  forward, then we will stop at that point in time, but

11  otherwise we will continue and then we can make copies over

12  lunch.

13           MR. BAKMAN:  Very well.

14           THE COURT:  All right.

15           MR. YANG:  Your Honor, I do have an extra copy.

16           THE COURT:  I don't need a copy at this point in

17  time.

18           MR. BAKMAN:  I would.

19           THE COURT:  I think Mr. Bakman is the one who

20  needs a copy.

21           Before we start again, let me just have the dates

22  because I think I actually have myself transcripts of

23  various hearings already.

24           I have the transcript of the hearing from

25  December 11th, 2009, and the transcript of the hearing from

```
 1    December 14th, 2009, and also from the October 6th, 2009.
 2              MR. YANG:  That's the one, Your Honor, the
 3    October 6th.
 4              THE COURT:  October 6th, all right.  I have those
 5    already.  All right.
 6              Javier, you can bring in the jury.
 7                 (The jurors entered the courtroom.)
 8              THE COURT:  All right.  Let me ask the defense.
 9    Does the defense wish to present any evidence?
10              MR. BAKMAN:  Yes, Your Honor, and before I do that
11    I would reserve on a motion.
12              THE COURT:  All right.
13              MR. BAKMAN:  With that understanding, we would
14    call Calvin Colbert.
15              THE COURT:  All right.  Let me have the defendant
16    approach the stand and my clerk will swear him in.
17              THE CLERK:  Please raise your right hand.
18              Do you solemnly swear that the testimony you shall
19    give in the cause now before this court shall be the truth,
20    the whole truth, and nothing but the truth, so help you God?
21              THE DEFENDANT:  Yes, sir.
22              THE CLERK:  Please have a seat.  State your name
23    and spell your last name for the record.
24              THE DEFENDANT:  My name is Calvin Colbert.
25    C-A-L-V-I-N, and Colbert, C-O-L-B-E-R-T.
```

**WIL S. WILCOX, OFFICIAL FEDERAL REPORTER**

1           DIRECT EXAMINATION

2    BY MR. BAKMAN:

3    Q    And Mr. Colbert, turning your attention to March 9th of

4    2009, did you register as an occupant at the Economy Inn in

5    San Bernardino?

6    A    Yes, sir.

7    Q    And when you registered, what room number were you

8    given?

9    A    I was given room number 217.

10   Q    Did you check in?

11   A    Yes.

12   Q    And what was the reason for your going to the

13   Economy Inn on March 9th?

14   A    Well, I had a female friend that's in the area of

15   San Bernardino, and I went on March '09 to go visit this

16   female friend.

17   Q    How long was your stay?

18   A    My stay was for about until I left again on March 10th,

19   and then I came back that same day.  So it was about until

20   March 11th until I got arrested.

21   Q    And at some point in time did you move rooms from 217

22   into 220?

23   A    Yes, sir.

24   Q    And can you tell the jury, sir, how it came about that

25   you moved from 217 into 220?

1   A     Well, room 217 was about to -- was on its way at

2   checkout time on March 11.  So prior to getting a notice

3   from the maid that it was checkout time, I took my

4   belongings and I was preparing them for moving to leave to

5   go back to Los Angeles.

6         And then I was notified through a text message that my

7   ride wouldn't be able to come.  So with that being said, I

8   waited for a little while longer, got another phone call.

9   They told me the reasons why I wouldn't be able to get a

10  ride.  Then I decided to stay a little, so I decided to stay

11  a little longer.

12        I was going to stay a little longer at the Greyhound

13  bus station, but I didn't want to bring my things over there

14  too and just wait there.  So what I decided to do was to try

15  to find another place to stay or another place to put my

16  belongings, and then this is how I came about Jamine

17  Marshell.

18        I saw him, and I talked to him.  I spoke with him

19  several times before this incident.  We had a couple of

20  talks maybe about two or three months ago.  It's been around

21  that time, somewhere around that nature.  We had a few

22  talks.  So that's how I pretty much knew him.  But this time

23  I asked him would he allow me to put my things in his room.

24  He stated that he would.  So then I went, and I stored my

25  things in his motel room.

104

1    Now later on he brought up the issue.  It was a dispute

2  about a key that he had.  He didn't have a key.  So what he

3  wanted me to do was is he was offering me a proposition.

4  The proposition was that I would be able to keep the room

5  until the entire stay which would allow me to stay until the

6  12th.

7    So he said if I would be able to give him -- I think it

8  was $25 for the motel room and some extra change later on

9  that day, he would allow me to stay in the room and just

10  take over the room completely.  So with that being in mind,

11  I went with him to the motel lady.  It was a manager, the

12  manager, and it was a male manager.

13    I went with him to the male manager and the motel lady

14  and I spoke with them and they wanted Jamine to produce the

15  $25 that he was needing.  So they asked Jamine -- no.  They

16  asked me.  My mistake.  They asked me.  They asked me to

17  produce it.

18  Q    Who asked you?

19  A    Well, the clerk manager, he asked me.

20  Q    He asked you what?

21  A    He asked me that he wanted that he would need $25

22  because Jamine had lost a remote, a remote control of some

23  sort.  I think it was a remote control.  He lost a remote

24  control.

25  Q    Let me stop you for a minute.

**WIL S. WILCOX, OFFICIAL FEDERAL REPORTER**

105

```
1          The transaction for you to go into room 220, did that
2    take place in the presence of the hotel manager?
3    A    Yes.
4    Q    Who did you pay the $25 to?
5    A    I paid it to the hotel manager.
6    Q    And the $25 was the security deposit for the remote
7    control; is that right?
8    A    Yes, sir.
9    Q    Had Jamine Marshell lost the remote control for that
10   room?
11   A    Yes, sir.
12   Q    So after you paid the money to the manager, what day
13   was that, was that March 11th?
14   A    That was March 11.
15   Q    And then did you take your belongings from room 217
16   into room 220?
17   A    Yes.
18   Q    Did you ever have a white jacket that day?
19   A    No, not at all.
20   Q    Did you have a white jacket in your belongings?
21   A    Not at all.
22   Q    Did the police ever find the white jacket in your
23   belongings?
24            MS. WILLIAMS:  Objection, calls for speculation.
25            THE DEFENDANT:  No, not at all.
```

**WIL S. WILCOX, OFFICIAL FEDERAL REPORTER**

106

```
 1            THE COURT:  Again, let me instruct the witness.
 2   Don't answer if there is an objection until I have an
 3   opportunity to rule on the objection.
 4            I will sustain the objection.  I will strike that
 5   last answer.
 6            However, counsel, if you want to, you can attempt
 7   to rephrase the question.
 8            MR. BAKMAN:  All right, Your Honor.
 9   Q    You've reviewed discovery in this case that was
10   provided to both you and myself and your prior attorney,
11   have you?
12   A    Yes.
13   Q    And you've reviewed the return to the search warrant,
14   have you?
15   A    Yes.
16   Q    In your review of any of the discovery, did you see
17   anywhere where the police recovered a white jacket from room
18   220?
19            MR. YANG:  Objection, hearsay.
20            THE COURT:  I will sustain the objection.
21   BY MR. BAKMAN:
22   Q    You never had a white jacket?
23   A    I never had a white jacket.
24   Q    You saw a videotape played in court with someone on the
25   second floor landing.  Do you remember seeing that?
```

**WIL S. WILCOX, OFFICIAL FEDERAL REPORTER**

1    A    Yes, sir.

2    Q    You viewed that videotape quite a number of times

3    before coming into court and to trial here; is that right?

4    A    Yes.

5    Q    Was that you on the second floor landing?

6    A    No, it wasn't.

7    Q    Was that you talking to Officer White on the second

8    floor landing?

9    A    No, I never talked to Officer White.

10   Q    When you went into room 220, did you see the drugs?

11   A    No.  I did not see the drugs in room 220.

12   Q    What did you see in room 220?

13   A    When I went into room 220 I saw a lot of things.  One

14   of the things I saw was the bed was kind of unneat and

15   wasn't kept right.  And there was clothes scattered on top

16   of the bed, and then I saw on the dresser, I saw a scale.  I

17   saw a scale on the dresser.  This is when you walk into room

18   220, there was a scale.  There was a scale on the first

19   dresser, not the one in the corner, but on the first

20   dresser, and I placed my water bottles right there.  I

21   placed a water bottle right there, and I placed my hygiene

22   right there and I also took my bags and I placed it on the

23   side.  It's not in any of the pictures, but it's right by

24   the air conditioner, and then after that I went to the

25   restroom, checked out the restroom and then went back to

108

1    room 217.

2    Q    Were you at the motel to sell drugs?

3    A    No, sir.

4    Q    The cocaine that's in the pictures that were found when

5    you were in room 220, is that your cocaine?

6    A    No, sir.

7    Q    Whose cocaine was it?

8    A    I don't know, but I can pretty much assume whose it

9    was.

10   Q    I don't want you to assume.

11        Who was in the room shortly before you went in before

12   the search warrant was executed?

13   A    Before I went into the room I was present in the room

14   with a female.  I didn't really know her name and I also was

15   present with Jamine and I was present with some other guy.

16   There was another guy too in the room and another one came

17   later on that time.

18   Q    What was Jamine Marshell doing when you were there?

19   A    Well, when I was there he was coming to drop and

20   transfer his belongings.  He wanted to move, he wanted to

21   take his stuff and move out also.  So he was coming with

22   other things and he needed some more time in the room.

23   Q    The gun that the police found in room 220, was that

24   yours?

25   A    No, sir.

**WIL S. WILCOX, OFFICIAL FEDERAL REPORTER**

1  Q     Had you ever touched it?

2  A     I never touched it.

3  Q     Did you ever tell Officer Beall that that was your gun?

4  A     No.  That was a mischaracterization of his questions.

5  Q     When he was questioning you, where were you?

6  A     When he was questioning me I was -- face down, prone

7  position, or not prone, hands behind my back.  I had cuffs

8  on and he had a knee in the side of my head with a gun and

9  he was asking me questions.

10  Q     Did the police break down the door when you were in

11  there?

12  A     Yes, sir.

13  Q     When you were in there and the police were breaking

14  down the door, you've heard testimony that you were in a

15  chair counting money?

16  A     No, I wasn't.  I would never be in a chair counting

17  money.

18  Q     Where were you when the police broke down the door?

19  A     Well, when the police broke down the door I was

20  standing next to the TV.  I was still on my phone.  I had my

21  phone in the charger.  My phone was dying out on me, so I

22  was on the phone talking.  And now when I heard the police

23  knocking and screaming I put down the phone.  I went to the

24  door, and they knocked down the door.  Then I turned around.

25  I turned around to make sure my back was facing them, and

1  then I laid down on the floor.

2  Q     During the search of room 220 did Jamine Marshell show

3  up?

4  A     Yes.

5  Q     Tell us about that.

6  A     Well, during the search -- a little bit before the

7  search, I think it was not during the search but when I came

8  out, so it might have been after the search.  I don't know

9  what they were doing in the room.  It more than likely was

10 after the search.  So after they finished searching I was

11 brought up and I was walked out of the room, I was walked

12 out by -- I don't know what officer.  I think it was Officer

13 Beall.  I think Officer Beall is the one that walked me out

14 of the room.  I'm not for sure though.

15      But I was walked out of the room by one of the

16 officers, and when I was walked of the room I was set on a

17 patio and I was questioned.  But before I was questioned, I

18 was asked, well, do you know anything about a Jamine or do I

19 know anything about a monster or some name, it was a couple

20 other nicknames he asked me.  And I told him I didn't know.

21      Then it was another guy that came up around the stairs.

22 He was coming up towards the stairs, and the officer looked

23 at the guy.  And then the guy turned around and ran back and

24 walked right back down the stairs.  Then another guy came,

25 and then that's when the officers seen that, that was

111

1    Jamine, so he told Jamine to leave.

2    Q    Did you transport drugs from room 217 to room 220?

3    A    No, sir.

4    Q    When you moved your belongings from 217 to 220, how

5    many bags did you have?

6    A    I had about I would say about four or three bags.

7    Q    What kind of bags were they?

8    A    I had plastic bags and I had like a Colgate bag.  It

9    was a Colgate overnight bag.

10   Q    Well, did the police search the Colgate bag?

11   A    Yes.

12   Q    To your knowledge did they find any cocaine residue in

13   the Colgate bag?

14   A    No.

15   Q    Did they find any cocaine residue in any of your bags?

16          MS. WILLIAMS:  Objection, calls for speculation.

17          THE COURT:  I will sustain the objection.

18   BY MR. BAKMAN

19   Q    Did the police while you were present in room 220 --

20   let's take it a step further.  When you were arrested, you

21   were taken to the police station?

22   A    Yes.  No, not the police station.  I was taken to

23   San Bernardino Jail.

24   Q    Did the police ever show you your bags and say, look,

25   there is cocaine residue in your bags?

**WIL S. WILCOX, OFFICIAL FEDERAL REPORTER**

112

1    A    No.

2    Q    When the police came into the room and they executed

3    the search warrant, did you have any cocaine residue on your

4    hands?

5    A    No, sir.

6    Q    Had you ever touched any cocaine in room 220?

7    A    I never touched any cocaine at all.

8    Q    How tall are you?

9    A    I'm six-feet, three-inches or six-feet, two-inches,

10   something in that nature of six-two, six-three.

11   Q    Back on March 11th of 2009, how much did you weigh?

12   A    I weighed about 200 pounds.

13   Q    Have you lost weight since then?

14   A    I lost a little weight.

15   Q    They don't feed you real good at the --

16            MS. WILLIAMS:  Objection.

17            THE COURT:  I will sustain that one.

18   BY MR. BAKMAN

19   Q    How old are you?

20   A    I'm 22.

21   Q    What's your date of birth?

22   A    12/30/87.

23   Q    How old were you on March 11th, 2009?

24            MS. WILLIAMS:  Objection, relevance.

25            THE COURT:  Overruled.

**WIL S. WILCOX, OFFICIAL FEDERAL REPORTER**

1          THE DEFENDANT:  I was 21.

2          MR. BAKMAN:  Your Honor, this might be a good time

3     to break if we might.

4          THE COURT:  All right.  Let me indicate, ladies

5     and gentlemen, why don't we start again at five after 1:00.

6     All right.  Thank you.

7               *(The jurors exited the courtroom.)*

8          THE COURT:  All right.  Anything else, Mr. Bakman?

9          MR. BAKMAN:  No, Your Honor.

10         THE COURT:  Let me see you guys back at 1:00.

11         MR. BAKMAN:  Your Honor, might we keep him here in

12    the courtroom for say 15 minutes?

13         THE COURT:  Let me ask the marshal, any problem

14    with that?

15         U.S. MARSHAL:  No problem with that, Your Honor.

16

17              *(Court recessed at 12:00 p.m. to reconvene at 1:00*

18    *p.m., November 19, 2010.)*

19

20

21

22

23

24

25

**WIL S. WILCOX, OFFICIAL FEDERAL REPORTER**

--oOo--

CERTIFICATE


1

2

3

4

5          I hereby certify that pursuant to Section 753,

6     Title 28, United States Code, the foregoing is a true and

7     correct transcript of the stenographically reported

8     proceedings held in the above-entitled matter and that the

9     transcript page format is in conformance with the

10    regulations of the Judicial Conference of the United States.

11

12    Date:  February 24, 2011

13

14

15                          s/_____

16                              WIL S. WILCOX
                                U.S. COURT REPORTER
17                                CSR NO. 9178

18

19

20

21

22

23

24

25

**WIL S. WILCOX, OFFICIAL FEDERAL REPORTER**

1

1            UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA

3                 WESTERN DIVISION

4      THE HONORABLE GEORGE H. WU, JUDGE PRESIDING

5

6   UNITED STATES OF AMERICA,        )
                                     )
7                    Plaintiff,      )
                                     )
8         vs.                        ) NO. CR 09-301-GW
                                     )
9   CALVIN CHARLES COLBERT, JR.,     )
                                     )
10                   Defendant.      )
    _____ )

11

12

13

14         REPORTER'S TRANSCRIPT OF PROCEEDINGS

15              Los Angeles, California

16

17       Thursday, November 19, 2010, 1:08 P.M.

18

19      Testimony of Calvin Charles Colbert, Jr.

20

21

22                      PAT CUNEO CSR 1600, CRR-CM
                        Official Reporter
23                      Roybal Federal Building
                        255 East Temple Street
24                      Room 181-E
                        Los Angeles, CA  90012
25                      (213) 617-1817
                        grammacuneo@aol.com

2

```
 1    APPEARANCES:

 2    FOR THE PLAINTIFF:    ANDRÉ BIROTTE, JR.
                            UNITED STATES ATTORNEY
 3                          BY:  JERRY C. YANG
                            and  JENNIFER L. WILLIAMS
 4                          ASSISTANT UNITED STATES ATTORNEYS
                            Riverside Branch Office
 5                          3880 Lemon Street, Suite 210
                            Riverside, California 92501
 6                          (951) 276-6221
                            (213) 894-5862
 7                          jerry.yang@usdoj.gov
                            jennifer.williams@usdoj.gov
 8
      FOR THE DEFENDANT:    LAW OFFICE OF LARRY M. BAKMAN
 9                          BY:  LARRY M. BAKMAN, ATTORNEY AT LAW
                            1901 Avenue of the Stars
10                          Suite 200
                            Los Angeles, California  90067
11                          (310) 461-1555
                            lbakman@lbakmanlaw.com
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

## I N D E X

### CHRONOLOGICAL INDEX OF WITNESSES

| DEFENDANT'S WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE | VOL |
|---|---|---|---|---|---|---|
| CALVIN CHARLES COLBERT | 4 | 11 | | | | 4 |

### ALPHABETICAL INDEX OF WITNESSES

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE | VOL |
|---|---|---|---|---|---|---|
| COLBERT, CALVIN CHARLE | 4 | 11 | | | | 4 |

### EXHIBITS

| DEFENDANT'S EXHIBIT | DESCRIPTION | FOR IDENTIFICATION | IN EVIDENCE | VOL |
|---|---|---|---|---|
| 10 | Photograph . . . . . . . . . . . . . | | 7 | 4 |
| 11 | Photograph . . . . . . . . . . . . . | | 8 | 4 |

4

```
 1   LOS ANGELES, CALIF.; FRIDAY, NOVEMBER 19, 2010; 1:08 P.M.

 2                             -oOo-

 3       (The following was held outside the jury's presence:)

 4           THE CLERK:  Please remain seated and come to

 5   order.  This United States District Court is now in session.

 6           THE COURT:  All right.  Let me ask counsel:  Is

 7   there anything I need to discuss with you before I bring the

 8   jury back in?

 9           MR. BAKMAN:  No, Your Honor.

10           MS. WILLIAMS:  No, Your Honor.

11           THE COURT:  All right.  Let me have Javier bring

12   the jury back in.

13           THE CLERK:  Yes, sir.

14               (Pause in the proceedings.)

15           (The jurors entered the courtroom.)

16           THE CLERK:  You may be seated.

17                     DEFENSE CASE RESUMED

18           THE COURT:  All right.  We'll continue with the

19   examination of the defendant.

20           MR. BAKMAN:  Thank you, Your Honor.

21           CALVIN CHARLES COLBERT, JR., DEFENDANT, RESUMED

22                     DIRECT EXAMINATION

23   BY MR. BAKMAN:

24   Q.   Now, let me ask you something, Mr. Colbert.  Are you

25   lying to the jury when you tell them those weren't your
```

```
 1   drugs in room 220?
 2   A.   No, I'm not.
 3           MR. BAKMAN:  Now, may I publish Exhibit 6, Your
 4   Honor?  It was admitted into evidence.
 5           THE COURT:  All right.  Any objection?
 6           MS. WILLIAMS:  No, Your Honor.
 7           THE COURT:  All right.  Go ahead.
 8           (The exhibit was displayed on the screen.)
 9   BY MR. BAKMAN:
10   Q.   Now, is this is a picture, Mr. Colbert, that
11   Agent Kaighin had indicated she took when she made entry in
12   the room before it was searched.
13           Did you hear that testimony?
14   A.   Yes, I did.
15   Q.   And you heard Agent Kaighin indicating that all of this
16   was laid out in front of you and that you were seated in the
17   chair when they made entry.  All this dope, all the
18   packaging, it was all laid out like that.  Did you hear
19   that?
20   A.   Yes, I did.
21   Q.   Was it, in fact, laid out like that?
22   A.   No, that's false.
23   Q.   That dope wasn't on the table, was it?
24   A.   No, it wasn't.
25           MS. WILLIAMS:  Objection; leading.
```

6

```
 1              THE COURT:  I'll sustain the objection.
 2              Rephrase the question.
 3   BY MR. BAKMAN:
 4   Q.   Do you see the scale there, sir?
 5   A.   Yes, I do.
 6              MR. BAKMAN:  And if we could have Government's
 7   Exhibit 10 and 11 placed in front of the witness, please.
 8                   (Pause in the proceedings.)
 9              MR. BAKMAN:  May I approach?
10              THE COURT:  Yes.
11              THE CLERK:  I'll get it, Mr. Bakman.
12                   (Pause in the proceedings.)
13   BY MR. BAKMAN:
14   Q.   And before you look at that, Cal, let me just stop you
15   for a minute.  You told this jury that when you first came
16   into room 220 the scale was on the dresser, didn't you?
17   A.   Yes, I did.
18   Q.   And you told the jury that the dope was not visible and
19   it wasn't the way it is on that picture that's being placed
20   before the jury right now; is that right?
21   A.   Yes, I did.
22   Q.   Take a look at Exhibit 10 for me, the government's
23   photograph.
24   A.   (Witness complies.)
25   Q.   Do you recognize that?
```

1  A.   Yes.  That's the scale.

2  Q.   Well, let me ask you something.  Do you recognize the

3  scale being in the -- in that same location when you went

4  into the room?

5  A.   Yes, that's where the scale was.

6           MR. BAKMAN:  Move 10 into evidence, Your Honor.

7           THE COURT:  Any objection?

8           MS. WILLIAMS:  No objection.

9           THE COURT:  All right.  Exhibit 10 is admitted.

10          (Exhibit 10 received in evidence.)

11          (The exhibit was displayed on the screen.)

12  BY MR. BAKMAN:

13  Q.   The scale is on the dresser, isn't it?

14  A.   Yes, it is.

15  Q.   The scale is not on the dresser in this photograph, is

16  it?

17  A.   No.  The scale was never there.  It was on the other

18  dresser.

19  Q.   Who put the scale in front of all the dope on the

20  table?  Do you know?

21  A.   One of the officers.  I seen one of the officers put

22  the scale on the table.  I don't know who it was.  I think

23  it was either Beall or her right there.

24  Q.   When you came in to room 220, at any time that you were

25  in room 220, was that dope out and visible to you in the

8

```
1   room?
2   A.   No, sir.
3   Q.   And showing you Government's Exhibit 11, do you see
4   that in front of you?
5   A.   Uh, no.  I don't see No. 11.  What's No. 11?
6   Q.   Another photograph.  Is there a folder that's labeled
7   "Government's Exhibit 11"?
8   A.   Yes.
9   Q.   Do you recognize that?
10  A.   Are we talking about the scale or the police bag that's
11  right there?
12  Q.   Do you recognize the photograph as being a photograph
13  of the interior of room 220?
14  A.   Yes.
15          MR. BAKMAN:  Move Government's Exhibit 11 into
16  evidence.
17          MS. WILLIAMS:  No objection.
18          THE COURT:  All right.  It's admitted.
19            (Exhibit 11 received in evidence.)
20          MR. BAKMAN:  And Government's Exhibit 11, may I
21  publish?
22          THE COURT:  Yes.
23            (The exhibit was displayed on the screen.)
24  BY MR. BAKMAN:
25  Q.   11 shows the drawer open with the gun in it, does it
```

1    not?

2    A.   Yes, it do.

3    Q.   And the scale is there still, isn't it?

4    A.   Yes, it is.

5    Q.   Tell me.   This dope here that's weighed out on the

6    table, did you see any of the officers take the dope out of

7    the box and lay it out so that it could be photographed when

8    you were present inside room 220?

9              MS. WILLIAMS:   Objection; leading.

10              THE WITNESS:   Yes.

11              THE COURT:   I'll sustain the objection.

12   BY MR. BAKMAN:

13   Q.   When you came into room 220, was there a box on the

14   table and only a box on the table?

15              MS. WILLIAMS:   Objection; leading.

16              THE COURT:   I'll sustain the objection.

17   BY MR. BAKMAN:

18   Q.   Was there a box on the table when you came into room

19   220?

20   A.   Yes, there was a box right there.

21   Q.   Had you seen that box earlier in the day in the

22   possession of anyone else?

23   A.   Yes, I did.

24   Q.   Who had possession of the box earlier in the day?

25   A.   Jamine.

1   Q.   When you unpacked your clothes that afternoon -- strike

2   that.   When you went into room 220, did you unpack any

3   clothes?

4   A.   Yes, I did.

5   Q.   Did you put any clothes on the chair next to the

6   dresser?

7   A.   Yes, sir.

8   Q.   What clothes?

9   A.   I folded my pants.   I had a pair of pants I folded.

10   Q.   And what were you going to do with the pair of pants?

11   A.   Well, I was going to put them on after my shower.

12   Q.   Did you happen to open a drawer in the dresser?

13   A.   Yes.

14   Q.   And when you opened the drawer in the dresser, what did

15   you see?

16   A.   I saw -- I saw a gun.

17   Q.   Was that your gun?

18   A.   No.

19   Q.   When the police broke down the door and they asked you

20   if you knew where a gun was, did you tell them?

21   A.   Yes.

22   Q.   Why did you tell them?

23   A.   Well, they asked me a question.   When I was proned out,

24   they asked me were there any weapons in the room.   I told

25   them yes.   They asked me did I have any weapons on my

11

```
 1    person.  I told them no.  They asked me where was the
 2    weapon.  With my hands behind my back, I motioned upwards
 3    toward the drawer.
 4    Q.   Were you ever asked:  Is that yours?
 5    A.   No.
 6    Q.   Did you ever tell the officers that was your gun?
 7    A.   No.
 8              MR. BAKMAN:  No further questions.
 9              THE COURT:  All right.
10              Cross?
11                     CROSS-EXAMINATION
12    BY MS. WILLIAMS:
13    Q.   Mr. Colbert, you registered at the Economy Inn for
14    the -- or you registered at the Economy Inn on March 9th,
15    2009; is that correct?
16    A.   Yes, ma'am.
17    Q.   And that wasn't the first time that you had been to the
18    Economy Inn, correct?
19    A.   I've been to the Economy Inn several times.
20    Q.   Several occasions in the past?
21    A.   Several occasions.
22    Q.   And when you registered at the Economy Inn on
23    March 9th, you were assigned to room 217, correct?
24    A.   Yes, ma'am.
25    Q.   And you put that room in your name, correct?
```

1    A.    Yes, ma'am.

2    Q.    And you used your correct name?

3    A.    I used my correct ID.  I mean, the ID to get a room.  I

4    need my ID so I used my ID.

5    Q.    And you presented that to the hotel manager?

6    A.    Yes.

7    Q.    And how long did you stay in room 217?

8    A.    I stayed in room 217 until, I think I rented it for

9    about two days.  Check-out time was on the 11th.

10   Q.    What time is check-out time?

11   A.    Check-out time is about 12 o'clock but they notify you

12   at 11:00 that if you're going to pay or if you're going to

13   leave.

14   Q.    So when did you -- were you notified that day?

15   A.    I was notified whether if I was going to pay or if I

16   was going to leave around 12:00.

17   Q.    Around 12 o'clock that day?

18   A.    No.  I was notified at 11:00 if I was going to leave or

19   not at 12:00.  Because before check-out time, which is

20   12:00, they notify you -- they ask you:  Do you want to rent

21   the room for another day or did you want to, you know, check

22   out at 12:00.

23   Q.    So you were notified at sometime before check-out time

24   at 12:00?

25   A.    I was notified sometime before check-out time which was

1   12:00.   It was about an hour before 12:00.

2   Q.   And you had been, before you were notified, going back

3   and forth between 220 and 217; and you knew that Jamine was

4   staying there?

5           MR. BAKMAN:   Objection.

6           THE WITNESS:   I was never --

7           THE COURT:   Nature of the objection?

8           MR. BAKMAN:   Compound.

9           THE COURT:   Rephrase it.

10  BY MS. WILLIAMS:

11  Q.   When you were notified, you knew that Jamine was

12  staying in room 220?

13  A.   When I was notified?

14  Q.   About the check-out time of 217.

15  A.   Oh, yes.

16  Q.   You knew Jamine was staying in room 220, Jamine

17  Marshell?

18  A.   Yes.

19  Q.   And you had been over there to see him?

20  A.   Yes.

21  Q.   And you had been going back and forth between the

22  rooms?

23  A.   No.

24  Q.   You were there to visit a female friend?

25  A.   Yes.

1    Q.    Is that Monae?

2    A.    No.

3    Q.    So I want to see if I can get the transition straight.

4          When you decided to leave room 217, you intended

5    to go back home to Los Angeles?

6    A.    Yes.  I intended to -- basically, I intended to, when I

7    decided to leave, my intentions were that I was going to

8    store my belongings in Jamine's room because, you know, my

9    time was running out and I had no more money.  I was running

10   out of money to have another room for another night so I was

11   going to store my belongings there until I get a ride to go

12   to Los Angeles or to a ride for the Metrolink.

13   Q.    So you packed up all of your belongings from 217,

14   right?

15   A.    Yes.

16   Q.    You didn't leave anything behind there, right?

17   A.    No, I didn't leave nothing.

18   Q.    And you had received a text message on your cell phone

19   that day about your ride not coming?

20   A.    Yes.

21   Q.    So you were receiving texts that day?

22   A.    Did I receive a text?

23   Q.    Yes.

24   A.    Yes.

25   Q.    And when did you come to this agreement with Jamine

1    Marshell that you were going to keep your belongings in room

2    220 and take over room 220?

3    A.    This -- that wasn't the original initial plan.  It was

4    never to take over the room or to stay there.  The initial

5    plan was to store my belongings there; but that plan came up

6    when he asked me for the $25, when the proposition was made

7    for the remote control for him -- something about a remote

8    control being --

9    Q.    It was the remote control and the key for room 220?

10   A.    Yeah, and the key.

11   Q.    And so how did that proposition come up?  Where were

12   you at that time?  Were you in 220?

13   A.    No.  I was in 217.

14   Q.    And Jamine Marshell came over to 217?

15   A.    Jamine Marshell came to 217 a few times.

16   Q.    A few times?

17   A.    Uh-huh.

18   Q.    And the discussion about you taking over the room

19   happened in 217?

20   A.    Hmm, no.

21   Q.    So where were you?

22   A.    It was a continuing discussion.  It was like me and him

23   was trying to come to an agreement.  This discussion took

24   place from 217 all the way to the manager's office.  We were

25   trying to negotiate a price.

16

```
1    Q.   Okay.  And how did that negotiating end up?
2    A.   It ended up with the remote -- to pay for the remote
3    which was $25, and then it was something about a key.
4    Q.   And what about the key?
5    A.   Something about the key.  The key was gone.  He was
6    missing a key.
7    Q.   Jamine was missing his key to the room?
8    A.   Yeah.
9    Q.   So when you went down to the management office, by that
10   point had you decided to take over the room from
11   Jamine Marshell?
12   A.   Well, no.  I still didn't decide yet until the manager
13   asked me to give him the $25.
14   Q.   Okay.  So it was before the manager that you decided to
15   take over the room?
16   A.   Yeah.  Because I say -- well, basically, my whole thing
17   was if I was going the give up this $25, then I might as
18   well just stay for the rest of the day.
19   Q.   So you paid $25 for the room?
20   A.   I gave -- yes, I paid $25 for the room.
21   Q.   In total?
22   A.   No.  I was supposed to pay about 15 more, some more
23   change later on, so it wasn't in total but it was $25.  I
24   never got a chance to make the second payment.
25   Q.   Who were you going to make the second payment to?
```

1   A.    I was going to give it to Jamine.  The $25 went to the

2   manager, the 15 was going to go to Jamine.

3   Q.    How much did the room cost?

4   A.    The room cost $50.

5   Q.    Had it already been paid for?

6   A.    It's been paid for for about two days.

7   Q.    So it had -- the room for the night of the 11th had

8   already been paid for?

9   A.    Yes, it's already been paid for.

10  Q.    And who was it paid by?

11  A.    I don't know.

12  Q.    How do you know it was paid for?

13  A.    Jamine told me.

14  Q.    He told you it was paid for?  So why did you have to

15  give the management $25?

16  A.    Because they didn't want it from Jamine.  Jamine had a

17  dispute about a remote.  It was some argument with them.  I

18  don't know what they had going on, but it was some argument

19  about a remote and a key.

20  Q.    And it was that he had lost the key to the room?

21  A.    Something of that nature.

22  Q.    It is, in fact, because he had lost the key to the

23  room, correct?

24  A.    Yes.  It's something to that nature.  Something

25  happened with the key.  Whether it was damaged or lost, I

18

1    couldn't tell you exactly but it was something of that

2    nature.

3    Q.   He wasn't able to return the key to 220 to the

4    management?

5    A.   No.

6    Q.   And when you decided to take over the room, you had to

7    get a new key for it?

8    A.   Yes.

9    Q.   So you were presented the room key to 220 by the

10   management at that time?

11   A.   Yes.

12   Q.   And they knew that you were going to take over the

13   room?

14   A.   Yes.

15   Q.   But you didn't give them your real name then, did you?

16   A.   They already knew my real name, Calvin Colbert.

17   Q.   But you didn't ask that the registration reflect that

18   you were taking over the room, did you?

19   A.   No.

20   Q.   You didn't give them your driver's license to use for

21   the registration, did you?

22   A.   I gave them my driver's license.

23        MR. BAKMAN:   Objection; vague as to what room.

24   217 or 220.

25        THE COURT:   I think she was referring to 220.

```
 1              MS. WILLIAMS:  I'll clarify, Your Honor.
 2              THE COURT:  All right.
 3    BY MS. WILLIAMS:
 4    Q.   You didn't give them your identification when you took
 5    over the room for 220, did you?
 6    A.   The management knows me.
 7    Q.   Yes or no?
 8    A.   Yes.
 9    Q.   You gave them my identification?
10    A.   They had my identification.  The management knows me.
11    Q.   Did you sign the form for registering for room 220?
12    A.   No.
13    Q.   So at that point you had taken over room 220 and you
14    had the key to the room?
15    A.   Yes.
16    Q.   When did you bring your belongings into the room?
17    A.   About -- about an hour or so before the search.  Hour
18    or 20 minutes or 30 minutes before the search.  I don't
19    recall exactly.
20    Q.   Around what time was it?
21    A.   I don't recall if it was 10:00 or 11:00.  Around that
22    time.
23    Q.   You said that were you notified about 11 o'clock that
24    you needed to leave?
25    A.   Yeah.
```

1    Q.    And so how long did this process take before you were

2    back to the room?

3    A.    Well, I told you it was before 12:00 but they notify

4    you at 11:00.  So it was sometime around 11:00.  So whether

5    is 10:50, 10:40, it's around that time.

6    Q.    So around what time did you move your belongings into

7    the room?

8    A.    I can't recall.  It happened -- What? -- 21 months ago?

9    Q.    So you don't recall all the details of that day?

10   A.    No, not specific details of that nature where we're

11   talking about minutes and seconds and things like that.

12   Q.    Was it before noon that you moved your belongings in

13   because you had to get out of room 217?

14   A.    It was before noon.

15   Q.    So is it fair to say it was before noon?

16   A.    It's fair to say it was before noon.

17   Q.    And the search happened at noon?  Around noon?

18   A.    Well, I don't know when they claim the search happened

19   but --

20   Q.    Well, when did the search happen?

21   A.    I don't remember the time.

22   Q.    How long had you been in room 220 by the time that the

23   police came?

24   A.    By the time the police came, I was in 220 for about an

25   hour, hour and a half before the police came.

1   Q.   You were there for about an hour and an hour and a

2   half?

3   A.   An hour or an hour and a half.  I don't know.

4   Somewhere around that time.  It wasn't that long.

5   Q.   And you had taken over the room by that time that you

6   brought your belongings in?

7   A.   I didn't take completely over the room because Jamine

8   had to come and get the rest of his belongings.

9   Q.   But you had the key to the room?  It was essentially

10  your room at that time?

11  A.   Did I have the key?

12  Q.   Yes.

13  A.   Like do you mean did I have the key when I went in the

14  room or did I have the key when Jamine was present?  I don't

15  understand the question.

16  Q.   Well, after the transaction with the management and you

17  decided to take over the room without putting it in your

18  name and you brought your belongings to the room, you had

19  the key to the room?

20  A.   Yes.

21  Q.   Because you had taken over the room by that point?

22  A.   At that point, I had the key.

23  Q.   How do you know Jamine Marshell?

24  A.   I seen him around the area a lot.

25  Q.   In what circumstance?

22

```
 1    A.    I just see him around like he hangs around that area.

 2    Q.    What area?

 3    A.    He hangs around San Bernardino area like that area.

 4    Q.    What does he do for a living?

 5    A.    I don't -- I don't know.

 6    Q.    Where does he live?

 7    A.    I don't know his exact address.  I don't know.

 8    Q.    Is he homeless?

 9    A.    I wouldn't know.

10    Q.    And he has a drug problem, right?

11    A.    Yes.

12    Q.    Crack cocaine?

13    A.    Yes.

14    Q.    Where had he kept his stuff in the room when you got

15    there?

16    A.    His stuff was scattered everywhere.  Mainly on the bed.

17    He had a sandwich bag box on the table.  He had a lot of

18    things in the room, just everywhere around the room.

19    Q.    And you said that the bed was messy?  Unkempt?

20    A.    Yes, it was messy.

21    Q.    What do you mean by that?  Like unmade or?

22    A.    Well, it was unmade and then it was just a little

23    messy.  It was scattered.  It wasn't like when you first

24    enter a motel room and it's just freshly neat, something

25    like that.
```

1   Q.   So it was like Jamine Marshell had slept in the room

2   prior to you taking it over?

3   A.   Jamine Marshell was there in the room prior to me

4   taking it over.

5   Q.   Had he stayed the night there before?

6   A.   I wouldn't know.

7   Q.   I'll ask you to look at Government's Exhibit 3.  It

8   should be in that folder.  It has been previously admitted.

9   A.   *(Searching through folders.)*

10          *(The exhibit was displayed on the screen.)*

11  BY MS. WILLIAMS:

12  Q.   Do you see that in front of you?

13  A.   Yes.

14  Q.   And is that a picture of room 220?

15  A.   Yes.

16  Q.   And the bed is made, isn't it?

17  A.   It's kind of messy.

18  Q.   But it's made as if it has been prepared, right?

19  A.   No.

20  Q.   It's not made?

21  A.   It's kind of messy.

22  Q.   Can you tell if it's made or not?

23  A.   It's not made.  It's kind of messy.

24          MR. BAKMAN:  Your Honor, I'd stipulate to the

25  admissibility of Exhibit 3.

```
 1              THE WITNESS:  It's kind of messy.

 2              THE COURT:  I presume he has answered it at this

 3    point.

 4              MR. BAKMAN:  I didn't realize it was on the

 5    screen.

 6    BY MS. WILLIAMS:

 7    Q.   And what was on the table when you entered the room?

 8    A.   On what table?  This table right here?

 9    Q.   Yes.

10    A.   On that table, it was a sandwich box.

11    Q.   And that's it?

12    A.   That was it.  Sandwich box and the two cups.

13    Q.   The sandwich box and the two cups?

14    A.   Yes.

15    Q.   And what did you do in the room?

16    A.   I went in the room.  I took a shower in the room,

17    washed up, and put my phone on the charger.

18    Q.   Were you there by yourself?

19    A.   No.

20    Q.   Jamine was there while you were showering?

21    A.   He came during the time.

22    Q.   How did he get into the room?

23    A.   Well, with the key.

24    Q.   He was using the key?

25    A.   Yes.
```

1    Q.    Your key?

2    A.    Not my key.  It was the key to the room.  It wasn't --

3    he had to get his stuff.  He had to move.  He was in the

4    process of moving his belongings out so he was in and out

5    the room.  I'm the one that got the key, but Jamine was in

6    and out of the room with the key.

7    Q.    So it was your key for the day?

8    A.    When you say --

9               MR. BAKMAN:  Objection; vague.  I don't --

10              THE COURT:  Rephrase the question.

11   BY MS. WILLIAMS:

12   Q.    Had the key been presented to you by the manager?

13   A.    Yes.

14   Q.    Looking at Government's Exhibit 3, is this your white

15   jacket on the bed?

16   A.    That's not a jacket.  I don't think it's a white

17   jacket.  Don't look like one.

18   Q.    And you carried your belongings over in plastic bags

19   you said earlier, correct?

20   A.    Plastic bags, a Colgate suitcase, and a -- it was a

21   Colgate overnight bag or something like that.

22   Q.    Like the plastic bag that's in this picture?

23   A.    No.  My belongings were on the side of this on the

24   other side by -- by an air conditioner.

25   Q.    When did the drugs come into the room?

1    A.    I don't know when the drugs came into the room.

2    Q.    You never saw the drugs at all that day?

3    A.    I never saw the drugs.  I saw that when the police did

4    the search.  They took the drugs out the box.

5    Q.    Out of what box?

6    A.    The sandwich box right there.

7    Q.    So your testimony is that the police took piles of

8    crack cocaine out of the box?

9    A.    My testimony is that the police took piles of crack

10   cocaine out of the box, took the scale off the other table,

11   brought that scale over there, and then weighed the drugs

12   just like the picture show.

13   Q.    Were you in the room at that time?

14   A.    Yes.

15   Q.    And you watched the police that it out of the box?

16   A.    I watched.  There's another picture where she took a

17   picture of my shoe.

18   Q.    I think you are referring to Government's Exhibit 4

19   that has been previously admitted?  I'll give you a chance

20   to find it there.

21   A.    *(Searching through documents.)*  Yes.

22            MS. WILLIAMS:  May I publish, Your Honor?

23            THE COURT:  Yes.

24            *(The exhibit was displayed on the screen.)*

25

1    BY MS. WILLIAMS:

2    Q.    Is that what you're referring to as the shoe

3    (indicating)?

4    A.    Yes.

5    Q.    And what is this right here (indicating)?

6    A.    That's the cell phone.

7    Q.    Did you see the police officers look in the cell phone?

8    A.    I seen them go through it.

9    Q.    So who is Monae?

10   A.    I wouldn't know.

11   Q.    You wouldn't know?

12   A.    Huh-uh.

13   Q.    Would you be surprised to learn that Monae had sent you

14   a text message that day?

15   A.    Well, she probably didn't send it to me.  Depending on

16   what time it was.  I loan out my phone a few times so

17   depending on what time it was.  What time is on the phone, I

18   wouldn't know.  I haven't looked into it.

19   Q.    Did you receive a text message from Monae that day?

20   A.    I wouldn't know.  I haven't looked into it.

21   Q.    Well, let's say that a text message came in at

22   7:14 a.m.  Would you have received it that day?

23   A.    If a text message came at 7 -- what o'clock?

24   Q.    7:14 a.m.

25   A.    7:14?  I wouldn't -- I would have never received it.

28

```
 1   Q.    I'd like you to take a look at Government's Exhibit 14.

 2   A.    (Witness complies.)

 3   Q.    And this is a picture of a text message from your

 4   phone, correct?

 5              MR. BAKMAN:  Objection --

 6              THE WITNESS:  I don't know.

 7              MR. BAKMAN:  -- no foundation.

 8              THE COURT:  Why don't you lay a foundation for the

 9   question.

10              MS. WILLIAMS:  If I could have Exhibit 21 handed

11   up to the witness, please.

12                       (Pause in the proceedings.)

13   BY MS. WILLIAMS:

14   Q.    Do you recognize that?

15   A.    Yes, I do.

16   Q.    What is that?

17   A.    It's a cell phone.

18   Q.    Who does it belong to?

19   A.    I don't know.

20   Q.    That's not your cell phone?

21   A.    I don't know if this is my cell phone or not.

22   Q.    What kind of cell phone did you have at the time?

23   A.    I had a cell phone just like this.

24   Q.    Just like that one?

25   A.    Yes.
```

```
 1    Q.    Okay.  Same color?

 2    A.    Same color.

 3    Q.    Same brand?

 4    A.    Yes, it's the same brand.

 5    Q.    What color is it?

 6    A.    It looks blue.

 7    Q.    Now, you said earlier that Jamine Marshell had the box

 8    of sandwich bags and not you; is that right?

 9    A.    Yes.

10    Q.    And once you moved your belongings into room 220, did

11    you stay inside the room the entire time?

12    A.    I may have left out probably once or twice.  I wouldn't

13    know.  I couldn't recall.

14    Q.    Because you mentioned that you were talking to a female

15    at one point?

16            MR. BAKMAN:  Objection.  Misstates his testimony.

17            THE COURT:  Let me ask the witness:  Do you

18    understand the question?

19            THE WITNESS:  No.

20            THE COURT:  Rephrase it.

21    BY MS. WILLIAMS:

22    Q.    Were you talking to a female at one point that day?

23    A.    A lot of points, yes.

24    Q.    A lot of points?

25    A.    Yes.
```

1    Q.    Various females?

2    A.    Various females.

3    Q.    And were you talking to a couple of other guys that

4    day, too?

5    A.    I talked to a few gentlemen that day.

6    Q.    People who had come to the motel?

7    A.    On the phone and a couple of individuals that came to

8    the motel.

9    Q.    Were you present with a female that day at one point?

10   A.    At several points, I was present with several different

11   females.

12   Q.    So lots of people were coming and going?

13   A.    No, not at this motel.  But I was present all through

14   that day like early in the morning, 6 o'clock in the

15   morning.  5 o'clock I went to grocery stores.  I went to

16   liquor stores.  I went around.  I moved around that day.  I

17   was present with a lot of people.

18   Q.    At 5 o'clock in the morning the liquor store?

19   A.    5 o'clock in the morning, there's a market around the

20   corner.  There's a gas station.  I think it's an APM or

21   something.  It's a liquor store or gas station.  I wouldn't

22   know.  But I call it a liquor store.  They sell liquor

23   there.

24   Q.    And when the police came in that day and they asked you

25   if you had a weapon, you responded "yes," correct?

1    A.    I was never asked if I had a weapon.

2    Q.    What were you asked?

3    A.    I was asked were there any weapons in the room.

4    Q.    And when you were asked:  Do you have any weapons on

5    you, you stated:  No, it's in the drawer, correct?

6    A.    No.  I said "no."

7    Q.    And when the police entered, you stated -- and correct

8    me if I'm wrong -- that you were talking on your phone at

9    the time?

10   A.    When the police entered, yes, I was by the -- by the TV

11   area.

12   Q.    Talking on your phone?

13   A.    I was on the phone.

14   Q.    Is it the phone pictured in the exhibit in front of

15   you?

16   A.    Yes.

17   Q.    And then it's your testimony that at that point the

18   police took out individual rocks of crack cocaine and put

19   them on the table?

20   A.    They took out the bag, the sandwich bag.  They

21   spread -- they opened it up and rocks were falling around.

22   They put it on a table; and then he went to the -- went to

23   one of the other sides or something and grabbed -- and

24   grabbed a scale.

25   Q.    The scale --

1   A.    He grabbed the scale.   It's in the other picture.   The

2   scale is in the other picture.

3   Q.    It's in the other picture?

4   A.    I'm pretty sure you saw it.

5         MS. WILLIAMS:   It's Government's Exhibit 10

6   previously admitted.   May I publish, Your Honor?

7         THE COURT:   Yes.

8         *(The exhibit was displayed on the screen.)*

9   BY MS. WILLIAMS:

10  Q.    Is this the picture you're referring to?

11  A.    Yes.

12  Q.    And this block object right here *(indicating)*, is it

13  your testimony that that is a scale?

14  A.    Yes.

15  Q.    And you saw that item pictured right here *(indicating)*

16  moved over to the other table.   Is that your testimony?

17  A.    Yes, I saw them reach over there and move it.

18  Q.    Where was the money that you were counting?

19  A.    I was never counting any money.

20  Q.    So where was the cash?

21  A.    Well, they took money out of a drawer, out of the top

22  drawers in one of the pictures where you see the drawer

23  open, the top drawer that's open.   They took the money out

24  and they were looking for marked bills or something.

25  Q.    How do you know they were looking for marked bills?

33

1    A.    Because it's what they were talking about.

2    Q.    What did they say?

3    A.    Well, they was trying to find some marked bills.  They

4    was asking each other:  Where's the money?  Check his

5    pockets first.  Then they checked my pockets.  One of the

6    officers said:  Yeah, I think he just did a buy or

7    something.

8          He checked my pockets and he found some money and

9    he said:  Well, the marked bills should be in his pockets.

10   So he looked through my pockets and he found $18.

11   Q.    Did that money belong to Jamine?

12   A.    This money was mine.

13   Q.    I'm sorry.  The money -- the $957 of cash?

14   A.    No.  Not the $957 of cash.

15   Q.    That was Jamine's?

16   A.    I don't know whose it was.

17   Q.    But your testimony is that it was in the room?

18   A.    That during the search, they took the money out the --

19          MR. BAKMAN:  I object.  The testimony said he saw

20   it when the police opened up the drawer and started to count

21   it.

22          THE COURT:  Well, let me indicate that is a

23   speaking objection; but rephrase the question.

24   BY MS. WILLIAMS:

25   Q.    At what time did you first see the $957?

1    A.    Well, I seen a pile of money when they took it out the

2    drawer.   They took piles of money out the drawer and then

3    they started running through the money.

4    Q.    $957?

5    A.    Well, that's what was stated in my discovery unless

6    there's more or less.  I don't know.

7    Q.    And it wasn't your money is your testimony?

8    A.    That's my testimony, yes.

9    Q.    And your testimony is that it must have been somebody

10   else's money cash that they left in the room?

11   A.    I'm telling you it wasn't my money.

12   Q.    And Jamine had been the person whose room it was before

13   you?

14   A.    Jamine and other people were in the room.

15   Q.    And Jamine is a drug user?

16   A.    Yes.

17   Q.    Have you ever seen him with $957 before?

18   A.    I seen him with lots of money before.

19   Q.    You have?

20   A.    Yes.

21   Q.    Now, when the police came and they walked you out and

22   questioned you, that was on the patio?

23   A.    I don't -- they -- they questioned me several times.

24   First they took me to the restroom.

25          MR. BAKMAN:   I'm going to object at this point,

35

```
 1   Your Honor.
 2              THE COURT:  On what basis?
 3              MR. BAKMAN:  Well, ask to approach.
 4              THE COURT:  All right.
 5          (The following was held at the bench:)
 6              MS. WILLIAMS:  I'm not going to go there.
 7              MR. BAKMAN:  Well, the way the question is phrased
 8   is he may go there; and so I want to stop it before he does.
 9   So I'm objecting to the form of the question.  It's vague,
10   it's ambiguous, and it opens up a wide door that this
11   individual could walk through.
12              THE COURT:  Rephrase the question.
13        (The following was in open court in the jury's presence:)
14   BY MS. WILLIAMS:
15   Q.   When the police came that day, where were you when you
16   saw the scale being moved?
17   A.   I think I was may have been in the restroom at this
18   time or around that area or I may have been coming out.
19   Q.   Coming out of the room?
20   A.   Yes.  I saw the scale being moved, though.
21   Q.   And who was moving it?
22   A.   One of these officers.  I think it was either her or
23   Beall.
24   Q.   So it was either Special Agent Kaighin or
25   Officer Beall?
```

1   A.   Yeah.   I'm pretty sure.   It may have been Beall though.

2   They kind of look the same.

3   Q.   You're aware that -- strike that.

4            And sitting here today, you can visualize the

5   scale being moved?

6   A.   Yes.

7   Q.   And when you were taken out of the room, at some point

8   were you on the landing outside of this hotel?

9   A.   I was -- I was on the landing at some point.

10   Q.   Were you on the landing when you saw Jamine coming back

11   to the room?

12   A.   Yes.

13   Q.   And was that to get his stuff?

14   A.   I don't -- more than likely, that's probably what he

15   was trying to do.

16   Q.   And were you aware at that time why you were being

17   arrested?

18   A.   I was told why I was arrested.

19   Q.   Because of the drugs on the table?

20   A.   No.   Just because they just said:   You know why and

21   just handcuffed me.

22   Q.   And because of the gun in the drawer?

23   A.   I don't -- I hope not.

24   Q.   So when you saw Jamine coming back, you made every

25   effort to call out to him at that time?

1    A.    No.

2    Q.    You didn't call out at all, did you?

3    A.    No.  Officer Beall did.

4    Q.    Officer Beall called out to Jamine at that time?

5    A.    Yes.

6    Q.    That's your testimony?

7    A.    Yes.

8    Q.    And you didn't call out to Jamine at any point?

9    A.    I didn't call out to Jamine.  I don't remember me

10   calling out to him.

11             MS. WILLIAMS:  May I have one moment, Your Honor?

12             THE COURT:  Yes.

13                  (Counsel conferred.)

14             MS. WILLIAMS:  No further questions, Your Honor.

15             THE COURT:  Any further questions, Mr. Bakman?

16             MR. BAKMAN:  No further questions.

17             THE COURT:  The witness is excused.  Thank you

18   very much.

19                  (End of requested testimony.)

20

21                       -oOo-

22

23

24

25

38

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:  March 10, 2011

s/ _____

PAT CUNEO, OFFICIAL REPORTER
CSR NO. 1600

EXHIBIT

10



EXHIBIT

14



EXHIBIT

29

