1            UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA

3                 WESTERN DIVISION

4        THE HONORABLE GEORGE H. WU, JUDGE PRESIDING

5

6   UNITED STATES OF AMERICA,          )
                                       )
7                      Plaintiff,      )
                                       )
8           vs.                        ) NO. CR 09-301-GW
                                       )
9   CALVIN CHARLES COLBERT, JR.,       )
                                       )
10                     Defendant.      )
    _____)

11

12

13

14         REPORTER'S TRANSCRIPT OF PROCEEDINGS

15              Los Angeles, California

16

17        Thursday, November 18, 2010, 1:08 P.M.

18

19      Day 3 of Jury Trial, Page 323 to 455, Inclusive

20

21

22              WIL S. WILCOX, CSR 9178
          Official U.S. District Court Reporter
23           312 North Spring Street, # 430
             Los Angeles, California 90012
24              Phone:   (213) 894-2849
                Fax:     (818) 286-3910
25            Email: wswilcox@pobox.com

 1   APPEARANCES:

 2   FOR THE PLAINTIFF:    ANDRÉ BIROTTE, JR.
                          UNITED STATES ATTORNEY
 3                        BY:   JERRY C. YANG
                          and   JENNIFER L. WILLIAMS
 4                        ASSISTANT UNITED STATES ATTORNEYS
                          Riverside Branch Office
 5                        3880 Lemon Street, Suite 210
                          Riverside, California 92501
 6                        (951) 276-6221
                          (213) 894-5862
 7                        jerry.yang@usdoj.gov
                          jennifer.williams@usdoj.gov
 8
     FOR THE DEFENDANT:    LAW OFFICE OF LARRY M. BAKMAN
 9                        BY:  LARRY M. BAKMAN, ATTORNEY AT LAW
                          1901 Avenue of the Stars
10                        Suite 200
                          Los Angeles, California  90067
11                        (310) 461-1555
                          lbakman@lbakmanlaw.com
12

13

14

15

16

17

18

19

20

21

22

23

24

25

Day 3 of Jury Trial, November 18, 2010, P.M. Session

**I N D E X**

**CHRONOLOGICAL INDEX OF WITNESSES**

| GOVERNMENT'S WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE | VOL |
|---|---|---|---|---|---|---|
| RICARDO LANDEROS | 332 | | | | | 3 |
| LON ANDERSON | 344 | 359 | 378 | 379 | | 3 |
| LON ANDERSON | | | 387 | | | |
| ANGIE KAIGHIN | 389 | 432 | | | | 3 |

**ALPHABETICAL INDEX OF WITNESSES**

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE | VOL |
|---|---|---|---|---|---|---|
| ANDERSON, LON | 344 | 359 | 378 | 379 | | 3 |
| ANDERSON, LON | | | 387 | | | |
| KAIGHIN, ANGIE | 389 | 432 | | | | 3 |
| LANDEROS, RICARDO | 332 | | | | | 3 |

Day 3 of Jury Trial, November 18, 2010, P.M. Session

326

**EXHIBITS**

| GOVERNMENT'S EXHIBIT | DESCRIPTION | FOR IDENTIFICATION | IN EVIDENCE | VOL |
|---|---|---|---|---|
| 1 | Photograph . . . . . . . . . . . . . | .431 | 3 |
| 2 | Photograph . . . . . . . . . . . . . | .431 | 3 |
| 3 | Photograph . . . . . . . . . . . . . | .431 | 3 |
| 4 | Photograph . . . . . . . . . . . . . | .431 | 3 |
| 5 | Photograph . . . . . . . . . . . . . | .431 | 3 |
| 6 | Photograph . . . . . . . . . . . . . | .409 | 3 |
| 7 | Photograph . . . . . . . . . . . . . | .408 | 3 |
| 8 | Photograph . . . . . . . . . . . . . | .425 | 3 |
| 9 | Drivers License  . . . . . . . . . . | .422 | 3 |
| 12 | Photograph . . . . . . . . . . . . . | .395 | 3 |
| 13 | Photograph . . . . . . . . . . . . . | .420 | 3 |
| 17 | Razor Blade  . . . . . . . . . . . . | .414 | 3 |
| 18 | Scale  . . . . . . . . . . . . . . . | .410 | 3 |
| 19 | Ruger .22  . . . . . . . . . . . . . | .401 | 3 |
| 20 | .22 Ammunition . . . . . . . . . . . | .420 | 3 |
| 21 | Samsung Cell Phone . . . . . . . . . | .423 | 3 |
| 22 | Social Security Card . . . . . . . . | .422 | 3 |
| 24 | Cash . . . . . . . . . . . . . . . . | .414 | 3 |
| 25 | Cash . . . . . . . . . . . . . . . . | .424 | 3 |
| 26 | Baggies  . . . . . . . . . . . . . . | .414 | 3 |
| 27 | Keycard  . . . . . . . . . . . . . . | .414 | 3 |
| 29 | Entry Video  . . . . . . . . . . . . | .405 | 3 |

EXHIBITS

| GOVERNMENT'S EXHIBIT | DESCRIPTION | FOR IDENTIFICATION | IN EVIDENCE | VOL |
|---|---|---|---|---|
| 39 | Photographs . . . . . . . . . . . | .419 | 3 |
| 42 | Photograph . . . . . . . . . . . | .394 | 3 |

EXHIBITS

| DEFENDANT'S EXHIBIT | DESCRIPTION | FOR IDENTIFICATION | IN EVIDENCE | VOL |
|---|---|---|---|---|
| 21 | Document . . . . . . . . . . . . | .371 | 3 |
| 22 | Document . . . . . . . . . . . . | .375 | 3 |
| 30 | Registration Cards . . . . . . . . | .450 | 3 |

```
 1      LOS ANGELES, CALIF.; THURSDAY, NOVEMBER 18, 2010; 1:08 P.M.

 2                            -oOo-

 3        (The following was held outside the jury's presence:)

 4            THE COURT:  Let me ask counsel.  Is there anything

 5      we need to discuss before I bring in the jury?

 6            MR. BAKMAN:  No, Your Honor.

 7            MR. YANG:  Just one brief preliminary matter

 8      again, Your Honor.  Yesterday defense counsel cross-examined

 9      Officer White on misconduct of the lead case officer.

10            I just wanted to make sure -- and the court

11      sustained the objection.

12            THE COURT:  Yes.

13            MR. YANG:  I just wanted to make sure defense

14      counsel wouldn't be attempting to do that again.

15            THE COURT:  I don't think he'll attempt to do that

16      again.

17            MR. BAKMAN:  No, Your Honor.

18            MR. YANG:  Thank you, Your Honor.

19            THE COURT:  All right.

20            MR. YANG:  And, Your Honor, the court, I believe,

21      forgot the last time to instruct the jury that we're not

22      allowed to talk to them.  It's very awkward when they're

23      trying to smile at us.

24            THE COURT:  All right.  When I bring them in, I

25      will admonish them.
```

1          MR. YANG:  Thank you, Your Honor.

2          THE COURT:  Okay.  Why don't you bring them in.

3              *(The jurors entered the courtroom.)*

4          THE COURT:  All right.  Good afternoon, ladies and

5     gentlemen.  Let me just remind you again that sometimes when

6     you're on these breaks you might see the attorneys or

7     witnesses in the hallway.  You may say hello to them; they

8     may not respond to you.

9          Well, don't assume if they don't respond to you

10    that they're being unfriendly to you.  In real life,

11    probably they're very unfriendly people --

12                    *(Laughter.)*

13         THE COURT:  -- but the reason why they're not

14    responding to you at that point in time is that they are

15    under instructions from me not to have direct communications

16    with the jurors because, again, we don't want to have the

17    situation of an appearance of impropriety or anything of

18    that sort.

19         So, you know, they will not be responding to you

20    even if you say "good morning" or "hello."  I want you to

21    keep a safe distance from counsel and witnesses.  Okay?

22         Thank you.

23             **GOVERNMENT'S CASE-IN-CHIEF (RESUMED)**

24         THE COURT:  Now, are we missing the witness?

25         MR. YANG:  He's right outside, Your Honor.  Just a

1    second.

2          THE COURT:  Okay.

3              *(Pause in the proceedings.)*

4      **RICARDO LANDEROS, GOVERNMENT'S WITNESS (RESUMED)**

5          THE COURT:  The witness is back on the stand; and

6    we will have the -- let me ask.

7          You had indicated you had no further questions;

8    but you didn't play back a portion.  Are you going to play

9    back a portion?

10         MR. YANG:  Yes, Your Honor, if I may.

11         THE COURT:  All right.

12         MR. YANG:  Thank you, Your Honor.

13         THE COURT:  Yes, you may pass out the transcripts.

14   And while my clerk is doing that, let me just simply remind

15   the jurors again.  The evidence consists of the audio

16   portion of the tape that you're about to hear.  The

17   transcript is just being provided to assist you when you

18   listen to the tape.

19             *(Pause in the proceedings.)*

20         MR. YANG:  Your Honor, just for the record, I'm

21   going to be playing Exhibit -- I believe it's Exhibit 31,

22   Your Honor, starting from minute 15.

23         THE COURT:  All right.

24         MR. BAKMAN:  Your Honor, excuse me; but can we

25   approach briefly?

1          THE COURT:  All right.

2              *(The following was held at the bench:)*

3          THE COURT:  Yes.

4          MR. BAKMAN:  Your Honor, I've got document 53-2 as

5    opposed to 66-3.  I don't know if there are changes.

6          No, it looks like it's the same, Your Honor.  I

7    apologize.

8          MS. WILLIAMS:  No changes were made to this.

9          MR. BAKMAN:  I'm sorry.

10     *(The following was in open court in the jury's presence:)*

11         MR. YANG:  Your Honor, may we proceed?

12         THE COURT:  All right.

13         MR. YANG:  And this should start, for everyone's

14   transcript, it should start on page 3 at the very top.

15   Those would be the page numbers that we're using; page 3 of

16   19.

17         MR. BAKMAN:  If I can help, he's got to go down to

18   11 minutes, 30 seconds, for that portion.

19         THE COURT:  All right.

20             *(The audio recording was played.)*

21         THE COURT:  Let me just stop.  Let me indicate to

22   the jury.  At this point in time, we're on page 2 at about

23   the second paragraph on page 2 is the line that's just been

24   spoken, I believe; is that correct?

25         MR. YANG:  Your Honor, actually, I think to avoid

1    any confusion, we'll use the page numbers that's referenced

2    on the very top of the page so it would be page 3 of 19.

3          THE COURT:  Okay.  Page 3 of 19 or if you look at

4    the bottom of the page, page 2 of 11, however you want to

5    refer to it.  Okay.

6                      **DIRECT EXAMINATION (RESUMED)**

7    BY MR. YANG:

8    Q    Officer Landeros, let me stop right there.  Who just

9    spoke?

10   A    Referring to the --

11   Q    Let me back it up a little bit because of that break.

12              (*The audio recording was played.*)

13   BY MR. YANG:

14   Q    "And Ricky has the point," who just spoke right there?

15   A    Officer White.

16   Q    Who is Ricky referring to?

17   A    Me.

18              (*The audio recording was played.*)

19   BY MR. YANG:

20   Q    Officer Landeros, was that the information that you

21   were given for that day?

22   A    Yes.

23          MR. YANG:  I'm going to play another video-clip

24   starting at minute 21 and 33 seconds.  I'm sorry.

25   Audio-clip.

1          MR. BAKMAN:  Can we get a page to orient ourselves

2     to the transcript?

3          MR. YANG:  Certainly.  It's also page 3 of 19

4     toward the lower bottom.

5               *(The audio recording was played.)*

6     BY MR. YANG:

7     Q    And, Officer Landeros, what were you relating there?

8     A    That was the first female I saw make any contact with

9     anyone up there in the second floor.

10    Q    So this is the female that you described earlier as the

11    female with the black top?

12    A    The black top, yes.

13         MR. YANG:  Your Honor, let me skip ahead a little

14    bit to minute 24, five seconds, same page.

15              *(The audio recording was played.)*

16    BY MR. YANG:

17    Q    Officer Landeros, is that your voice that just spoke?

18    A    That's my voice.

19              *(The audio recording was played.)*

20    BY MR. YANG:

21    Q    Officer Landeros, when during the operation did this

22    occur?  Was this before or after the search warrant?

23    A    This was at the beginning of the operation.  It was way

24    before the search warrant.

25    Q    Okay.  So this is towards the beginning?

1    A    This is the beginning.

2    Q    So did Officer White purchase the narcotics by this

3    point?

4    A    No.  This is way before that.

5    Q    Okay.  The preliminary, basically?

6    A    The preliminary, yeah.

7              MR. YANG:  Okay.  I'm going to skip ahead to

8    minute 30 and 44 seconds.  This is on page 4 right below the

9    middle.  Page 4 of 19.

10                  (The audio recording was played.)

11   BY MR. YANG:

12   Q    Officer Landeros, what does "BMA" stand for?

13   A    Black male adult.

14   Q    Which black male adult were you referring to when you

15   made that statement right there?

16   A    That was the black male adult in the room, the one that

17   was always in the landing area.

18   Q    Okay.  So this is the black male that you observed on

19   the landing subsequently?

20   A    Yes.

21                  (The audio recording was played.)

22   BY MR. YANG:

23   Q    Officer Landeros, what's going on right now at this

24   point?

25   A    At this point, he made contact with the females that

1    were there in front of the fence.

2    Q    And what's going on?

3    A    What appears to be a hand-to-hand transaction.

4    Q    And what do you base that belief on?

5    A    Contact was made from one hand to another.

6    Q    And then what happens next shortly after this?

7    A    The females leave.  They both leave.  They walk away.

8    And after that, he goes back up.  And after that, several

9    minutes later, that's when the other female shows up.  The

10   female wearing the brown jacket shows up, knocks on 220,

11   then on 218, and then she walks away and comes back several

12   minutes later and meets with the man on the landing in front

13   of room 217.

14   Q    And was this relayed to the rest of the officers?

15   A    I'm sorry.  The what?

16   Q    Was this information relayed to the rest of the

17   officers?

18   A    Yes.

19            MR. YANG:  Now I'm playing the same audiotape from

20   32, 45 seconds.

21            *(The audio recording was played.)*

22   BY MR. YANG:

23   Q    Officer Landeros, who is Chuy referring to?

24   A    That would be me.  They call me Ricky, Rick, Chuy,

25   Chewster, Chewby.  They call me different names.  They

```
 1   either call me Ricky or Chuy or Chewby or Chewster.  If you
 2   hear those names, that would be me.
 3             MR. YANG:  Now I'm playing track 2 of the exhibit,
 4   same audiotape; and this should start on page 5 of 19.
 5                  (The audio recording was played.)
 6             MR. YANG:  I'm going to skip ahead on track No. 2
 7   to minute 255, and it's also on page 6 of 19.
 8                  (The audio recording was played.)
 9   BY MR. YANG:
10   Q    Officer Landeros, what does "write paper" mean?
11   A    Write paper means write a search warrant.
12             MR. YANG:  I'm going to continue with that track.
13                  (The audio recording was played.)
14   BY MR. YANG:
15   Q    Officer Landeros, whose voice was that?
16   A    That's my voice.
17   Q    And what were you relating to them?
18   A    I was relaying to them that I saw a black female
19   wearing the brown jacket went up to 220, knocking on it, and
20   then walking to 218, knocking, and then leaving southbound.
21             MR. YANG:  I'm going to play track 3 of the same
22   exhibit.
23                  (The audio recording was played.)
24   BY MR. YANG:
25   Q    Officer Landeros, who does "Dub" refer to?
```

```
 1              MR. BAKMAN:  I'm going to object as speculation.
 2   This is not Officer Landeros speaking.
 3              THE COURT:  Lay a foundation for the response.
 4              MR. YANG:  Certainly.
 5   Q    Officer Landeros, do you know anyone by the name of
 6   "Dub"?
 7   A    Yes.
 8   Q    Who is "Dub"?
 9   A    "Dub" is Officer White.  It's a nickname we give him.
10              MR. YANG:  I'm going to continue on that track.
11                  (The audio recording was played.)
12   BY MR. YANG:
13   Q    Officer Landeros, who's he referring to here?
14   A    Who's what?
15   Q    I'm sorry.  When you said "he," who is he referring to?
16   A    The gentleman in the landing.
17   Q    Okay.  I'm sorry.  Let me backtrack a little.  Is that
18   your voice that just made that statement?
19   A    Yes.
20                  (The audio recording was played.)
21   BY MR. YANG:
22   Q    Officer Landeros, who you are referring to right there?
23   A    That, to me, it seemed like the person was agitated
24   maybe or mad because the stranger walked up to the bottom of
25   his room.
```

1   Q     Well, specifically, what did you see occur?

2   A     I saw the gentleman in the landing kind of -- he was

3   animated.  He was kind of like waving like, get away type,

4   just waving; and I saw the officer immediately walk away;

5   but the female stayed there.

6                 *(The audio recording was played.)*

7   BY MR. YANG:

8   Q     Officer Landeros, at this point where was the man that

9   was previously on the landing?

10  A     The man was inside the room.

11  Q     Did you see any other males go inside the room at this

12  point?

13  A     No.

14  Q     And the female with the brown jacket, what did you see

15  her do at this point?

16  A     She left the room.  She walked south, like southwest.

17  There's a stairwell there.  From there, I lost visual of

18  her; and she was the female that I saw later on on the

19  corner of Sixth and G meet with Officer White.

20  Q     And approximately how much later?

21  A     Maybe a couple minutes later.

22                 MR. YANG:  I'm going to continue playing this

23  track.

24                 *(The audio recording was played.)*

25

1   BY MR. YANG:

2   Q    I'm sorry.  Prior to the last person that just spoke,

3   whose voice was that prior to the last person?

4   A    That was my voice.

5   Q    Okay.  And what were you observing there?

6   A    The room 217, the door was open.  I observed the guy

7   that was on the landing I guess making some type of contact

8   with the lady in the purple suit.

9            MR. YANG:  I'll continue the audio.

10           *(The audio recording was played.)*

11  BY MR. YANG:

12  Q    Officer Landeros, was that your voice that just spoke?

13  A    Yes.

14  Q    What were you talking about when you said "Hand it

15  off"?

16  A    That the girl in the brown jacket made hand contact

17  with Officer White.

18           *(The audio recording was played.)*

19  BY MR. YANG:

20  Q    Officer Landeros, was that your voice that just spoke?

21  A    Yes.

22  Q    And what were you talking about there?

23  A    When Officer White walked away out of my view, walking

24  I guess south, the female in the brown jacket threw

25  something at the male on the landing; and then after that,

```
 1    she walked away with the other female.
 2              (The audio recording was played.)
 3              MR. YANG:  Your Honor, I'm going to play CD No. 2
 4    of that same exhibit, track No. 1, starting at minute --
 5    three minutes and 48 seconds.
 6              I'm sorry.  And this is on page 13 of 19.
 7              (The audio recording played.)
 8              MR. YANG:  I'm sorry.  I'll start it from the
 9    beginning of that track.
10              (The audio recording was played.)
11    BY MR. YANG:
12    Q    Officer Landeros, was that your voice that just spoke?
13    A    Yes.
14    Q    And who was the bad guy that you're referring to?
15    A    The bad guy would be the gentleman that was in the
16    landing.
17              MR. YANG:  Now I'm going to skip ahead to minute
18    348 of that same track.  That's just toward the bottom of
19    that same page, page 13 of 19.
20              (The audio recording was played.)
21    BY MR. YANG:
22    Q    Officer Landeros, was that your voice, the last
23    speaker?
24    A    Yes, it was.
25    Q    What were you referring to there?
```

```
 1   A    He was crossing the street, the man in the landing, and
 2   I believed he was too close to me and I needed to move
 3   because he was more than likely going to spot me.
 4              (The audio recording was played.)
 5   BY MR. YANG:
 6   Q    Officer Landeros, was that your voice, the last person
 7   who just spoke?
 8   A    Yes, it was.
 9   Q    What were you referring to there?
10   A    I was referring to the man on the landing.  He wasn't
11   wearing a gray jacket.  He had on what I thought was a dress
12   shirt, a white striped shirt; and he was meeting up with a
13   gentleman in a red truck.
14              MR. YANG:  I'm going to continue with that track.
15              (The audio recording was played.)
16   BY MR. YANG:
17   Q    Officer Landeros, who was speaking right now?  Who just
18   spoke?
19   A    The last voice, that was me.
20   Q    And when you were referring to "he," who were you
21   referring to?
22   A    He.
23   Q    In the recording, you just said "he."  Who were you
24   referring to?
25   A    The gentleman in the landing.
```

```
 1            MR. YANG:  No further questions, Your Honor.
 2            THE COURT:  All right.
 3            Cross?
 4            MR. BAKMAN:  No questions.
 5            THE COURT:  No question?
 6            MR. BAKMAN:  No questions.
 7            THE COURT:  All right.  Thank you very much.  The
 8    witness is excused.
 9            The next government witness.
10            MS. WILLIAMS:  May we confer with defense counsel?
11    This is something we spoke about with order of witnesses.
12            THE COURT:  All right.  Let me indicate to the
13    jurors.  You can all stand and stretch, touch your toes if
14    you can.
15            MS. WILLIAMS:  Your Honor, may we approach?
16            THE COURT:  Yes.
17            THE COURT:  Does the government have its next
18    witness?
19            MS. WILLIAMS:  It does, Your Honor.  The United
20    States calls Lon Anderson.
21            THE COURT:  All right.
22            MR. BAKMAN:  And, Your Honor, if you might in the
23    presence of the jury.
24            THE COURT:  Yes.
25            MR. BAKMAN:  Mr. Anderson is going to be taken out
```

 1    of order.

 2              THE COURT:  Okay.

 3              MR. BAKMAN:  He's going to testify as to evidence

 4    that will probably later be admitted through Agent Kaighin;

 5    but I would reserve any objection to that admissibility

 6    until after Miss Kaighin testifies.

 7              THE COURT:  Okay.

 8              MR. BAKMAN:  So if there's a problem, I'll make a

 9    motion to strike at a later point in time.

10              THE COURT:  The only thing I would ask, though, is

11    if the objection is based on something that could be

12    addressed when the witness is here, I'd prefer it.

13              So, in other words, for example, if you have some

14    sort of foundation objection with this witness, I'd prefer

15    that you complete it now.

16              MR. BAKMAN:  Very well.

17              THE COURT:  Okay.

18                         *(Counsel conferred.)*

19              MR. YANG:  Your Honor, I'm sorry to interrupt; but

20    I just conferred with defense counsel and we're in agreement

21    to dismiss Officer Landeros; to excuse him.  I'm sorry.

22              THE COURT:  Okay; that's fine.

23              **LON ANDERSON, GOVERNMENT'S WITNESS, SWORN**

24              THE CLERK:  Please raise your right hand.

25              Do you solemnly swear that the testimony you shall

| | |
|---|---|
| 1 | give in the cause now before this court shall be the truth, |
| 2 | the whole truth, and nothing but the truth, so help you God? |
| 3 | THE WITNESS:  I do. |
| 4 | THE CLERK:  Please have a seat. |
| 5 | State your name and spell your last name for the |
| 6 | record. |
| 7 | THE WITNESS:  My name is Lon Anderson.  The last |
| 8 | name is A-N-D-E-R-S-O-N. |
| 9 | **DIRECT EXAMINATION** |
| 10 | BY MS. WILLIAMS: |
| 11 | Q    Sir, how are you employed? |
| 12 | A    I'm a forensic chemist with the Drug Enforcement |
| 13 | Administration. |
| 14 | Q    Is that also referred to as the DEA? |
| 15 | A    Yes. |
| 16 | Q    How long have you been a forensic chemist there? |
| 17 | A    Just under six years. |
| 18 | Q    What do you do as a forensic chemist with the DEA lab? |
| 19 | A    I have four primary duties:  I analyze exhibits that |
| 20 | are submitted to the laboratory to identify them; I conduct |
| 21 | training for law enforcement; I assist law enforcement in |
| 22 | the field for the seizure of clandestine laboratories; and, |
| 23 | number four, I testify in court as to my findings. |
| 24 | Q    Okay.  You said that one of your duties is analyzing |
| 25 | exhibits that come into the lab.  What kind of exhibits are |

1   you talking about?

2   A     Materials that are suspected of being controlled

3   substances.

4   Q     And you mentioned that you conduct training for law

5   enforcement.  What does that training consist of?

6   A     An example would be I will take a group of law --

7   police officers or task force officers through a synthesis

8   of methamphetamine or, say, the conversion of cocaine

9   hydrochloride to cocaine base.

10  Q     Sir, what's your educational background?

11  A     I have a Bachelor's Degree in chemistry from St. Olaf

12  College in Northfield, Minnesota, and a Master's Degree in

13  chemistry from the University of Iowa.

14  Q     What positions have you had before joining the DEA

15  laboratory relating to chemistry?

16  A     I worked as an intern for a pharmaceutical company, I

17  worked as a research chemist at a food products laboratory,

18  and I also worked as a teaching assistant in graduate

19  school.

20  Q     Have you received other specialized training outside of

21  your formal education relating to your current position as a

22  forensic chemist?

23  A     Yes.  I completed a nine-month on-the-job training

24  program as a forensic chemist in the identification of

25  controlled substances.

1          I also completed a one-month training program in

2   Quantico, Virginia, basic forensic sciences school; and I

3   also completed a week-long training there for clandestine

4   laboratory safety.

5   Q    Sir, how much of your position as a forensic chemist is

6   devoted to analyzing the exhibits you referred to,

7   specifically substances that are suspected to be narcotics

8   or controlled substances?

9   A    That varies from time to time, but I'd say primarily

10  what I'm doing is analyzing substances probably 80 percent

11  of the time.

12  Q    Would you say, generally, that you analyze substances

13  on a routine daily basis as part of your position?

14  A    Yes.

15  Q    And how many times, conservatively speaking, have you

16  chemically analyzed exhibits to determine whether substances

17  are or contain controlled substances?

18  A    I would estimate approximately 1500.

19  Q    1500 exhibits?

20  A    Yes.

21  Q    Have those 1500 exhibits included what is suspected to

22  contain or be cocaine base?

23  A    Yes.

24  Q    And we've referred to controlled substances.  Can you

25  explain to the jury what that term means?

1    A     The United States Code defines a list of materials to

2    be controlled substances so the fact that they're listed

3    makes them controlled.  So there's various regulations as to

4    how they may be handled, who may handle them, what

5    quantities, how they may transact them.

6              There are different schedules depending on whether

7    or not a material has a recognized legitimate medical use in

8    the United States.

9              So Schedule I would be something that has no

10   recognized medical use in the United States; and then II,

11   III, IV, and V are lesser degrees of health, safety, or

12   hazard risk to the public.

13   Q    And when you analyze exhibits as part of your job, when

14   you make conclusions as to what those exhibits contain, are

15   those conclusions reviewed?

16   A     Yes.  100 percent of my work is reviewed by my

17   supervisor; and work is -- various chemists have their work

18   reviewed on a quarterly basis by a quality assurance

19   committee.

20   Q    What's the purpose of that?

21   A    To ensure compliance with our procedures and to have a

22   second set of eyes or, in the case of the third review, to

23   have a third set of eyes to verify that the conclusions I

24   draw are based on the data I collect.

25   Q    And that's a regular practice in the laboratory that

1    all chemists' conclusions are reviewed?

2    A    Yes.

3    Q    I think that you mentioned that one of your duties is

4    to testify if necessary.  Have you previously testified in

5    court in relation to your current position?

6    A    Yes.

7    Q    Has that included state and federal court?

8    A    I've testify in state and federal court in Southern

9    California and in Arizona.

10   Q    So are you familiar with the procedure for submitting

11   exhibits to your lab for review; how that process is done?

12   A    Yes.

13   Q    And if you could just generally explain that to the

14   jury.

15   A    Exhibits are brought into our laboratory either by a

16   certified courier or by a submitting agent.  They're

17   hand-delivered to our evidence technicians who are trained

18   in the handling of suspected controlled substances.

19              In some cases, they may be particularly hazardous.

20              They'll inspect the paperwork that comes with the

21   evidence and compare it to the evidence to make sure the

22   evidence is in a sealed condition.

23              They'll check the weight.  They'll assign -- they

24   will give the submitting agent a receipt; and the custody of

25   the evidence will be transferred to our evidence

1    technicians; and then they will assign a unique laboratory

2    number to a particular exhibit.

3    Q    And then where does the exhibit go?

4    A    The actual evidence itself remains in the vault until

5    the work is assigned to a chemist like myself at which point

6    I will request from the vault to have the custody of the

7    evidence transferred to me so that I can analyze the

8    evidence.

9    Q    What does this vault look like?  Is it one room?

10   A    It's approximately the size of maybe two of these

11   courtrooms so you could drive a forklift in it.  It's

12   blast-proof with the thick blast-proof vault doors.

13   Q    Are there measures to secure the vault?

14   A    Yes.  There are many mechanisms in place:  Armed

15   guards, combination locks, et cetera, to secure the evidence

16   in the vault.

17   Q    And you mentioned that when evidence is submitted

18   either through the courier or the submitting officer or

19   agent that the evidence technician compares the paperwork to

20   the actual evidence; and what is on there that they're

21   comparing?

22   A    The paperwork that comes in with a submitted exhibit

23   will contain, for example, the type of container that the

24   evidence is submitted in.

25        It could be a box, it could be a bucket, it could

1    be a see-through heat-sealed evidence envelope.  So that

2    will be one thing they'll check.

3            There's also information on there as to what it

4    contains.  So if it says "box containing 20 bricks," they

5    can weigh the box and compare the weight and see if it's

6    consistent with the description in that manner; and they

7    also check the seals on the evidence.

8    Q    And the procedure that you just described, is that the

9    same procedure that's used for all drugs or only particular

10   drugs?

11   A    That procedure is followed for all submissions to the

12   laboratory.

13   Q    So you mentioned that in order for you to get the

14   evidence you have to go to the vault.  Can you walk through

15   that process?  How do you know what evidence to get or when

16   you're assigned to an exhibit?

17   A    Well, when I'm assigned an exhibit, I will receive --

18   it's Form DEA7.  This is the same form that comes with the

19   evidence when it's submitted to the laboratory.

20           So it has all of the information on there such as

21   the type of container it's in, the weight, the further

22   description.  I will take that and use the information on

23   there to request the evidence from the vault; and when they

24   present it to me, prior to it transferring custody, I'll

25   ensure that the case information matches, the description.

1        I will check the condition of the seals.  So prior
2   to having the custody of the evidence transferred to me, I
3   will make sure that all of those things are in order.
4   Q    And once you take custody of an exhibit, what efforts
5   do you make to safeguard it, if any?
6   A    I have several ways that I safeguard evidence.  It's a
7   regular procedure that I follow that while evidence is in my
8   custody, I make sure that it's either within arm's reach or
9   in a locked condition.
10        I have several different ways to do that.  I have
11   a locked metal box.  At night or over weekends, I will
12   secure that in a separate vault that is accessible only to
13   chemists; and inside that vault, I have a separate locked
14   container.
15   Q    And, Mr. Anderson, once you receive an exhibit and you
16   analyze it pursuant to your position, how are the
17   investigating officers involved, if at all?
18   A    They are really not.  Only if there was some sort of
19   clarification needed or something on rare occasion.
20   Otherwise, I would likely have no contact with the
21   submitting officer or investigators.
22   Q    Were you asked to test substances submitted by ATF
23   Agent Angie Kaighin in relation to the case of Calvin
24   Colbert?
25   A    Yes.

1    Q    Do you know Calvin Colbert?

2    A    I'm sorry.  Do I know him?

3    Q    Yes.

4    A    No, I do not.

5    Q    Okay.  Did you, in fact, analyze those exhibits that

6    were submitted?

7    A    Yes.

8    Q    Did you use the procedure that you just described to

9    the jury in going to get the evidence from the vault?

10   A    Yes.

11   Q    Did you make a report of your analysis?

12   A    Yes.

13   Q    When did you do that?

14   A    March of 2009.

15   Q    Have you reviewed the report before coming in today?

16   A    Yes.

17   Q    And was that a 159-page report?

18   A    Yes.

19        MS. WILLIAMS:  And, Your Honor, may I ask Special

20   Agent Kaighin to hand up Exhibits 23 and 24?

21        THE COURT:  All right.

22        MS. WILLIAMS:  Not yet admitted.

23        MR. BAKMAN:  And may I approach as well?  I need

24   to take a look at the exhibits.

25        THE COURT:  Yes.

```
 1                (Pause in the proceedings.)
 2          MR. BAKMAN:  Do you know which one is 23 and 24?
 3          MS. WILLIAMS:  It should be marked on the back.
 4          MR. BAKMAN:  Thank you.
 5                (Pause in the proceedings.)
 6          MR. BAKMAN:  And, Your Honor, may I stay here
 7  while he's being questioned on these two items so I can take
 8  a look?
 9          THE COURT:  If he doesn't mind.
10          THE WITNESS:  It's fine by me.
11          THE COURT:  All right.
12          MR. BAKMAN:  We might want to ask the jury; they
13  may mind.
14          THE COURT:  I think they have to stand you.  He's
15  temporary; you're it for the long haul.
16                      (Laughter.)
17          THE COURT:  All right.  May I ask for the question
18  from the government?
19  BY MS. WILLIAMS:
20  Q    Do you recognize those, Exhibits 23 and 24?
21  A    Yes.
22  Q    What are they?
23  A    These are the sealed -- these are heat-sealed evidence
24  envelopes that originally the evidence was submitted in; and
25  when I completed my analysis, I then sealed with a
```

1    tamper-evidence seal with my signature.

2    Q    Do you see these seals that you just referred to right

3    now?

4    A    Yes.  They're at the bottom of the heat-sealed evidence

5    envelopes.

6    Q    And where did you receive those exhibits for the first

7    time?

8    A    I received them from our evidence technician at the

9    laboratory.

10   Q    In what condition were those exhibits in when you first

11   received them from the vault?

12   A    They were in a sealed condition.

13   Q    Was there any evidence of tampering?

14   A    No.

15   Q    What did you do with the package and the contents when

16   you took them from the vault?

17   A    I proceeded with my analysis.

18   Q    And what tests are a part of your analysis?

19   A    Well, in this case, I obtained a gross weight of the

20   submitted evidence.

21   Q    What does that mean, "gross weight"?

22   A    That would be simply everything that was in the package

23   at the time on the balance.  So that would include the

24   labels, these paper envelopes, the evidence envelope itself,

25   and all the contents.  That would be the gross weight.

1  Q    And then what?  Continue.

2  A    After that, I would determine the net weight of the

3  substance that had been submitted in the packaging so I

4  would separate out, in this case, Exhibit 23 and the

5  Exhibit 24.  They contained several smaller envelopes which

6  contained knotted plastic baggies.  Those were removed.

7  Q    The plastic baggies?

8  A    Yes.  And I weighed new Ziploc bags that I put the

9  material in; and I determined the net weight of the

10  material; and I did several chemical tests to determine the

11  identity of the substance and to determine if there were any

12  other substances present as well.

13  Q    Okay.  So the net weight is just the weight of the

14  substance itself; is that correct?

15  A    Yes.

16  Q    Okay.  And then what type of chemical test did you

17  perform to determine the substance?

18  A    I did infrared spectroscopy.  That's where,

19  essentially, infrared light is shined through the material;

20  and different chemicals will absorb that light differently;

21  and when plotted as a function of the amount of light

22  absorbed versus the wavelength, it creates a unique pattern

23  or a chemical fingerprint from which I'm able to identify

24  the material.

25          And I also did a gas chromatography mass

1   spectrometry test.  That's essentially a chemical

2   separation.  It takes everything that's present in a

3   mixture, separates it chemically, and then I'm able to

4   identify those individual components.

5   Q    And the tests that you described, are those the normal

6   accepted tests for determining chemical composition?

7   A    Yes.

8   Q    Did you make any variations to those normal, accepted

9   tests in determining the chemical composition of these

10  substances before you?

11  A    No.  I didn't vary my analysis from any, you know,

12  relative to any commonly accepted practices.  It's a very

13  routine analysis in fact.

14  Q    So based on the tests that you just described and based

15  on the training and experience that you earlier described,

16  did you come to any conclusions about what that substance is

17  in front of you in Exhibits 23 and 24?

18  A    Yes.  They both contained cocaine base.

19  Q    And what is the basis of your opinion?

20  A    The data that I collected from the chemical tests, the

21  observations I made, based on my knowledge, skills, and

22  experience, I formed that opinion.

23  Q    And you mentioned the net weight of the substance.  The

24  net weight, did you determine is it more or less than five

25  grams?

1    A     It's more than five grams.

2    Q     Is it more or less than 20 grams?

3    A     It's more than 20 grams.

4    Q     After you conducted these tests on the substances, what

5    did you do?

6    A     When I completed the chemical tests, I returned the

7    evidence to this heat-sealed evidence envelope.  I took

8    careful notes as to how I repackaged it, how much material

9    was left.  Some of the material is destroyed.  It's a

10   destructive type of testing.

11          I resealed it with the tamper-evidence label that

12   I mentioned, and I returned both of the pieces of evidence

13   to our evidence technicians.

14   Q     And when you say "destructive type of testing," like

15   some of the substance is used up in the testing itself?

16   A     Yes.  It's used up, it's consumed, destroyed.  So it

17   may start out with a certain amount, and I use up a small

18   amount of the material that's submitted.

19   Q     After you packaged it up, where did you take it?

20   A     To our evidence technicians in our main vault.

21   Q     Was it after that time that you prepared a report or is

22   it prepared in conjunction with the test?  How does that

23   work?

24   A     While I'm doing the testing, I take notes as to my

25   observations; and I assemble a packet of data from the

1    chemical tests that I perform.

2           When I'm ready to form a conclusion and create the

3    report, then I seal this up and return it to the vault at

4    their first opportunity and I turn in the report at

5    approximately the same time.

6    Q    And you mentioned observations so I wanted to go back

7    just for a second.  You mentioned in the tests that you

8    perform you weigh it, then you do the chemical analysis.  Is

9    part of your analysis your observations of the substance?

10   A    Yes.

11   Q    And what did that consist of in this case, your

12   observation of it?

13   A    The evidence submitted were chunky whitish solids with

14   a waxy appearance.

15   Q    And after you completed your analysis and returned it

16   to the vault and completed your report, was your report then

17   reviewed by anyone in your office?

18   A    Yes.  It was reviewed by my supervisor.

19   Q    And is that pursuant to the normal procedure at the

20   lab?

21   A    Yes.

22           MS. WILLIAMS:  One moment, Your Honor.

23              (Pause in the proceedings.)

24           MS. WILLIAMS:  No further questions at this time.

25           THE COURT:  All right.

1    Cross?

2         MR. BAKMAN:  Yes, Your Honor.

3                    **CROSS-EXAMINATION**

4    BY MR. BAKMAN:

5    Q    All right.  Good afternoon, Mr. Anderson.

6    A    Good afternoon.

7    Q    You must have loved that statement when the *Matrix* came

8    out, huh?

9    A    I have heard that.

10   Q    All right.  Let me start out by asking you some

11   questions about the evidence that you analyzed.  First off,

12   when you used the infrared spectrophotometry method to

13   analyze the substance, what type of IR machine did you use?

14   A    What type of?

15   Q    Infrared machine did you use?

16   A    You mean the brand name?

17   Q    Yes.

18   A    It is a Thermal Electron Corporation brand.

19   Q    And is that a multi-wavelength machine or is it a

20   single-wavelength machine?

21   A    Multi-wavelength.  I'm not sure what you mean by that.

22   Q    What was the wavelength you used to measure the

23   decrease in the infrared energy?

24   A    The way the instrument works, it has a complex set of

25   mirrors that are kept in calibration by a helium neon laser

1  so, essentially, it's a laser-calibrated movement of a

2  mirror that then changes its distance from a fixed source.

3          That light is then sent through the material to a

4  detector which measures the absorption of many different

5  wavelengths.

6  Q    All right.

7  A    There's a broad spectrum of energies of wavelengths

8  that are sent through the material.

9  Q    When you have an idea of what the material -- so that

10  we're clear, the way the machine works is there's a

11  projector on one side which is the infrared energy and there

12  is a detector on the other side which measures the decrease

13  in the energy that is being put through the substance --

14  Correct? -- in a simplified form?

15  A    Essentially, that's one way of looking at it, sure.

16  Q    All right.  And when you send the energy through the

17  substance, you have an idea as to what wavelength the

18  substance will absorb the energy; is that right?

19  A    That's true.  It's considered the mid to near infrared

20  region of the electromagnetic spectrum which has energies

21  ranging from -- they're measured in wave numbers so say 400

22  wave numbers to 4,000 wave numbers which means in one

23  centimeter there will be between 400 and 4,000 wavelengths.

24          It's very scientific terminology.  I don't expect

25  that that is something that one can visualize, but it's very

| | |
|---|---|
| 1 | much like a microwave oven.  It's in that region of energy. |
| 2 | Q    All right.  It sounds somewhat complex overall.  I'm |
| 3 | assuming that your laboratory has systematic procedures and |
| 4 | policies to test the accuracy of that device; would I be |
| 5 | right? |
| 6 | A    That's correct. |
| 7 | THE COURT REPORTER:  I'm sorry, Mr. Bakman.  I |
| 8 | didn't hear the last part of your question. |
| 9 | BY MR. BAKMAN: |
| 10 | Q    That the laboratory would have systematic procedures |
| 11 | and policies to test the accuracy of the device; is that |
| 12 | correct? |
| 13 | A    Yes. |
| 14 | Q    And when was the device -- well, let's start out.  When |
| 15 | did you conduct your testing of the materials located in |
| 16 | those two plastic bags, Exhibit 23 and 24?  What date was |
| 17 | that testing conducted? |
| 18 | A    I would have to refer to my notes to give you the exact |
| 19 | date. |
| 20 | Q    Could you do that? |
| 21 | MS. WILLIAMS:  Your Honor, I have a copy of the |
| 22 | report. |
| 23 | MR. BAKMAN:  I have no objection. |
| 24 | THE COURT:  All right. |
| 25 | *(Pause in the proceedings.)* |

1          THE WITNESS:   Each exhibit was opened on the

2     26th of March in 2009.   That is when I began the analysis of

3     the material.

4     BY MR. BAKMAN:

5     Q     How long did it take you to complete the analysis?

6     A     I completed my report on March 30th so approximately

7     one week.

8     Q     In that intervening week period of time, I take it then

9     the analysis wasn't done where you just inserted some

10    material into the infrared machine, obtained a result, and

11    jotted it down.   It took you a week to do this, did it?

12    A     Approximately.   But, for example, I mentioned the

13    material was in knotted plastic baggies.   So I carefully

14    removed that material and kept -- for example, if there were

15    multiple knotted plastic baggies, I kept the material

16    separate and tested individually knotted plastic baggies.

17          So it wasn't a matter of testing just one portion

18    of material.   There were many tinier portions of material

19    packaged so that I needed to test them individually.

20    Q     So did you test all of the material in Exhibit 23 and

21    24?

22    A     I tested nearly all of it.   I used a statistical

23    sampling plan that we use.

24    Q     Okay.   And it took you a week to do that, correct?

25    A     Yes.

1    Q    During that week period of time, did you test samples
2    from other cases that were submitted to your laboratory?
3    A    No.
4    Q    All right.  So you worked only on these samples for the
5    entire week?
6    A    I may have had other duties at the time; but as far as
7    exhibits that I was working on, I only work on a limited
8    number of exhibits at a time so in this case I had these
9    both open and I was working on them.
10   Q    And did they stay open during the entire week period of
11   time?
12   A    Yes.  I resealed them only when I was complete, when I
13   was done.
14   Q    Let's go back to the machine and let's talk about the
15   accuracy of the machine.  Is it the machine checked for
16   accuracy before your sample analysis in this case and again
17   after to make sure you got the right results?
18   A    That's essentially two questions.
19   Q    Let me withdraw it and let me break it up.
20          Do you use a standard solution or do you use a
21   quality control reference material to check the machine for
22   accuracy?
23   A    I do not but our laboratory does have a procedure for
24   that, yes.
25   Q    Did you use a reference -- what is it?  Is it a

1    reference sample or a standard solution?

2    A    There is a reference material that's used to calibrate

3    or to check the calibration of the instrument.  It's

4    mist-traceable polystyrene.

5    Q    Was is it used by you in checking the machine that you

6    used when you analyzed the material in Exhibit 23 and 24?

7    A    No.  That procedure is conducted by the person who is

8    responsible for maintaining the instrument.  They specialize

9    in how to make some repairs, how to make sure it's operating

10   correctly.  They do that on a monthly basis; and if it's

11   ever not in -- how do I say this?  If it's ever out of --

12            MR. BAKMAN:  I'll object as nonresponsive at this

13   point in time.

14            THE COURT:  All right.

15   BY MR. BAKMAN:

16   Q    Sir, in the 159-page report that you gave the

17   government in this case, did that report include the

18   accuracy testing of the IR machine that you used to test

19   Exhibits 23 and 24?  Yes or no?

20   A    No.  The report does not.

21   Q    Did you bring the accuracy determination reports or

22   records here with you to court so that we could look at them

23   in the courthouse today?

24   A    No, I did not bring those.

25   Q    Now let's talk about the gas chromatograph that you

1    used.  Was that a Perkin-Elmer or Hewlett-Packard machine?

2    A    That's an Agilent machine.

3    Q    And gas chromatography was used as the second analysis

4    or the second step in your testing, was it?

5    A    A second test that I did was gas chromatography with

6    mass spectrometry detection.

7    Q    And you indicated that the gas chromatograph results

8    also established that the substance you were testing was

9    cocaine base; is that right?

10   A    I did not indicate that, no.

11   Q    All right.  The gas chromatograph that you used, that's

12   another instrument that is subject to periodic testing for

13   accuracy, is it?

14   A    Yes.

15   Q    And how often does your lab check the GC machine for

16   accuracy?

17   A    That's also checked on a monthly basis.

18   Q    And did you bring any records relating to the accuracy

19   determination tests that were utilized on the machine that

20   you used to test Exhibit 23 and 24?

21   A    No, I did not bring those.

22   Q    And was that -- were those accuracy records part and

23   parcel of the 159-page report that you provided to the

24   government in this case?

25   A    No, it's not part of the report.

1    Q    Did you review the accuracy records before you came

2    into court to testify here today?  And when I say "accuracy

3    records," I'm talking about accuracy or maintenance records

4    relating to both the IR machine and the GC machine.

5    A    I personally did not, no.  There is -- there are a

6    number of individuals who check that.  I am not among them,

7    but I personally did not check that.

8    Q    Now, let's talk about cocaine base for a minute.  Is

9    cocaine base chemically the same as cocaine or cocaine

10   hydrochloride?

11   A    It's a different material.  It's a different salt form.

12   So, no, it's not the same.

13   Q    How is does it differ chemically?

14   A    Chemically, there's a core molecule called cocaine; and

15   if you add one molecule of hydrochloride, which is

16   hydrochloric acid, it will form a salt and it will have

17   different chemical properties.

18          Cocaine hydrochloride is a white powdery

19   substance; and without the hydrochloride, the base form is a

20   waxy, often chunky or creamy or soft substance.

21   Q    Now, are there different types of cocaine base?

22   A    Cocaine base is a chemical term that identifies the

23   salt form of cocaine.  So, chemically speakingly, it

24   identifies the salt form as one of several.  There's cocaine

25   sulfate, tartrate, hydrochloride.  I don't know if that's --

Day 3 of Jury Trial, November 18, 2010, P.M. Session

1  Q    Well, let me ask you this.  Is there a difference
2  between cocaine base and crack cocaine?
3  A    Crack cocaine is considered -- I consider that a slang
4  term.  As a chemist, I would say that cocaine base is a very
5  specific chemical terminology and crack is a very less
6  precise way to -- that I'm well aware that it references
7  cocaine base in many examples.  But I suppose, depending who
8  you asked, you might get different answers when asking to
9  define the slang term "crack."
10  Q    In this case, when you examined Exhibit 23 and
11  Exhibit 24, what did you determine the substance to be?
12  A    The substances are cocaine base.
13  Q    Are they in the form of crack cocaine or not?
14  A    In my opinion, yes, they are in the form of crack
15  cocaine.
16  Q    And what's the basis for your opinion?
17  A    The basis of my opinion is my skills and experience, my
18  job duties where I train law enforcement how to convert
19  cocaine hydrochloride into crack which I've done many times
20  and in many different ways.
21       So I'm familiar with what the finished product
22  looks like both visually and how it compares from a -- based
23  on the data I would collect during an analysis of it.
24  Q    Now, let me go off subject for just a minute.
25       You weren't present on March 11th when --

1    March 11th, 2009, at the Economy Inn hotel when any type of

2    evidence was seized, were you?  March 11th, 2009, you were

3    probably in your laboratory out in San Diego, were you not?

4    A    Probably, yes.

5    Q    In other words, another way of my asking it,

6    Mr. Anderson, is that Exhibit 23 and 24, you have no idea

7    where that came from, do you?

8    A    I really don't.  It's submitted separate from -- I'm

9    not part of the origination of those.  I receive it.  I

10   analyze it.  I form an opinion independent of where it may

11   have come from.

12   Q    All right.  You don't know who seized that material?

13   A    No idea.

14   Q    You don't know any officer by the name of Gerald Beall,

15   do you?

16   A    It doesn't ring a bell, no.

17   Q    And you don't know if Gerald Beall was involved in the

18   seizure of that evidence, do you?

19            MS. WILLIAMS:  Asked and answered.

20            THE COURT:  Sustained.

21   BY MR. BAKMAN:

22   Q    Do you know how the evidence that you analyzed that's

23   contained in Exhibit 23 and 24, how it was packaged or when

24   it was packaged?

25   A    Originally by the agent?  I would have to look at the

1   DEA Form 7 to see what the submitting agent put down for

2   there, and I would have to go on that information.  So I

3   don't have any firsthand knowledge of that, no.

4   Q    Now, you prepared a report in this case, did you not?

5   A    Yes.

6             MR. BAKMAN:  Could I have the defense exhibit book

7   placed before the witness if I might.

8             *(Pause in the proceedings.)*

9   BY MR. BAKMAN:

10  Q    And directing your attention to tab 21, sir, would you

11  take a look at that for me?

12  A    *(Witness complies.)*

13  Q    Is that document a document entitled "DEA7" that you

14  were just referencing?

15  A    Yes.

16  Q    What is a DEA7?

17  A    It's a form that's -- it's a report of drug property

18  that is collected by seizure, purchase, or otherwise.

19  Q    And what's this document used for?

20  A    This records information pertaining to the seizure,

21  purchase, or other method of collecting evidence such that

22  when it's submitted to the laboratory, in my case, I'll have

23  the information to compare to the evidence.

24             It also serves as part of the chain of custody.

25  There's a documentation section so that when the evidence is

1  transferred to the evidence technicians, they can sign on

2  this form and document when that takes place and in what

3  manner.

4  Q    And let's explain for the jury the chain of custody if

5  we could.  Is chain of custody a concept where you want to

6  ensure that when you get the substance that was seized in

7  the field and what you evidently are ultimately analyzing,

8  you want to make sure it's the same substance that was

9  seized from a particular defendant in the case; is that

10  right?

11  A    That's one way of putting it.  I would say making sure

12  that the whereabouts of a material are accounted for so that

13  if three people handled a various piece of evidence they'd

14  say:  I gave it to person B and person B gave it to person

15  C.  Nobody messed with it in between.  And when we finished,

16  we packaged it in a way that we would know if anyone messed

17  with it afterwards.

18  Q    The DEA7 that is behind tab 21, is that the DEA7 that

19  you looked at to determine whether or not at least a certain

20  portion of the chain of custody was met?

21  A    Yes.

22          MR. BAKMAN:  Move 21 into evidence, Your Honor?

23          THE COURT:  Any objection?

24          MR. YANG:  No objection.

25          THE COURT:  All right.  It's admitted.

```
 1                    (Exhibit 21 received in evidence.)
 2                MR. BAKMAN:  May I publish?
 3                THE COURT:  Yes.
 4                (The exhibit was displayed on the screen.)
 5     BY MR. BAKMAN:
 6     Q    And if we look at the top half of the form, sir, can
 7     you take us through the form and tell us what we're looking
 8     at?
 9     A    Okay.  The form is divided into various block numbers
10     so there's the date the form is prepared in the top left.
11     Unique case number.  File title will be the defendant or
12     defendants.
13                Various other information is collected.  In this
14     example, it was a purchase and a seizure.  There's two -- in
15     block 13 there were two exhibits submitted:  ATF
16     Exhibit No. 1 and ATF Exhibit No. 2.
17     Q    Now let me ask you.  On the right-hand side of -- or
18     underneath block No. 17 and 18, on the right-hand side I see
19     a number 24G and then 90G.  Does the "G" represent grams?
20     A    I'm sorry.  Can you repeat that?
21     Q    Does the "G" represent grams?
22     A    Yes.
23     Q    And what is the "seized"?  What does the "24G"
24     represent?
25     A    Where it says "24G seized," that represents the weight
```

1    of the evidence when it was seized.

2    Q    Now, is that a net weight or a gross weight?

3    A    It's most likely a gross weight.  I did not record

4    this.  I can't tell you if that was.

5    Q    Do you know who recorded that?

6    A    The DEA agent submitting it, in this case Special Agent

7    Angie Kaighin.

8    Q    Do you know what she used in order to make that

9    measurement?

10   A    No, I don't.

11   Q    Is that consistent with the measurements that you

12   obtained?

13   A    If I could refer to my notes, I can answer that.

14                  *(Pause in the proceedings.)*

15            THE WITNESS:  The submitted weights were -- the

16   submitted weight for ATF 1 is consistent.  The submitted

17   weight for ATF Exhibit 2 was different.

18            In the case of ATF 2, the material weighed more

19   when I received it than is recorded here.

20   BY MR. BAKMAN:

21   Q    And you don't know -- do you know what happened in

22   between the time the -- well, let's go through the rest of

23   the document.  Let's go to the lower portion of the

24   document.

25            Block No. 24 appears to be a telephone number,

1    does it?

2    A    It appears to be, yes.

3    Q    And then there is a signature and a date and we believe

4    that's Special Agent Angie Kaighin?

5    A    Yes.

6    Q    That date is March 11th, '09?

7    A    Yes.

8    Q    And then the next date on our document appears to be

9    March 16th of '09; is that correct?

10   A    Yes.  In block 34A, our evidence technician Jon Curtis

11   signed for the evidence on the 16th of March.

12   Q    Jon Curtis, is that an individual down at your

13   laboratory in San Diego?

14   A    Yes.  He's an evidence technician who was working that

15   day.

16   Q    And you recognize that as being his signature in block

17   34A?

18   A    I'm sorry.  Can you repeat that?

19   Q    You recognize that as being Mr. Curtis' signature in

20   block 34A?

21   A    Yes.

22   Q    All right.  Now, between March 11th and March 16th,

23   what happened to the samples?

24   A    That would depend on the method of delivery of the

25   exhibit to the laboratory.  In this case, it was transferred

1    by FedEx.  So the amount of time to package and ship and
2    have it delivered on a business day so the delivery time
3    essentially.
4    Q    So let me see if I understand this right.  When we go
5    back up to submission No. 17 and No. 18, the 24 grams on
6    sample two, it got to you weighing more; and this sample was
7    shipped by using FedEx?  Yes?
8    A    It was sent by FedEx; but the weight of the exhibit,
9    not the sample.  The weight of the exhibit, which includes
10   the packaging, was more.
11   Q    Who at FedEx handled these narcotics?  Do you know?
12   A    I do not have the name of the persons.
13   Q    How long did it take?  When was it shipped with FedEx,
14   do you know?
15   A    I don't have that information.
16   Q    Do you know whether it was shipped overnight?
17   A    No, I do not.
18   Q    Turning to Exhibit 22, or tab 22, if you would look at
19   that for me, Mr. Anderson.
20   A    *(Witness complies.)*
21   Q    Do you recognize that document?
22   A    Yes.
23   Q    And is that your signature at the bottom of the
24   document?
25   A    Yes.

```
 1              MR. BAKMAN:  Move Exhibit 22 into evidence.
 2              THE COURT:  All right.  Any objection?
 3              MS. WILLIAMS:  No objection.
 4              THE COURT:  All right.  It's admitted.
 5          (Exhibit 22 received in evidence.)
 6              MR. BAKMAN:  May I publish?
 7              THE COURT:  Yes.
 8          (The exhibit was displayed on the screen.)
 9   BY MR. BAKMAN:
10   Q    And what are we looking here at on the screen?
11   A    This is the laboratory report that I prepared as a
12   result of my analysis of these exhibits:  Government's
13   Exhibits 23 and 24.
14   Q    And I see Exhibit No. 1A, 1B, 1C, 1D, and 2 on the
15   left-hand side of your report; is that correct?
16   A    Yes.
17   Q    Now, you only have -- you have two plastic bags, or
18   Exhibit 23 and 24, in front of you; is that correct?
19   A    Yes.
20   Q    Do those bags contain Exhibits 1A through 1D and
21   Exhibit 2?
22   A    Yes.  When I completed my analysis, I returned all the
23   evidence to these heat-sealed evidence envelopes.
24   Q    What was 1A?
25   A    I made a -- we call it a split.  So I took Exhibit 1
```

1   which was one of these.  It contained four separate

2   envelopes.  In each envelope was -- How do I say? -- either

3   one or several knotted plastic baggies of material.  So I

4   took each envelope and I called it -- the first envelope

5   Exhibit 1A.  The contents of envelope two were Exhibit 1B,

6   1C, and 1D.  Since I didn't know how this came to be

7   packaged, whether or not there might be a difference,

8   instead of treating it all the same, I treated the different

9   envelopes differently to make sure that they were each

10  analyzed as thoroughly as possible.

11  Q    Well, did you document what envelope or what material

12  came out of what envelope that went into your Exhibit 1A?

13  A    Yes.

14  Q    Where did you document that?

15  A    This is documented in my chemist notes.

16  Q    And what material comprised 1A?

17       Let me ask you this before I get -- let me

18  withdraw that question.  Let's go to Exhibit 23 in my book

19  if you would.  Are those your chemist notes?

20  A    Tab 23?

21  Q    Tab 23; yes, sir.

22  A    Yes, those are my chemist notes.

23  Q    And looking at page 1, there's a breakdown, is there

24  not, on box No. 7 where you have Exhibit 1A, 1B, 1C?

25  A    Yes.

1   Q    And do those notes -- am I looking or am I missing

2   something in there when I'm trying to determine where 1A,

3   1B, and 1C came from?

4   A    In block size, there's a description of the evidence.

5   So when I opened it up, it was -- the heat-sealed evidence

6   envelope contained a paper envelope containing four paper

7   envelopes.

8        The first envelope which I labeled "envelope A,"

9   it contained loose, chunky white solids.  Those loose,

10  chunky white solids are what I analyzed and reported as

11  Exhibit 1A in block 7.

12  Q    What was the weight of Exhibit 1A that you -- or what

13  was the weight of the material that you decided you would

14  label "1A"?

15  A    4.4 grams.

16  Q    And where is that?

17  A    Where is that recorded on the --

18  Q    In block 5.

19  A    The net weight is not reported in block 5.  That's the

20  description.  The net weight would be on the back -- well,

21  in the case of these sheets, it will be the following pages

22  where at the top of the sheet there's gross weight, date

23  opened, and net weight.

24  Q    Is that in my tab 23, sir?

25  A    Yes.

1    Q    What page?

2    A    The second page.  The fourth page.  The second and

3    fourth pages.

4    Q    All right.  Let me go back to the exhibit that's on the

5    board.  In your analysis here, the question I have for you:

6    In your report, did you document that the cocaine base that

7    you determined was from those bags that you analyzed was

8    cocaine base in the form of crack cocaine?

9    A    I'm sorry.  I didn't understand the question.

10   Q    Sir, on this document is there anything that references

11   that the cocaine base is in the form of crack cocaine?

12   A    No, there's not.

13   Q    Is there anything in your notes that states the cocaine

14   base is in the form of crack cocaine?

15   A    No, there's not.

16            MR. BAKMAN:  No further questions.

17            THE COURT:  All right.

18            Redirect?

19            MS. WILLIAMS:  Just briefly, Your Honor.

20                    **REDIRECT EXAMINATION**

21   BY MS. WILLIAMS:

22   Q    Is crack cocaine a scientific term or I believe you

23   referred to it as a slang term?

24   A    It's a slang term.  It's not scientific or very

25   descriptive in scientific terms at all.

```
 1  Q    In your experience, have you seen what people refer to
 2  as a slang term as crack cocaine?
 3  A    Yes, I've seen it.
 4  Q    And what does it look like?
 5  A    Chunky solids with a waxy appearance to it.  It can be
 6  creamy white, off-white, slight yellow.
 7  Q    And in Exhibits 23 and 24 that you examined, not the
 8  defendant's exhibits -- I apologize -- Government's Exhibits
 9  23 and 24, the evidence that you examined for this case, you
10  made observations of those substances?
11  A    Yes.
12  Q    And how did you observe them?
13  A    I reported them as chunky white solids in the
14  description of evidence section of my chemist worksheet.
15          MS. WILLIAMS:  No further questions.
16          MR. BAKMAN:  I have just a few, Your Honor.
17          THE COURT:  All right.
18                  RECROSS-EXAMINATION
19  BY MR. BAKMAN:
20  Q    Mr. Anderson, I'm going to read to you some statements
21  from a Ninth Circuit case if I might.  I'm going to ask if
22  you agree with --
23          MS. WILLIAMS:  I'm going to object.
24          MR. BAKMAN:  Well, let me read you a statement and
25  ask you --
```

```
 1              MS. WILLIAMS:  There's an objection.

 2              THE COURT:  I'll sustain the objection.  I mean,

 3      in other words, are you asking him to criticize the

 4      Ninth Circuit?

 5              MR. BAKMAN:  No, I would never do that.  I would

 6      never criticize the Ninth Circuit.

 7              We start out with the premise --

 8              THE COURT:  Let me do this.  I'll allow you to

 9      read the statement; but let me instruct the witness.  Before

10      you answer the statement, let me think about what he's

11      asking you to opine on.

12              All right.

13              MR. BAKMAN:  Statement one, cocaine and cocaine

14      base are chemically identical.  Yes or no?

15              MS. WILLIAMS:  And I'm going to object.

16              THE COURT:  Cocaine and cocaine base?

17              MR. BAKMAN:  Yes.

18              THE COURT:  Let me put it this way.  I'll allow

19      you to ask him that question as a question insofar as his

20      expertise is concerned.

21              But the fact that the Ninth Circuit may have said

22      that in an opinion is a factual question of which they, not

23      to criticize the Ninth Circuit, they wouldn't be qualified

24      to state.

25              MR. BAKMAN:  I will just ask the question, Your
```

1    Honor.
2              THE COURT:  All right.
3    BY MR. BAKMAN:
4    Q    Is -- cocaine and cocaine base are chemically
5    identical -- yes or no -- in your opinion?
6    A    In my opinion, those two terms are not the same.
7    Q    While crack -- strike that.
8              While all crack is cocaine base, not all cocaine
9    base is crack.
10             THE COURT:  Are you asking him if he disagrees or
11   agrees with that statement?
12             MR. BAKMAN:  Yes.
13             THE COURT:  All right.
14             THE WITNESS:  I would say I agree with that, yes,
15   all cocaine base is not necessarily crack.  All crack is
16   cocaine base.
17   BY MR. BAKMAN:
18   Q    Well, if we want to know what cocaine base is crack,
19   how do you chemically distinguish it from other forms of
20   cocaine base?
21   A    I can give you an example that can answer that better
22   than a direct answer.  Cocaine hydrochloride --
23             MR. BAKMAN:  Well, I'm going to object as
24   nonresponsive, Your Honor.  If he can answer the question,
25   he can answer it.

```
 1          THE COURT:  He's indicating that the best answer
 2   he can give is by way of an example.  So either -- if you
 3   don't want the example, you can withdraw the question.
 4          MR. BAKMAN:  I'll withdraw the question.
 5   Q    Is there a way to chemically distinguish crack from
 6   other forms of cocaine base?
 7          THE COURT:  Let me stop you, counsel.  He's
 8   already testified that in his opinion the term "crack" is
 9   not a scientific term.  Your question seems to imply within
10   it that there is some sort of chemical distinction between
11   crack cocaine and cocaine base.  So, by definition, he can't
12   answer that question as you've asked it.
13   BY MR. BAKMAN:
14   Q    All right.  Cocaine in its natural form is cocaine
15   base.  Do you agree with that?
16   A    Yes.
17   Q    When the leaves of the coca plant are shredded and
18   mashed with a strong alkaline, a solvent, and sulphuric
19   acid, a paste is produced containing cocaine base that is
20   smokable.  Do you agree with that?
21   A    Not necessarily.  That may or may not be the case.  It
22   would depend.
23   Q    Only when the paste is processed with hydrochloric acid
24   to create a salt, cocaine hydrochloride, does it become what
25   is commonly known as cocaine.
```

1    A    Chemically it's cocaine if it has the structure of the

2    cocaine molecule regardless of the stage of refinement by

3    man.  It occurs naturally in the coca leaf.  Whether or not

4    a human takes that and collects it or it just remains in the

5    leaf, it's still cocaine.

6    Q    Beginning in the '70s, American drug dealers --

7             MS. WILLIAMS:  Objection.  This is improper.

8             THE COURT:  At this point, I would agree.

9    BY MR. BAKMAN:

10   Q    Is there a different between free base cocaine and

11   crack?

12   A    In my opinion, yes, there is a distinction that can be

13   made between those two terms.

14   Q    Free base comes from cocaine base, does it not?

15   A    In my experience, free base is terminology that

16   describes how the cocaine was separated and purified from

17   whatever form it started out in.  So it uses a base to

18   liberate the cocaine molecule or it is abbreviated using the

19   term "free base."

20   Q    And that is different than what we refer to as crack,

21   correct?

22   A    Again, in my experience, crack can be created in many

23   different ways.  One of those ways is free base.  There's

24   also the rock method.  There's also a method that's called

25   the crack method of making crack.

1              All of these methods result in the same end

2     product of cocaine base; but as a chemist, I would be able

3     to tell you that one of these different methods was used or

4     not.

5     Q    What method was used in this case?

6     A    In my opinion, the method that was used in this case

7     is -- I call it the rock method; and what it is is a

8     container of water is heated, cocaine hydrochloride is added

9     and dissolved, and then sodium bicarbonate, or baking soda,

10    is added.

11             That is a chemical base that is used to remove the

12    hydrochloride molecule I mentioned; and what forms is a

13    foamy, thick milkshake-looking slurry; and as it's heated

14    and heated, the milkshakey appearance goes away; and it

15    almost becomes -- it more resembles a lava lamp.

16             Cocaine base is waxy, but at the right

17    temperature, it will melt; and the blobs of wax will form

18    together; and then after the majority of it has collected,

19    the container can be removed from the heat at which point

20    the solids will sit collected together.

21             And if the material is allowed to cool, the waste

22    products, the majority of the water, the sodium bicarbonate,

23    any salts that may have been formed, they can be discarded

24    and a big chunk of cocaine base, or crack, can be collected

25    and smashed into smaller pieces.

1    Q    And that's your opinion as to this substance, correct?

2    A    Yes.

3    Q    And that opinion, is it based on what you believe or is

4    it based on scientific evidence?

5    A    It's based on the observations I made and the data I

6    collected in my analysis.

7    Q    What data -- what scientific data did you collect that

8    supports that opinion of yours?

9    A    In this case, one of the tests I do is to test for

10   insoluble components.  I use an alcohol.  It's not ethanol

11   but methanol; and one of the components that gets trapped in

12   that rock is portions of the water that are used to make the

13   crack; and it will contain sodium bicarbonate.

14          In this case, I separated and isolated sodium

15   bicarbonate and I identified it.  This is the evidence, in

16   addition to my observations, that is the data that I used to

17   form that opinion.

18   Q    Is sodium bicarbonate used to free base or create

19   cocaine used for free basing?

20   A    It can be.

21   Q    So sodium bicarbonate by itself doesn't indicate

22   whether it's free base cocaine or cocaine base in the form

23   of crack cocaine, does it?

24   A    Again, it would depend on the appearance.  It is my

25   opinion that the method used was the rock method.  In the

1    free base method, the likelihood of contamination by the

2    sodium bicarbonate is much less.

3            A separate solvent is used to remove the cocaine

4    base; and as an example, one could use Coleman fuel or

5    gasoline and mix it with water containing cocaine.

6            And the sodium bicarbonate, you shake it up and it

7    will -- the gasoline, or the Coleman fuel, will absorb the

8    cocaine base.

9            And the person making the crack can simply collect

10   the Coleman fuel, or the gasoline, without any of the water

11   and the contaminants in the water getting into the cocaine

12   base.

13   Q    Let me ask you something.  In terms of the -- you've

14   indicated that as part of your background and experience you

15   teach law enforcement; is that right?

16   A    Yes.

17   Q    One of the reasons that there's a discussion occurring

18   or there's testimony occurring between us as to cocaine base

19   in the form of crack cocaine is because that's what the

20   statute requires and you've taught that to law enforcement;

21   is that right?

22   A    I taught law enforcement how to make crack.

23   Q    Have you read 21 USC 841?

24   A    I'm not familiar with the section you're referring to,

25   no.

1    Q    Do you know what my client is charged with in this

2    case?

3             MS. WILLIAMS:  Objection; improper.

4             THE COURT:  I'll allow him to answer that

5    question.

6             THE WITNESS:  I'm not aware of what he's charged

7    with, no.

8             MR. BAKMAN:  No further questions.

9             THE COURT:  All right.  Any other questions?

10            MS. WILLIAMS:  Just two that I want to ask.

11            THE COURT:  All right.

12                    **REDIRECT EXAMINATION**

13    BY MS. WILLIAMS:

14    Q    I just wanted to clarify.  You mentioned a rock method.

15    Is that a method that's used to make what is referred to as

16    crack cocaine?

17    A    Yes.

18    Q    And in your opinion, what's in Exhibits 23 and 24, is

19    that crack cocaine as you know as a street term?

20    A    Yes.  I've identified the material as cocaine base

21    which can also be called crack which is -- I say it can be

22    called crack which, based on my understanding, is the street

23    term for crack.

24            MS. WILLIAMS:  No further questions.

25            THE COURT:  All right.

```
 1              I presume nothing else?
 2              MR. BAKMAN:  No, nothing else, Your Honor.
 3              THE COURT:  All right.  The witness is excused.
 4    Thank you very much.
 5              Let's take our afternoon recess.  Let me have you
 6    come back in -- let's say -- well, about approximately 3:25
 7    is when we'll start again.
 8                   (The jurors exited the courtroom.)
 9                        (Recess.)
10                   (The jurors entered the courtroom.)
11              THE COURT:  All right.  The next government's
12    witness?
13              MR. YANG:  Yes, Your Honor.  The United States
14    calls Special Agent Angie Kaighin to the stand.
15         ANGIE KAIGHIN, GOVERNMENT'S WITNESS, SWORN
16              THE COURT:  All right.
17              THE CLERK:  Please raise your right hand.
18              Do you solemnly swear that the testimony you shall
19    give in the cause now before this court shall be the truth,
20    the whole truth, and nothing but the truth, so help you God?
21              THE WITNESS:  I do.
22              THE CLERK:  Please state your name and spell your
23    last name for the record.
24              THE WITNESS:  Angie Kaighin, K-A-I-G-H-I-N.
25              THE COURT:  All right.
```

```
 1              MR. YANG:  Thank you, Your Honor.
 2                    DIRECT EXAMINATION
 3   BY MR. YANG:
 4   Q     Agent Kaighin, who do you currently work for?
 5   A     I work for the Bureau of Alcohol, Tobacco, and
 6   Firearms.
 7   Q     How long have you worked at -- is that shorthand for
 8   ATF?
 9   A     Yes.
10   Q     How long have you worked at ATF?
11   A     Over 11 years.
12   Q     And what's your position there?
13   A     I'm a special agent.
14   Q     How long have you been a special agent?
15   A     11 years.
16   Q     What is your current assignment?
17   A     I am assigned to the San Bernardino Violent Crime
18   Impact Team.
19   Q     How long have you been assigned there?
20   A     Off and on since the fall of '07.
21   Q     What are your duties at this assignment?
22   A     My primary objective is to assist the City of San
23   Bernardino in reducing their violent crime.
24   Q     And with respect to this investigation, what were your
25   responsibilities?
```

1   A    I was the federal case agent.

2   Q    What are your responsibilities as the federal case

3   agent?

4   A    To simplify it, I consider myself as a fact-gatherer.

5   I gather the facts, I submit those to the U.S. Attorney's

6   office.  The U.S. Attorney decides what charges, if any, to

7   file and what follow-up investigation needs or wants to be

8   done; and then I conduct that follow-up.

9   Q    Let me take your attention back to March 11th of 2009.

10  Were you involved in the investigation of defendant Calvin

11  Colbert?

12  A    I was.

13  Q    How were you involved?

14  A    I was asked to assist in the execution of a search

15  warrant.

16  Q    Who were you assisting with the execution of the search

17  warrant?

18  A    Detective Roebuck's narcotics team.

19  Q    Where is Detective Roebuck from?

20  A    San Bernardino Police Department.

21  Q    Where was this search warrant going to be executed?

22  A    The Economy Inn in San Bernardino at Sixth and G.

23  Q    Were there any specific rooms?

24  A    Room 217 and 220.

25  Q    At some point, did you find out that a search warrant

1    was obtained?

2    A    I did.

3    Q    What did you do when you found out that a search

4    warrant was obtained?

5    A    I got geared up.

6    Q    Did you go anywhere?

7    A    We did.

8    Q    Where did you go?

9    A    We drove to the location.

10            MR. BAKMAN:  I'm going to object to the phrase of

11   "we," Your Honor, and ask that she limit her answers to what

12   she personally did.

13            THE COURT:  I would agree unless the question

14   calls for what she saw other people doing; but this question

15   can be answered solely as to herself.

16            MR. YANG:  Certainly, Your Honor.

17   Q    Where did you go after you geared up?

18   A    To the Economy Inn in San Bernardino.

19   Q    Who was with you at that time?

20   A    Detective Roebuck, Officer Rich Everett, Officer Ryan

21   Tack, Officer Jerry Beall, and Special Agent Amy Maholick.

22   Q    What did you do when you arrived in the vicinity of

23   Economy Inn?

24   A    We formed our stack, we had our assignments, and we

25   approached the rooms.

1   Q    Agent Kaighin, what's a stack?

2   A    That's where the officers fall into a line so that we

3   can make a single-file line to approach the location.

4   Q    What happened after everyone got into a stack?

5   A    We began approaching the rooms in question.

6   Q    Then describe what happened next.

7   A    At some point, I recall being told to go straight to

8   220.  We went to room 220.  The team knocked and announced:

9   Police.  Search warrant.  Demand entry.  And then entry was

10  made into 220.

11  Q    What happened when entry was made into the room?

12  A    Right when I entered the room, I saw the defendant

13  sitting in the corner of the room with money in his hands.

14  Q    What was he doing?

15  A    It looked like he was counting it.

16  Q    Did he respond when you guys went in?

17  A    He yelled and threw the money in the air.

18  Q    What was defendant wearing?

19  A    He had a button-up what I would consider a dress shirt.

20  It was mostly white with some stripes on it.

21  Q    Do you see the person that you saw in the Economy Inn

22  on that day sitting in the courtroom today?

23  A    I do.

24  Q    Can you identify that person?

25  A    Yes.

1  Q    Who is that person?

2  A    He's the younger gentleman at the defense table wearing

3  the sweater vest.

4  Q    Does he appear the same today as he did when he was at

5  the Economy Inn that day?

6  A    He didn't have glasses on when we first met him.

7         MR. YANG:  I'm going to show you a document that's

8  been marked as Exhibit 42.

9         Sorry, Your Honor.  May I approach the witness

10  with Exhibit 42?

11         THE COURT:  All right.

12  BY MR. YANG:

13  Q    Agent Kaighin, what's depicted in this photograph?

14  A    This is a still photo of a video that was taken that

15  day just right after we made entry into the room.

16  Q    Who is that depicted in the photo?

17  A    That's the defendant.

18  Q    And the clothes that he's wearing, is that consistent

19  with what he was wearing that day when you went into room

20  220?

21  A    Yes, that's what he was wearing.

22  Q    I'm sorry.  I cut you off.

23  A    Yes, that's what he was wearing.

24         MR. YANG:  Your Honor, government moves to admit

25  Exhibit 42 into evidence.

```
 1              THE COURT:  All right.
 2              Any objection?
 3              MR. BAKMAN:  No objection.
 4                (Exhibit 42 received in evidence.)
 5              MR. YANG:  Your Honor, may I publish to the jury?
 6              THE COURT:  Yes, you may.
 7                (The exhibit was displayed on the screen.)
 8  BY MR. YANG:
 9  Q    And, Agent Kaighin, it's a little blurry in here; but
10  do you see that door on the right of the photograph?
11  A    I do.
12  Q    Okay.  Can you make out what those numbers are?
13  A    It's 22.
14  Q    Were there any numbers missing?
15  A    The zero was missing that day.
16  Q    Okay.  What happened once the entry team entered the
17  room and the defendant threw up the money?
18  A    He was ordered to the ground.
19  Q    Did he comply?
20  A    He did.
21  Q    What happened next?
22  A    He was asked if he had any weapons.
23  Q    How did he respond?
24  A    He said yes.
25  Q    Did he indicate where the weapon was?
```

1   A     He did.

2   Q     Where did he indicate it was?

3   A     He made a head motion towards the dresser and said:

4   It's in the drawer.

5   Q     Agent Kaighin, I'm going to show you -- or if you can

6   turn to Exhibit 12, Government's Exhibit 12, please.

7   A     *(Witness complies.)*

8   Q     Do you recognize that photo?

9   A     I do.

10  Q     And what is that photograph?

11  A     This is a photo of the interior of the room.

12  Q     Did you take this photograph?

13  A     I did.

14  Q     And you took it on what day?

15  A     March 11th, 2009.

16        MR. BAKMAN:  I'm sorry.  Which exhibit?

17        MR. YANG:  12.

18        Your Honor, government moves to admit Exhibit 12

19  into evidence.

20        THE COURT:  All right.

21        And there is no objection?

22        MR. BAKMAN:  No objection.

23        THE COURT:  All right.  It's admitted.

24        *(Exhibit 12 received in evidence.)*

25

```
 1              MR. YANG:  Your Honor, I will publish to the jury.
 2              THE COURT:  All right.
 3              (The exhibit was displayed on the screen.)
 4    BY MR. YANG:
 5    Q    Agent Kaighin, on Exhibit 12, where was defendant
 6    sitting when you entered the room?
 7    A    The chair in the far left corner of the picture.  He
 8    was sitting in that chair.  However, the chair was facing
 9    under the table.
10    Q    So this chair over here on the left side (indicating)?
11    A    That's correct.
12    Q    And when he lie down on the ground, where did he lie
13    down?
14    A    Between the table and the bed.
15    Q    So there's an area here (indicating) between the table
16    and the bed?
17    A    That's correct.
18    Q    And when he motioned, where did he motion towards?
19    A    The drawer that's open in the picture.
20    Q    At the time, was the drawer open or closed?
21    A    It was closed upon entry.
22    Q    Okay.  Have you executed search warrants before with
23    the San Bernardino Police Department?
24    A    I have.
25    Q    Approximately how many times?
```

1    A    Probably well over a hundred.

2    Q    Do you know what the standard procedures for search

3    warrants with San Bernardino Police Department is?

4    A    I do.

5    Q    And what is that?

6         MR. BAKMAN:  Hearsay.  Objection; irrelevant, 403.

7         THE COURT:  Lay the foundation for the response.

8    BY MR. YANG:

9    Q    Are you familiar with the procedures that are used by

10   San Bernardino when conducting a search warrant?

11   A    I am.

12   Q    How many times -- have you followed those procedures?

13   A    I do follow those.

14   Q    How many times would you estimate you followed those

15   procedures?

16   A    Like I said, I believe it's over a hundred.

17   Q    Okay.  And what are those procedures upon entry into a

18   room?

19         MR. BAKMAN:  Same objection, same grounds.  It's

20   hearsay, 403, irrelevant.

21         THE COURT:  She can testify as to her

22   understanding of what procedures are to explain what she did

23   on that day and upon entering the room.

24         MR. YANG:  Certainly.

25   Q    Agent Kaighin, do you understand that?

1    A     I believe so.

2    Q     You can go ahead and answer.

3    A     During the briefing, assignments are typically given,

4    keeping in mind that these situations are fluid because

5    you're not a hundred percent sure what you're going to

6    encounter when you go into a residence or a business or a

7    building.

8             You're told about all known intel.  You're let

9    known if there's any dogs that they've been seen in the

10   area, if there are children present, all things you have to

11   take into consideration when you make entry.

12            The first priority when you make entry is officer

13   safety, public safety, children safety.  So the first thing

14   we do is gather and detain all persons located at a premise.

15            Then, typically, the case agent will interview the

16   suspects.  The other members of the team divide up their

17   responsibilities.  One person will do the entry-exit video.

18            And after the video is conducted, then the

19   remaining team members who aren't having to handle bodies

20   that are detained or watching children, they typically do

21   the searching of the premise.

22   Q     And, Agent Kaighin, let me take you back.  So you said

23   that defendant indicated that there was a gun towards the

24   dresser.  Is that what you said?

25   A     He said it was in the drawer.

1    Q     Okay.  Was the drawer searched?

2    A     It was found in the drawer.

3    Q     What was found in the drawer?

4    A     The Ruger firearm.

5    Q     And which drawer are we talking about in Exhibit 12?

6    A     The dresser drawer that is open in this picture that

7    was closest to the defendant when he was on the ground.

8    Q     And, Agent Kaighin, how far was -- where was the

9    entrance relative to where this photograph was taken?

10   A     It was about one or two steps behind me as I was taking

11   this photograph.

12   Q     Agent Kaighin, can you turn -- I'm sorry.  Can you

13   examine Exhibit 19?

14           MR. YANG:  Your Honor, Exhibit 19 is a physical

15   object.  May I have cocounsel assist in handing all of the

16   physical objects to Agent Kaighin?

17           THE COURT:  Yes, she can.

18              (Pause in the proceedings.)

19   BY MR. YANG:

20   Q     Agent Kaighin, what's Exhibit 19?

21   A     This is the Ruger .22 caliber semiautomatic pistol that

22   was recovered from room 220.

23   Q     Were you present in the room when it was recovered?

24   A     I was.

25   Q     Was the gun loaded when it was recovered?

1   A     It was.

2   Q     How many rounds was it loaded with?

3   A     Eleven.

4   Q     Did it have a round chambered?

5   A     It did.

6   Q     What does it mean to have a round chambered?

7   A     It means that there's a round of ammunition in the

8   barrel; therefore, if the safety is off and you pull the

9   trigger, the firearm will expel a projectile.

10  Q     Agent Kaighin, walk me through it.  If I had a firearm,

11  how do I go about firing it; firearm and bullets?

12  A     Well, this particular firearm has a magazine.  You

13  would load the magazine with the rounds of ammunition one at

14  a time.

15         Then you would insert the magazine.  In this case,

16  it would be into the magazine well which is in the grip.

17         You would move the bolt forward to pick up a round

18  from the magazine and insert it into the chamber.

19  Q     And at that point is the gun ready to fire?

20  A     As long as there's no safety on, yes.

21  Q     Agent Kaighin, you mentioned earlier there's an

22  entry-exit video.  What's an entry-exit video?

23  A     San Bernardino Police Department has a policy of trying

24  to do an entry and exit video prior to any searching and

25  after the search is complete.

1    Q    And what's the purpose of doing that?

2    A    It's my understanding they do it for civil liability

3    purposes.

4    Q    And what do you mean by "civil liability"?

5    A    For example, if someone alleges that their 50-inch flat

6    screen was broken due to the search and we have the video

7    showing that when we left the premise the 50-inch TV was

8    fine, then that protects the officers from being sued.

9    Q    And to clarify, so this video is taken before or after

10   the search?

11   A    We do a video before the search, before any searching

12   is done to show the location as it is; and then we do a

13   video as we're leaving, we're done searching and we're

14   leaving the residence and we're going to lock the door and

15   leave.

16          MR. YANG:  Your Honor, at this point I'd like to

17   play -- I'm sorry.  Let me admit the exhibit first.

18   Q    Agent Kaighin, can you take a look at Exhibit -- Your

19   Honor, I apologize.  The government moves to admit

20   Exhibit 19 into evidence, the firearm.

21          THE COURT:  Any objection?

22          MR. BAKMAN:  No objection.

23          THE COURT:  All right.  It's admitted.

24          (Exhibit 19 received in evidence.)

25

Day 3 of Jury Trial, November 18, 2010, P.M. Session

```
 1   BY MR. YANG:
 2   Q    Agent Kaighin, can you take a look at Exhibit 29.
 3   A    (Witness complies.)
 4   Q    Do you recognize what exhibit this is?
 5   A    I do.
 6   Q    What is this?
 7   A    It's a copy of the entry and exit video taken on March
 8   11th of 2009.
 9              MR. YANG:  Your Honor, the government moves to
10   admit Exhibit 29 into evidence.  We have a stipulation from
11   counsel.
12              THE COURT:  All right.
13              MR. BAKMAN:  No, we don't.  I'd ask to approach
14   sidebar.
15              THE COURT:  All right.
16               (The following was held at the bench:)
17              THE COURT:  Yes.
18              MR. BAKMAN:  I'm going to object to the playing of
19   this videotape, Your Honor.  I believe it's an exit video
20   only.  It shows my client coming out.  It shows the interior
21   of the room.  Clearly, there is money scattered all over.
22              It looks as if the officers have already been
23   through it.  It's not an accurate depiction of what the
24   evidence -- where the evidence was located, what it looked
25   like when the officers went in.
```

1          It's also cumulative in that they have the

2     physical evidence.  They are introducing the physical

3     evidence into evidence.  It's displayed out on counsel

4     table, government counsel table.

5          THE COURT:  Let me stop you.  Are you going to be

6     offering it as both an entry and an exit video or just an

7     exit video?

8          MR. YANG:  Presently, just as an entry video.

9     There is an entry portion of the video and then there is a

10    discrete exit portion of the video; and I'm not planning to

11    play the exit video at this point.

12         THE COURT:  You are just going to play the entry

13    video?

14         MR. YANG:  Yes.  And it's approximately two

15    minutes long, Your Honor.

16         MS. WILLIAMS:  And it would be without the removal

17    of the defendant.

18         MR. YANG:  That part we are going to stipulate.

19         THE COURT:  Let me ask.  If the witness is present

20    and if they have a video of what took place while she was

21    watching, she can simply testify that's an accurate

22    representation of what happened when they made the entry so

23    I don't understand the nature of the objection.

24         As far as cumulative is concerned, it's not

25    cumulative in the sense that even though they have testimony

1    as to certain things, there is no testimony specifically

2    about the entry.

3              So I will allow the video of that portion to come

4    in as long as it is the entry.

5              MR. BAKMAN:  Your Honor, my understanding from

6    watching the video that they gave me is it starts out with

7    the removal of the defendant.

8              MR. YANG:  We are going to skip ahead.

9              THE COURT:  If it starts at the removal, it's not

10   an entry; it's an exit video.

11             MR. YANG:  Your Honor, we are getting the

12   nomenclature wrong.  The entry refers to they enter the room

13   before they touch anything.  That's deemed the entry video.

14             The exit video is after they've conducted the

15   search.  That's the exit video.  That's the terminology.

16             MR. BAKMAN:  It starts with him being led out so

17   they've already been in there.  They've already laid him out

18   on the ground.  They've already gone through and opened the

19   drawers and gone through the -- it's not --

20             THE COURT:  Let me put it this way.  I will allow

21   her to testify as long as she explains what it is; but you

22   have not laid the foundation so lay the foundation.

23             MR. YANG:  Will do.

24        *(The following was in open court in the jury's presence:)*

25

1   BY MR. YANG:

2   Q    Agent Kaighin, the entry portion of the video, is this

3   video conducted before or after the search warrant is

4   conducted?

5   A    After entry before searching.

6   Q    And have you had an opportunity to view this video that

7   was just handed over to you?

8   A    I have.

9   Q    And the entry portion of the video, is that

10  consistent -- is that a fair and accurate depiction of the

11  before-search condition of that room?

12  A    It is.

13          MR. YANG:  Your Honor, the government moves to

14  admit Exhibit 29 into evidence.

15          THE COURT:  All right.

16          MR. BAKMAN:  And it's over defense objection.

17          THE COURT:  Okay.  I will overrule defense

18  objection, and I'll allow it to be admitted.

19          *(Exhibit 29 received in evidence.)*

20          THE COURT:  Let me just ask.

21          On the tape is more than just that so the tape

22  itself is not going into evidence.  The only thing that is

23  going into evidence is just the portion that is being played

24  at this portion of this trial.

25          So the disk itself doesn't go into the jury room.

1    If the jury wants to see this thing again, they'll ask for

2    it to be played back and just that portion of it will be

3    played back.

4              Is that correct?

5              MR. YANG:  That's correct, Your Honor.

6              THE COURT:  Okay.

7              MR. YANG:  Thank you.

8                    *(The video was played.)*

9              MR. BAKMAN:  Your Honor, again, do you want me

10   to -- there's going to be an objection as to the audio

11   portion.

12             THE COURT:  I thought the audio portion was not

13   going to be played.  Let me stop.  The audio portion was not

14   going to be played.  I thought that's what you indicated.

15             MR. YANG:  That's fine, Your Honor.  There's no

16   label but I'll mute it.

17                    *(The video was played.)*

18   BY MR. YANG:

19   Q    Agent Kaighin, the cash that was on that corner, had

20   that been disturbed prior to this video being taken?

21   A    No.

22             MR. YANG:  And, Your Honor, just for the record,

23   the government has just played Exhibit 29 from the 52-second

24   mark of the first track to the one minute and 57 mark.

25             THE COURT:  All right.

1    BY MR. YANG:

2    Q    Agent Kaighin, did you take photographs of the room?

3    A    I did.

4    Q    Can you turn to the document that's been marked as

5    Exhibit 7.

6    A    *(Witness complies.)*

7    Q    Do you recognize what's in that photograph?

8    A    I do.

9    Q    What's in that photograph?

10   A    This is the corner of the room and the chair that the

11   defendant was sitting in when we entered the room.  The

12   money on the floor was what he was holding when he tossed it

13   in the air as we entered.

14   Q    And did you take this photograph?

15   A    I did.

16   Q    Did you take it on March 11, 2009?

17   A    I did.

18   Q    Is this a fair and accurate depiction of that area of

19   the room?

20   A    It is.  I believe the drawer was shut upon entry.

21   Q    And the chair?

22   A    The chair was as I had stated before.  It was -- his

23   knees were facing the table.

24        MR. YANG:  Your Honor, the government moves to

25   admit Exhibit 6 -- I'm sorry -- Exhibit 7 into evidence.

```
 1              THE COURT:  All right.

 2              Any objection?

 3              MR. BAKMAN:  No objection.

 4              THE COURT:  All right.  It's admitted.

 5                (Exhibit 7 received in evidence.)

 6              MR. YANG:  Your Honor, may I publish to the jury?

 7              THE COURT:  Yes.

 8              (The exhibit was displayed on the screen.)

 9    BY MR. YANG:

10    Q    Agent Kaighin, do you see a portion of the area where

11    defendant got down on the ground and lay down upon order?

12    Is it depicted in this photograph?

13    A    Part of his body would have been on the floor.

14    Q    Okay.  And in what part in the picture?

15    A    His feet would have been near the chair.

16    Q    Can you turn to Exhibit 6.

17    A    (Witness complies.)

18    Q    Do you recognize this photograph?

19    A    I do.

20    Q    What is this photograph?

21    A    This is a closeup of the items that were located on the

22    table.

23    Q    And was this photograph taken before anything was

24    disturbed on that table?

25    A    Yes.
```

1  Q    Is this a fair and accurate depiction of the table on

2  March 11, 2009?

3  A    Yes.

4         MR. YANG:  Your Honor, the government moves to

5  admit Exhibit 6 into evidence.

6         THE COURT:  All right.

7         Any objection?

8         MR. BAKMAN:  No.

9         THE COURT:  All right.  It's admitted.

10         *(Exhibit 6 received in evidence.)*

11         MR. YANG:  Your Honor, the government would

12  publish to the jury.

13         THE COURT:  All right.

14         **(The exhibit was displayed on the screen.)**

15  BY MR. YANG:

16  Q    Agent, was anything recovered from the table?  Any

17  evidence?

18  A    Yes.

19  Q    What was recovered?

20  A    Starting from the top, the razor blade, the -- what

21  appeared to be crack rocks of cocaine, the scale.  To the

22  right of the scale, the prepackaged -- what appeared to be

23  crack rocks of cocaine, the room key, the plastic baggies,

24  the box of baggies.  And then in the center, the larger --

25  what appears to be a chunk that was two pieces of what

1    appeared to be crack cocaine.

2    Q    Agent Kaighin, can you take a look at Exhibit 18.

3    A    *(Witness complies.)*

4    Q    Do you recognize that object?

5    A    I do.

6    Q    And what is that object?

7    A    This is the digital scale that was recovered from the

8    middle of the table in room 220.

9    Q    So that's the digital scale that's depicted in that

10   photograph?

11   A    Yes.

12   Q    How do you know it's the same scale?

13   A    Because I removed it from my ATF evidence item No. 4.

14          MR. YANG:  Your Honor, the government moves to

15   admit Exhibit 18 into evidence.

16          THE COURT:  All right.

17          Any objection?

18          MR. BAKMAN:  No.

19          THE COURT:  All right.

20          *(Exhibit 18 received in evidence.)*

21          MR. YANG:  Your Honor, in the interest of saving

22   time and preventing everyone from falling asleep, can I go

23   ahead and have the agent look at several exhibits all

24   together?

25          THE COURT:  Sure.  As long as you tell the defense

```
 1   counsel in advance which ones those are.
 2             MR. YANG:  Certainly.
 3             THE COURT:  Okay.
 4   BY MR. YANG:
 5   Q    Agent Kaighin, can you take a look at Exhibit 26, 27,
 6   17, 24.
 7   A    (Witness complies.)
 8   Q    Agent Kaighin, starting with Exhibit 26, what's
 9   Exhibit 26?
10   A    26 is the box of baggies and some extra baggies that --
11   some appear to have white powder residue in that were found
12   on the table.
13   Q    Were these recovered on March 11th?
14   A    They were.
15   Q    Were they recovered in room 220?
16   A    They were.
17   Q    Were you in the room when they were recovered?
18   A    Yes.
19   Q    Were these the same bags that you found on the desk on
20   the table?
21   A    Yes, they are.
22   Q    And how do you know that?
23   A    Because I removed them from ATF packaging No. 4.
24   Q    Agent Kaighin, can you take a look at Exhibit 27.
25   A    (Witness complies.)
```

1    Q    Do you recognize what that is?

2    A    I do.

3    Q    What is that?

4    A    This is the room key for room 220 that's depicted in

5    the photograph.

6    Q    Were these recovered also on March 11th?

7    A    It was.

8    Q    Were they also recovered in room 220?

9    A    It was.

10   Q    Were you also in the room when they were recovered?

11   A    I was.

12   Q    Are these the same bags that were found on that

13   table -- I'm sorry -- the same keycard that was found on

14   that table?

15   A    Yes.

16   Q    How do you know that?

17   A    Because I removed it from ATF packaging No. 4.

18   Q    Can you take a look at Exhibit 17, please.

19   A    *(Witness complies.)*

20   Q    Were these recovered on March 11th?

21   A    This is the razor blade and, yes, it was recovered.

22   Q    Was it recovered in room 220?

23   A    It was.

24   Q    Were you in the room when it was recovered?

25   A    I was.

1    Q    Was there anything on the razor blade when it was

2    recovered?

3    A    It appeared to be a white residue.

4    Q    Is there any white residue on it right now?

5    A    Yes.

6    Q    And can you take a look at Exhibit 24, please.

7    A    *(Witness complies.)*  Okay.

8    Q    What's Exhibit 24?

9    A    24 is what appeared to be crack cocaine that was found

10   on the table.

11   Q    Were these recovered on March 11th, 2009?

12   A    It was.

13   Q    Were they recovered from the Economy Inn?

14   A    Yes.

15   Q    From room 220?

16   A    Yes.

17   Q    Were you in the room when they were recovered?

18   A    Yes.

19   Q    How is that exhibit divided into?

20   A    There are four separate manila envelopes; and, in fact,

21   the fourth envelope was what appeared to be crack cocaine

22   that was found on the bed so it's not depicted in this

23   picture.  But A, B, and C are found on this table.

24          MR. YANG:  Your Honor, the government moves to

25   admit Exhibits 26, 27, 17, and 24 into evidence.

```
 1              THE COURT:  All right.

 2              Any objections?

 3              MR. BAKMAN:  No objection.

 4              THE COURT:  All right.  They're admitted.

 5                  (Exhibit 26 received in evidence.)

 6                  (Exhibit 27 received in evidence.)

 7                  (Exhibit 17 received in evidence.)

 8                  (Exhibit 24 received in evidence.)

 9              MR. BAKMAN:  Your Honor.

10              THE COURT:  Yes.

11              MR. BAKMAN:  Let me reverse my position on that

12     until after cross-examination so at this point in time I

13     would object.

14              THE COURT:  All right.

15     BY MR. YANG:

16     Q    Agent Kaighin, can you turn to the envelope marked

17     Exhibit A that's in Exhibit 24.

18              MR. BAKMAN:  Might I approach Agent Kaighin, Your

19     Honor?

20              THE COURT:  Yes.

21                  (Pause in the proceedings.)

22     BY MR. YANG:

23     Q    Agent Kaighin, what's in the envelope marked Exhibit A

24     that's within Exhibit 24?

25     A    I apologize.  When I opened 24, all I see is a piece of
```

1    paper so I must not be looking in the right place.

2              MR. YANG:  The physical Exhibit 24.

3              THE WITNESS:  I apologize.

4              In A, it is approximately 35 chunks of suspected

5    crack cocaine.

6    BY MR. YANG:

7    Q    And where was this recovered from?

8    A    The table in room 220.

9    Q    Is it depicted in the photograph that was previously

10   marked as Exhibit 6?

11   A    Yes.

12   Q    Agent Kaighin, Exhibit 24, can you take a look at

13   Exhibit B, the envelope marked Exhibit B.

14   A    I can't see it.  I mean, it's in here but I can't see.

15             MR. YANG:  Your Honor, may we open the envelope?

16             THE COURT:  I presume there's no objection.

17             MR. BAKMAN:  No, there's not.  I've viewed them

18   previously.

19             THE COURT:  Okay.  All right.

20             THE WITNESS:  I know what was packaged in it, but

21   I'm sure it's not in it right now.

22                  *(Pause in the proceedings.)*

23             THE WITNESS:  Okay.  I have the envelope marked B.

24   BY MR. YANG:

25   Q    Agent Kaighin, what was inside the envelope marked B?

1    A    Approximately 19 pieces of packaged -- what appeared to

2    be crack cocaine that was found on the table.

3    Q    Is that depicted in the photograph in Exhibit 6?

4    A    It is.

5    Q    And where is it?

6    A    It's to the right of the digital scale.

7    Q    Is it this one here *(indicating)*?

8    A    Yes, sir.

9    Q    And can you turn to envelope C of Exhibit 24.

10   A    Okay.

11   Q    What was inside envelope C?

12   A    The two larger pieces that were found just below the

13   scale in the photograph that were on the table.

14   Q    Is it depicted in this photograph?

15   A    Yes.  Just below the scale, correct.

16   Q    By the way, I'm sorry.  Agent Kaighin, were all of

17   these envelopes marked?

18   A    They were.

19   Q    Did they contain any description of where the item --

20   of what the items were?

21   A    Yes.  The exterior was marked and then I marked the

22   exterior as well.

23   Q    And if you can lastly turn to Exhibit D of Exhibit 24.

24   A    *(Witness complies.)*

25   Q    What does envelope D contain?

1  A     That was the smaller pieces that were found in a

2  plastic cup on the bed in the room.

3  Q     And were all of these items collected as evidence?

4  A     They were.

5  Q     What does it mean to collect it as evidence?

6  A     As they're located and collected, they're put into some

7  form of container, marked as to where they were found,

8  typically what it is that was found, and then they are

9  further packaged into another container that's not to be

10 tampered with.  They're labeled and put into some kind of

11 logging system.

12 Q     At any point do you initial the label?

13 A     Yes, I do.

14 Q     Are your initials on the label on the exhibit you're

15 holding right now?

16 A     They are.

17         MR. YANG:  Your Honor, the government moves to

18 admit Exhibit 24 into evidence.

19         THE COURT:  All right.

20         Any objection?

21         MR. BAKMAN:  Yes, at this time.

22         THE COURT:  There is an objection?  Are you

23 reserving your objection?

24         MR. BAKMAN:  I'm reserving.

25         THE COURT:  We'll address it after the defense

1    counsel has had an opportunity to cross.

2         MR. YANG:  Certainly, Your Honor.

3    Q    And, Agent Kaighin, did you take a photograph of these

4    envelopes at any point?

5    A    I did.

6    Q    When did you take a photograph of it?

7    A    After I received them and prior to putting them into

8    this heat-sealed packaging before I sent them to the DEA lab

9    for testing.

10   Q    Can you turn to Exhibit 39.

11   A    *(Witness complies.)*

12   Q    Do you recognize that photograph?

13   A    I do.

14   Q    What is that photograph?

15   A    This is a photograph of the four envelopes I just

16   described prior to my putting them into the heat-sealed

17   envelope to give them to the DEA.

18   Q    And you took this photograph?

19   A    I did.

20        MR. YANG:  Your Honor, the government moves to

21   admit Exhibit 39 into evidence.

22        THE COURT:  All right.

23        Any objections?

24        MR. BAKMAN:  No objection.

25        THE COURT:  All right.  They're admitted.

```
 1            (Exhibit 39 received in evidence.)
 2            MR. YANG:  Your Honor, the government is going to
 3   publish to the jury.
 4            THE COURT:  All right.
 5            (The exhibit was displayed on the screen.)
 6   BY MR. YANG:
 7   Q    Agent Kaighin, these four envelopes depicted in this
 8   photograph, are they the same envelopes that are in
 9   Exhibit 24?
10   A    They are.
11   Q    Agent Kaighin, was anything else recovered from the
12   room?
13   A    Yes.
14   Q    What else was recovered?
15   A    There was some extra ammunition that was found on the
16   bed, a man's wallet containing the defendant's driver's
17   license and social security card and a cell phone.
18   Q    Agent Kaighin, turning your attention to the ammo, how
19   was the ammo found?
20   A    In a plastic cup just sitting on the bed.
21   Q    Can you turn to Exhibit 13, please.
22   A    (Witness complies.)
23   Q    What is that a photograph of?
24   A    This is the photo I took of the ammunition after I
25   found it.
```

1   Q    So you took this photograph?

2   A    I did.

3   Q    Can you turn to Exhibit 20, also.  I'm sorry.  Can you

4   look at Exhibit 20.

5   A    *(Witness complies.)*

6   Q    What is Exhibit 20?

7   A    This is all of the ammunition that was recovered that

8   day from room 220.

9   Q    Is this the same ammunition that's depicted in

10  Exhibit 13?

11  A    That as well as the rounds that were inside the

12  firearm.

13  Q    Did you find this ammunition?

14  A    In the cup on the bed, yes, I did.

15           MR. YANG:  Your Honor, government moves to admit

16  Exhibits 13 and 20 into evidence.

17           THE COURT:  All right.

18           Any objection?

19           MR. BAKMAN:  No objection.

20           THE COURT:  All right.

21           *(Exhibit 13 received in evidence.)*

22           *(Exhibit 20 received in evidence.)*

23           MR. YANG:  Your Honor, the government's going to

24  publish Exhibit 13 to the jury.

25           THE COURT:  All right.

Day 3 of Jury Trial, November 18, 2010, P.M. Session

```
 1              (The exhibit was displayed on the screen.)
 2   BY MR. YANG:
 3   Q    And, Agent Kaighin, how many rounds did you find in
 4   that cup?
 5   A    Approximately 32.
 6   Q    What caliber was the ammunition?
 7   A    .22 caliber.
 8   Q    Did that caliber fit the gun that was also found in the
 9   room?
10   A    It does.
11   Q    And what manufacturer was the ammunition?
12   A    All but one was made by Federal Manufacturing Company.
13   Q    And, Agent Kaighin, Exhibit 20, the ammunition, did you
14   mark any of the ammunition?
15   A    I did.
16   Q    Why did you mark it?
17   A    I wanted to make sure that I could tell which rounds
18   came from the firearm and which ones were extra that were
19   found in the cup just in case they got commingled.
20   Q    Did you mark which one was found inside the chamber?
21   A    I did.
22            MR. YANG:  Your Honor, may I display Exhibit 20 to
23   the jury?
24            THE COURT:  Any problem?
25            MR. BAKMAN:  No, I don't have a problem.
```

```
 1                    THE COURT:  All right.

 2                    MR. YANG:  Thank you, Your Honor.

 3                (The exhibit was displayed on the screen.)

 4   BY MR. YANG:

 5   Q    Agent Kaighin, can you turn to or can you look at

 6   Exhibit 22, please, and also Exhibit 9.

 7   A    (Witness complies.)

 8   Q    What are these exhibits?

 9   A    This is the defendant's driver's license and social

10   security card that were found in the wallet on the dresser

11   in room 220.

12   Q    That's Exhibit 22?

13   A    Social security card is 22; 9 is the driver's license.

14                    MR. YANG:  Your Honor, the government moves to

15   admit Exhibits 9 and 22.

16                    THE COURT:  Any objections?

17                    MR. BAKMAN:  No objection.

18                    THE COURT:  All right.  Thank you.

19                 (Exhibit 9 received in evidence.)

20                 (Exhibit 22 received in evidence.)

21   BY MR. YANG:

22   Q    Agent Kaighin, whose names are on -- whose name is on

23   the driver's license?

24                    MR. BAKMAN:  The document speaks for itself.  It's

25   been admitted.
```

```
 1              THE COURT:  I'll sustain the objection.
 2  BY MR. YANG:
 3  Q    Agent Kaighin, please take a look at Exhibit 21,
 4  please.
 5  A    (Witness complies.)
 6  Q    What is Exhibit 21?
 7  A    It's a Samsung flip phone.
 8  Q    Was this the cell phone that was recovered from the
 9  Economy Inn on March 11, 2009?
10  A    It was.
11              MR. YANG:  Your Honor, the government moves to
12  admit Exhibit 9 into evidence.
13              THE COURT:  All right.
14              THE WITNESS:  It's 21.
15              MR. YANG:  I'm sorry; 21.
16              THE COURT:  All right.
17              Any objection?
18              MR. BAKMAN:  No, no objection.
19              THE COURT:  All right.
20              (Exhibit 21 received in evidence.)
21  BY MR. YANG:
22  Q    Agent Kaighin, can you finally take a look at Exhibit
23  25.
24  A    (Witness complies.)
25  Q    Do you recognize that exhibit?
```

1    A     I do.

2    Q     What is that exhibit?

3    A     This is the cash that was found inside the room.

4    Q     Was this the cash that was also depicted in the

5    photographs that we saw earlier?

6    A     Yes.

7              MR. YANG:  Your Honor, the government moves to

8    admit Exhibit 25 into evidence.

9              THE COURT:  All right.

10             Any objection?

11             MR. BAKMAN:  No.

12             THE COURT:  All right.  They're admitted.

13          *(Exhibit 25 received in evidence.)*

14   BY MR. YANG:

15   Q     Agent Kaighin, finally, please take a look at -- turn

16   to Exhibit 8, please.

17   A     *(Witness complies.)*

18   Q     Do you recognize that photograph?

19   A     I do.

20   Q     And what is that photograph?

21   A     It's a closeup of the cash, how it was found when we

22   entered the room.

23             MR. YANG:  Your Honor, the government moves to

24   admit Exhibit 8 into evidence.

25             THE COURT:  All right.

```
1              Any objection?

2              MR. BAKMAN:  No.

3              THE COURT:  All right.  They're admitted.

4                 (Exhibit 8 received in evidence.)

5              MR. YANG:  Your Honor, may I publish to the jury?

6              THE COURT:  All right.

7              (The exhibit was displayed on the screen.)

8    BY MR. YANG:

9    Q    Agent Kaighin, did you find any instruments in room 220

10   on that day that were designed to use crack cocaine?

11   A    I did not.

12   Q    Did you send the crack cocaine to get tested?

13   A    I did.

14   Q    Why did you send to get it tested?

15   A    Because in order to charge the case, you have to prove

16   that it is, in fact, a controlled substance.

17   Q    Is that part of ATF's policy?

18   A    It's normal standard procedure.

19   Q    And how did you send it?

20   A    Via FedEx.

21   Q    And sending by FedEx, is that a normal procedure?

22   A    That's how I was taught to do it when I transferred to

23   California.

24   Q    Does your agency normally send it by FedEx?

25              MR. BAKMAN:  Objection.  Calls for hearsay.
```

```
 1              THE COURT:  You have to lay the foundation for
 2      that question.
 3      BY MR. YANG:
 4      Q     Agent Kaighin, are you familiar with the practices and
 5      policies of your agency?
 6      A     Yes.
 7      Q     Are you familiar with the practices and policies of
 8      your agency with respect to sending drugs to the DEA lab?
 9      A     Yes.
10      Q     And what is that practice and policy?
11              MR. BAKMAN:  I'm going to object and ask to
12      approach the sidebar.
13              THE COURT:  All right.
14                (The following was held at the bench:)
15              THE COURT:  Yes.
16              MR. BAKMAN:  Your Honor, I have been provided no
17      discovery whatever with respect to ATF policies and
18      procedures regarding the use of FedEx or the transportation
19      of narcotics from field agents to a DEA lab.
20              So if he's going to go into this area, I'm going
21      to ask that the government be compelled to provide me ATF
22      policies and procedure manuals on this prior to the
23      commencement of my cross-examination.
24              THE COURT:  All right.
25              MS. WILLIAMS:  Perhaps the government can limit it
```

1    to her personal experience.

2            MR. BAKMAN:  That wasn't the question that was

3    asked.

4            THE COURT:  I understand that.  She's indicated

5    now that the government will tailor its question.

6            MR. BAKMAN:  Well, her personal experience -- the

7    door's been opened by the asking of the question.  Now, if

8    we're going to confine it to her personal experience, I'm

9    going to still want to see the policies and procedures since

10   the issue was brought up by counsel.

11           And he's already asked questions and already

12   gotten some answers regarding ATF policy and procedures.  So

13   I'm going to ask for the court to make an order compelling

14   the government to provide me with policy and procedure

15   manuals applicable to March of '09 in terms of how they are

16   to ship narcotics to the crime labs.

17           THE COURT:  What's the response?

18           MR. YANG:  Your Honor, defense counsel put that at

19   issue by his questioning of the government's expert and how

20   he received the drugs and suggesting that there was some

21   tampering.

22           Although it's in the form of a direct question,

23   it's essentially rebuttal to the issue that he's raised.  He

24   suggested during his cross-examination very specifically

25   towards DEA chemist Lon Anderson that he received via FedEx

1    and that --

2            THE COURT:  Let me stop.  I will allow you to

3    question this witness as to how she was instructed to send

4    samples to the DEA; and if she's the one who sent them that,

5    she did send it that way and that will be it.

6            I'm not going to require them to produce all of

7    the DEA policy because it's only going to be coming in

8    insofar as what she was instructed to do and whether or not

9    that was what she did in this particular case.

10           MR. BAKMAN:  Isn't that really hearsay then, Your

11   Honor?

12           THE COURT:  No, because it explains why she did

13   what she did.  Who knows who cares what the actual policy of

14   the DEA is.  If she was instructed that way and she believes

15   if that's what she was supposed to do and that's what she

16   did.

17    *(The following was in open court in the jury's presence:)*

18           MR. YANG:  Your Honor, may I proceed?

19           THE COURT:  Yes.

20   BY MR. YANG:

21   Q    Agent Kaighin, how were you instructed to send drugs to

22   DEA?

23   A    I'm only aware of two ways.  You either drive it to the

24   lab or you can send it by FedEx where there's a tracking

25   system.

1    Q    Very quickly, Agent Kaighin, if you can just quickly

2    turn to Exhibits 1 through 4.

3    A    *(Witness complies.)*  Okay.

4    Q    Do you recognize those photographs?

5    A    Yes.  I took these.

6    Q    And what are those photographs?

7    A    One is the exterior of the room showing the 2, the 2,

8    and then what would have been a zero if there was a zero

9    there.  There's a discoloration on the door.

10            Number two is a closeup showing that.

11            Three is just an overall picture of the interior

12   of the room, and four is a closeup of the cell phone and

13   some cash.

14   Q    And, Agent Kaighin, also can you take a look at

15   Exhibit 5.

16   A    (Witness complies.)  Okay.

17   Q    And what is Exhibit 5?

18   A    This is a photograph of the Ruger .22 caliber handgun

19   that was located in the drawer.

20   Q    And did you take all of those exhibits -- 1 through

21   5 -- on March 11, 2009?

22   A    I did.

23            MR. YANG:  Your Honor, the government moves to

24   admit Exhibits 1 through 5 into evidence.

25            THE COURT:  All right.

1        Any objection?

2        MR. BAKMAN:  I have a question as to 3, Your

3   Honor.

4        THE COURT:  All right.

5        MR. BAKMAN:  I don't know at what point in time 3

6   was taken and what it's an accurate representation of, Your

7   Honor.

8        THE COURT:  All right.

9   BY MR. YANG:

10  Q    Agent Kaighin, when was Exhibit 3 taken?

11  A    Prior to searching, it was as I was -- I always stand

12  outside, take a picture outside, go inside, take a picture

13  of the overall, and then take a picture of each individual

14  area or items.  So this would have been as I was entering

15  the room getting an overall.

16  Q    And is this a fair and accurate depiction of the room?

17  A    It is.

18       MR. YANG:  Your Honor, the government moves to

19  admit Exhibits 1 through 5 into evidence.

20       THE COURT:  All right.

21       Any objection?

22       MR. BAKMAN:  No.

23       THE COURT:  All right.  They are admitted.

24          *(Exhibit 1 received in evidence.)*

25          *(Exhibit 2 received in evidence.)*

```
 1              (Exhibit 3 received in evidence.)

 2              (Exhibit 4 received in evidence.)

 3              (Exhibit 5 received in evidence.)

 4         MR. YANG:  No further questions, Your Honor.

 5         I'm sorry, Your Honor.  One more.

 6   Q    Agent Kaighin, I'm sorry.  Can you look at Exhibit 23.

 7   It's a physical exhibit.

 8   A    Help me.  Tell me what it is.

 9              (Pause in the proceedings.)

10         THE WITNESS:  Now I have it.  Thank you.

11   BY MR. YANG:

12   Q    Do you recognize that exhibit?

13   A    I do.

14   Q    What is that exhibit?

15   A    This is ATF Exhibit No. 2 that I took into evidence.

16   Q    And what is this particular exhibit?

17   A    This is the crack cocaine that Officer White purchased

18   on March 11th, 2009.

19   Q    Where did you obtain these drugs from?

20   A    From San Bernardino Police Officer Beall.

21         MR. YANG:  Your Honor, the government moves to

22   admit Exhibit 23 into evidence.

23         THE COURT:  All right.

24         MR. BAKMAN:  The same reservation.

25         THE COURT:  All right.  We will address it at the
```

1    close of the defense cross-examination.

2              MR. YANG:  No further questions.

3              Thank you, Your Honor.

4              THE COURT:  All right.

5              Cross?

6              MR. BAKMAN:  Yes.

7                        **CROSS-EXAMINATION**

8    BY MR. BAKMAN:

9    Q    Prior to becoming an ATF agent, I take it you went

10   through training?

11   A    Yes, sir.

12   Q    Where did you go through training?

13   A    I was a police officer and a detective in St. Louis

14   County prior to being an ATF agent.

15   Q    How long were you an officer with St. Louis?

16   A    From '95 through '99.

17   Q    Four years, then?

18   A    That sounds right.

19   Q    Then you went to the ATF?

20   A    Yes.

21   Q    Did they train you at Quantico?

22   A    No.

23   Q    You didn't get to go to Quantico, huh?

24   A    No.

25   Q    Where were you trained when you went to the ATF?

1  A    Biloxi, the Federal Law Enforcement Training Center in

2  Brunswick, Georgia.

3  Q    And how long was your training?

4  A    There were two separate courses approximately six

5  months long.

6  Q    Both being six months?

7  A    No.  Cumulative, total.

8  Q    And when you were trained as a police officer for

9  St. Louis, how long was your training?

10  A    That was long, too.  Several months.

11  Q    And in that training, both with ATF and both with the

12  St. Louis Police Department, some of your training concerned

13  fingerprinting, did it not?

14  A    A small portion, probably.

15  Q    How much time do you think you spent with the ATF in

16  which discussions concerning latent prints and the

17  collection of latent prints was discussed?

18  A    My best recollection is maybe a couple hours of one

19  day.

20  Q    And in your time with the ATF -- Alcohol, Tobacco, and

21  Firearms -- the firearms portion deals with firearms; is

22  that right?

23  A    Yes.

24  Q    It's kind of a silly question.

25  A    Yes.

1    Q    In your 11 years, I take it you've recovered weapons?

2    A    I have.

3    Q    And you've asked for weapons to be printed, have you?

4    A    Very few.

5    Q    But you have?

6    A    I could probably count on one hand.

7    Q    All right.  And have you asked for other items of

8    evidence seized during your 11 years with the ATF to be

9    subjected to print analysis?

10   A    It's possible.  I can't picture anything off the top of

11   my head right now.

12   Q    And your training also dealt with investigative tools

13   that were available for use in law enforcement, right?

14   A    Sure.

15   Q    Some of the investigative tools that you can use in

16   your job are search warrants, yes?

17   A    Yes.

18   Q    And, in fact, a search warrant was obtained by law

19   enforcement in this case and it was executed that afternoon;

20   is that right?

21   A    That's correct.

22   Q    Other investigative tools that you have available to

23   you are subpoenas, correct?

24   A    Unfortunately, we don't have administrative subpoena

25   power, you know, issue power, so it's harder, but yes.

1    Q    You have grand jury subpoenas?

2    A    I have to go through the U.S. Attorney's office to make

3    that happen.

4    Q    And you also -- well, let me ask you this.   In criminal

5    cases that you've investigated, have you ever issued

6    subpoenas or search warrants to obtain telephone records?

7    A    A few times.

8    Q    Did you do that in this case?

9    A    I did not.

10   Q    The telephone that was recovered, let's just start with

11   that piece of evidence.   We saw a Samsung telephone, I

12   believe, in the pictures so the jury was *(inaudible)*.

13        THE COURT REPORTER:   I'm sorry.   I didn't hear the

14   last part of your question.

15   BY MR. BAKMAN:

16   Q    The jury was shown a photograph that contained a

17   Samsung phone; is that right?   You were here just now?

18   A    Yes.   I'm sure it was in the picture somewhere.

19   Q    And that phone was recovered in room 220; is that

20   right?

21   A    It was.

22   Q    Now, whose phone is it?   Who is the owner of that

23   telephone?

24   A    The defendant.

25   Q    And how do you know that?

```
 1   A     From a prior hearing.

 2   Q     Did you get a subpoena and obtain the telephone number

 3   and trace it back to an account holder?

 4   A     No, I believed him.

 5   Q     Did you ask him at the time was that his telephone?

 6   A     I don't recall asking that.

 7              MR. BAKMAN:  I think we're going to need to

 8   approach, Your Honor.

 9              THE COURT:  All right.

10               (The following was held at the bench:)

11              MR. BAKMAN:  I'm going to make a motion for a

12   mistrial based on Kaighin's answer that she learned that

13   from the defendant at a prior hearing.

14              MR. YANG:  Your Honor, defense counsel opened the

15   door.

16              THE COURT:  You asked her the question.  What's

17   she supposed to do?

18              MR. BAKMAN:  Well, I'm going to ask for a copy of

19   the transcript, Your Honor, to see if the defendant ever

20   testified whether that was his telephone or not.  I don't

21   have an independent recollection of that.

22              MS. WILLIAMS:  I can provide the page where he

23   admitted it.

24              I do want to bring to the court's attention this

25   area is pretty tricky because we have instructed Agent
```

1   Kaighin not to talk about the defendant's confession at this

2   time.

3          Although she did review portions of it, she wasn't

4   there sitting down with him so some questions may be unfair

5   to her; and I just want defense counsel to be careful.

6          THE COURT:  All right.

7          MR. BAKMAN:  No, it's not all right, Your Honor.

8          THE COURT:  Well, but the problem is you asked her

9   a question of that sort.  You've asked her the question.

10   She's been instructed.  If you ask her the question, she

11   will answer the question.

12          MR. BAKMAN:  All right.

13   *(The following was in open court in the jury's presence:)*

14   BY MR. BAKMAN:

15   Q    Did you obtain a search warrant for the telephone?

16   A    I did not.

17   Q    Did you ever examine the telephone to determine contact

18   calls or the internal telephone Rolodex so to speak?

19   A    I remember it was viewed at the time; but I did not

20   receive a search warrant, no.

21   Q    Were you present -- you sat through this case and

22   you've heard the testimony of Officer White; is that right?

23   A    I did.

24   Q    Were you present when Officer White was on the street

25   conducting the transaction with either of the black females?

1    A      No, sir, I wasn't.

2    Q      Were you present when Officer Landeros was heard on the

3    Channel 7 recording?

4    A      I was not.

5    Q      When did you first come on scene?

6    A      With the entry team.

7    Q      What time was that?

8    A      I have no idea.  In the afternoon, I believe.

9    Q      Can you do any better than that?

10   A      Well, if you show me a report, I probably could tell

11   you.

12   Q      Based on your recollection, can you do any better than

13   that?

14   A      Well, surveillance started at 9:00, went a couple

15   hours, noon-ish.

16   Q      Did you write a report in this case?

17   A      I did a synopsis, yes, I did.

18   Q      Who was the lead officer on the scene?

19   A      The person in charge was Detective Roebuck.

20   Q      Who wrote the report for the San Bernardino Police

21   Department?

22   A      That would be Officer Jerry Beall.

23   Q      Now, you've read the report, have you not?

24   A      I have.

25   Q      As the case agent in this case, you took a look at

1    Jerry Beall's report, did you?

2    A    I have looked over it, yes.

3    Q    When was the last time you reviewed it?

4    A    In preparation for this case, I glanced over it.

5    Q    And that's an eight-page report written by Officer

6    Beall?

7    A    It's several pages.

8    Q    And it details, does it not, the individuals that

9    recovered evidence once the entry was made; is that correct?

10   A    It does.

11   Q    Let's talk a little bit about the entry since that's

12   when you showed up.  When you showed up and you talked to

13   the jury about this stacked column of officers, when you got

14   to the second floor, how did you get up there?

15   A    We walked up the steps.

16   Q    And what kind of gear were you wearing?  You mentioned

17   you geared up.  Are you in tact outfits?

18   A    Yes.  BDU pants, a shirt, a bulletproof vest, a helmet,

19   my sidearm.

20   Q    What about boots?

21   A    I probably had boots on.

22   Q    How many others were a part of the entry team with you?

23   A    Those officers:  Roebuck, Tack, Everett, myself, Jerry

24   Beall, and Amy Maholick.

25   Q    So how many total?

1    A    That six?

2    Q    Roebuck, Beall, Tack.  Was Landeros part of the entry

3    team?

4    A    Nope, he was the eye.

5    Q    White was out?

6    A    He was not present.

7    Q    Everett, yourself, and Macalick?

8    A    Maholick.

9    Q    Maholick.  So there was six of you?

10   A    Yes, sir.

11   Q    How did you get to the second floor?

12   A    We walked up the stairway.

13   Q    From where?

14   A    From the parking lot.

15   Q    So which stairwell did you walk up?  Did you walk up

16   the stairwell that everybody saw in the video or a different

17   stairwell?

18   A    I don't recall, but I believe in the report it tells us

19   which stairwell.

20   Q    Well, the other officers that were with you, they were

21   all geared up, too?

22   A    Yes.

23   Q    Wearing boots?

24   A    To the best of my recollection.

25   Q    And when you go to execute a search warrant and you

1    want -- were you in a hurry?

2    A    I don't believe so.

3    Q    I'm trying to figure out what kind of noise six

4    officers dressed in combat gear with bulletproof vests with

5    guns -- and, by the way, the guns were drawn as you went up

6    the stairwell, was it not?

7    A    Probably at least one or two for cover, yes.

8    Q    And so you're going up the stairs and you're walking

9    down the hallway or the landing area of the second floor,

10   what kind of noise are you making as you're going down that

11   hallway?

12   A    We try to be quiet to remain, you know, get the element

13   of surprise.

14   Q    How thin are those doors there at that hotel or that

15   motel?

16           MR. YANG:  Objection; lacks foundation.

17           THE COURT:  She was at the motel so she knows.

18   She can testify.  If she didn't notice, she will indicate

19   so.

20           THE WITNESS:  I have no idea.

21   BY MR. BAKMAN:

22   Q    Well, you broke it in, didn't you?

23   A    I didn't.

24   Q    Well, one of your entry teams broke in the motel door,

25   did they not?

1    A    I believe there was a breached entry.

2    Q    Well, what does that mean, "a breached entry"?  Does

3    that mean somebody took a ram and busted the lock open and

4    broke the door down?

5    A    Typically.

6    Q    Is that what happened in this time?

7    A    I believe that's what happened.

8    Q    Well, is that what happened or is that what you

9    believed happened?

10   A    I don't have any specific recollection as I sit here;

11   but from reviewing the report prior to, it said we breached

12   entry.

13   Q    Well, you've just testified to the jury about

14   everything you saw inside the room, where it was, how it was

15   that there was no money on the floor, that my client was

16   sitting at a chair counting money; and you can't recall for

17   the jury whether you breached the door?

18            MR. YANG:  Objection, Your Honor; argumentative.

19            THE COURT:  I'll sustain the objection.

20   BY MR. BAKMAN:

21   Q    Was knock-notice given?

22   A    Absolutely.

23   Q    What is knock-notice?

24   A    That's when the -- typically the case agent or the

25   first officer in the stack, he will knock on the door

1     extremely loudly and state very loudly:  Police.  Search

2     warrant.  Demand entry.

3     Q    That was done in this case?

4     A    It was.

5     Q    So the defendant's behind the door and we've got an

6     officer knocking on the door saying "San Bernardino police"

7     or "police officers, we have a warrant.  We demand entry" in

8     a loud voice, correct?

9     A    Yes.

10     Q    And did you receive a response?

11     A    I don't recall hearing anything.

12     Q    Where were you in the stack?

13     A    Somewhere in the middle.

14     Q    Who was the first person that made entry?

15     A    I believe it was Officer Beall.

16     Q    And now we had a hearing in which you testified, did we

17     not, saying that you were directly behind Beall when he made

18     entry.  Do you remember saying that, ma'am?

19           MR. YANG:  Objection, Your Honor; misstates the

20     testimony.

21           MR. BAKMAN:  I beg to differ.

22           THE COURT:  Well, let me stop.  I'm not going to

23     resolve the difference in terms of the attorney's

24     recollection of the testimony.  However, you can rephrase

25     the question.  You can ask the witness the question.

1    BY MR. BAKMAN:

2    Q    Where were you in the stack specifically?

3    A    I do not have 100 percent recollection of what place I

4    was in the stack.

5    Q    Were you the last one in?

6    A    I don't believe so.

7    Q    Were you the first one in?

8    A    I don't believe so.

9    Q    Were you behind Beall?

10   A    I was close to Beall.

11   Q    At a hearing do you recall being asked whether you were

12   close enough -- strike that.

13          Beall was the one who asked Mr. Colbert to get

14   down on the ground; is that right?

15   A    That is correct.

16   Q    Mr. Colbert complied with Beall's request; is that

17   correct?

18   A    He did.

19   Q    And Beall went over to him and put his knee into my

20   client's back; is that correct?

21   A    I don't recall that.

22   Q    Did you ever see Beall on top of my client with his

23   knee in his back?

24   A    I don't recall Beall on top of him.

25   Q    Did you see Beall handcuff my client?

1    A    Yes.

2    Q    When did Beall -- strike that.

3         You testified that my client made a motion over to

4    where the gun was.  When did that happen?  Was that after

5    Beall had secured him or before?

6    A    I believe that was after.

7    Q    Beall's the one that asked my client questions there in

8    the room, correct?

9    A    That's correct.

10   Q    You didn't ask any questions, did you?

11   A    Not at that time.

12   Q    How many people were in the room when Beall asked the

13   questions?

14        THE COURT:  Sorry?

15   BY MR. BAKMAN:

16   Q    How many people -- how many police officers were in the

17   room when Beall asked Mr. Colbert questions?

18   A    I believe the entire entry team.

19   Q    How much time went by between the time the officer

20   stated:  We have a warrant.  We demand entry, to the point

21   in time in which the door was broken down?

22   A    I would estimate seconds.

23   Q    How many seconds?

24   A    A few.

25   Q    Time enough that if this was Mr. Colbert's dope he

1    could have gotten rid of it or flushed it?

2    A    I hope not.

3    Q    Well, how much time went by between the time the

4    officer said:  We demand entry.  Police officers, and the

5    time you actually got into the room?

6    A    A few seconds.

7    Q    And in that few-second period of time, this man was

8    holding money?

9             MR. YANG:  Objection, Your Honor; argumentative.

10            THE COURT:  I'll sustain the objection.

11   BY MR. BAKMAN:

12   Q    Did you print the gun?

13   A    I did not.

14   Q    As the case agent, did you ask for anyone to print the

15   gun?

16   A    I did not.

17   Q    As the case agent, did you ask for anybody to print the

18   ammunition?

19   A    I did not.

20   Q    To your knowledge, was the ammunition printed?

21   A    No.

22            MR. BAKMAN:  Let's go back to Exhibit 9 or Exhibit

23   6 of the government.  If I might publish, Your Honor?

24            THE COURT:  All right.

25            *(The exhibit was displayed on the screen.)*

1    BY MR. BAKMAN:

2    Q    Now, let me ask you, Agent Kaighin, the top of this

3    table where the cocaine is, that's whiter in color than the

4    skin on my client; is that right?

5    A    I'm sorry?

6    Q    The table top, it's whiter in color than my client's

7    skin, correct?

8    A    This is a tan or a beige.

9    Q    You see is there residue, cocaine residue, on the table

10   that's visible?

11   A    Appears to be?

12   Q    Is there cocaine residue that was visible on the scale?

13   A    There was.

14   Q    Is there cocaine residue that's visible on the keycard?

15   A    I believe there was.

16   Q    Is there cocaine residue that was visible on the razor

17   blade?

18   A    Yes.

19   Q    Did you look at my client's hands to see if there was

20   any cocaine residue on his black skin?

21   A    I did not.

22   Q    Did you note in your report that my client had any

23   cocaine residue apparent on his skin?

24   A    I did not.

25   Q    Do you think -- let me ask you something.  In your

1    experience, the keycard with cocaine residue, does that

2    indicate that somebody was chopping up the cocaine with the

3    keycard because of the residue present on it?

4    A    I can only presume that that's what was going on.

5    Q    And so if somebody is handling the cocaine residue or

6    strike that.  If someone's handling the cocaine and the card

7    itself can pick up residue, don't you think it might be

8    present on somebody's hands or fingers?

9                MR. YANG:  Objection, Your Honor; argumentative.

10                THE COURT:  Overruled.  She can answer the

11   question if she can.

12                THE WITNESS:  After I heard the expert yesterday,

13   it doesn't sound like it happens.

14   BY MR. BAKMAN:

15   Q    I'm asking you based on your opinion, not what an

16   expert regurgitated in here.

17   A    I don't have any personal knowledge of residue being on

18   people's hands.

19   Q    Did you look at Colbert that day to see if there was

20   white powder on his black fingers?  Yes or no?

21   A    I already said I did not.

22   Q    And the metal -- the razor blade made out of metal,

23   that picked up residue as well?

24   A    It did.

25   Q    Is the scale that's made of plastic, is it?  That

1  picked up residue?

2  A    It did.

3  Q    Did you print the scale?

4  A    I did not.

5  Q    Did you print the blade?

6  A    I did not.

7  Q    Did you print the keycard?

8  A    I did not.

9  Q    How about the plastic wrappings?

10 A    I did not.

11 Q    During the execution of the search warrant, Jamine

12 Marshell showed up at this room, didn't he?

13 A    Not to my knowledge.

14 Q    Did a male black show up when you were in there

15 conducting the search of that room?

16 A    Not to my recollection.

17 Q    And is that recollection as good as when you were

18 telling us about your position in the stack?

19           MR. YANG:  Objection, Your Honor; argumentative.

20           THE COURT:  I'll sustain the objection.

21 BY MR. BAKMAN:

22 Q    You obtained at some point that morning or that day you

23 obtained the motel registrations, did you not?

24 A    I personally did not.

25 Q    Did somebody obtain the registrations that day?

450

```
 1   A      Somebody on the team did.

 2   Q      You have the originals here with you, do you not?

 3   A      (No response.)

 4          MR. BAKMAN:  I have here what is marked as

 5   Government's Exhibit 30, Your Honor.

 6          THE COURT:  All right.

 7   BY MR. BAKMAN:

 8   Q      Have you seen Exhibit 30 before, ma'am?

 9   A      I have.

10   Q      Do you know what they are?

11   A      I do.

12   Q      What are they?

13   A      Apparently, those are the original registration cards

14   from the Economy Inn.

15          MR. BAKMAN:  Move 30 into evidence.

16          THE COURT:  Any objection?

17          MR. YANG:  No objections, Your Honor.

18          THE COURT:  All right.  They are admitted or it is

19   admitted?

20          (Exhibit 30 received in evidence.)

21          MR. BAKMAN:  May I publish?

22          THE COURT:  Yes.

23          (The exhibit was displayed on the screen.)

24   BY MR. BAKMAN:

25   Q      Now, I'm looking at -- on the screen, can you explain
```

Day 3 of Jury Trial, November 18, 2010, P.M. Session

1    what that is?

2    A    It appears to be the registration card for room 220.

3    Q    That's the room that you executed the search warrant

4    on; is that right?

5    A    It is.

6    Q    That's the room where all this dope and all this

7    contraband was found?

8    A    Correct.

9    Q    And the room is filled out in the name of Jamine

10   Marshell; is that right?

11   A    Yes.

12   Q    And there's some areas that are whited out.  Do you see

13   that?  Appear to be whited out on here?  Maybe not.

14          MR. BAKMAN:  I think it's a reflection.

15          THE WITNESS:  I believe it's glare.

16          MR. BAKMAN:  All right.  Let me take it out.

17   Well, it's sealed in here, Judge.

18          THE WITNESS:  Here's scissors.

19               *(Pause in the proceedings.)*

20   BY MR. BAKMAN:

21   Q    Now, on the registration card, the first thing that we

22   see at the top is the name "Daryl Sean Montoya"; is that

23   right?

24   A    Yes.

25   Q    Is that the black male that made contact with Officer

1   White -- or strike that.  Is that the male that made contact
2   with Officer White down on the corner of Sixth Street and G?
3   A    That's impossible.
4   Q    Well, who was in -- did you put that name, Daryl Sean
5   Montoya, with the California driver's license number on that
6   registration form?
7   A    I did not.
8   Q    Do you know who did?
9   A    I don't.
10  Q    As the case agent, did you follow up and have any
11  conversations with the manager to find out if both Jamine
12  Marshell and Daryl Sean Montoya had rented 220?
13  A    A member of the team did talk with the management.
14  Q    Is that the manager's handwriting on the registration
15  form as to Daryl Sean Montoya?
16  A    I believe that's what they said.  They said that was
17  their cards; and I believe they said that was their
18  handwriting; but I'm not certain.
19  Q    Well, as the case agent, did you make a follow-up?
20  Strike that.  Did you obtain the DMV Soundex for Daryl Sean
21  Montoya?
22  A    I just learned what a Soundex was yesterday; but his
23  photo, yes, I did.  And did I run queries?  Yes, I did.
24  Q    Did you go out and interview the man at an address that
25  showed up on the DMV Soundex and ask him:  Hey, were you

1   present in room 220 on March 11th with Jamine Marshell?

2   A    We tried but he's deaf and we weren't able to locate

3   him.

4   Q    When did you make that attempt to locate him?

5   A    I believe it was a few weeks prior to the trial.

6   Q    So let me understand this right.  You think you have

7   your man Calvin Colbert because he's found inside the room;

8   but a few weeks before the trial, you're going out to

9   interview Sean Montoya?

10             MR. YANG:  Objection, Your Honor; argumentative.

11             THE COURT:  I'll sustain the objection.

12   BY MR. BAKMAN:

13   Q    How many males were seen going in and out of room 220

14   on March 11th?

15             MR. YANG:  Objection, Your Honor.  This is all

16   hearsay.

17             THE COURT:  I'll sustain the objection.

18   BY MR. BAKMAN:

19   Q    As the case agent, did you debrief Officer Landeros?

20   A    I did not.

21   Q    Did you ever talk to Officer Landeros as to how many

22   males he saw going in and out of room 220?

23   A    Only in preparation for this case.

24   Q    How many males did he say went in and out of room 220

25   before the execution of the warrant?

1   A     I believe he mentioned there was a couple in their 40s.

2   Q     Before the warrant was executed, there were other

3   individuals going in and out of that room, correct, ma'am?

4   A     I believe that's true.

5   Q     Now --

6          THE COURT:  Would this be a convenient spot to

7   stop for the evening?

8          MR. BAKMAN:  Yes.

9          THE COURT:  All right.  Ladies and gentlemen,

10  we'll stop at this point in time.  Let me ask you to come

11  back tomorrow morning at 9:00 o'clock and we'll start at

12  9:00.

13         Please remember not to conduct any investigation

14  or talk to anyone about this case.

15         Drive safely.  Have a very pleasant evening.

16         I'll see you all tomorrow at 9:00 o'clock; and let

17  me indicate to counsel:  I want to see you guys at 8:45.

18              *(The jurors exited the courtroom.)*

19         *(At 5:01 p.m. proceedings were concluded.)*

20

21                        -oOo-

22

23

24

25

455

1                        **CERTIFICATE**

2

3          **I hereby certify that pursuant to Section 753,**

4    **Title 28, United States Code, the foregoing is a true and**

5    **correct transcript of the stenographically reported**

6    **proceedings held in the above-entitled matter and that the**

7    **transcript page format is in conformance with the**

8    **regulations of the Judicial Conference of the United States.**

9
    Date:   July 10, 2011
10

11

12

13

14                              **/s/  WIL S. WILCOX**

15                              **OFFICIAL COURT REPORTER**
                                **CSR NO. 9178**
16

17

18

19

20

21

22

23

24

25

Day 3 of Jury Trial, November 18, 2010, P.M. Session