ANDRÉ BIROTTE JR.
United States Attorney
ANTOINE F. RAPHAEL
Assistant United States Attorney
Chief, Riverside Branch Office
JERRY C. YANG
Assistant United States Attorneys
California Bar Number 241323
    3880 Lemon Street
    Riverside, California 92501
    Telephone:  (951) 276-6221
    Facsimile:  (951) 276-6202
    E-mail: jerry.yang@usdoj.gov

Attorneys for UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR No. 09-301-GW |
| Plaintiff, | <u>GOVERNMENT'S SUPPLEMENTAL SENTENCING POSITION FOR DEFENDANT CALVIN CHARLES COLBERT, JR.; EXHIBIT C</u> |
| v. | |
| CALVIN CHARLES COLBERT, JR., aka "Cal", | <u>Sentencing</u> |
| Defendant. | Date: August 29, 2011<br>Time: 8:30 a.m. |

Plaintiff United States of America, by and through its attorney of record, Assistant United States Attorney Jerry C. Yang, hereby submits the attached Government's Supplemental Sentencing Position for Defendant Calvin Charles Colbert, Jr. The government's supplemental response is based upon the attached memorandum of points and authorities, the files and records in this case, the government's response to presentence investigation report and sentencing position, the United States Probation

///

Office's Presentence Investigation Report, and any other evidence or argument that the Court may wish to consider at the time of sentencing.

Dated: August 10, 2011          Respectfully submitted,

                                ANDRÉ BIROTTE JR.
                                United States Attorney

                                ANTOINE F. RAPHAEL
                                Assistant U.S. Attorney
                                Chief, Riverside Branch Office


                                 /s/
                                JERRY C. YANG
                                Assistant United States Attorney

                                Attorneys for Plaintiff
                                United States of America

2

**MEMORANDUM OF POINTS AND AUTHORITIES**

On April 25, 2011, the government filed its initial response to the presentence investigation report and sentencing position for defendant Calvin Charles Colbert, Jr. ("Govt. Sent. Pos."). Among other things, the government argued that defendant is subject to the five-year mandatory minimum sentence for violating 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(iii): Possession With Intent to Distribute At Least 5 Grams of Cocaine Base in the Form of Crack Cocaine (count one). On or about July 15, 2011, the United States Department of Justice directed the government to take the position that the Fair Sentencing Act, which revised the mandatory minimum thresholds for crack cocaine from 5 to 28 grams and 50 to 140 grams, respectively, retroactively applied to defendants that have yet to be sentenced - regardless of whether the criminal conduct occurred before or after passage of the Act. In light of this, the government adopts this position, as more fully set forth in Exhibit C.

The Sentencing Guideline calculation is unaffected and remains at a total offense level of 26. With a criminal history category III and offense level 26, the Guidelines range remains at 78-97 months imprisonment on count one, followed by a consecutive 60 months' imprisonment on count two.

Based on the reasons more fully set forth in the government's initial sentencing position paper, the government maintains that a mid-end sentence of 87 months' imprisonment on count one to be followed by 60 months' imprisonment on count two is both appropriate and reasonable in light of the factors set forth in 18 U.S.C. § 3553(a). Specifically, defendant

1  accumulated a significant criminal history in a short amount of
2  time.  See Govt. Sent. Pos., pp. 18-19.  He has four criminal
3  history points stemming from two drug-related convictions, and
4  three prior arrests.  Id.  In particular, one of these prior
5  convictions involved conduct that was almost identical to the
6  conduct here, that is, selling crack cocaine out of a motel room
7  while armed with a loaded firearm.  Id. at 18-19.  Moreover,
8  defendant's contempt for the law was illustrated by his lies
9  under oath to the jury.  See id. at 12-16.  As such, the
10 government's recommended mid-end sentence is necessary to protect
11 the community, deter defendant from future criminal conduct, and
12 accord respect for the law.
13     For foregoing reasons, the government respectfully requests
14 that the Court sentence defendant to: (a) 87 months' imprisonment
15 on count one to be followed by 60 months' imprisonment on count
16 two; (b) five years of supervised release; and (c) pay a $200
17 special assessment.

Dated: August 10, 2011           Respectfully submitted,

                                 ANDRÉ BIROTTE JR.
                                 United States Attorney

                                 ANTOINE F. RAPHAEL
                                 Assistant U.S. Attorney
                                 Chief, Riverside Branch Office


                                 /s/
                                 _____
                                 JERRY C. YANG
                                 Assistant United States Attorney

                                 Attorneys for Plaintiff
                                 United States of America

EXHIBIT C

## STATEMENT

1.   On August 3, 2010, the President signed into law the Fair Sentencing Act of 2010, Pub. L. No. 111-220, 124 Stat. 2372 ("FSA"). It amends the threshold quantities of crack cocaine that trigger mandatory minimum sentences under federal law. Before the FSA, federal drug law treated possession of crack cocaine much more severely than possession of powder cocaine. One gram of crack cocaine was enough to trigger the same mandatory minimum that required 100 grams of powder cocaine. When Congress adopted that 100-to-1 ratio in the Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, 100 Stat. 3207 ("1986 Act"), it believed that crack was significantly more dangerous to society, in that it was highly potent, was increasingly prevalent, and led to more violence than did other drugs. *See Kimbrough v. United States*, 552 U.S. 85, 95-96 (2007).

Based on those conclusions, Congress adopted a ten-year mandatory minimum sentence that was triggered by 5,000 grams of powder cocaine or just 50 grams of crack cocaine. 21 U.S.C. § 841(b)(1)(A) (2009). Similarly, Congress adopted a five-year mandatory minimum sentence that was triggered by 500 grams of powder cocaine or just 5 grams of crack cocaine. 21 U.S.C. § 841(b)(1)(B) (2009).

In the ensuing years, commentators began to question Congress's factual assumptions about the dangers of crack cocaine. *See United States v. Santana*, 761 F. Supp. 2d 131, 135-136 (S.D.N.Y. 2011) (collecting authorities). For example, the Sentencing Commission subsequently reported that "significantly less trafficking-related violence or systemic violence . . . is associated with crack cocaine trafficking offenses than previously assumed." U.S. Sent. Comm'n, *Report to the Congress: Cocaine and Federal Sentencing Policy* 100 (May 2002) ("2002 Report"). The Commission also concluded that the 100-to-1 ratio was inconsistent with the 1986 Act's goal of targeting major drug traffickers, because "major traffickers generally deal in powder cocaine, which is then converted into crack by street-level sellers." *Kimbrough*, 552 U.S. at 98 (describing the Commission's 1995 Report to Congress on crack cocaine).

Moreover, commentators observed that the 100-to-1 ratio "fosters disrespect for and lack of confidence in the criminal justice system" because of "the widely-held perception that the current penalty structure for federal cocaine offenses promotes unwarranted disparity based on race." 2002 Report 103. As the Commission explained, that conclusion reflects the fact "[t]he overwhelming majority of offenders subject to the heightened crack cocaine penalties are black." *Id.* at 102; *see* 156 Cong. Rec. S1680-S1681 (daily ed. Mar. 17, 2010) (statement of Sen. Durbin) ("[T]he heavy sentencing we enacted years ago took its toll primarily in the African-American community.").

2.   The Fair Sentencing Act is Congress's response to those concerns. The Act's preamble clearly and unambiguously states its purpose: "To restore fairness to Federal cocaine sentencing." FSA, 124 Stat. at 2372.

The Act does so in several related ways. First, it amends 21 U.S.C. § 841 to increase the crack thresholds for mandatory minimum sentences. Specifically, the Act increases the crack

threshold for the five-year mandatory minimum sentence from 5 grams to 28 grams, and it increases the crack threshold for the ten-year mandatory minimum sentence from 50 grams to 280 grams. FSA § 2, 124 Stat. at 2372.[1] By increasing those thresholds, the Act changes the ratio between powder and crack threshold quantities to approximately 18:1. *Id.*; *see* 21 U.S.C. § 841(b).

The Act also directs the Sentencing Commission to issue "such conforming amendments to the Federal sentencing guidelines as the Commission determines necessary to achieve consistency with other guideline provisions and applicable law." FSA § 8, 124 Stat. at 2374. Those amendments also must account for certain aggravating and mitigating circumstances in certain drug cases. *Id.* The FSA orders the Commission to issue those amendments "as soon as practicable"—and in any event within 90 days—under an "emergency authority" that allows the Commission to amend the guidelines without delayed effectiveness for congressional review. FSA § 8, 124 Stat. at 2374 (referencing Section 21(a) of the Sentencing Act of 1987, Pub. L. No. 100-182, 101 Stat. 1266); *see* 28 U.S.C. § 994(p).

In response to that mandate, the Commission issued a temporary, emergency guideline amendment effective on November 1, 2010. U.S. Sent. Comm'n, *Notice of a Temporary, Emergency Amendment to Sentencing Guidelines and Commentary*, 75 Fed. Reg. 66,188 (Oct. 27, 2010). The amendment increases the quantities of crack cocaine that trigger the base offense levels in Sentencing Guidelines § 2D1.1. Those increased quantities now correspond to FSA's thresholds and reflect the Fair Sentencing Act's 18:1 ratio. *See id.* at 66,191.[2]

## ARGUMENT

Immediately following the enactment of the Fair Sentencing Act, the government took the view that the Act's new threshold quantities for mandatory minimum penalties apply only to offense conduct that occurred on or after the date of its enactment. That view was based on the general savings statute, 1 U.S.C. § 109, which provides that the repeal of a criminal statute does not extinguish liability for previous violations of that statute, unless the repealing law expressly so states. The Fair Sentencing Act has no express statement extinguishing existing liability under the old threshold quantities. Accordingly, the government concluded that the prior crack thresholds would continue to apply for all offense conduct that occurred before the date of enactment.

---

[1] The 28-gram threshold was designed to target "wholesale and mid-level traffickers," who "often trafficked in 1-ounce quantities." 156 Cong. Rec. H6202 (daily ed. July 28, 2010) (statement of Rep. Lungren). One ounce is approximately 28 grams. *Id.*

[2] That temporary amendment has been reissued as a permanent amendment, to be effective November 1, 2011. U.S. Sent. Comm'n, *Notice of (1) Submission to Congress of Amendments to the Sentencing Guidelines Effective November 1, 2011; and (2) Request for Comment,* 76 Fed. Reg. 24,960 (May 3, 2011).

Many courts have now considered the temporal scope of the Act and have reached varying conclusions.[3] Some courts read the Act's revised penalty provisions to apply only to new offense conduct. Other courts, however, reading the Act in light of Congress's purpose and the Act's overall structure, conclude that Congress intended the revised statutory penalties to apply to all sentencings conducted after the Act was passed. In light of those differing court decisions—and the serious impact on the criminal justice system of continuing to impose such unfair penalties—the government undertook a full reconsideration of the temporal reach of the Fair Sentencing Act. We concluded that our former analysis was incomplete. As the Supreme Court has explained, the general savings statute carries only the force of a law, and its demand of an express statement must yield to the clear intent of a subsequent Congress. If a repealing law shows Congress's clear intent to extinguish existing liability under a repealed penalty scheme, that intent must prevail even absent an express statement to that effect. *Great N. Ry. v. United States*, 208 U.S. 452, 465 (1907).

The government has concluded that the best reading of Congress's intent, considered in light of the structure and purpose of the Act and applicable legal principles, is that Congress intended that the new penalties would apply to all federal sentencings that take place on or after the Act's effective date, *i.e.*, August 3, 2010. That reading is most consistent with the Act's stated purpose: "To restore fairness to Federal cocaine sentencing." It also ensures that the law applicable in postenactment sentencings will be consistent with the conforming amendments that Congress directed the Sentencing Commission to implement on an emergency basis. Given that Congress explicitly sought to restore fairness to cocaine sentencing, and repudiated the 100-to-1 ratio as unprincipled and unjust, there is no compelling reason Congress would want judges to continue to impose new sentences that are not fair over the next five years, while the statute of limitations runs.

I.  **The General Saving Statute's Rule Of Construction Cannot Trump The Clear Intent Of Congress In A Later Repealing Law.**

Congress enacted its first general savings statute in 1871, in response to the common-law presumption that the repeal of a criminal statute abated all prosecutions that had not yet become final on appeal. *Warden v. Marrero*, 417 U.S. 653, 660 (1974). That common-law rule applied when a statute was repealed and reenacted with different penalties, and it applied regardless of whether the penalties were increased or decreased. *Bradley v. United States*, 410 U.S. 605, 607-608 (1973); *see, e.g.*, *United States v. Tynen*, 78 U.S. (11 Wall.) 88, 95 (1870).

To avoid such abatements, which were often the product of legislative inadvertence, Congress enacted a general savings statute. It provides in pertinent part: "The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under

---

[3] *See, e.g.*, *United States v. Rojas*, __ F.3d __, 2011 WL 2623579 (11th Cir. July 6, 2011) (Act applies in post-August 3 sentencings); *United States v. Douglas*, __ F.3d __, 2011 WL 2120163 (1st Cir. May 31, 2011) (Act applies in post-November 1 sentencings); *United States v. Fisher*, 635 F.3d 336 (7th Cir. 2011) (Act does not apply in sentencings for preenactment offenses).

such statute, unless the repealing Act shall so expressly provide." 1 U.S.C. § 109. The phrase "penalty, forfeiture, or liability incurred" includes penal liability incurred when a person violates a criminal law. *United States v. Reisinger*, 128 U.S. 398, 402-403 (1888) (holding that the savings statute allowed defendant's prosecution under an indictment returned after the repeal of the criminal law under which he was charged). And the savings statute applies not just to the repeal of criminal prohibitions, but also to the repeal of sentencing provisions. *See Marrero*, 417 U.S. at 661 (explaining that the savings statute covers "application of ameliorative criminal sentencing laws repealing harsher ones in force at the time of the commission of an offense"). Thus, under the express-statement rule of the savings statute, the Fair Sentencing Act's revised statutory penalties would not apply in future sentencing proceedings involving preenactment offense conduct.

But the savings statute does not control when it contradicts the clear intent of Congress in a later repealing law. "[I]ts provisions cannot justify a disregard of the will of Congress as manifested, either expressly or by necessary implication, in a subsequent enactment." *Great N. Ry.*, 208 U.S. at 465; *see Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 135 (1810) (Marshall, C.J.) ("[O]ne legislature cannot abridge the powers of a succeeding legislature.").

That holding follows from the principle that, "if possible, . . . effect be given to all parts of a law." *Great N. Ry.*, 208 U.S. at 465. A later, repealing enactment is part of the same body of law as the general savings statute. Therefore, if application of the savings statute is inconsistent with Congress's clear intent in the subsequent law, the more specific provisions of the later enactment must control over the general terms of the savings statute. *Id.*; *Hertz v. Woodman*, 218 U.S. 205, 218 (1910) (stating that, if a subsequent act "necessarily, or by clear implication, conflicts with the general [savings statute], the latest expression of the legislative will must prevail"); *cf. Lockhart v. United States*, 546 U.S. 142, 148 (2005) (Scalia, J., concurring) ("[A]n express-reference or express-statement provision cannot nullify the unambiguous import of a subsequent statute."); *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 348 (1998) ("[I]t is a commonplace of statutory construction that the specific . . . language in [statutory text] governs the general terms of the savings clause.") (internal quotation marks omitted).

Accordingly, the analysis turns on much more than the presence or absence of an express statement extinguishing incurred liability. Even without an express statement, Congress may demonstrate its intent to apply a revised penalty scheme to future sentencings for even pre-repeal conduct. And the Fair Sentencing Act demonstrates that intent.

II. **The Fair Sentencing Act Creates A Necessary Implication That The Revised Statutory Penalties Supersede The Old Penalty Scheme In All Future Sentencings.**

A. <u>The purpose of the Act supports the government's reading.</u>

The Fair Sentencing Act clearly and forcefully states its purpose: "To restore fairness to Federal cocaine sentencing." 124 Stat. at 2372. The Act embodies Congress's broad agreement that the 100-to-1 ratio between crack and powder thresholds was unsound and unjust, leading to

disturbing racial disparities in incarceration rates. *See Restoring Fairness to Federal Sentencing: Hearing Before the Subcomm. on Crime and Drugs of the S. Comm. on the Judiciary*, 111th Cong., 1st Sess. 1-3 (2009) (*"Restoring Fairness"*); 155 Cong. Rec. S10492 (daily ed. Oct. 15, 2009) (statement of Sen. Leahy) ("This policy is wrong and unfair, and it has needlessly swelled our prisons, wasting precious Federal resources. Even more disturbingly, this policy has had a significantly disparate impact on racial and ethnic minorities."). Senator Sessions crisply summarized that problem: "I definitely believe that the current system is not fair and that we are not able to defend the sentences that are required to be imposed under the law today." 155 Cong. Rec. S10492 (daily ed. Oct. 15, 2009); *see also, e.g.*, 156 Cong. Rec. S1681 (daily ed. Mar. 17, 2010) (statement of Sen. Durbin) ("There is a bipartisan consensus that current cocaine sentencing laws are unjust.").

Given that Congress explicitly sought to restore fairness to cocaine sentencing, and repudiated the much-criticized 100-to-1 ratio, there is no compelling reason Congress would have wanted judges "to *continue* to impose new sentences that are not 'fair' over the next five years while the statute of limitations runs." *United States v. Douglas*, 746 F. Supp. 2d 220, 229 (D. Me. 2010), *affirmed*, *United States v. Douglas*, __ F.3d __, 2011 WL 2120163 (1st Cir. May 31, 2011); *see* 156 Cong. Rec. H6197 (daily ed. July 28, 2010) (statement of Rep. Scott) (stating that the Fair Sentencing Act is designed to ensure that the defendant "is sentenced" for what he or she did, not the form of cocaine involved); 156 Cong. Rec. S1681 (daily ed. Mar. 17, 2010) (statement of Sen. Durbin) ("Every day that passes without taking action to solve this problem is another day that people are being sentenced under a law that virtually everyone agrees is unjust.").

To be sure, Congress may have been troubled by application of the Fair Sentencing Act to past sentences, imposed before the Act's effective date. Such retroactive application raises concerns about the administrative burden of reopening sentencing proceedings for a large number of defendants, as well as the logistical burden of ensuring defendants' presence at those resentencings. *See* Fed. R. Crim. P. 43 (defendant's right to be present at a resentencing); *Restoring Fairness* 11 (statement of Sen. Durbin) ("What are we to do with all the people who were sentenced over the last 23 years with this disparity of 100:1?"). Moreover, "Congress may well have decided that it is simply too difficult to rewind these cases to the beginning, unscramble all of the decisions that had been made, and reprosecute the cases." *United States v. Acoff*, 634 F.3d 200, 205 (2d Cir. 2011) (Lynch, J., concurring). And, as a general matter, changes in statutory law do not undo past transactions. *Blodgett v. Holden*, 275 U.S. 142, 149 (1927) (opinion of Holmes, J.) (noting "the usual understanding that statutes direct themselves to future not to past transactions"). The Act thus provides no necessary implication that Congress intended its new statutory penalty scheme to apply to past sentences. *See United States v. Powell*, __ F.3d __, 2011 WL 2712969 (7th Cir. July 13, 2011) ("[T]he Fair Sentencing Act does not apply retroactively to sentences imposed before that Act was signed into law. Every circuit to address this issue has reached the same conclusion.") (citation omitted); *cf. Landgraf v. USI Film Prods.*, 511 U.S. 244, 286 (1994) ("A legislator who supported a prospective statute might reasonably oppose retroactive application of the same statute.").

But there is no sound reason Congress would have wanted "to continue to require that courts impose unfair and unreasonable sentences on those offenders whose cases are still pending." *Acoff*, 634 F.3d at 205 (Lynch, J., concurring); *cf. Landgraf*, 511 U.S. at 269 ("A statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment."). Those defendants still needed to be sentenced, so there would be no administrative burden in bringing them to court. For the same reason, there would be no burden in conducting a full sentencing proceeding for those defendants. There is no basis to impute to Congress an intention to "inflict[] punishment at a time when it can no longer further any legislative purpose." *Hamm v. City of Rock Hill*, 379 U.S. 304, 313 (1964). The natural understanding of Congress's intent for future sentencing proceedings is that the revised statutory penalties would apply.

      B.      <u>The structure of the Act also supports the government's reading.</u>

The structure of the Fair Sentencing Act confirms Congress's intent that the new statutory penalties apply at all future sentencings. If Congress had intended the repealed crack thresholds to remain applicable in future sentencing proceedings, the Act's requirement that the Commission promptly issue "conforming amendments" to achieve consistency with "applicable law" would make little sense. Congress knew that 18 U.S.C. § 3553(a)(4) requires a sentencing court to apply the Sentencing Guidelines "in effect on the date the defendant is sentenced," irrespective of the date of the offense. And Congress ordered the Sentencing Commission to issue conforming guideline amendments without any delay for congressional review. FSA § 8, 124 Stat. at 2374. That authority means that the Commission could have issued guideline amendments on the Act's effective date, the following week, or any time before the 90-day deadline Congress imposed. *See Gozlon-Peretz v. United States*, 498 U.S. 395, 404 (1991) ("It is well established that, absent a clear direction by Congress to the contrary, a law takes effect on the date of its enactment.").[4] Congress must have intended that, throughout that period, the Act's revised statutory penalties would provide the "applicable law" for the Commission to use in shaping its conforming amendments, and for courts to use at sentencing.

Any other interpretation would posit that the "applicable law" in future sentencings varies from case to case, depending on the date of the offense. But that makes little sense in the context of Congress's direction to the Commission. To our knowledge, the Commission has never issued guideline amendments that are effective in all future sentencings but whose directives turn on the date of the offense conduct. Reading the Fair Sentencing Act as itself providing the "applicable law" in future sentencing proceedings gives the Commission a clear, fixed standard for its "conforming amendments." FSA § 8, 124 Stat. at 2374.

---

[4] The Fair Sentencing Act applies to events not only after the date of enactment, but also on the date of enactment. *Gozlon-Peretz*, 498 U.S. at 404; *cf., e.g.*, *United States v. Hutchins*, 818 F.2d 322, 329-330 (5th Cir. 1987) (holding that defendants should have been sentenced under amendments to 21 U.S.C. § 841 that were enacted on the date of the offense conduct).

Moreover, the view that Congress intended the repealed crack thresholds to remain applicable in some future sentencings is in tension with the Act's requirement that the Commission issue guideline amendments on an emergency basis. Congress specifically ordered the Commission to put those amendments into effect "as soon as practicable" and, in any event, no later than 90 days after enactment. FSA § 8, 124 Stat. at 2374. But if the "applicable law" to which those guideline amendments must conform turns on the offense date, not the sentencing date, then the interest in such prompt amendments is greatly diminished. Almost all crack offenders sentenced in the days and weeks following the Fair Sentencing Act's effective date would be preenactment offenders, as very few drug-distribution cases are carried from crime to sentencing within 90 days.[5] And if the "applicable law" for those offenders remained the old 100-to-1 crack thresholds, then the "conforming amendments" rushed out by the Commission would afford those offenders no benefit at all. For those offenders, the amended guidelines would be the same as the old guidelines, as they would "conform" to the same governing law. It seems unrealistic to assume that Congress directed the Commission to issue guideline amendments with all possible speed if the practical value of the Commission's haste would be so substantially limited.

There has long been a relationship between the applicability of a mandatory minimum sentence and events occurring after the offense, including events tied to the sentencing proceeding. For example, the government at sentencing may move for a substantial-assistance departure, which tempers "the purity of the mandatory minimum regime." *Douglas*, 2011 WL 2120163, at *4; *see* 18 U.S.C. § 3553(e). The applicability of a mandatory minimum sentence in effect on the date of the offense has never been inviolate. And here, the Fair Sentencing Act reflects Congress's clear intent that courts no longer be required to sentence defendants under the unfair crack thresholds so strongly rejected by Congress.

\* \* \* \* \*

For the reasons explained above, the Court should hold that the revised statutory penalties of the Fair Sentencing Act apply to all sentencings conducted on or after the date of its enactment, August 3, 2010.

---

[5] *See, e.g.*, Administrative Office of the United States Courts, *Judicial Business of the United States Courts* 270-271, tbl. D-10 (2010) (median time from *filing* to disposition for criminal defendants in U.S. district courts is 6.3 months for all offenses and 9.7 months for drug offenses).