ANDRÉ BIROTTE JR.
United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
ANTOINE F. RAPHAEL
Assistant United States Attorney
Chief, Riverside Branch Office
JERRY C. YANG/JENNIFER L. WILLIAMS
Assistant United States Attorneys
California Bar Number 241323/268782
    3880 Lemon Street / 312 North Spring Street
    Riverside, California 92501 / Los Angeles, California 90012
    Telephone:  (951) 276-6221 / (213) 894-5862
    Facsimile:  (951) 276-6202 / (213) 894-0142
    E-mail: jerry.yang@usdoj.gov / jennifer.williams6@usdoj.gov

Attorneys for UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　　　v.<br><br>CALVIN CHARLES COLBERT, JR.,<br><br>　　　　Defendant. | ) CR No. 09-901-GW<br>)<br>) GOVERNMENT'S OPPOSITION TO<br>) DEFENDANT CALVIN CHARLES<br>) COLBERT, JR.'S MOTION FOR NEW<br>) TRIAL<br>)<br>) Trial<br>) Date: March 12, 2012<br>) Time: 8:00 a.m.<br>)<br>)<br>) |

    Plaintiff United States of America, by and through its

counsel of record, the United States Attorney for the Central

///

District of California, hereby submits the government's

Opposition to Defendant Calvin Charles Colbert Jr.'s Motion for

New Trial.

Dated: February 13, 2012          Respectfully submitted,

                                  ANDRÉ BIROTTE JR.
                                  United States Attorney

                                  ROBERT E. DUGDALE
                                  Assistant United States Attorney
                                  Chief, Criminal Division

                                  ANTOINE F. RAPHAEL
                                  Assistant United States Attorney
                                  Chief, Riverside Branch Office


                                  _____/s/_____
                                  JERRY C. YANG
                                  JENNIFER L. WILLIAMS
                                  Assistant United States Attorney
                                  Attorneys for Plaintiff
                                  United States of America

2

**MEMORANDUM OF POINTS AND AUTHORITIES**

I.    **INTRODUCTION**

On March 11, 2009, agents from the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and officers from the San Bernardino Police Department ("SBPD")(collectively, "agents") went to the Economy Inn motel in San Bernardino to attempt an undercover purchase of cocaine base (also referred to as "crack cocaine") from defendant Calvin Charles Colbert, Jr. ("defendant").  Agents observed defendant going in and out of motel rooms 217 and 220 and conducting what appeared to be hand-to-hand drug transactions with others.  After undercover SBPD officer Anthony White successfully purchased $20 worth of crack cocaine from defendant through defendant's use of a female "runner," who brought the crack cocaine out of the motel for Officer White, agents obtained a state search warrant to search the motel rooms.  When agents entered room 220, they discovered defendant counting nearly $1,000 in cash, while sitting at a table with a digital scale, baggies, and 21.31 grams of cocaine base packaged into distribution amounts.

Agents also recovered a loaded .22 caliber Ruger semi-automatic handgun, with a round chambered, inside the dresser drawer.  In addition, agents located 32 rounds of live ammunition near the bed.  Agents also found a motel keycard with white residue, a razor blade with residue, plastic sandwich bags used to package cocaine base, a cell phone, and defendant's wallet containing, among other things, his identification.  At trial, defendant testified and claimed that agents framed him by staging the drugs, cash, and drug paraphernalia inside room 220.

1   On November 23, 2010, after the five-day trial, a jury
2   convicted defendant of violating 21 U.S.C. §§ 841(a)(1),
3   841(b)(1)(B)(iii): Possession With Intent to Distribute At Least
4   5 Grams of Cocaine Base in the Form of Crack Cocaine ("crack
5   cocaine") ("count one") and 18 U.S.C. § 924(c)(1)(A): Possession
6   of a Firearm in Furtherance of a Drug Trafficking Crime ("count
7   two").  On January 30, 2012, over one year after his conviction,
8   defendant filed a Motion for New Trial pursuant to Federal Rule
9   of Criminal Procedure 33(a) ("Motion") raising three arguments:
10  1) defendant was improperly precluded from calling SBPD Officer
11  Gerald Beall to testify; 2) the Court improperly denied
12  defendant's request to relieve his attorney; and 3) the Court
13  improperly denied defendant's request to include jury
14  instructions for mere presence and the lesser included offense of
15  simple possession of narcotics.
16      All three arguments are unavailing.  First, once defendant
17  failed to offer a permissible purpose to call Officer Beall, the
18  Court properly agreed to wait and see what the government's case-
19  in-chief would be before determining whether Officer Beall's
20  testimony is relevant.  Once the government presented its case-
21  in-chief, however, defendant never even attempted to call Officer
22  Beall to testify.  Second, defendant's request for new counsel
23  was properly denied because he made his request on the eve of
24  trial--after the Court had already granted one similar request
25  from him on the eve of trial almost one year earlier.  Finally,
26  the Court properly denied defendant's request to instruct the
27  jury on mere presence because the government presented much more
28  evidence of defendant's possession of the crack cocaine and gun

than his mere presence in room 220.  The Court also properly denied instructing the jury on the lesser included charge of simple possession because there was no evidence presented upon which a rational jury could have found simple possession.

Accordingly, defendant's motion should be denied.

## II. STATEMENT OF RELEVANT FACTS

### A. Undercover Buy From Defendant

On March 10, 2009, based on a tip from a confidential informant that a subject known as "Cal" was selling drugs, agents conducted surveillance at the Economy Inn and observed what appeared to be a hand-to-hand drug transaction between "Cal" and another male.  Affidavit of Gerald Beall in Support of Search Warrant No. 2009-08274 ("Beall Aff."), attached as Exhibit A to defendant's Motion to Suppress Evidence, p. 2.  Agents also observed numerous individuals go to room 217, knock, and receive no response.  Id.  Agents returned with undercover officers and unsuccessfully attempted to purchase crack cocaine.  Id.

The next day, agents returned to try again.  At approximately 10:00 a.m., Officer White, who was operating in an undercover capacity and wearing an audio/visual recording device, walked into the Greyhound bus station parking lot across the street from the Economy Inn in San Bernardio.  Presentence Investigation Report, ("PSR"), ¶ 11.  Officer White asked a black female wearing a maroon-colored tracksuit if she had the "fire" – a street term used in this context for high-quality crack cocaine.  Id.  Office White gave the female a pre-recorded $20 bill (serial number EF85620576D) and the two of them walked across the street to the Economy Inn near a fence below Rooms 217

and 220.  PSR, ¶ 12.  There, the female yelled up to the second floor of the hotel (toward rooms 217 and 220).  Id.  Officer White observed defendant come towards the stairwell, look at Officer White, and respond, "I don't know that dude."  Id.  Officer White walked back toward the Greyhound parking lot while the female in the tracksuit continued to try to talk to defendant, who ultimately went back inside room 217.  Id.

A few moments later, a second black female, wearing a brown-colored jacket, left room 217, walked across the motel parking lot, and approached Officer White.  PSR, ¶ 13.  Officer White stated he was the one who asked for the crack cocaine and he went back towards the female in the tracksuit to retrieve his $20.  Id.  He then gave the money to the female in the brown-colored jacket and she handed him two prepackaged baggies of suspected crack cocaine.  Id.

The female in the tracksuit followed Officer White back to the Greyhound parking lot.  Officer White would not give her a share of the crack cocaine, but instead gave her a pre-recorded $10 bill (serial number DJ01816340A).  SBPD Officer Ricardo Landeros, who was surveilling rooms 217 and 220 from across the street, observed the female in the tracksuit head back to the motel where she appeared to purchase crack cocaine from defendant using that $10.  PSR, ¶ 14.  Defendant threw something towards the female, which caused her to be on her hand and knees looking for it.

B.  State Search Warrant

Officers White and Beall went back to the police station to draft a search warrant.  While enroute, Officers White and Beall

4

discussed what they each observed.  <u>See</u> Transcript of Video
Recording[1], p. 11.  Officer White neglected to turn off his
video-recording device so it captured their conversation about
what they observed during the transaction, which started,

> Officer Beall: Alright, I'll have you help me spew some
> of that shit out to write my affidavit.
>
> Officer White: Ok.
>
> Officer Beall: I got everything up to that point pretty
> much already scratched down.  Just right
> there clear me up.  As far as I'm
> concerned, he fucking' threw at you from
> the fucking room upstairs.

Exh. A, p. 12.

The recording continued to record the rest of their
conversation about the drug transaction.  At one point, Officer
White recorded his own observations of the transaction into a
tape-recorder, which was replayed for the typist, who is seen on
the video typing up the affidavit as the recording is played.
Exh. A, pp. 14-16.  The rest of the video captured Officer White,
Officer Beall, and the typist putting together the affidavit.
Exh A., pp. 17-19.  There was nothing on the final affidavit that
mentioned anything about any drugs being thrown at Officer White.
<u>See</u> Affidavit of Gerald Beall in support of search warrant
("Beall Affidavit"), attached as an exhibit to defendant's motion
to suppress (Docket no. 35).

---

[1] Previously filed on December 15, 2009 (Docket no. 66-2) by
defendant.  For the Court's convenience, the transcript has been
re-attached here as Exhibit A ("Exh. A").

C. <u>Execution of State Search Warrant on Room 220</u>

While Officers White and Beall went to obtain a state search warrant, other agents maintained surveillance on the rooms.  PSR, ¶ 15.  During this time, Officer Landeros observed defendant move personal items from room 217 into room 220 and later, a cleaning crew clean room 217.  <u>Id.</u>

Around noon, agents began to execute the warrant.  Upon entering room 220, agents found defendant sitting in a chair with a stack of money in front of him and in his hands, and appearing to be in the middle of counting the money.  <u>See</u> PSR, ¶ 16.  In addition, there was a pile of individual baggies of crack cocaine on the table in front of him.  <u>Id.</u>

Defendant was ordered to the ground, and he complied.  Prior to being searched, defendant was asked if he had any weapons, and he responded, "yes."  <u>See</u> PSR, ¶ 16.  Upon being asked whether the weapons were on him, defendant motioned toward the dresser and said, "it's over there."  <u>Id.</u>  Defendant was asked whether he had any weapons on his person, and he responded, "no, it's in the drawer."  <u>Id.</u>

Inside an otherwise empty dresser next to the entrance of the room, agents recovered a .22 caliber Ruger MK2 semi-automatic handgun with a loaded magazine and one round chambered.  PSR, ¶ 19.  Agents also found the following in the room: 1) 21.31 grams of crack cocaine: 19 pieces were individually packaged ready for sale; 35 pieces were unpackaged, but consistent in size with $20 pieces; two larger pieces were in a separate plastic bag; 2) 32 rounds of ammunition for the handgun; 3) a digital scale with a white residue that field tested-positive for cocaine; 4) a room

pass keycard marked "220" with a white residue consistent with
cocaine base on one edge of the card; 5) $957 cash, including the
two pre-recorded bills used in the undercover operation; and 6) a
razor blade with white residue that field tested positive for
cocaine base.  PSR, ¶ 17-22.

After defendant was arrested, agents obtained the
registration cards of rooms 217 and 220 from the Economy Inn
manager.  PSR, ¶ 23.  Room 217 was registered to defendant and
room 220 to Jamine Marshell.  <u>Id.</u>  Altogether, the crack cocaine
found in room 220 weighed 21.31 grams.  PSR, ¶ 22.

Defendant was <u>Mirandized</u> and admitted that the crack cocaine
and gun belonged to him.  Police Report[2], Bates No. 22.  He also
stated that there would be approximately $1,000 found in room
220.  <u>Id.</u>

D.   <u>Defendant's Testimony At Trial</u>

At trial, defendant testified in his defense.  During direct
examination, defendant testified the crack cocaine found in room
220 did not belong to him:

> **Defense Counsel:** Were you at the motel to sell drugs?
>
> **Defendant:** No, sir.
>
> **Q.** The cocaine that's in the pictures that were found
> when you were in room 220, is that your cocaine?
>
> **A.** No, sir.

11/19/2010(a) RT: 108[3].  Defendant also claimed that the gun

---

[2] Attached as Exhibit A to government's sentencing position
(Docket no. 156).

[3] "11/19/2010(a) RT" refers to the Reporter's Transcript for
the court proceedings on November 19, 2010 during the morning
session and "11/19/2010(b) refers to the transcript for the court
proceedings on November 19, 2010 during the afternoon session.

found in room 220 did not belong to him and that he was not the
person on the second floor landing who negotiated the crack
cocaine transaction with the first female on behalf of Officer
White.  11/19/2010(a) RT: 107-109.  Defendant claimed that when
the agents entered into room 220, he was not sitting at the chair
counting money, but instead on the cellular phone.  11/19/2010(a)
RT: 109-110.

On cross-examination, defendant explained that agents framed
him by staging the crack cocaine on the table:

> **Government counsel**: You never saw the drugs at all that
> day?
>
> **Defendant:** I never saw the drugs.  I saw that when the
> police did the search.  They took the drugs out the
> box.
>
> **Q.** Out of what box?
>
> **A.** The sandwich box right there.
>
> **Q.** So your testimony is that the police took piles of
> crack cocaine out of the box?
>
> **A.** My testimony is that the police took piles of crack
> cocaine out of the box, took the scale off the other
> table, brought that scale over there, and then weighed
> the drugs just like the picture show.
>
> **Q.** Were you in the room at that time?
>
> **A.** Yes.
>
> **Q.** And you watched the police that it out of the box?
>
> **A.** I watched.  There's another picture where she took a

Both citations are followed by applicable page references.  Both
transcripts were attached as Exhibit B to the government's
sentencing position (Docket no. 156).

1    picture of my shoe.

2    11/19/2010(b) RT: 26.  He claimed that agents "took out the bag,

3    the sandwich bag.  They spread -- they opened it up and rocks

4    were falling around.  They put it on a table; and then he went to

5    the -- went to one of the other sides or something and grabbed --

6    and grabbed a scale."  11/19/2010(b) RT: 31.  Defendant also

7    testified that the unidentified black object on the dresser

8    depicted in government's exhibit 10 at trial was the digital

9    scale and that agents moved it to the table.  11/19/2010(b) RT:

10   32.  See also, Government's Trial Exhibit 10[4].

11       Moreover, defendant claimed that sitting in the courtroom

12   that day, he could specifically visualize the scale being moved

13   by the agent.  11/19/2010(b) RT: 36.  However, he was uncertain

14   whether it was Agent Kaighin (a female) or Officer Beall (a male)

15   who moved the scale because "[t]hey kind of look the same."

16   11/19/2010(b) RT: 35-36.

17       E.   Jury Verdict

18       On November 23, 2010, the jury convicted defendant of

19   violating 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(iii): Possession

20   With Intent to Distribute Cocaine Base in the Form of Crack

21   Cocaine (Count One); 18 U.S.C. § 924(c)(1): Possession of Firearm

22   in Furtherance of a Drug Trafficking Crime (Count Two).  Upon

23   defendant's request, the Court extended defendant's time to file

24   a motion for new trial and/or judgment of acquittal to January

25   24, 2011.

26       On March 7, 2011, more than one month after that deadline,

27

28       [4] Attached as Exhibit 10 to government's sentencing position
     (Docket no. 156).

9

1  defendant filed a request to extend the sentencing date, but with
2  no mention of the motion deadline date, from March 14, 2011 to
3  May 9, 2011.  (Docket no. 154.)  The Court granted his request.
4  (Docket no. 155.)  On May 3, 2011, defendant filed another
5  request to continue the sentencing, again with no mention of
6  extending the motion deadline, from May 9, 2011 to August 29,
7  2011.  (Docket no. 160.)  The Court granted this request.
8  (Docket no. 161.)

9      Nonetheless, defendant again blew that deadline and again
10  failed to file any motion.  The Court took the sentencing date
11  off calendar.  For two months, nothing happened.  On October 25,
12  2011, defendant filed a stipulation to set a briefing schedule
13  for a Rule 29/33 motion whereby his moving papers would be due on
14  December 19, 2011.  (Docket no. 177.)  The Court granted this
15  request.  (Docket no. 180.)

16      Defendant again failed to file any motions by the deadline.
17  Nine days after the deadline passed, on December 28, 2011,
18  defendant filed a stipulation, in which the government expressly
19  reserved its right to challenge the motion based on timeliness,
20  to set a modified briefing schedule whereby defendant's motion
21  would be due on January 20, 2012 (which was subsequently extended
22  to January 30, 2012).  (Docket nos. 182-185.)  On January 30,
23  2012, defendant filed the instant motion.

24  **III.  <u>ARGUMENT</u>**

25      A.   <u>The Motion For a New Trial Should Be Denied Because</u>
26           <u>This Court No Longer Has Jurisdiction To Order A New</u>
27           <u>Trial</u>

28      Federal Criminal Rule 33 requires that all motions for a new

10

1 trial based on reasons other than newly discovered evidence be
2 brought within 14 days after the verdict or finding of guilty.
3 Fed. R. Crim. P. 33(b)(2).  Although this time limit may be
4 extended by the Court pursuant to Rule 45, "this time limit is
5 jurisdictional."  United States v. Lara-Hernandez, 588 F.2d 272,
6 275 (9th Cir. 1978).  See also, United States v. Ross, 338 F.3d
7 1054, 1057 (9th Cir. 2003) (citing United States v. Endicott, 869
8 F.2d 452, 457 (9th Cir. 1989) and denying Rule 33 motion because
9 defendant did not "bring the motion within seven days of the
10 verdict -- a jurisdictional requirement"); United States v.
11 Woods, 399 F.3d 1144, 1146 (9th Cir. 2005) (citing that "'because
12 Rule 33's time limitations are jurisdictional, a district court
13 is powerless to consider an untimely motion for a new trial.'")
14 (citation omitted).

15      The Court does not have jurisdiction to consider the instant
16 motion because defendant untimely filed it.  Following the
17 conviction, the Court originally extended the deadline for
18 defendant to file a motion under Rules 29 and 33 to January 24,
19 2011.  Defendant failed to meet that deadline.

20      Instead, on March 7, 2011, more than one month after that
21 deadline, defendant filed a request to extend the sentencing
22 date, but with no mention of the motion deadline date, from March
23 14, 2011 to May 9, 2011.  (Docket no. 154.)  On May 3, 2011,
24 defendant filed another request to continue the sentencing, again
25 with no mention of extending the motion deadline, from May 9,
26 2011 to August 29, 2011.  (Docket no. 160.)  The Court generously
27 granted both of these requests even though arguably, jurisdiction
28 to consider the motion had already been divested from the Court.

(Docket nos. 155, 161.)

Nonetheless, defendant again ignored the Court's deadline by failing to file any motion or even a request for an extension. As such, the Court took the sentencing date off calendar.  For two months, nothing happened.  Again, the Court was divested of jurisdiction to consider a motion based on Rule 33.  On October 25, 2011, defendant filed a stipulation to set a briefing schedule for a Rule 29/33 motion whereby his moving papers would be due on December 19, 2011.  (Docket no. 177.)  Despite the untimeliness of this request, the Court graciously granted it. (Docket no. 180.)

Notwithstanding this, defendant again failed to file any motions by the Court's deadline.  Nine days after the deadline passed and the Court's jurisdiction was again divested, on December 28, 2011, defendant filed a stipulation, in which the government expressly reserved its right to challenge the motion based on timeliness, to set a modified briefing schedule whereby defendant's motion would be due on January 20, 2012 (which was subsequently extended to January 30, 2012).  (Docket nos. 182-185.)

The Court's jurisdiction to grant a new trial under Rule 33 dissipated when defendant failed to file a motion or ask for an extension, by the first deadline, January 24, 2011.  The Court also lost jurisdiction on August 29, 2011 when for almost two months, defendant inexplicably failed to file either a motion under Rule 29/33, or a request for an extension.  Finally, to the extent the Court retained any jurisdiction to consider such a motion, the Court again lost such jurisdiction (for the third

1   time) on December 19, 2011, when defendant failed to meet that
2   deadline.  Accordingly, based on timeliness, this Court has no
3   jurisdiction to consider a Rule 33 motion and the motion should
4   be denied on this ground.

5      B.   The Rule 33 Motion For New Trial Should Be Denied On
6           The Merits

7      The motion should also be denied on the merits.  To prevail
8   on a motion for new trial under Rule 33, the defendant must show
9   that a new trial is required "in the interest of justice."  Fed.
10  R. Crim. P. 33(a); see also United States v. Young, 17 F.3d 1201
11  (9th Cir. 1994).  "The object of a motion for new trial is both
12  to give the trial court the chance to correct errors in the
13  proceedings, if any, and to preserve such errors for appeal."
14  United States v. Reyes, 510 F.Supp. 150, 153 (D. Ariz. 1981).  A
15  decision to grant a defendant a new trial in the wake of a guilty
16  verdict is an exceptional remedy limited to extraordinary cases.
17  As the Ninth Circuit has recognized on a number of occasions, a
18  motion for a new trial "should be granted only in exceptional
19  cases in which the evidence preponderates highly against the
20  verdict."  See, e.g., United States v. Pimentel, 654 F.2d 538,
21  545 (9th Cir. 1981) (emphasis added); United States v. Rush, 749
22  F.2d 1369, 1371 (9th Cir. 1984).  Generally, the Ninth Circuit
23  has found a new trial to be appropriate only in exceptional cases
24  involving a "miscarriage of justice" or situations where "the
25  evidence preponderates heavily against the verdict."  United
26  States v. Rush, 749 F.2d 1369, 1371 (9th Cir. 1984).  Such a
27  situation does not exist here.
28  ///

### 1.   Defendant Does Not Have an Unfettered Right to Present Any Evidence He Wishes

Defendant argues that his inability to call Officer Gerald Beall to testify violates his right to present a complete defense.  This argument fails for two reasons: 1) there is no right to call any witness to testify, irrespective of how irrelevant or how much of a sideshow the testimony may be; and 2) after the Court agreed to re-visit the issue once the government presented its case-in-chief, defendant <u>never even attempted</u> to call Officer Beall to testify.

There was no basis to call Officer Beall to testify. Federal Rule of Evidence 607 provides that "the credibility of a witness may be attacked by any party, including the party calling the witness."  A party, however, may not call a witness in its case-in-chief as a pretext for impeaching that witness's credibility and thus present the jury with evidence that would be inadmissible but for the impeachment.  <u>See</u> <u>United States v. Johnson</u>, 802 F.2d 1459, 1466 (D.C. Cir. 1986) ("Impeachment evidence is to be used solely for the purpose of impeachment, and it may not be employed as a mere subterfuge to get before the jury evidence not otherwise admissible.") (internal quotation marks omitted); <u>see also</u> <u>United States v. Gomez-Gallardo</u>, 915 F.2d 553, 555 (9th Cir. 1990) (holding that the government improperly called a witness "for the primary purpose of impeaching him"); <u>United States v. Gilbert</u>, 57 F.3d 709, 711 (9th Cir. 1995).

This exception to Rule 607, while most frequently raised by defendants to challenge impeachment by the government, authorizes

14

this Court to preclude the defense from impeaching its own witnesses. See, e.g., United States v. Libby, 475 F. Supp. 2d 73, 80-84 (D.D.C. 2007) (barring the defense from impeaching its witness with hearsay statements); see also United States v. Lattin, 108 F.3d 1374 (4th Cir. 1997) (unpublished disposition) (affirming district court order prohibiting defense from calling a witness on the ground that, "[w]hile a party may impeach its own witness, the district court did not abuse its discretion here because the Government did not call [the witness] to testify");[5] cf. United States v. Buffalo, 358 F.3d 519, 522-27 (8th Cir. 2004) (holding that Federal Rule of Evidence 403 governs whether defense may call a witness for the primary purpose of impeachment); Beasley v. United States, 218 F.2d 366, 408 (D.C. Cir. 1955) ("The defense may not call a witness who has not testified merely to attempt to discredit him in the course of eliciting adverse testimony . . . .").

In carrying its burden of proof at trial, the government did not rely, at all, on the testimony of Officer Beall. Instead, undercover Officer White testified about how he purchased cocaine base in the form of crack cocaine from defendant via the use of the two female drug runners. PSR, ¶¶ 11-14. The transaction was recorded because Officer White wore a video recording device. Id. at ¶ 11. Officer Ricardo Landeros testified that he surveilled the transaction from across the street. Id. at ¶ 14. By contrast, during this time, Officer Beall was in the vicinity

---

[5] Ninth Circuit Rule 36-3 does not bar this Court from citing to the unpublished decisions of other circuit courts as persuasive authority. See Alvarenga-Villalobos v. Reno, 133 F. Supp. 2d 1164, 1167-68 (N.D. Cal. 2000).

of the Greyhound bus station across the street on the other side of the Economy Inn during the entire transaction.

Special Agent Kaighin testified that after the officers obtained the search warrant, she, along with SBPD officers Roebuck, Taack, Everett, Beall, and ATF Special Agent Amy Michalik executed the search warrant on Room 220 and found defendant sitting in the room in the middle of counting his money with small piles of crack cocaine on the table in front of him. PSR, ¶ 16.  Defendant was ordered to the ground and asked if he had any weapons or object that could hurt the officers.  Id. Defendant responded yes and indicated that it was in the dresser. Officers recovered a loaded .22 caliber Ruger semi-automatic handgun in the dresser.  Id. at ¶ 19.  Officer Beall did not testify at trial to any of these events.

Until the instant motion, defendant has never, despite multiple invitations from the government and opportunities from the Court, proffered how defense expected the testimony of Officer Beall, who was across the street during the undercover purchase, would be relevant to the defense.  Defendant raised in his moving papers, for the first time, that Officer Beall should have been allowed to testify because Officer Beall "fabricated evidence against [defendant] and had admitted as much on tape, stating in reference to the search warrant affidavit that he be 'spewing some shit' and 'that as far as he was concerned the person on the second story landing threw the cocaine at White.'" Motion, p. 11.  Moreover, defendant believed that Officer Beall fabricated evidence of "defendant counting money upon [law enforcement] making entry into the motel room, and that [Officer

16

1  Beall] had moved/planted evidence once inside the motel room for
2  use in photographs and video ultimately played before the jury."
3  Id.  This appears to be defendant's long-awaited offer of proof
4  of Officer Beall's testimony.

5       If defendant (in good faith) believed this would have been
6  Officer Beall's testimony, defendant should have made this offer
7  of proof at trial.  He failed to do so.  Instead, after the Court
8  reasonably held that it would wait and see what the government's
9  case-in-chief was comprised of before ruling on the admissibility
10 of Officer Beall's testimony, defendant never even sought to call
11 Officer Beall to testify, much less make an offer of proof.
12 Defendant concedes as much in his moving papers, "defense counsel
13 chose to not call the officer."  Motion, p. 14.  Not
14 surprisingly, Officer Beall did not testify and the Court never
15 ruled definitively on whether Officer Beall could testify.

16      Defendant explained that he did not attempt to call Office
17 Beall to testify because he was concerned that the Court would
18 repeatedly sustain the government's objections in the presence of
19 the jury.  Setting aside the obvious fact that the Court could
20 easily entertain arguments over the admissibility of such
21 evidence outside the presence of the jury (as it had done earlier
22 in the trial over many issues, including this specific issue),
23 this argument is pure speculation.  Unfortunately for defendant,
24 such a conscious trial strategy cannot form the basis of
25 obtaining a new trial.  United States v Garcia-Alvarez, 541 F3d 8
26 (1st Cir. 2008) (Fed. R. Civ. P. 33 does not give counsel second
27 opportunity to rectify faulty trial strategy).  Defendant cannot
28 now try -- after his trial strategy failed and he was convicted -

17

1  - to claim that he was precluded from calling Officer Beall when

2  he did not even take the necessary steps set forth by the Court

3  to try to call him.

4        In any event, even if defendant had tried to call Officer

5  Beall, such testimony would have been precluded unless defendant

6  could have proffered that he was calling Officer Beall to

7  establish the fabrication of evidence[6].  Otherwise, the sole

8  purpose defendant would have called Officer Beall to testify

9  would have been to impeach him and make his testimony into a

10  side-show.  Officer Beall was across the street during the

11  undercover purchase.  Moreover, the transaction was video-

12  recorded and defendant can use that recording.

13        Defendant's new argument that Officer Beall would have shed

14  light on how he fabricated the evidence inside Room 220 has no

15  basis.  Indeed, it is very telling that defendant never even

16  tried to elicit any testimony from Special Agent Kaighin about

17  his claim that Officer Beall was fabricating evidence.  Special

18  Agent Kaighin testified that she was present in Room 220 during

19  the execution of the search warrant and as such, certainly would

20

21        ⁶Having failed in his attempt to confuse the jury, defendant

22  now again tries to confuse the Court with the same argument that
   Officer Beall's statements about "spewing shit" and "as far as

23  I'm concerned, he fucking threw [the drugs] at you from the
   fucking room upstairs" taken out of context, were somehow

24  admissions that Officer Beall fabricated the affidavit and/or
   evidence.  Defendant fails to point out that absolutely nothing

25  in Officer Beall's search warrant affidavit contained anything
   about anyone throwing any drugs at Officer White.  It was simply

26  a joke made in poor taste that was unknowingly captured on
   Officer White's recording device.  Indeed, the recording shows

27  Officer Beall, Officer White, and a typist sitting there putting
   together the affidavit in good faith with no reference to any

28  drug throwing at Officer White nor any discussions about
   fabricating evidence and/or testimony.  Exh. A, pp. 12-16.

18

1  have been in position to observe this alleged fabrication.

2  Defense did not question her at all about any fabrication of

3  evidence.

4        Defendant failed to make a sufficient offer of proof of

5  Officer Beall's testimony so the Court reserved its ruling until

6  the government presented its case-in-chief.  Once the government

7  did so, defendant failed to even attempt to call Officer Beall to

8  testify.  Now defendant finally makes his long-awaited offer of

9  proof and claims that notwithstanding his failure to try to call

10 Officer Beall to testify during the defense case, he should get a

11 new trial.  The Court should deny defendant's motion.

2.    **The Court Properly Declined To Grant Defendant's**

**Request to Substitute Counsel**

14       Review of a denial of a substitution motion involves

15 consideration of three factors: (1) the timeliness of the motion;

16 (2) the adequacy of the court's inquiry; and (3) "whether the

17 asserted conflict was so great as to result in a complete

18 breakdown in communication and a consequent inability to present

19 a defense." United States v. Lindsey, 634 F.3d 541, 554 (9th

20 Cir. 2011)(quoting United States v. Prime, 431 F.3d 1147, 1154

21 (9th Cir. 2005)).  The two hearings regarding defendant's request

22 to relieve Larry Bakman as defense counsel were sealed.  Although

23 the Court granted defendant's ex parte application for an order

24 to unseal the hearing and prepare transcripts (Docket no. 189),

25 these transcripts were not prepared as of the date of this

26 filing.  As such, the government cannot substantively respond

27

28

19

1  regarding the second and third factors[7].  The first factor,

2  however, supports the Court's order denying defendant's request.

3      The Ninth Circuit has "consistently held that a district

4  court has broad discretion to deny a motion for substitution made

5  on the eve of trial if the substitution would require a

6  continuance."  United States v. Garcia, 924 F.2d 925, 926 (9th

7  Cir. 1991); see, e.g., United States v. Mendez-Sanchez, 563 F.3d

8  935, 942 (9th Cir. 2009) (motion made two weeks before trial

9  untimely when new counsel would have required a continuance to

10  prepare the case, which had been continued twice and involved

11  significant discovery); Prime, 431 F.3d at 1155 (motion for

12  substitution made ten days before trial untimely given that

13  counsel would likely require a continuance given volume and

14  complexity of discovery).

15      According to the moving papers, defendant requested to

16  substitute Mr. Bakman as counsel on November 8, 2010 - the day

17  before the then-trial date of November 9, 2010.  Motion, p. 18.

18  He again renewed his request during the middle of the trial.  Id.

19  At the time defendant made his request at the pre-trial

20  conference on November 8, 2010, the trial date had already been

21  continued 9 times (the trial was later continued that day, yet

22  again, to November 17, 2010).  Indeed, the trial date had already

23  dragged on for over 18 months from the original trial date of May

24  5, 2009.  In fact, the Court had already honored his request to

25  substitute counsel before, on or about December 15, 2009 (Docket

26  no. 69), when Deputy Federal Public Defender Sylvia Torres

27

28      [7] The government respectfully requests leave to file a short
supplemental brief once the transcript is made available.

Guillen was replaced by Mr. Bakman.  That substitution, which occurred on the eve of trial, pushed the trial date from December 15, 2009 to March 15, 2010.

In light of the above, the Court properly denied defendant's request because any additional delays resulting from defendant's denied requests for new counsel would have prejudiced the government and wasted judicial resources.  See United States v. Corona-Garcia, 210 F.3d 973, 976 (9th Cir. 2000) (timeliness of substitution motion is weighed against any inconvenience or delay that would result from granting it).

### 3.   The Court Properly Declined To Issue a Mere Presence Jury Instruction

The Court properly refused to issue a mere presence instruction because the government's case was much more than just based on defendant's presence in that motel room.  A mere presence instruction is only proper where the government's case rested primarily on defendant's presence.  United States v. Negrete-Gonzales, 966 F.2d 1277, 1282 (9th Cir. Wash. 1992).  In Negrete-Gonzales, the Ninth Circuit held that a mere presence instruction was necessary where the primary evidence of defendant's culpability was his presence at a meeting and noted,

> Defendant accompanied Medina to the parking lot meeting
> and was in the house, but not in the bedroom, during
> the attempted sale.  Little more links him to the
> attempted sale.  His activity in the parking lot was
> described by agents as countersurveillance and he
> passed a knife into the bedroom when requested to do so
> by Medina.  These factors were important, but the key

21

1    evidence remained his presence at the initial meeting

2    and in Medina's house.

3 Id. Based on the government's case there, the Ninth Circuit held

4 that a mere presence instruction was appropriate.  Id.

5    By contrast, such an instruction is not proper if "the

6 government's case is based on more than just a defendant's

7 presence, and the jury is properly instructed on all elements of

8 the crime." United States v. Chambers, 918 F.2d 1455, 1460 (9th

9 Cir. 1990).  In Chambers, the Ninth Circuit held that the trial

10 court properly denied a mere presence instruction because,

11    [T]he case against [Chambers] was not based primarily

12    on his presence in the van and association with the

13    passenger.  The case against him was much stronger.  As

14    we have recounted, Chambers engaged in a lengthy,

15    reckless high-speed chase in an attempt to get away.

16    This conduct assisted his passenger in getting rid of

17    the cocaine.

18 Id. Likewise, in United States v. Gooch, the defendant, who was

19 convicted of being felon in possession, was asleep on a bed when

20 police arrived to execute an arrest warrant for his roommate.

21 506 F.3d 1156, 1158 (9th Cir. 2007).  When officers approached,

22 he made a furtive movement towards a pillow.  Id.  Officers

23 discovered three loaded firearms under that pillow.  Id.  The

24 Ninth Circuit held that "no 'mere presence' instruction was

25 necessary" because the "jury was properly instructed on all of

26 the elements of the charged offense, and the government's case

27 for possession rested on more than Gooch's presence in the room

28 with the firearms."  Id.

1      Similarly here, the government's case was based on far more

2   evidence than merely defendant's presence in the motel room.

3   Instead, the jury heard testimony that defendant was on the motel

4   landing negotiating a crack cocaine transaction with the female

5   in the tracksuit.  Officer White positively identified defendant

6   as the person on that landing.  Defendant directly rejected

7   Officer White- only to shortly thereafter, send a woman in a

8   brown jacket to sell crack cocaine to Officer White for a pre-

9   recorded $20 bill.  Officer Landeros tracked the man come out

10  onto the landing, negotiate the sale, then return into room 220.

11  Officers Landeros maintained eyes on him until the other officers

12  returned and executed the search warrant.

13      When the search warrant was executed, defendant was found

14  inside the room in the middle of counting money.  This money

15  included the pre-recorded $20 bill, as well as a $10 pre-recorded

16  bill that Officer White gave to the woman in the tracksuit (which

17  Officer Ricardo Landeros subsequently observed throwing something

18  to the man on the landing, i.e. defendant).  Finally, when

19  detained and asked about the presence of a weapon, defendant

20  indicated that there was a weapon in the dresser.  Officers and

21  agents subsequently recovered a loaded Ruger .22 caliber semi-

22  automatic firearm in that dresser.  Sergeant Travis Walker also

23  testified that many drug dealers in San Bernardino are armed,

24  especially out of town drug dealers (such as defendant), who come

25  into San Bernardino to sell drugs and face local drug dealers

26  protecting their territories.  Based on the foregoing, there was

27  much more evidence of defendant's possession of both the crack

28  cocaine and firearm than just his mere presence to the drugs and

gun.

Moreover, the Court instructed the jury that the government had to prove that defendant "possess[ed] with intent to deliver or transfer possession of cocaine base in the form of crack cocaine to another person."  Jury Instruction No. 29. Defendant's mere presence would not have been sufficient to satisfy this requirement.  As such, a mere presence instruction was unnecessary and repetitive.

### 4.   **The Court Properly Refused to Give a Jury For the Lesser Included Offense of Simple Possession**

A defendant is not entitled to a lesser included offense instruction unless "the evidence at trial is such 'that a jury could rationally find the defendant guilty of the lesser offense, yet acquit him of the greater.'" United States v. Powell, 932 F.2d 1337, 1342 (9th Cir.), cert. denied, 112 S. Ct. 256 (1991) (quoting Schmuck v. United States, 489 U.S. 705, 716 n.8 (1989)). "A defendant is entitled to a lesser included offense instruction when 'the elements of the lesser offense are a subset of the charged offense' and a factual basis supports [the] instruction." United States v. Walker, 915 F.2d 480, 486 (9th Cir. 1990) (citation omitted).  Simple possession of a controlled substance is a lesser included offense of possession with intent to distribute. United States v. Sitton, 968 F.2d 947, 959 (9th Cir. 1992).  However,

> [I]f a jury finds possession in circumstances where
> large quantities of drugs and other evidence tending to
> establish distribution are present, such a jury could
> not rationally conclude that there was not intent to

24

1   distribute.  A simple possession instruction would

2   therefore not be necessary.

3   Id.

4   Here, the evidence at trial would not support a rational

5   jury's decision to convict for simple possession and acquit for

6   possession with intent to distribute crack cocaine.  The jury

7   heard testimony and saw evidence that defendant was caught with,

8   among other things, 21.31 grams of cocaine base in the form of

9   crack cocaine consisting of 19 individually packaged pieces ready

10  for sale; 35 pieces of unpackaged pieces, but consistent in size

11  with $20 pieces; and two larger pieces in a separate plastic bag,

12  as well as scales, empty baggies, pre-recorded currency, and

13  loaded .22 caliber Ruger firearm.  In addition, Officer White

14  testified that he observed defendant on the landing negotiating

15  the sale with the first female on behalf of Officer White.

16  Officer Landeros also tracked that same male on the landing go

17  into room 220, and kept eyes on that room until the other

18  officers arrived with the search warrant and executed it.

19  Perhaps just as significantly, as the Court noted before,

20  there was no evidence of any personal use of crack cocaine found

21  in room 220.  See 11/19/2010(a) RT: 527-542, attached as Exhibit

22  B.  Based on all of this evidence, no rational jury could have

23  found that the crack cocaine was possessed for personal use.  As

24  such, the Court correctly refused to issue a jury instruction for

25  simple possession of narcotics.

26  **IV.  CONCLUSION**

27  Based on the foregoing, the government respectfully requests

28  that the Court deny defendant's motion for a new trial.

### TABLE OF CONTENTS

I.    INTRODUCTION............................................... 1

II.   STATEMENT OF RELEVANT FACTS............................... 3

      A.   Undercover Buy From Defendant....................... 3

      B.   State Search Warrant................................ 4

      C.   Execution of State Search Warrant on Room .......... 6

      D.   Defendant's Testimony At Trial...................... 7

      E.   Jury Verdict....................................... 9

III.  ARGUMENT................................................. 10

      A.   The Motion For a New Trial Should Be Denied
           Because This Court No Longer Has Jurisdiction
           To Order A New Trial............................... 10

      B.   The Rule 33 Motion For New Trial Should Be
           Denied On The Merits............................... 13

           1.   Defendant Does Not Have an Unfettered
                Right to Present Any Evidence He Wishes........ 14

           2.   The Court Properly Declined To Grant
                Defendant's Request to Substitute Counsel...... 19

           3.   The Court Properly Declined To Issue a
                Mere Presence Jury Instruction................. 21

           4.   The Court Properly Refused to Give a
                Jury For the Lesser Included Offense
                of Simple Possession........................... 24

IV.   CONCLUSION............................................... 25

## <u>TABLE OF AUTHORITIES</u>

**FEDERAL CASES**                                                    **PAGE**

<u>Alvarenga-Villalobos v. Reno</u>,
133 F. Supp. 2d 1164 (N.D. Cal. 2000)......................... 15

<u>Beasley v. United States</u>,
218 F.2d 366 (D.C. Cir. 1955)................................. 15

<u>United States v. Buffalo</u>,
358 F.3d 519 (8th Cir. 2004)................................. 15

<u>United States v. Chambers</u>,
918 F.2d 1455 (9th Cir. 1990)................................ 22

<u>United States v. Corona-Garcia</u>,
210 F.3d 973 (9th Cir. 2000)................................. 21

<u>United States v. Endicott</u>,
869 F.2d 452 (9th Cir. 1989)................................. 11

<u>United States v. Garcia</u>,
924 F.2d 925 (9th Cir. 1991)................................. 20

<u>United States v Garcia-Alvarez</u>,
541 F.3d 8 (1st Cir. 2008)................................... 17

<u>United States v. Gilbert</u>,
57 F.3d 709 (9th Cir. 1995).................................. 14

<u>United States v. Gomez-Gallardo</u>,
915 F.2d 553 (9th Cir. 1990)................................. 14

<u>United States v. Gooch</u>
506 F.3d 1156 (9th Cir. 2007)................................ 22

<u>United States v. Johnson</u>,
802 F.2d 1459 (D.C. Cir. 1986)............................... 14

<u>United States v. Lara-Hernandez</u>,
588 F.2d 272 (9th Cir. 1978)................................. 11

<u>United States v. Lattin</u>,
108 F.3d 1374 (4th Cir. 1997)................................ 15

## <u>TABLE OF AUTHORITIES</u> (Continued)

**FEDERAL CASES**                                                    **PAGE**

<u>United States v. Libby</u>,
475 F. Supp. 2d 73 (D.D.C. 2007)............................ 15

<u>United States v. Lindsey</u>,
634 F.3d 541 (9th Cir. 2011)................................ 19

<u>United States v. Mendez-Sanchez</u>,
563 F.3d 935 (9th Cir. 2009)................................ 20

<u>United States v. Negrete-Gonzales</u>,
966 F.2d 1277 (9th Cir. Wash. 1992)...................... 21, 22

<u>United States v. Pimentel</u>,
654 F.2d 538 (9th Cir. 1981)................................ 13

<u>United States v. Powell</u>,
932 F.2d 1337 (9th Cir. 1991) .............................. 24

<u>United States v. Prime</u>,
431 F.3d at 1147 (9th Cir. 2005)........................ 19, 20

<u>United States v. Reyes</u>,
510 F. Supp. 150 (D. Ariz. 1981)........................... 13

<u>United States v. Ross</u>,
338 F.3d 1054 (9th Cir. 2003)............................... 11

<u>United States v. Rush</u>,
749 F.2d 1369 (9th Cir. 1984)............................... 13

<u>United States v. Sitton</u>,
968 F.2d 947 (9th Cir. 1992)................................ 24

<u>United States v. Walker</u>,
915 F.2d 480 (9th Cir. 1990)................................ 24

<u>United States v. Woods</u>,
399 F.3d 1144 (9th Cir. 2005)............................... 11

<u>United States v. Young</u>,
17 F.3d 1201 (9th Cir. 1994)................................ 13

## TABLE OF AUTHORITIES (Continued)

**FEDERAL STATUTES**                                              **PAGE**

18 U.S.C. § 924(c)(1)(A)................................... 2, 9

21 U.S.C. §§ 841(a)(1).................................... 2, 9

Fed. R. Civ. P. 33...................................... passim

Fed. R. Crim. P. 33(b)(2)............................... 11, 13

Exhibit A

# TRANSCRIPTS OF VIDEO SURVEILANCE

<u>United States v. Calvin Charles Colbert</u>
CR No. 09-301-GW

**Transcript of Undercover Video with Officer White and Officer Beall**
**March 11, 2009**

**Part I**
**Video Duration: 40:36**

- Officer Gerald Beall
- Officer Scott Everett
- Officer "Chuy" Landeros
- Janine Newbry
- Detective Roebuck
- Officer Anthony White
- UF1 - Kimberly Miles
- UF2 - Rose Mary Wilkerson
- UM1 - Unknown
- UM2 - Unknown

Beall:      [unclear]...on the radio.  We got a black female with a purple running suit with a white stripe on the back.  [unclear]...pick me up and uh...[unclear]...  I got Tony coming over right now to act like he's getting off the bus.  We're gonna see if we can send her across the street to pick us something up.  So I'm going to be off the air but I will have my phone when she's close.

Roebuck:    And this is going to be like a controlled buy.  No one is going to be taken down.  We're gonna [write or right] paper after, correct?

Beall:      Yeah, affirmed.  Again, black female purple track suit with a big white stripe on it.  So you guys watch her once she makes contact and who's it with.  Alright, I'm off the air.

Roebuck:    Hey just for giggles, does anybody have an eye on Jerry?

Everett:    Rich does.

Roebuck:     Beautiful, thank you.

White:       Scottie, ready for me?

Roebuck:     Absolutely.

White:       Alright, I'll be off the air on the Nextel.

Landeros:    Black female, brown jacket going up to 220.  She knocks on the door,
             no one answers.  She's walking back towards the other one. Knocks
             on 218...[unclear] southbound, along the east side.

White:       10-9.

White:       I'm in F & G now.  F & 6th, westbound.

White:       Alright, I'll be there in a sec.

White:       Today's date is March 11, 10:10 hours.  Tony White.  I'm gonna do a
             controlled buy at the Econolodge.  6th & G.

White:       Coming up on the apartments now.

White:       Say again?  Alright.

White:       Damn, cuz.  I was waiting for your ass over there, nigga.  Whassup?

Beall:       How the fuck you doing, man?

White:       Whassup?

Beall:       [Unclear]... drive your ass over here.  What the fuck you walking for?
             Took you for ever.

White:       Hey, who got the fire, man?

Beall:       Hey...

White:      Whassup girl?

Beall:      This girl right here is gonna hook you up.

White:      Whassup, you got the fire?

UF1:        Yeah, my homeboy got it.

White:      Can I go whitcha'?

UF1:        [Unclear]...somebody over there...[unclear]?

Beall:      Hurry up we got a bus...  [Unclear]

White:      Oh yeah, we gotta get going.

Beall:      I'll get some of that [unclear] girl.

UF1:        Alright.

White:      Where is it at?  I thought it was around here.  I thought it was around here.

UF1:        [Unclear]...hold on.  Huh?  What's your name?

White:      "T".

UF1:        "T".

White:      Hmm mm.

UF1:        My uncle's name is "T."

White:      Is that right?

UF1:        Yeah.

White:        What's your boy name?

UF1:         Huh?

White:        What's you boy name, here?

UF1:         Ahhh...[unclear].  You saw him around the corner?

White:        Nah, I ain't seen nobody yet.  Here you go.

UF1:         Pull up to this car [?]...

White:        A dub.

UF1:         A dub?

White:        Yeah.

UF1:         You gotta pipe [?]

White:        Nah...[unclear]...

UF1:         I got one.

White:        You got one?

UF1:         Yup...[unclear]...

*UF talking to someone else*:    [Unclear].  Huh?  That one...[Unclear].  [Long pause...]  He come right now...  You can wait right here.

White:        Huh?

UF1:         [Unclear]... You taking the bus?

White:        Yeah.

UF1:         [Unclear]...

White:        Fifteen minutes?

UF1:          Oh, ten minutes?

White:        Fifteen.

UF1:          Where you going?

White:        Up north.

UF1:          Can't you catch that bus?

White:        Huh?  Nah, nah, I gotta catch this one.

*UF talking to UM1 on the stairwell*:    [Unclear]... right here.

UM1:          I don't know that dude.

UF1:          Hey, that was for me.  Hey...hey...hey... That's for me.

*UM2 at the corner*:        She be back - she got your money?

White:        Yeah.

UM2:          She be right back.

White:        She ain't gonna burn me is she?

UM2:          Nah... you could've went someplace else, though.

White:        Yeah.

UM2:          You know what I'm saying.  You the one driving the car, right?

White:        Nah, that's my homeboy in the car.

UM2:          You didn't see her in the back?

White:        Huh?

UM2:        You didn't see her in the back?

White:      Yeah, but old dude didn't want so serve me, though.

UM2:        Yeah.

White:      I ain't trippin' - I just didn't trust homegirl.

UM2:        Us standing on this corner ain't cool, though.

White:      It ain't cool?  I ain't from around here, man.  Poli?

UM2:        Yeah.

White:      I ain't got nothing on me right now.

UM2:        Yeah.  At least you standing by the bus stop.

White:      Yeah.  I just don't want homegirl to take off with my money.

UM2:        You gave it to her?

White:      Yeah, nah, I gave it to her.

UM2:        Oh, the other girl [unclear]...

White:      This, this chick right here.  She alright?

UM2:        Yeah, she alright.

White:      She seem like, she kinda slow.

UM2:        I thought that was your young girl [?]

White:      I could've went somewhere close - oh, there go the police right there.

UM2:        [Unclear]...

UF2:        Who was it?

White:      Me.

UF2:        [Unclear]...

White:      Yeah, she got my money.

UF2:        Go get your money from her.

White:      Hey... Hey... Just give me my money, I'll go get it down there.

UF1:        But she's locked out.

UF2:        He gave it to me right here.

UF1:        Oh.

UF2:        Here.  [Unclear] here.

UF1:        I'm sorry.

White:      That's alright.

UF1:        Huh?

White:      That's alright, homegirl.  Alright, homeboy.

UF1:        I'm so sorry.

White:      Why was he tripping?

UF1:        Because he acting stupid.  He was like, "who was that?"  [Unclear]...
            is for me.  I said, "It's for me."  And he was like, "oh."  And then he
            decided to give it to me.  Cuz he's stupid... That's fire, too.

White:      Hmm?

UF1:        That's fire.

White:      Is it?

UF1:        [Unclear]...You gonna go back for seconds, watch.

White:      Is that right?

UF1:        I'm telling you, it's fire. [Unclear]... it's fire.

UF2:        You straight over here?

White:      Yeah, I'm straight.  I appreciate it, lady.

UF2:        [Unclear]... couldn't resist.

White:      Yeah, I know... I ain't trippin.

UF2:        You know him?

White:      Nah, I don't know him.  That's why...

UF2:        He's my nephew.  [Unclear]...I look and I seen you up here. I said [unclear]...go down there...

White:      Yeah.

UF2:        [Unclear] crack... [unclear] smoke it all up...

White:      I ain't trippin'.  Appreciate it though.

UF2:        You guys be careful.

UF1:        Thank you.

White:      Alright.

UF1:        I'm so sorry about that.

White:      That's alright.  That's alright.

UF1:        Please don't be mad at me.

| White: | Huh? |
|---|---|
| UF1: | Don't be mad at me. |
| White: | I ain't mad at you.  Here, here, homey... |
| UF1: | Well, thank you. |
| White: | Alright. |
| Beall: | What the fuck took so long, man? |
| White: | Man... |
| UF1: | Because they was trippin' on him. |
| Beall: | Hey, my old lady is calling and freakin' out... |
| White: | Hold up, hold up... |
| Beall: | Here, here, just... |
| White: | I gave her some money. |
| Beall: | Alright, hey, I gotta go.  My old lady is calling... |
| UF1: | [Unclear]... |
| White: | Huh... |
| Beall: | He took care of you? |
| White: | I gave you a dub - I mean, that's a dime. |
| UF1: | [Unclear]... |
| White: | Go get you one.  Yeah, go get you one.  I just gave you a dime. |
| Beall: | Fucking beautiful. |

White:    It was him.  He gave it to the chick.  And the chick gave it to me and she said that he gave it to her. I just hope I got it on video.

Beall:    It... fuck...we got a no dope - it don't matter.

White:    No, yeah, but all the conversation and shit.

Beall:    [Unclear] would be nice.  11-3-52 be nice, too. But...

White:    Yeah.

Beall:     Are you off?

White:    Yeah.

Beall:    That chick is fucking 'tarded, ay?

White:    Yeah, she was.  I need to go down to my car, though.

Beall:    Alright...  Chewy [?] is gonna hold point.  We're gonna head back to the barn.  Where's your car at?

[Landeros/Roebuck in background on radio.]

White:    Right down there on 6th Street.

White:    Yeah, she's fucking seriously retarded.  She said, "Go go go go. He don't wanna serve." He came down and he looked.  He said, "I don't know that dude." And she said, "Go away go away go away." Alright.  I was trying to get the camera focused so I can see him.  And I walked back.  And uh, I waited on the corner.  The dude on the corner told me, "Hey man, you can get it closer than that dude, right there.  It's closer than that.  You don't have to go all the way over there." So...ok.  So he was helping me watch for the police - then the lady came down and she said, "Whatcha looking for, a dub?" I said yeah.  I said yeah.  She said, "I got it right here.  He gave it to me." I said, "Oh, okay." She said, "Go get your money from her.  He gave it to me already." Then when I went to go get the money, he said that I gave it to her.  He said it.  I heard her.  I heard him say it.  "I gave it to her." So, and then she came, she handed it to me, and she said, "Oh, he cool, that's my nephew.  He cool." I said, "Alright."

[Roebuck in background on radio... telling Landeros to maintain point on the suspect/rooms in case he moves.]

Beall:       She said that about the guy in the room?

White:      Yeah.

Beall:       Where at?

White:      Go up to 6th, turn right.

Beall:       Alright, I'll have you help me spew some of that shit out to write my affidavit.

White:      Ok.

Beall:       I got everything up to that point pretty much already scratched down. Just right there clear me up.  As far as I'm concerned, he fucking' threw at you from the fucking room upstairs.

White:      We got his room pinned down and all that shit.

Beall:       Yeah, we got two.

White:      Alright.  I'm a leave this here.

Beall:       Alright.

White:      Alright, I'm back up.  I'm gonna be heading to the barn with Jerry.

Roebuck:   Good job dub.

White:      She was seriously 'tarded.  I think I coulda' did that wearing a uniform.

Landeros:   You know what's funny, Behemoth lost her rock - she can't find. She's looking for it on the northside on the ground.

White:          Was she... she went and bought her a dime?

Landeros:       Yeah, he threw it at her and she can't find it.  She's all looking for it.

Everett:        She's gonna start licking that sidewalk if she doesn't find it soon.

Landeros:        [Unclear]... boy back at 220 now.

White:          Same guy with the white jacket and short Afro?

Landeros:       Yup... I bet you the dope's in 220 and the money is in the other one.

Roebuck:        I bet you you're wrong. I bet you the dope's in 220, the money is in his pocket and he's staying in the other one.

[Landers/Everett talking in the background on radio.]

Landeros:       [Unclear]... the door is wide open.  They're all wide open.  I'm wondering if someone is inside there?

Landeros:       Alright.  He's moving out of the primary room.  He's got his clothes in a bag - going over to the other room, 220.

Roebuck:        He's moving to 220 Chewy?"

Landeros:       Yeah, he just took about 4 bags out of the primary room and put'em inside the other room.

White:          You hear that Jerry?

Beall:          No... what was that?  What was that [unclear]?  Last traffic?

Roebuck:        He said your primary is moving clothing and bags from 217 into 220.

Beall:          Ok, just keep an eye on him, Chewy.  Make sure he goes no further than that.

.

..

White:        Where is the dope?

White:        I made contact with a Black female at the bus stop.  Negotiated the purchase of 20 dollars of cocaine.  She said she would go and get it at the Economy Inn on 6th & "G" George.  I asked if I could go with her and she said yeah.  We walked around to the north side of the fence. She walked into the vacant lot just east of and made contact with a black male wearing a white jacket.  Medium  dark complexion. Appeared to be about 5'8, maybe 160, 165.  Short Afro.  He came after she told him that she needed a dub.  She came at the edge of the stairwell, looked at me and said I don't know him.  She then told me to walk down the street.  I then walked west, stayed at intersection of 6th and "G" George and she continued to, what appeared to be, negotiate the transaction with the subject  who was standing on the stairway.  Moments later a second black male, excuse me, second black female, older, appeared from the westside of the motel and approached me.  She contacted me and said who wanted the dub. I told her it was me.  She then said that she had it - that "he gave it to her."  She told me to go get my money from the first female.  I then walked midway between the intersection and the vacant lot where the female was and told her that the other female had gotten the dope and that I needed the 20 dollars back.  She gave me the 20 dollars, I gave it to the second black female, who handed me two pre-packaged baggies of suspected cocaine base.  She said that he was cool.  That he just didn't know me and that he was her nephew.  She also stated that he had sent her down with the dope.  After the transaction was complete, the second black female walked away westbound on 6th Street and the first black female accompanied me across the street to the Greyhound where we met with Officer Beall.  The first black female asked me if I was going to give her one of the rocks of cocaine and I gave her a ten dollar bill instead.  She then immediately walked back to the area of the vacant lot just east of the motel and conducted what appeared to be a second transaction with the black male subject.

                \*\*Officer White plays above-recording\*\*

Beall:        You gave her 20 bucks at that point?

White:        Uh, yeah.  Which point?

Beall:        [Unclear]... started walking off with [unclear].  Ok yeah Officer
              White arrived... $20 bill and requested to purchase an amount of
              cocaine base.  This black female took Officer White to the fence
              along 6th Street.

Beall:        [Talking on his recording machine]...

UNK Officer:      Good job you two [unclear]...

White:        It worked out alright.  Let's see, let's see.

Roebuck:      I wondered what happened when your buddy...?  What happened
              when the first time he walked away?  He came down...

White:        He came down...

Roebuck:      Was he bitter?

White:        Yeah, he was bitter.  He came down, he looked at me, he stared at me
              for a little while and said, "I don't know him.  I don't know him."  So
              I walked away.

Beall:        Hey Tony I need your help...

White:        [Government's interpretation] - "Where you at?"
              [Defendant's interpretation] - "What's up?"

Beall:        Ok, we're at the point where you gave her 20 bucks and she walks
              you over to the fence, below Room 217.  And she yells out to the guy
              in the room.

              **Officer White, UNK Officer and Female Typist begin listening to White's
              previous recording**

Beall:          Can you fill her in on that part from there?

White:          Hmm mm.

Beall:          [Unclear]... little part there in the end.  I'll start up the search warrants.

White:          Where are you at now?

Female Typist:          [Unclear]...

White:          That's where I'm at, right there.  You know how to work this thing?  No?

Newbry:         What is it?

White:          This is where, this is where you are at, right here.

Newbry:         [Unclear]... you want me to take that out, or...?

White:          Ummm, [unclear] that's cool.  To the room... to a Black male wearing a white jacket...

Newbry:         Is that the [unclear]...?  Puma thing.

White:          Hmm mm.  She, she told, oh, she told him that she needed a dub.  He then...  [Listening to recording]...

Newbry:         [Unclear]...?

White:          Holy cow, you type fast.  And then, the female told me to walk down the street.  I walked to the southwest corner of 6th and "G".  [Listening to recording]... uh, older female.

End - Duration:  40:36 minutes

<u>United States v. Calvin Charles Colbert</u>
**CR No. 09-301-GW**

**Transcript of Undercover Video with Officer White and Officer Beall**
**March 11, 2009**

**Part II**
**Video Duration:  5:23**

- Officer Gerald Beall
- SA Angie Kaighin
- Janine Newbry
- Officer Anthony White

***Officer White and Janine Newbry (Female Typist) listen to recording:*** *She then said that she had it - that "he gave it to her."  She told me to go get my money from the first female.  I then walked midway between the intersection and the vacant lot where the female was...*

| | |
|---|---|
| White: | You know what, I didn't put the [unclear]... |
| Newbry: | The first female or...? |
| White: | Yeah.  From the place where we first did it, so, wherever you did - however you described it the first time.  Where we ended up. |
| Newbry: | [Unclear]... on my desk.  Uhmm, huh? |
| White: | Wherever you described - how did you describe where I was the first time?  Midway between the intersection and under the stairwell.  Or something like that. |
| Newbry: | Where do you want that?  "Walk midway between the intersection..." |
| White: | Or you could just say walk back to... original location. |
| [Recording]: | *and told her that the other female had gotten the dope and that I needed the 20 dollars back.  She gave me the 20 dollars.  I gave it to the second black female, who handed me two pre-packaged baggies of suspected cocaine base.  She said that he was cool.* |
| Newbry: | You or the...? |

White:          The...

Newbry:         The first, ok.

White:          He was cool but he just didn't know you.

*[Recording]:*          *and that he was her nephew. She also stated that he had sent her down with the dope.*

White:          Sent her down with the dope [unclear]...

Newbry:         How about [unclear]...?

White:          Ok.

*[Recording]:*          *After the transaction was complete, the second black female walked away westbound on 6th Street and the first black female accompanied me across the street to the Greyhound where we met with Officer Beall. The first black female asked me if I was going to give her one of the rock of cocaine and I gave her a ten dollar bill instead. She then immediately walked back to the area of the vacant lot just east of the motel and conducted what appeared to be a second transaction with the black male subject.*

White:          That's all I got.

Newbry:         Ok.

White:          Thank you, ma'am.  Ok, I'm done with my piece, Jerry.

Beall:          [Unclear]...that should, uh...

White:          [Unclear]... two out there... probably go...

Beall:          Good job, though.

White:          Thank you, sir.

Beall:          Who is this McNally?

Kaighin:        That's the D.A. that's got the Delgado case [talking to Kaighin about unrelated case].  And, he never calls back, so what I do is just say, this is what we're going to do.  If you have any concerns or problems, call me.

Page 2 of 3

White:        If we find stupid out there...

Kaighin:      And I left a message for [unclear]...

White:        ...unless we wanna use stupid for...

Beall:        [Unclear]...in this case...  I gotcha.


              End - Duration:  05:23 minutes

**United States v. Calvin Charles Colbert**
**CR No. 09-301-GW**

**Transcript of Undercover Video with Officer White and Officer Beall**
**March 11, 2009**

**Part III**
**Video Duration: 1:30**

- Officer Gerald Beall
- Officer Scott Everett
- SA Angie Kaighin
- Officer Anthony White

Beall:      We got [unclear] for his report he can say recommend filing of... on this bitch.

White:      Because, I mean, we can use her again. She's stupid enough that she...

Beall:      Yeah, instead of burning her, she can get you another rock later today. We can do it again.

Kaighin:    'Cuz she'll forget who you are by the afternoon.

Beall(?):   No, she'll remember [unclear]...

White:      I gave her money. I was giving her, yeah, I was giving her $10 dollars and she wasn't even looking at the $10 dollars. She said, "Just give me a piece of rock." That's all she wanted. She just zero'd in on the rock. Like, "Here, I got some money for you. Money, money, money, money, money."

Beall:          Get your own rock.

White:      You can go buy your rock.

Unk:       This shit's mine.

White:      Yeah. "You gonna give me a piece - just a little piece?"

Beall:      You're not suiting up, right?

White:      No.

Beall:      Ok.

| | |
|---|---|
| Beall: | Was she the one that Chewy said, when we were leaving, she was scrambling around trying to [unclear]....? |
| White: | Yeah, she went and bought her a rock. |
| Beall: | He threw her... or she the threw him the crumbled up ten and then he fuckin' tossed out her rock to her and... |
| White: | You know what... |
| Beall: | [Unclear]...whoo hoo! |
| White: | That ten is probably going to be... |
| Beall: | That ten is photocopied, too, right. |
| White: | Yeah, I think so |
| Beall: | She went straight to the ground [unclear]... |
| Everett: | I told Chewy she's gonna crack her head [unclear]... |
| White: | She's gonna - yeah... She's gonna be in there... She's gonna be still there looking for her rock. |
| Everett: | She's sniffing it out like a bloodhound. |
| White: | I doubt very seriously if I got him on video 'cuz he was up on the stairs. And I was trying to lean back. |
| Everett: | Oh, you were wired? |
| White: | Yeah. So, we'll see. |
| Everett: | Jerry, may I help you with anything? |
| Beall: | Ah, I don't think so, brother. I got the, uh... |

End - Duration: 1:30 minutes

Exhibit B

```
 1          MR. BAKMAN:  Yes, Your Honor.  Before Mr. Colbert

 2   makes his decision as to whether he wants to testify or not,

 3   he is asking whether or not the court would consider the

 4   jury instructions that I submitted both last night and this

 5   morning.

 6          THE COURT:  I received the ones that you submitted

 7   in regards to lesser included.

 8          MR. BAKMAN:  Yes.

 9          THE COURT:  Are there any others other than those?

10          MR. BAKMAN:  One was mere presence and the other

11   was eyewitness identification.  I think the only two that

12   are relevant to this inquiry is the lesser included and the

13   mere presence instruction.

14          THE COURT:  Okay.  To be honest, I did not see

15   your mere presence.  Although, there was a prior request

16   from prior defense counsel in regards to mere presence.

17          Is that the same thing?

18          MR. BAKMAN:  Yes.  Mine was from the

19   Ninth Circuit, Your Honor.  On the filing this morning, I

20   included the annotated versions.  I wasn't able to print it

21   out for Your Honor because --

22          (Court and the clerk conferred.)

23          THE COURT:  Okay.  Insofar as the lesser included

24   is concerned, let me just indicate.  Let me see if I have

25   it.  I was looking up some cases in that regard.
```

1            And the problem I have with the defendant's lesser

2    included -- there's a number of cases.  I can give you the

3    citations.  Well, let me see if I can find the cases.

4                    *(Pause in the proceedings.)*

5            THE COURT:  I haven't fully looked into these

6    items; but the case I was looking at was *United States v.*

7    *Sitton*, S-I-T-T-O-N, which is 968 F.2d 947 around the

8    page 959.

9            And there the Ninth Circuit held that a defendant

10   is entitled to a lesser included offense instruction when

11   the elements of the lesser offense are a subset of the

12   elements -- I'm sorry -- are a subset of the elements of the

13   charged offense and a factual basis supports such an

14   instruction.

15           The simple possession of a controlled substance is

16   a lesser included offense with respect to possession with

17   intent to distribute.

18           To establish the required factual basis, the

19   defendant must show that the jury could rationally find him

20   guilty of the lesser offense while acquitting him of the

21   greater.

22           But then the court goes on to say that where there

23   are large quantities of a drug and other evidence tending to

24   establish distribution, this court has declined to require a

25   possession instruction citing to such cases as -- well, I

1    don't have the full citation, but *Powell*, which is at 932

2    F.2d at 1342, and *United States v. Espinoza*, 827 F.2d 604 at

3    615.

4           Under such circumstances, no rational jury could

5    conclude that defendant possessed the drug without also

6    concluding that he intended to distribute it.

7           So in this situation, you know, if he is found to

8    possess, I presume he would be found to possess that the

9    drugs are in, you know, his immediate presence which is an

10   amount which would be in excess of any personal use type

11   situation.

12          MR. BAKMAN:  See, I disagree.  I think a rational

13   interpretation of the evidence is he was in the room, the

14   drugs were in the room; and because of his presence in the

15   room, he had control and dominion over the drugs.

16          But if they were somebody else's, one of the other

17   black males, he may have had temporary possession without

18   harboring an intent to distribute.

19          This is very different.  You have a room with a

20   different registration.  The room is registered to somebody

21   else.  It may have been somebody else's drugs.

22          There's certainly enough question that's been

23   called into context here about the identification of the

24   individual who was earlier distributing the drugs; and, you

25   know, again, there is nothing to --

```
 1          THE COURT:  You see, that's the problem, though.
 2   Either he is in possession of the drugs or he's not in the
 3   possession of the drugs.
 4          In other words, he can't claim to a portion of it
 5   and say:  The rest isn't mine.  So he's arguing
 6   nonpossession.
 7          In other words, I can understand your claim that
 8   he's claiming that he doesn't have any possession, they're
 9   not his.  I can understand that as a claim.  But if he's
10   going to say that I had some, what some?
11          MR. BAKMAN:  He could be in the room with the
12   drugs and, therefore, he is in possession of those drugs but
13   doesn't have an intent to distribute them; and simply by
14   virtue of the fact --
15          THE COURT:  He would not have possession of them.
16          In other words, the mere presence of him with the
17   drugs does not show possession.
18          MR. BAKMAN:  Well, I think if you are talking
19   about dominion and control, if he is in the room and nobody
20   else is in the room, the jury could find that he had the
21   sufficient dominion and control to support a conviction for
22   possession but not possession to distribute.
23          So the jury alternatively can find, one, either
24   mere presence and he didn't have possession or, two, that he
25   was in the room and he had something to do with something
```

1    but not an intent to distribute.

2            THE COURT:  Let me hear from the government.

3    What's the government's response?

4            MR. YANG:  Your Honor, I think the court's right.

5    It seems like it's inconsistent.  He's either in possession

6    with intent or he's not in possession.  There's no -- this

7    gray area that defense is trying to carve out.  It's

8    confusing.

9            MR. BAKMAN:  If he's a temporary visitor in the

10   room, just happens to be there when they knock down the

11   door, the argument could be made that he is in possession of

12   the drugs --

13           THE COURT:  Not legally.

14           MR. BAKMAN:  I think so.

15           THE COURT:  You have to have the intent to

16   possess.  He doesn't have the intent to possess.  In other

17   words, his mere presence in a room which has drugs in it --

18   for example, if I walk into a party and there are people

19   around, you know, the room smoking marijuana, that doesn't

20   mean I am possessing that marijuana.

21           I have no intent to possess that marijuana.  The

22   marijuana belongs to other people.

23           MR. BAKMAN:  I think the jury could find either

24   way, Your Honor.

25           THE COURT:  I don't think the jury could find --

```
 1    it does not make sense.  Either it is not possession at that
 2    point in time, in other words, he has no intent to exercise
 3    any dominion or control over it.
 4              MR. BAKMAN:  Well, I think the jury can infer that
 5    if they believe that he was counting money.
 6              THE COURT:  Well, no.  If he's counting money,
 7    then he's part and parcel of an overall, you know, drug
 8    operation.
 9              MR. BAKMAN:  Well, I am asking for the lesser
10    included in this case.
11              THE COURT:  I am not going to give the lesser
12    included in this particular situation because it does not
13    come into play.
14              MR. BAKMAN:  The court will give the mere
15    presence?
16              THE COURT:  I don't know.  Let me just make sure I
17    understand what the mere presence instruction is.
18              MR. YANG:  Your Honor, I don't know if the court
19    received the government's objections which were filed last
20    night but it does cite --
21              THE COURT:  I think I -- let me take a look.  If
22    it's Document No. 137, I did receive 137.  Let me take a
23    look.
24                   (Pause in the proceedings.)
25              MR. BAKMAN:  Your Honor, in terms of just a
```

1    revisit to the lesser included --

2            THE COURT:  Yes.

3            MR. BAKMAN:  -- I believe that this jury could

4    find that Mr. Colbert was a buyer of the cocaine and,

5    therefore, he was in the room with an intent to possess

6    some, if not all, of the cocaine as a buyer.

7            And, therefore, if in fact he is a buyer of the

8    cocaine, he's not in possession of the weapon to use in

9    furtherance of a drug activity and he does not possess all

10   of that cocaine with an intent to distribute.

11           I think very easily from all of the totality of

12   the evidence in this case with the number of runners, the

13   number of buyers in the area, the testimony of Walker that

14   this is a high narcotic area where there are buyers and

15   users predominantly present in the location, the fact that

16   motels are commonly used to sell and buy narcotics, that

17   this jury could very easily find that my client was a

18   purchaser, that's why he was in the room and, therefore, he

19   possessed some cocaine in that room for his own use.

20           The totality of the circumstances does not

21   diminish that argument, and I think the lesser included of

22   simple possession is appropriate in this case.

23           THE COURT:  I would disagree.

24           I mean, first of all, there is no evidence that

25   he's a user in the sense that he is not carrying with him

```
 1   any indicia of use or intended use.  The testimony is he has

 2   no paraphernalia to use the particular item.

 3            Secondly, normally, when you have a buyer and

 4   seller, you have the presence of a buyer and seller.

 5   There's nobody else in the room but him at that point in

 6   time.

 7            And he's not counting out his money.  He's

 8   counting out the money that's been collected from,

 9   apparently, drug sales; and so, you know, there's no indicia

10   of his status as a buyer.

11            MR. BAKMAN:  Well, that's because they didn't

12   search room 217.  We don't know if there was drug

13   paraphernalia or a pipe in room 217 --

14            THE COURT:  Let me stop.

15            MR. BAKMAN:  -- the room that was registered to

16   him.

17            THE COURT:  We held a hearing on this issue, and

18   let me ask.  Am I not to consider the testimony that I heard

19   in the other motions because we already know -- we already

20   have that testimony and it's within my knowledge.

21            So that's the problem that I have.  Are you saying

22   that I cannot consider his testimony in that regard?

23            MR. BAKMAN:  I don't believe -- I think you can

24   consider that testimony; but I think it's what can be argued

25   rationally and reasonably within the evidence that's been
```

1    presented by the government.

2           And I certainly believe that's a reasonable

3    inference from the circumstantial evidence in this case.

4           THE COURT:  Well, because there was no evidence

5    that there was any use of paraphernalia that was found in

6    217; and he's already testified that he had moved from 217

7    into 220 and so he's, you know, not a buyer in that sense.

8           MR. BAKMAN:  Well, I'm not going to be arguing to

9    the jury clearly what he testified to; but I am going to be

10   arguing inferences from the testimony that's been elicited

11   thus far in this case; and that is going to be an argument

12   that he was a buyer.

13          THE COURT:  Let me hear from the government.

14          MR. YANG:  Your Honor, I think he can certainly

15   argue that; and the elements of the 841 charge, the

16   possession with intent, already adequately cover what

17   defense counsel wants to argue, that is, that the government

18   has to prove that he knowingly possessed cocaine base and

19   that he possessed it with the intent to distribute, to

20   deliver to another person.

21          If he's going to argue that, you know, he happened

22   to be a buyer in there or whatever, then he does not possess

23   it with the intent to distribute to another person.

24          It's already adequately covered in the elements of

25   the instructions that the court is going to be giving.

```
1              THE COURT:  All right.
2              MR. YANG:  And that's the mere presence analysis
3    as cited by the government in its objection.
4              So I think, Your Honor, just to be on the safe
5    side, I don't know if the court can properly consider the
6    evidence that was developed in the suppression hearing.
7              But I think the court doesn't even need to
8    consider that.  As a matter of law, the elements are covered
9    by or the mere presence instruction is already covered by
10   the elements of the possession with intent to distribute
11   charge and the lesser included.
12             THE COURT:  I didn't catch the last part of it.
13   What did you say about the lesser included?
14             MR. YANG:  I think the lesser included and the
15   mere presence are similar in that both are adequately
16   covered by the possession.
17             THE COURT:  No, they're not because there's a
18   difference -- in other words, if they are adequately
19   covered, I have to give the lesser included.
20             MS. WILLIAMS:  If I may, Your Honor.
21             THE COURT:  In other words, I cannot -- if they're
22   adequately covered, I cannot not give the lesser included.
23             Basically, I have to make a determination that no
24   rational juror could find, on the basis of the evidence,
25   that the elements of the lesser are present.  So your
```

```
1    argument is wrong.
2              MR. YANG:  Your Honor is correct.  I confused the
3    two.
4              MS. WILLIAMS:  And just to clarify.
5              MR. BAKMAN:  Two bites of the apple again, Your
6    Honor?
7              THE COURT:  Well, again, if it saves her from
8    passing the notes; it saves us time.
9              MS. WILLIAMS:  The instruction for the current
10   charge adequately covers the issue raised by counsel because
11   he can still argue to the jury that he didn't possess it
12   with the intent to distribute.
13             If he wants to argue that he was there as a buyer,
14   there is no evidence to that.
15             THE COURT:  That's my point.  My point is this.
16             In other words, if he admits to possession, he
17   cannot -- again, he can't admit to part in this particular
18   situation because I mean -- it's what the cases in the
19   Ninth Circuit have talked about, you know.
20             I mean, again, he's there by himself in the room.
21   There are all of these -- a vast quantity of drugs which is
22   clearly not a personal use type of situation.
23             He's counting the money.  He doesn't have any
24   individual, you know, devices to utilize that contraband.
25   So, I mean, all those things are such that under the
```

1   language of the *Sitton* case and the cases cited therein,

2   it's, you know, it's not a simple possession case.

3           And once he claims possession, he can't just claim

4   part.

5           MR. BAKMAN:  Well, I take it the court is not

6   going to prevent me from arguing that.

7           THE COURT:  I will allow you -- well, I don't

8   understand.  In other words, you're going to argue that he

9   only intended to possess something?

10          MR. BAKMAN:  I'm going to argue that he may

11  possibly have been a buyer there.

12          THE COURT:  I'll allow you to argue that, yes.  I

13  will allow you to argue that the government has not proved

14  beyond a reasonable doubt a possession of intent to

15  distribute which is obviously one of the elements of their

16  case-in-chief.

17          And, frankly, I mean, since you're argue that, the

18  lesser included, you know -- well, I have already made my

19  ruling on that.  All right?

20          And as to mere presence, let me just take a look

21  at the cases.

22              *(Pause in the proceedings.)*

23          THE COURT:  Let me just ask, Mr. Bakman.

24          Even the Ninth Circuit comments says:  Such a mere

25  presence instruction is unnecessary if the government's case

1   is not solely based on the defendant's presence and the jury

2   has been instructed on the elements of the crime.

3           So why would I give a mere presence instruction in

4   this particular situation?

5           MR. BAKMAN:  Well, I think their case is basically

6   premised upon his presence in that room.

7           THE COURT:  Well, it's based in part on his

8   presence in the room; but it's also based on the fact of his

9   presence in the room counting the money.

10          He's, you know, made a statement as to where the

11  gun was in that particular situation.  Also, there is

12  testimony that he was seen by the law enforcement officers,

13  whether or not the jury finds that testimony credible or

14  not, there's this other testimony as to his, you know,

15  activities in or around the area over a period of time which

16  is not, you know, an indicia of a buyer because a buyer does

17  not linger, you know, in that particular area.

18          MR. BAKMAN:  But those are arguments, Your Honor.

19  How does the mere presence instruction prejudice the

20  government in any way in this case?

21          It certainly is an appropriate argument to make

22  based on the evidence, and the jury instruction itself does

23  not mislead the jury.  It does not misstate any portion --

24  it doesn't misstate the law to the jury, and it's certainly

25  supported by the evidence in this case.

1    A reasonable argument that can be made by the
2    defense is that the defendant is merely present in the room.
3         THE COURT:  All right.  Let me hear a response
4    from the government.
5         MR. YANG:  Your Honor, the court's correct.  The
6    elements -- first of all, the government's case is not based
7    on merely defendant's presence in that room.
8         Had the government only presented evidence that
9    they went into the room and defendant was just sitting there
10   and this was the only evidence that the government
11   presented, yes, then perhaps the mere presence instruction
12   should be given.
13        However, here defendant's caught sitting in a room
14   counting money which includes, among other things, Your
15   Honor, the bill that was used by Officer White to make the
16   previous purchase of crack cocaine.
17        Defendant indicates where the gun is.  There's
18   multiple items inside the room indicating defendant's
19   possession of the room, and then two hours before that
20   defendant was seen on the landing giving -- rejecting the
21   female in the tracksuit as Officer White stood there looking
22   at him trying to negotiate a crack transaction watching the
23   female try to negotiate a crack transaction.
24        And then, Your Honor, after the crack transaction
25   was completed, Officer White gives the female with the

1   tracksuit a $10 bill that's prerecorded; and that $10 bill

2   is also found in the room where defendant is.

3   So the government's case is based much more than

4   on just mere presence.  There's much more than that here,

5   and that instruction should not be given.

6   MR. BAKMAN:  My point is this, Your Honor.  The

7   jury can reject everything else other than mere presence in

8   this case.

9   And if they do reject the earlier identification

10  and they reject the notion that my client was sitting there

11  counting money as officers were trampling down the second

12  story floor and then barging into the room after giving

13  knock-notice, then they're left with mere presence.

14  And without direction from the court, it's

15  patently unfair to the defense.  As I indicated, it doesn't

16  prejudice the government in any way, the giving of that

17  instruction.

18  THE COURT:  It does in the sense that it, you

19  know, indicates that, you know, the court at least has not

20  found all the other evidence to be worthy of reference.

21  In other words, this is not a mere presence case

22  by any way, shape, or form; and, you know, you can argue the

23  argument that you want to make; but I don't feel I have to

24  instruct on something which, you know, under the Ninth

25  Circuit decision, *Sitton*, and I also refer to the one that's

1  cited in the comments, *United States v. Gooch*, G-O-O-C-H,

2  506 F.3d at 1156 at page -- roughly, it's about 1160.

3          I mean, it stands that it's not error for the

4  court to refuse to give such an instruction where the

5  government's case is resting on more than the defendant's

6  presence at a location; and it's clear here that the

7  government's case is resting on more than that.

8          All right.  So that's how I would rule on those

9  two jury instructions.

10          How much more time do you think you need to talk

11  with your client?

12          MR. BAKMAN:  About five minutes.

13          THE COURT:  Okay.

14              *(Counsel and his client conferred.)*

15                      *(Recess.)*

16      *(The following was held outside the jury's presence:)*

17          THE CLERK:  Please remain seated and come to

18  order.

19          THE COURT:  All right.  Let me ask, Mr. Bakman.

20  What's the situation?

21          MR. BAKMAN:  Your Honor, I'd ask that we be able

22  to address the court outside the presence of the government.

23          THE COURT:  All right.  Let me ask the government

24  to be excused for a moment.

25          MR. YANG:  Certainly, Your Honor.